UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO.   25-cv-22602-RAR


NANETTE DALFINO,

             Plaintiff,

     -vs-

CARNIVAL CORPORATION,

             Defendant.
_____/



DEPOSITION OF NANETTE DALFINO

Pages 1-112

January 27, 2026
10:32 a.m. - 1:50 p.m.
Volume I
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131






Stenographically Reported by
Paul Cunningham, FPR
Florida Professional Reporter

Page 2

APPEARANCES:


      On behalf of the Plaintiff
      DANIEL W. COURTNEY, P.A.
      BY:  DANIEL W. COURTNEY, ESQUIRE
      10800 Biscayne Blvd., Suite 700
      Miami, FL 33161
      Dwcourtney@hotmail.com


      On behalf of the Defendant
      GRAY ROBINSON, P.A.
      BY: COOPER JARNAGIN, ESQUIRE
      515 N. Flagler Drive, Suite 650
      West Palm Beach, FL 33401
      Cooper.jarnagin@gray-robinson.com

Also present: Ira Scharaga, Esq.

                     I N D E X

Witness                          Direct          Cross
Nanette Dalfino                     3

              Exhibits Marked for I.D.

                               Page #

Exhibit No. 1 Sign & sail stmt. 24

Exhibit No. 2 Movement detail    25

Exhibit No. 3 Composite photos   43

Exhibit No. 4 Eye care notes     59

Exhibit No. 5 Plf's answers      76

Exhibit No. 6 Composite photos  105

Page 3

Deposition taken before Paul Cunningham, Florida Professional Reporter and Notary Public in and for the State of Florida at Large in the above cause.

******

THE COURT REPORTER:  Raise your right hand please.

Do you swear the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

Nanette Dalfino, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JARNAGIN:

Q.  Hi.  Good morning, Ms. Dalfino.

A.  Good morning.

Q.  My name is Cooper Jarnagin.  I'm the attorney for the defendant, Carnival Corporation. Before we get started, I will layout a few ground rules and instructions to make this process go a little quicker.

I try to respect my time and yours and be as efficient as I can.  Your only obligation today is to answer truthfully.  If you don't remember something

that is perfectly fine as well.

All of your answers need to be out loud so the court reporter can type them down.  Don't shake your head or move it up and down.  Say yes or no.

If you don't understand a question, let me know.  If you answer the question, I will take it to mean you understood it, okay.  All right?

A.  Yes.

Q.  Can you tell me your full legal name please?

A.  Sure.  Nanette, N-a-n-e-t-t-e, Theresa, T-h-e-r-e-s-a Dalfino, D-a-l-f-i-n-o.

Q.  Have you ever gone by any other legal names?

A.  Yes.  Nanette Theresa Liantonio, L-i-a-n-t-o-n-i-o.

Q.  Any other than those two?

A.  No.

Q.  Are you currently married?

A.  Yes.

Q.  For how many years?

A.  Isn't it horrible?  It will be 26 -- it will be 28 in June, so 27.

Q.  What's your husband's name?

A.  Angelo, A-n-g-e-l-o.

Q.  Dalfino?

A.  Yes.

Q.   What's your current residential address?

A.   ██████████████████████████████████████

████████████████████████████████████.

Q.   How long have you been at that particular address for?

A.   I have been there -- I bought it in May, May of 2025.

Q.   And is this an apartment or townhouse or a home?

A.   It's a home.

Q.   How many stories is it?

A.   Two.

Q.   Do you have any children?

A.   I have two daughters.

Q.   What are their ages?

A.   They are both twins, 26.

Q.   Your residence is in New York?

A.   Long Island.

Q.   And then your two twin daughters, do they live in the area as well?

A.   They live with me.

Q.   Did they live with you back in June of 2024?

A.   They never left.  They have been with me. They are holding on.

Q.   What are your daughter's names?

A.    Roseanne, R-o-s-e-a-n-n-e, and Antonette, A-n-t-o-n-e-t-t-e.

Q.    And what is your date of birth?

A.    

Q.    That makes you how old today?

A.    54.  I want to say 21 but that will not work.

Q.    I assume your husband lives with at your residence?

A.    Yes.

Q.    And your two daughters?

A.    Yes.

Q.    Anyone else?

A.    I have two cats.

Q.    Two cats?

A.    Yes.

Q.    What are their names?

A.    Bell and Mini.

Q.    Are you currently employed?

A.    I am.

Q.    What's your profession?

A.    Paralegal.

Q.    Do you work for a particular law firm?

A.    Yes, Ira Scharaga.  I-r-a, next word M, S-c-h-a-r-a-g-a.

Q.   Ira is present with us today; right?

A.   Yes, yes.

Q.   As a paralegal, what are your day-to-day job functions?

A.   Before the accident or after?

Q.   We will start with when did you become employed as a paralegal at Ira's firm?

A.   2022 (sic) so 23 years, it should be 24, 26.

MR. COURTNEY:  Do you mean 2002?

THE WITNESS:  Yeah, oh, I'm sorry.  I thought I said that, I'm sorry 2002.

BY MR. JARNAGIN:

Q.   You are not making a lost wages claim in this case?

A.   I am not.  My employer has been nice enough to pay me for the time I was out.  However, I would like to add, I am not sure, I mean, God forbid, okay, no.  God forbid I have to change employment, I am not sure what my tasks that I will be able to do.

Q.   Now you have been working at this particular firm for over two decades; right?

A.   Yes.

Q.   What type of law is practiced at this firm?

A.   Negligence and collections.

Q.   Collections?

A.   Collections, yes.

Q.   Thank you.  Where were you born?

A.   I was born in Long Island for my birth and I lived in Queens most of my life.

Q.   Have you ever lived outside of the five boroughs?

A.   I have.  I moved to New Jersey when I was 18 and then I moved back when I was 21.  I moved back to New York when I was 21 years old.

Q.   Have you ever been married to anyone other than Antonio? (Sic)

A.   Angelo, no.

Q.   Angelo.  No other children besides the two daughters?

A.   No.

Q.   What's the highest level of education you have completed?

A.   Some college.

Q.   Do you hold any college degrees or paralegal certificates?

A.   No.

Q.   Since 2002, have you held any other employment besides your paralegal position?

A.   Employment?  I'm trying to think.  Well, I have done three Paint and Sips.  I'm trying to think.

Page 9

I did -- way back when, I sold beauty supplies.  I am not even sure of the name of the company anymore.

Q.   Would that be like a Mary K situation?

A.   Not Mary K.  I couldn't even tell you.  It was like a -- I liked their perfume so I got a discount if I was employed with them but I did have a Tupperware party with beauty, it was pretty cool.

Q.   Now we are here today to discuss a cruise that you took back in 2024; correct?

A.   Yes.

Q.   Prior to that particular cruise, had you ever been on a cruise ship before?

A.   Yes.

Q.   How many times?

A.   I would have to say three or four times.

Q.   About what year was your first cruise that you took?

A.   Probably about 2010, 2011.

Q.   Do you recall what cruise line that was with?

A.   Norwegian.

Q.   And what year would have been the second cruise that you took?

A.   I don't know 2013, 2014, somewhere around there.

Page 10

Q. What cruise line would that have been?

A. That was Norwegian also.

Q. And then the next cruise prior to our subject cruise --

A. Carnival.

Q. What year was that?

A. That was 2023.

Q. What ship?

A. I don't recall, no.

Q. What port did the ship leave from?

A. New York.

Q. Do you recall any prior cruises other than the three we discussed?

A. That was it.

Q. The three prior cruises, did you ever have to visit the ship's Medical Center for any reason?

A. No.

Q. And those three prior cruises, did any member of your travelling party that you were there with have to visit the ship's Medical Center for any reason?

A. No.

Q. One rule I didn't mention. You will anticipate my question, but you have to let me finish so the court reporter doesn't get mad.

Page 11

A.    Yes.

Q.    Okay.  So your first Carnival cruise was in 2023?

A.    Yes.

Q.    What did you think about that experience?

A.    I enjoyed it.  I had a good time.

Q.    Who went with you on that particular cruise in 2023?

A.    That was me, my sister, my mother and my girlfriend, Geraldine.

Q.    Were any of the people that you just mentioned on our subject cruise in 2024 with you?

A.    My sister was on in 2024.

Q.    What's your sister's name?

A.    Rosemarie, R-o-s-e-m-a-r-i-e, Montefusco M-o-n-t-e-f-u-s-c-o.

Q.    I understand from your answers to interrogatories in this case that you were involved in a motor vehicle accident back in 2013?

A.    Yes.

Q.    Can you tell me a little bit about where that happened?

A.    That happened on the Long Island Expressway. I was stopped in dead stop traffic and someone hit me from behind because she was hit in behind from

Page 12

another woman.

Q. Did you bring a lawsuit as a result of that car accident in 2013?

A. I am not sure if we actually brought a lawsuit. I know we went to arbitration with that.

Q. You did pursue a claim after the car accident in 2013?

A. Yes.

MR. COURTNEY: Pause. See if you can get into a rhythm where he finishes the question and you breath and see if you can answer.

THE WITNESS: Okay. I'm trying to have a conversation. I understand it is questioning.

MR. COURTNEY: He has to get an accurate transcript so that's why we have to do this. (Indicating)

BY MR. JARNAGIN:

Q. As a result of the 2013 car accident, did you make a claim for personal injuries to your body?

A. I did.

Q. What particular areas of your body?

A. My left shoulder, my back and my neck.

Q. As a result of those injuries that you claim from that lawsuit, did you seek out medical treatment?

Page 13

A. I did.

Q. Did you undergo any type of surgery as a result of that car accident in 2013?

A. I did. Left shoulder arthroscopy.

Q. And what physician performed that surgery?

A. I do not remember.

Q. How soon after the car accident did you undergo the left shoulder arthroscopy?

A. Eight months.

Q. As a result of the car accident in 2013, did you undergo any type of physical therapy?

A. I did.

Q. Was the physical therapy to all of the aforementioned parts of your body?

A. Yes, my back, neck and left shoulder.

Q. As a result of the 2013 car accident, did you undergo any type of injections to your body?

A. No. I did have acupuncture. That's not an injection.

Q. As a result of the 2013 car accident, did you treat with a chiropractor?

A. I believe I did go to the chiropractor a few times.

Q. Now at this time following the 2013 accident you are treating for those injuries, are you paying

Page 14

with your health insurance?

A. No, that was no fault.

Q. There was insurance paying for the treatment just not your health insurance?

A. Right. No fault insurance.

Q. That was going through your driver's insurance?

A. My automobile, yes.

Q. Who was your automobile insurer at the time?

A. Geico.

Q. You stated that eventually there was some type of arbitration in regards to that claim?

A. Yes.

Q. Did the matter resolve at the arbitration?

A. Yes.

Q. Who was your attorney representing you for those proceedings?

A. Ira M Scharaga.

Q. Now we will work within a window here.

What date did your car accident happen?

A. I believe it was May 13, 2013.

Q. Then my understanding is the first day of the cruise we are here to talk about was June 10, 2024?

A. Yes.

Page 15

Q.   You said following the car accident you had a left shoulder arthroscopy about eight months later?

A.   Approximately.

Q.   Now, between May 13, 2013 and June 10, 2024, other than the left shoulder arthroscopy, did you undergo any other type of surgery?

A.   No, I think everything was before that.

MR. COURTNEY:  You are including things unrelated to the neck, left shoulder and back?

BY MR. JARNAGIN:

Q.   Correct.

A.   Unrelated.

Q.   Correct.

A.   I'm drawing a blank.

Q.   Within that same window May 13, 2013 to June 10, 2024, before you boarded the cruise, did you treat with any type of medical doctor for arthritis in any part of your body?

A.   No, no.

Q.   In that same window May 13, 2013 through June 10, 2024, did you treat with any type of doctor for joint disease?

A.   No.

Q.   In that time of May 13, 2013 to June 10, 2024, did you ever break a bone in your body?

Page 16

A.    No, I never broke a bone.

MR. COURTNEY:  During that window?

THE WITNESS:  During that window.

BY MR. JARNAGIN:

Q.    After your accident in May of 2013 I understand you had a left shoulder arthroscopy eight months later?

A.    Can I stand a minute?  I'm sorry.  I will answer it.  Go ahead.

Q.    My understanding is after your May 13, 2013 car accident you had a left shoulder arthroscopy eight months later?

A.    Uh-huh.

Q.    How long after that surgery was performed did you continue treating for any symptoms in the left shoulder?

A.    A few months.

Q.    What medical facilities did you treat at for the left shoulder symptoms?

A.    Physical therapy.

Q.    At what facility did you undergo the physical therapy for that?

A.    I was in the neighborhood in Middle Village. I don't believe they are still there.  Another medical facility took over.

Page 17

Q.   From May 13, 2013 to June 10, 2024 did you treat with a medical doctor for any symptoms in the right shoulder?

A.   No.

Q.   From May 13, 2013 up until June 10, 2024, did you ever treat with any medical doctor for any symptoms to the left or right wrist?

A.   No.

Q.   From May 13, 2013 up until June 10, 2024, did you ever treat with a medical doctor for any type of hip pain?

A.   No.

Q.   At the time that you boarded the cruise on June 10, 2024 were you actively taking any prescription medications?

A.   Yes.

Q.   Tell me what those were.

A.   Lipitor and Zoloft.

Q.   And what was the Lipitor treating?

A.   Cholesterol.

Q.   And the Zoloft?

A.   Depression.

Q.   The medication for the Zoloft, what doctor prescribed that for you?

A.   Dr. Shalom Fineberg.

Page 18

Q.   Give me one second.  I will see if these names are listed in the answers to interrogatories so I don't have to make you spell all of them.

How long had you been treating with that particular doctor?

A.   25 years after my children were born.

Q.   And who was the doctor that prescribed the Lipitor to you?

A.   That would be Dr. Mathew Yovino.

Q.   What kind of doctor is he?

A.   He's a primary physician.

Q.   So those were the only two prescription medications you took on the cruise with you?

A.   Yes.

MR. COURTNEY:  Objection to the form.  I think I know what you meant but you mean that she brought with her on to the cruise?

BY MR. JARNAGIN:

Q.   Yes.

A.   Yes.

Q.   Prior to going on this cruise in June of 2024, had you ever been hospitalized due to a fall?

A.   No.

Q.   Other than for the birth of your daughters prior to the cruise in June of 2024, had you ever

Page 19

been admitted overnight into a hospital?

A.   I'm sorry, from the time my daughters were born?

Q.   I will reask the question for you.

Prior to going on the cruise in June of 2024 and other than for the birth of your daughters, had you ever been admitted overnight into a hospital for any reason?

A.   Yes, yes.

Q.   Tell me what those occasions were.

A.   I had kidney stones.  I think that's the only overnight, yeah.

Q.   And earlier we talked about a claim that you brought as a result of the 2013 car accident, other than that claim and the one you currently have against Carnival, have you ever brought a lawsuit against any person or business entity?

A.   No.

Q.   Your husband's name is Angelo?

A.   Yes.

Q.   What does Angelo do for a living?

A.   He is an electrician.

Q.   Does he work for a particular company?

A.   Yes.

Q.   What's the name of the company?

A.   Forest Electric.

Q.   Does that mean he is handy around the house?

A.   He's very handy.

Q.   Was there any particular reason that you were taking this cruise in June of 2024?

A.   Well, I had gone on a cruise in 2023 because I like the slides, they gave me an offer for a free suite and I said to my girlfriends, let's have a girl's cruise.

Q.   That 2023 cruise, was it the same cruise ship as the 2024?

A.   I don't believe so.  I will say I am not really positive.

Q.   What was the reason for picking this particular cruise ship in 2024 to go on?

A.   Well, the 2024 I chose because they gave me a free suite.  2023 it was economical.

Q.   For the June 2024 cruise, who all did you invite to go with you?

A.   My sister, Rosemarie Montefusco.  My girlfriend Diane Dady, D-a-d-y, Giovanna Innella.

Q.   Did you know anyone on this cruise in June of 2024 other than the three women you just mentioned?

A.   No.

Page 21

Q.    Prior to going on the cruise in June of 2024 were you a member of any Facebook group?

A.    Yes.

Q.    What was the name of the Facebook group?

A.    Facebook group, just have a page on Facebook.

Q.    So you know some people make Facebook groups and plan to do events together onboard the ship prior to getting together?

A.    No, no, no.

Q.    Did you end up staying in a suite on this cruise in June of 2024?

A.    Yes.

Q.    Who all stayed in the suite with you?

A.    Well, because me and my sister had gone on the 2023 cruise together, she likes the slides also, we both had offers, so we both got a suite, my sister, Rosemarie and myself.

And you know two people will stay in one room and two people stay in the other room.  We opted me and my sister to stay in one room together, it was more comfortable being with my sister and Diana and Joanne -- Giovanna, we call her Joanne stayed together.

Q.    So the person that was actually sharing the

cabin with you on the June 2024 cruise her name was?

A.   I think it was registered as Giovanni Innella but my sister stayed in the room.

Q.   Rosemarie?

A.   Yes.

Q.   Prior to going on this particular cruise in June of 2024, had you ever used any type of assistive device to help you walk?

A.   No, I never had any.

Q.   So prior to going on the cruise in June of 2024 you never had to use a cane or walker or any type of mobility scooter?

A.   No, thank God.

Q.   Prior to going on the cruise in June of 2024, had you ever treated with a medical doctor for knee pain?

A.   Knee pain I did fall outside of -- I was interning at because my major in college when I went back was accounting so I was interning at this accounting office in Staten Island and there was gravel, there was a hole in the gravel and I fell in there and I did sprain my right knee but it was just like a very -- it hurt but it was just a sprain.

I did go to a doctor and then I took I believe an MRI but it was just a sprain.  It resolved

Page 23

itself.

Q.   So around how old were you when this event happened that you fell?

A.   Like 2015, something like that approximately.  Somewhere in the teens.

Q.   So you did go to a doctor and you believe an MRI may have been taken of your right knee?

A.   I believe so.

Q.   As a result of the MRI of the right knee being taken, did the medical doctor prescribe any type of care or medication to you?

A.   I don't recall.  But I did not go for any treatment for that.

Q.   What was the name of the doctor you consulted with for that right knee MRI?

A.   I do not recall.

Q.   Prior to going on the cruise in June of 2024, had you ever treated with a podiatrist or foot doctor?

A.   No.

Q.   Prior to going on the cruise in 2024, had any medical doctor ever prescribed to you any specific type of footwear?

A.   No.

Q.   Prior to going on the cruise in June of 2024

Page 24

had you ever used any orthotics inside of your shoes?

A.   No.

Q.   So how did you travel from your home to the cruise, the Venezia in 2024?

A.   My husband took me, took us.

Q.   Your husband drove you and your friends to the ship?

A.   Yes.

Q.   Where is the port located in New York?

A.   Somewhere -- I couldn't even tell you.  I know it's maybe by the west side highway.  I am not even sure.

MR. COURTNEY:  That's what I was going to guess.

BY MR. JARNAGIN:

Q.   And around what time did you board the ship that day on June 10, 2024?

A.   I don't know the time exactly.  I'm sorry.

(Thereupon, the document was marked for I.D.)

BY MR. JARNAGIN:

Q.   I'm going to mark as Defendant's Exhibit 1 the sign and sail statement.  These are the onboard charges generated at the time of the cruise in June of 2024.  They were produced in discovery CCL 11

Page 25

through 14.

A.   You know what, I spent a lot of money in the casino.  I spent a lot of money.

Q.   Disclaimer.

A.   Let me get my --

Q.   No questions yet but feel free to look at it.

(Thereupon, the document was marked for I.D.)

BY MR. JARNAGIN:

Q.   I will mark as Defendant's Exhibit 2 a movement detail.  I don't expect you to have seen this before.  This is a record that shows the time you boarded the ship and left the ship during the subject voyage in June of 2024.

MR. COURTNEY:  What's the Bates stamp on that?

MR. JARNAGIN:  CCL17.

THE WITNESS:  That looks about right.

BY MR. JARNAGIN:

Q.   I will be referring to these documents to help us with the timelines so feel free to look at them as you would like and I will ask you questions if they are necessary.

A.   I think the suite was ready.  I believe we

Page 26

went to the suite and put our bags in. We may have gone out -- I believe we got a drink at the bar and then after I couldn't tell you what we did.

Q. So looking at Defendant's Exhibit 2, my records show you got on the ship at 11:42 that day.

Does that sound accurate to you?

A. Yeah.

Q. Okay. Then looking at Defendant's Exhibit 1, there's an entry at 4:16 at the Carnival bar.

Would that have been the drink you ordered that day?

A. Yes.

Q. Do you recall where you had dinner that night?

A. I probably had it in the buffet if I am not mistaken.

Q. There is an entry at Marco Polo restaurant at 8:10 p.m.

A. What type of restaurant is that? I don't remember.

MR. COURTNEY: I guess Italian.

THE WITNESS: That's odd because we usually don't go to the pay for restaurants but I guess we did.

BY MR. JARNAGIN:

Page 27

Q.   That first day on June 10, did you meet anyone onboard other than your travelling party you still get in touch with to this day?

A.   No.

Q.   Did you go to the casino the first day onboard?

A.   I would have to think so.  Maybe not.  I don't know.  I don't recall.

Q.   Do you know if you saw any shows onboard the ship that night?

A.   It's possible that we did.  We went to a lot of comedy shows on the ship.  If there is a comedy show going, we went.

Q.   Your suite onboard the vessel, do you remember what deck that was on onboard the ship?

A.   I am not sure.

Q.   My record says you are in cabin 9205.  Does that ring any bells?

A.   Yeah.

Q.   Do you recall if your cabin was on deck nine of the cruise ship?

A.   I do not recall.

Q.   Now eventually we will get to the day of the incident on June 12 and the subject staircase.

A.   Okay.

Page 28

Q.   That first day onboard the ship, do you recall whether or not if you used the subject staircase that you eventually fell on on June 12?

A.   I do not recall to tell you the truth.

Q.   So for that first day onboard the ship there is an entry on June 11 at 1:13 a.m. at the casino, would you have been at the casino at 1 a.m. on the first night?

A.   I sure would.

Q.   Can you repeat that for me?

A.   Yes.

Q.   And do you play anything other than the slots when you are in the casino?

A.   No.

Q.   Your girlfriends that are with you on the trip, are they also playing the slots?

A.   My sister.

Q.   The next day of the cruise is June 11, the second day, my understanding is the ship is at sea this entire day?

A.   Yes.

Q.   What do you recall doing on the second day?

A.   That morning we actually we walked around the -- I'm not sure, there's a walking path onboard the top of the ship.  That's what we would try to do

Page 29

because we knew we would eat a lot so we were trying to burn off some of those calories.

Q. Did you bring a pair of tennis shoes onboard the ship?

A. Yeah, yeah.

Q. What other footwear did you bring with you on the ship?

A. We probably brought flats, sandals.

Q. Flats are different than sandals; right?

A. Yes.

Q. Did you bring any high heels or anything to wear on a formal night?

A. I probably had a couple of sandals that had a heel on it, yes.

Q. On the second day in the morning you recall using the walking path and walking?

A. Yes.

Q. What do you recall doing next onboard the ship that day?

A. That day we were going to see a seminar, some sort of -- something in a theater. Other than that we were in the solarium.

Q. Is the solarium an indoor patio?

A. It doesn't have a pool. It has a hot tub. It's a seating area. It's closed off. It's like a

Page 30

VIP.  It was with the offer.  I think anybody in a suite could go into the solarium.

Q.   On June 11, do you recall where you ate onboard for lunch that day?

A.   I do not know.

Q.   Do you recall where you ate for dinner that night onboard the ship?

A.   Let me look, no.  Probably if it is not on here, probably the buffet.

Q.   Now on the second day of the cruise ship voyage, did you use the staircase that you eventually fell on on June 12?

A.   I do not recall.

Q.   On the second day on June 11 at any point are you drinking alcoholic beverages?

A.   It's possible I had maybe a cocktail during the day and maybe a glass of wine or two at night.

Q.   Do you recall whether you went to the casino on the second day on June 11?

A.   I probably did.

Q.   So just to save sometime in the future, do you believe you went to the casino everyday of the voyage?

A.   I probably did.

Q.   For the first two days June 10th and

Page 31

June 11th, did you have any issues walking around the ship?

A.   Not at all.

Q.   Did any member of your travelling party have any issues walking around the ship?

A.   No.

Q.   So does anything stick out to you about that night on June 11, 2014?  Did you see any shows?

A.   Possible comedy.  We went to a lot of comedy if I remember.  A really good comedian.

Q.   So the third day of the cruise is June 12, 2024?

A.   Yes, yes.

Q.   Tell me what you recall -- strike that question.

About what time did you wake up on June 12, 2024?

A.   I don't know the time.  Probably early in the morning.  Maybe eight because we had a plan to go to a seminar about an excursion about the boat.  They tell you -- it's really a shopping hook shall we say.

Q.   You mentioned a seminar on June 11 as well, what was that particular seminar about?

A.   That I do not recall.  I don't know which one that was.  I had to think about which one this

Page 32

was.

Q.   On June 11, what venue was that held in?

A.   Probably the theater.

Q.   So on June 12 you said maybe you woke up at eight in the morning?

A.   Yeah.

Q.   And your sister is staying in the cabin with you?

A.   Yes.

Q.   What time that morning do you leave your cabin?

A.   Probably at 9:30.

Q.   And what's the plan?  Where do you intend to go once you left the cabin?

A.   The plan was to go get coffee.  We went to the cafe on the tenth floor.  I believe we took the elevator up.  I am not positive but we went to the coffee shop and we sat down on this table there by the coffee shop and drank the coffee and about 10:25 or 10:30, we said, okay, the seminar was at 11, and my sister insist on getting a good seat anywhere she goes, so we left a little earlier so around 10:30 or 10:20 or 10:30 I was by the staircase.

Q.   At the time you leave your cabin that morning, what clothes are you wearing?

Page 33

A.   My cover up and my Clark sandals.

Q.   When you say cover up, are you wearing a swim suit underneath it?

A.   No.

Q.   I'm sorry, tell me what a cover up is.

A.   It's like a one piece, it looks like a dress.

Q.   Do you have any photographs of you wearing the cover up onboard the cruise ship?

A.   No.

Q.   You said you were also wearing Crocs sandals, is that right?

A.   Not Crocs, Clarks.

Q.   Clarks?

A.   Yes.

Q.   Describe to me the sandals.  Do they have a little piece that fits between the big toe and the rest of the toes?

A.   Like the V in front, yeah.  It goes between the big toe and the second.

Q.   Do you have any photographs of the sandals you were wearing on June 12, 2024?

A.   I do not.  I sold my Pennsylvania house.  I believe I left them there with all of the stuff.

Q.   At what point did you sell the Pennsylvania

Page 34

house -- strike that.

When was the last time you saw the sandals after the cruise?

A.   A month or two.  They are summer sandals so I probably had them throughout the summer.  I think I sold the Pennsylvania house in the fall.

Q.   The fall of 2024?

A.   Yes.

Q.   Are you aware of any photographs that depict you wearing the sandals you were wearing the day of June 12?

A.   I am not aware of them, no.  It's possible but I am not aware.

Q.   When you left your cabin that morning on June 12, did you have a purse or a bag with you?

A.   I think I had a cross body, I probably was wearing.

Q.   Did you have any type of hat on?

A.   No.

Q.   At the time in June of 2024, were you prescribed any type of corrective lenses for your eyesight?

A.   No.  These are just reading glasses.

Q.   So prior to June of 2024 had you ever treated with an eye doctor to correct your vision?

Page 35

A.   I have gone to eye doctors, yeah, but I never got any prescriptions filled anyway.

Q.   So at the time of the cruise in June of 2024 you had never been prescribed corrective lenses?

A.   I had been prescribed but it's so nominal where I didn't really need them.

Q.   Now today you are wearing -- well, strike that?

A.   My reading glasses, yes.

Q.   With you today you have reading glasses?

A.   Yes.

Q.   Those glasses help you read?

A.   I could read.  I can actually see far with these.

Q.   Do you wear glasses when you operate a car?

A.   No.

Q.   That morning on June 12, when you left your cabin were you wearing any type of glasses?

A.   I could have been wearing my glasses, yes. These thin glasses.

Q.   Now you say you could have been.  Do you remember one way or the other if you wore --

A.   I do not recall.

Q.   Now if your passenger suite was on deck nine, I believe you say you may have taken the

Page 36

elevator to get to the coffee shop that morning?

A.   Possibly, yes.

Q.   Do you remember if you took the stairs or the elevator to get to the coffee shop that morning?

A.   I don't recall.

Q.   When you went to the coffee shop that morning, was your sister with you?

A.   Yes.

Q.   Did you and your sister go together in the cabin up to the coffee shop?

A.   Yes.

Q.   Did you meet the rest of your friends at the coffee shop that morning?

A.   Yeah, we probably met them up there.  I don't know if we went with them in the hallway but we definitely went to the coffee shop together.

Q.   All four girls were at the coffee shop that morning?

A.   Yes.

Q.   Did you have anything to eat at the coffee shop?

A.   I don't believe so.

Q.   About how much time do you believe you spent at the coffee shop before you guys made your way to the seminar?

Page 37

A. Well, like I said, we went to the coffee shop. We sat at the table and then we went out.

Q. Did you order any coffee?

A. Oh, yeah.

Q. You said you believe the coffee shop is on deck ten?

A. Yes.

Q. Is it inside of the ship?

A. Outside by the pool area.

Q. So you went to get coffee in the main outside pool area?

A. Yes.

Q. On deck ten?

A. Yes.

Q. Did you go directly from the area where you got the coffee to the staircase where you eventually had the incident?

A. Yes.

Q. So once you leave the coffee shop tell me what happens next.

A. We left the coffee shop. We went into the elevator area. Let me see. I'm sorry. We went to the elevator area. My girlfriend Joanne goes into the elevator. Me and my sister decided to take the stairs down.

Page 38

Q.   Why did Joanne decide to take the elevator?

A.   She's lazy.

Q.   What deck was the seminar being held on that you were going to?

A.   I don't remember.  It was not on deck three but I am not sure.

Q.   Do you recall if the seminar you were going to was in the same theater as the previous day?

A.   I believe so.

Q.   So does Joanne get on the elevator and down she goes?

A.   That was it, yeah.

Q.   So the three girls that are left are you and Rosemarie and Diane?

A.   Yes.

Q.   At the time you leave the coffee shop up until you reach the staircase, did you observe any crew members in the area?

A.   No.  Not that I know of.  It's possible but I don't know.

Q.   In the time that you leave the coffee area up until the point where you reach the interior staircase, do you recall seeing any type of warning signs?

A.   Not that I recall.

Page 39

Q. In the time that you left the coffee area until you reached the interior staircase, do you recall seeing any type of water on the floor?

A. I do not recall that, no.

Q. From the time you leave the coffee area until you reach the interior staircase, do you recall whether anyone was mopping the floor?

A. I do not recall, no.

Q. Okay. So once Joanne is down the elevator and you are at the staircase, tell me what happens next.

A. Okay. So my sister is in front of me, three feet in front of me because I will tell you when Joanne got on the elevator, I thought to myself for a split second, do I get on the elevator or take the stairs. Like I said, we were trying to be a little more active. I said I will take the stairs.

They were a little bit in front of me. Like I said, three or four feet in front of me so I was behind them. Diane went down the right side of that stair, you know, I think there is two staircases on there.

On the right side she went down the right and my sister went down the left. The decision in my head, do I go down the right or left? Of course I am

Page 40

following my sister.  I proceeded toward the left side of the ship or the staircase.

Q.   At the time you were about to use the staircase, your sister Rosemarie is about three or four feet down the staircase already?

A.   Yeah.  She's probably the last few steps down.

Q.   And is Diane walking side by side with Rosemarie on the right side of the staircase?

A.   No, my sister was on the left and Diane was going towards the right.

Q.   I understand they were on different sides of the staircase.  Were they walking side by side down the staircase?

A.   No.

Q.   Was Diane in front of Rosemarie?

A.   Probably because she didn't see anything. She was in front of Rosemarie.  Rosemarie saw the ending of it but --

Q.   Did Diane or Rosemarie have any issues going down the staircase prior to what happened to you?

MR. COURTNEY:  Object to the form of the question.  You can answer.

THE WITNESS:  She did not.

BY MR. JARNAGIN:

Page 41

Q. At the time Diane and Rosemarie are going down the staircase, are you three talking with one another?

A. No.

Q. So Rosemarie and Diane are three to four feet in front of you down the staircase?

A. Yes.

Q. At what point do you fall on the staircase?

A. Okay. Do you want me to go into the accident?

Q. Yeah.

A. Okay. So I get to the staircase. I'm literally just starting to proceed down with my right foot, immediately my left foot -- I would have held the handrail but I didn't get to that point yet. So I went down with my right.

My left foot slides up and when I go down the stairs, I always look down because I'm afraid of heights. So I have to look down the stairs. I just see my two legs in front of me.

At that point I'm like I'm falling, I grabbed the two handrails. I'm sorry. I grabbed the two handrails with all of my might and then my left slips.

I hit the floor with my back more towards my

Page 42

left side.  My right hand is just gripping tightly. It never left the handrail.  I'm sliding down the stairs more towards my left.  I have my right arm up and I'm sliding.  I hit my -- I bang my left hand trying to stop myself going down.

I'm still sliding.  That didn't work.  I'm still going down, bouncing down and then I finally stop at the second or third stair, maybe second stair I would think, and when I land, when I finally stop sliding down, I'm on my left side with my completely twisted back and I'm still gripping the handrail and I took my hand off the handrail.

I sat there, now my sister had -- she's on the landing there and looking at me and I looked at her.  I rolled my arms.  I did feel it in my right arm but I think from the excitement -- it was not as bad.  I went to the seminar afterwards.

I went right from the -- that's where we were going.  I went to the seminar and during the seminar that's when I really started feeling my right shoulder and everything.

I felt bruised but I fell down the stairs and I said to my sister, I have to go to the doctors. So after the seminar that's when -- I am not sure if we -- no, I definitely went to the customer service

Page 43

after that.

            (Thereupon, the document was marked for I.D.)

BY MR. JARNAGIN:

    Q.   I'm going to mark as Defendant's Exhibit 3 a composite exhibit.  It will be photographs produced by Ms. Dalfino in discovery.

    A.   Okay.

    Q.   So, Ms. Dalfino, looking at Defendant's Exhibit 3-1, who took that photograph?

    A.   I did.

    Q.   And when did you take the photograph?

    A.   After I went to the doctor.

    Q.   Defense Exhibit 3-1 that is the staircase you had your incident on?

    A.   Uh-huh.

    Q.   Earlier you said you were walking down the left hand side of the staircase?

    A.   Yes; right here.

    Q.   At what point did you actually begin to fall looking at 3-1?

    A.   Here and here.  I was putting my right leg down to go on to the second step.

    Q.   You had not even made it down the step at the time you fell?

Page 44

A.   I did not even --

MR. COURTNEY:  Can we pause for a second? She referred to the first step.  Let's call this the landing area.  This is first step and second step.  Explain again what you were saying.

THE WITNESS:  I was still on the landing here.  I was on the landing.  My right foot was going on to the first step.

BY MR. JARNAGIN:

Q.   Now at the time the right foot is going on the first step, you had your right hand on the handrail?

A.   No, I did not.  I hugged the left side and I did not have -- I don't believe I had my hand -- I probably was going to put my hand on to the handrail but it was so early in my descent.

MR. COURTNEY:  You made a motion with one of your hands.  Which hand were you going to put on the handrail?

THE WITNESS:  My left hand.

MR. COURTNEY:  He can't type that down.

THE WITNESS:  My left hand would have gone on the handrail but it was just so early in the descent, I had not even put my right foot on to the first step yet.

Page 45

BY MR. JARNAGIN:

Q.   So at the point you began to fall, was either your left hand or right hand touching any handrail?

A.   When I began to fall, no.  I was proceeding to put my left hand on to the handrail.

Q.   Okay.  And you said that you saw both of your feet go up in front of you?

A.   I saw my legs right in front of my eyes because I was looking down so they were up.

Q.   At the time you were beginning to descend the staircase and place your right foot or tried to on the step you were looking down at the staircase at the time?

A.   Yeah, yes.

Q.   Prior to attempting to ascend the staircase, did anything about the staircase visually concern you?

A.   No.

Q.   I asked this before but I will ask it again so I'm sure.  You don't recall whether or not if you used the same staircase prior to the incident?

A.   I do not.

Q.   Had you used any staircase onboard the vessel prior to the incident?

Page 46

A.   Yeah, definitely.  I don't know which staircase but --

Q.   So what do you believe caused your fall?

A.   Well, when -- now I believe because when I did get up off the stairs, my clothing was a little wet so I know water must have been involved somehow but this lifted rubber here could have definitely made me slide, my foot slide.  It's either or or both.

Q.   At what point did you form the opinion that the rubber that we see in Defendant's Exhibit 3-1 could have caused your fall?

A.   After I went to the doctor's office, the doctor said did anything happen to make you fall?  So I'm like, I don't know.  So after the doctor, I am like let's go see the staircase.  I went there.  I'm like, wow, that could have made me fall, that's why I took the picture.  I couldn't believe it.

Q.   So the first time you personally observed the rubber that we see in 3-1 that was after you went to the doctor's office that day?

A.   Yes.

        (Thereupon, there was a brief recess.)

Q.   So earlier you told me that after you fell you eventually landed and stuff on a certain

Page 47

location.

A.    Yes.

Q.    Where did you stop?

A.    I would say it's either the third or second step from the bottom.

Q.    So looking at 3-1.

A.    Right over here.

Q.    The third or second step from the bottom is where you came to a stop?

A.    Yes.

Q.    And you said that once you began falling you were able to contact the hand rail on your right?

A.    Yes, yes.  Both handrails I grabbed.

Q.    When you say you grabbed both handrails, that means you made contact with the handrail to your right with your right hand and also the handrail to the left with the left hand?

A.    Yes, yes.  I guess I have long arms.

Q.    Once you stopped on the staircase, where are Rosemarie and Diana located?

A.    Now Rosemarie was already around the bend. Diane was already the bend.  She didn't know what happened.  Rosemarie heard me and came back around. She saw me at the bottom already.

Q.    Before the fall at the staircase before

Page 48

attempting to go down with the right foot, are there any other people on the staircase other than Rosemarie and Diane?

A. (Witness nods head.)

Q. No?

A. No.

Q. And earlier you told me you don't recall seeing any type of warning sign prior to going down the staircase?

A. No.

Q. Now are you telling me that there was no warning sign or you just don't remember one way or the other?

A. I did not see a warning sign.

Q. Now earlier you told me once you stopped on the staircase after that you felt some portion of your body was wet?

A. Yes, my left side.

Q. And what part of your left side was wet?

A. It was right around --

Q. Try to use words.

A. Right around the hip area. I felt -- I don't know if there was any. I felt that area and it was wet. I even said to my sister, my clothing is wet.

Page 49

Q.   Were you able to observe your left hip was wet after you fell?

A.   When I felt my clothing.

Q.   Were you able to see the wetness on the clothing or was it something you felt?

MR. COURTNEY:  Objection to the form.  You can answer.

THE WITNESS:  I think I was rubbing my hip because it hurt and that's when I felt it.

BY MR. JARNAGIN:

Q.   Do you have any photographs of any part of your body being wet after the fall?

A.   I do not have photographs, no.

Q.   Are you aware of anyone that has photographs of any part of your body being wet after your fall?

A.   No.

Q.   Other than the sensation of the left hip area wet, was any portion wet?

A.   No.  Like I said, I was probably rubbing my hip because it did hurt at the time and that's when I felt it so I don't know any other place.

Q.   When you fell what part of the staircase struck first?

A.   My back, left side.

Q.   Looking at 3-1, can you tell me what part of

Page 50

the staircase your body struck first?

A.   Probably right here.  (Indicating)

MR. COURTNEY:  She's saying is this by the strip of step one?

THE WITNESS:  Step one, yeah.  Definitely step one.

BY MR. JARNAGIN:

Q.   When we are talking about step one, the first step below the landing?

A.   I don't believe -- it couldn't have been on that side.  It had to be in the middle somewhere.  Like I said, I was falling.  I felt it more than I saw exactly where I hit.  I felt the nose of the landing.

Q.   You felt the nose of the landing where?

A.   In my back on the left side.

Q.   So you are telling me that your back left side struck the nose on the landing as you fell?

A.   Yes, that's when I fell.

Q.   And at what point does your left arm begin to make contact with the left hand?

A.   When I -- on the left hand rail, that's when I saw my feet, my legs out.  I immediately grabbed both handrails.  That was before the fall.

Q.   At the time that your back left side of your

Page 51

body strikes the nose of the landing, are either one of your hands making contact with the handrail?

A.   My right hand is still on the handrail.  My left had slipped off and it also hit the first step.

Q.   Now you say when you came to rest, it was the third or second step from the bottom where the landing is located on the top portion of the picture in Defendant's Exhibit 3-1?

A.   So you know what, when I say the last, that's the landing.  So I would say right around here.  Yeah, the second or third step, yeah. (Indicating)

Q.   I marked with a blue X where you indicated you came to rest --

A.   Yes.

Q.   -- from your fall.

That's the location?

A.   Yes.

Q.   And point to me where the back left side of your body struck the nose of the landing during your fall?

A.   Like I said, I had my two hands on the handrail.  My left slipped off.  I'm actually not looking at the step at this point.  I would assume the middle here because my left -- I can't assume.

Page 52

MR. COURTNEY:  You are doing fine.  I want to put on the record she's pointing to the first step and she is referring to it as the landing. She's referring to the first step, not the landing.

THE WITNESS:  The first step right here. (Indicating)

BY MR. JARNAGIN:

Q.  I marked that with a circle where you just indicated.

A.  In and around that area.  I am not looking at the step.  I stepped upwards with my legs up but that has to be the --

Q.  When you came to rest on the X portion of the photograph, were your sandals still on your feet?

A.  Yes.

Q.  You said Diane and Rosemarie already rounded the bend.

A.  Yes.

Q.  Do you mean they reached the bottom landing?

MR. COURTNEY:  Let him finish.

BY MR. JARNAGIN:

Q.  I'm glad you are trying to be helpful.  We have to think of the court reporter.

Earlier when you said Rosemarie and Diane

Page 53

had already rounded the bend, do you mean they already reached the bottom landing and started to descend the bottom portion of the staircase?

A.    Yes.

Q.    Did Rosemarie witness your fall?

A.    No.

Q.    Did Diane witness your fall?

A.    No.

Q.    Are you aware of anyone that witnessed you fall down the staircase?

A.    I am not aware.

Q.    How did you get up off the staircase?

A.    I stood up.

Q.    Did Diane and Rosemarie have to help you get up?

A.    I do not recall.

Q.    Once you stood up after your fall, did you continue to use the staircase to get to the seminar?

A.    I believe, yeah, we did use the staircase.

Q.    About how many more flights down the stairs do you believe you took to reach the seminar?

A.    I believe we went up the stairs.

Q.    So once you stood up after you fell, you believe you went up the stairs?

MR. COURTNEY:  Do you understand what he is

Page 54

asking?

THE WITNESS:  Yeah, I'm trying to think.

MR. COURTNEY:  Just listen.  When you say you started to go up the stairs, that implies you went to a higher deck level or are saying you continued using the stairs is what you think?

THE WITNESS:  I definitely continued using the stairs.

BY MR. JARNAGIN:

Q.   So after you get up you continued to descend the stairs as you were doing before?

A.   I believe so.  I believe so.

Q.   How long was the seminar that you attended?

A.   Probably an hour or a little over an hour.

Q.   Once the seminar is concluded, where do you go next?

A.   Probably -- I mean I know I kept saying I have to go to the doctors but probably the customer service.

Q.   So about what time do you first present to customer service?

A.   I am not sure.

Q.   Did you speak with someone at customer service?

A.   I did.

Page 55

Q.   And onboard the ship we referred to it as guest services.  I will call it that for clarity.

When you reached the guest services desk, do you speak to someone in guest services?

A.   Yes.

Q.   Did you speak to a man or a woman?

A.   I don't recall.

Q.   Do you recall anything about what the person at guest services looked like that you initially spoke with after the fall?

A.   Not the first one, no.

Q.   What do you recall about that interaction?

A.   I told him or her what happened.  I am not sure.  I told him what happened and I wanted to see the doctor.  What time does the doctor you know -- where are they on the ship because I didn't know. They told me it opened at three and that was it.

Q.   Do you recall anything else that you and the guest associate discussed?

A.   I do not remember.

Q.   Once I leave the guest services desk, where do you go next?

A.   I do not remember.  It's possible I went to the room, I am not sure.

Q.   Looking at Defendant's Exhibit 1 on

Page 56

June 12th at 2:02 p.m., there's an entry at the Carnival Bar, did you get an alcoholic beverage after leaving the guest services desk prior to going to the Medical Center?

A.   Prior to?  I don't believe so.  It's possible.  I am not sure.

Q.   After leaving the guest services desk after your fall, about how many hours is it until you first present to the Medical Center?

A.   I got there exactly at three.  I was the second in line.

Q.   So do you recall what you did between leaving the guest services desk and going to the Medical Center at 3?

A.   No.

Q.   Do you recall whether you spoke to any crew members in that window of time between leaving the guest services desk and going to the Medical Center at 3?

A.   No.

Q.   So tell me what happens once you get to the Medical Center at 3?

A.   They had me fill out an intake form.  I waited there until they called me.  I went in and told the doctor what had happened, what hurts me.  I

Page 57

told him my right shoulder is really bothering me.

My back -- no.  I may not have said the back.

I said the left side.  It was really like my back and left side.  My pelvis, my hip and my wrist. I did mention the wrist.  He gave my anti-inflammatories.

Q.   Do you recall if the doctor that you presented to that day was a man or woman?

A.   It was a man.

Q.   Were you given any pain medication within the Medical Center that day?

A.   No, just the anti-inflammatories.

Q.   Did you request any other further medical treatment other than the anti-inflammatories you were given on that day?

A.   No.

Q.   Do you have any criticisms of the care you received within the Medical Center on June 12?

A.   No, everyone was very nice.

Q.   Was anyone with you in the Medical Center?

A.   My sister came with me.

Q.   So about how long are you in the Medical Center for?

A.   I am not even sure.  I was second.  I don't know how long I was in there.

Page 58

Q. Do you know if it was over an hour or under an hour?

A. I couldn't even tell you how long I was there.

Q. While you are in the Medical Center, do you speak to any type of security officer?

A. No.

Q. Once you leave the Medical Center that day, where do you go next?

A. After -- I don't know where we went afterwards. I am not sure.

Q. We talked about the photographs in Defendant's Exhibit 3 earlier. You took the photographs on June 12 after leaving the Medical Center?

A. Yes.

Q. Did you go straight from the Medical Center to the staircase to take the photographs?

A. It's possible.

Q. Before taking the photographs, did you go back to the guest services desk?

A. I don't think so.

Q. Did you go back to the guest services desk that day at all after leaving the Medical Center?

A. Yes.

Page 59

Q.   What did you go back to the guest services desk for?

A.   I never got a call from security.  I wanted to make a report.

Q.   Did you pay for the medical treatment that you received in the Medical Center on June 12?

A.   Yes.  I know I complained about it.

Q.   Why did you want to make sure that there was a report created that day on June 12?

A.   I would like it documented that I had the fall.  I know my right arm was hurting.

(Thereupon, the document was marked for I.D.)

BY MR. JARNAGIN:

Q.   I'm going to mark as Defendant's Exhibit 4 a document produced in discovery referring to eye care notes CCL 41 through 42.

Since there's so many entries I will point to you on the document what I'm referring to.  I made a little pen mark.  Do you see the entry I'm referring to, Ms. Dalfino?

A.   Uh-huh.

Q.   After leaving the Medical Center that day, did you go back to guest services and inform them that you didn't want to incur medical bills?

Page 60

A.   Yes, I did.

Q.   At that point then you went to the guest services desk, did you already have the photographs taken of the staircase?

A.   Let me just read this.  Can they make this any smaller?  Okay.  So I must have went back to the staircase at that point.  Yes, I took the pictures, yeah, so I wanted to -- so at that point, I'm like if it is not my fault, if I was caused to fall, why would I be expected to pay for the medical bills that's what I thought?

Q.   So I just want to understand the order of events.

After you left the Medical Center, did you go back to the staircase and take the photographs --

A.   Yes.

Q.   -- prior to going to the guest services desk the second time that day?

A.   Yes.

Q.   Before you went back to the guest services desk, were there any crew members present?

A.   No.

Q.   It was you and your sister taking photographs of the staircase?

A.   I believe so.  It's possible Diane and

Page 61

Joanne came but I don't think so.  I think it was me and my sister.

Q.    After the photographs of the staircase are taken, do you go directly to guest services?

A.    I did.

Q.    At that point you want to be sure that the incident is documented; right?

A.    Yes.

Q.    After you make that request to guest services, what is the response you receive from guest services?

A.    Once I said to guest services -- I -- guest services, when I showed guest services the picture, what time was this?  Okay.  I spoke to the security guard before this.

Right.  I spoke to the security guard.  I had gone to the guest services and said the security guard never called me and she said, okay, let me get them up here.  So I waited.

I spoke to the security guard and he said to me that the medical office needs to tell him to take the report.  So I said look at these pictures.  I said look at the staircase.  So he said there's nothing I can do.  The medical office controls whether a report is generated.

Page 62

So he said if you have anything else to say, go to the customer service and add in whatever you have to say.  So I went to the customer service and said I just spoke to the security guard.

I spoke to her saying I didn't speak to him yet.  I said he told me to give any additional information.  I said I took these pictures.  The rubber is lifted from the landing before the first step.

So she said wait a minute.  She said come with me.  Me and my sister proceeded into the elevator with her.  We went up the stairs and we get out of the elevator and there's the security guard with the maintenance guy fixing the step.

The face on this security guard could stop a clock.  He was so angry that we were up there.  The customer service basically ushered us back into the elevator and that was it.

Q.   So I want to understand the sequence of events that you told me.

A.   Okay.

Q.   Once you leave the Medical Center, the next thing you do is take photographs of the staircase?

A.   Right.

Q.   At the time you take photographs of the

Page 63

staircase, are you expecting to speak with a security officer about what had happened?

A.   Yes, definitely.

Q.   Had you made a request to speak to a security officer onboard from anyone at the ship?

A.   Definitely from guest services.

Q.   Did you make that request when you went to guest services before going to the Medical Center?

A.   Yes.

Q.   That's something you are remembering now?

A.   No.  I definitely asked her because that's why I was expecting his call.  That is why when I went back to guest services, I said he never called me.

Q.   So once you take the photographs and go back to guest services and said you had not received a call from security, had you been back to your cabin between leaving the Medical Center and taking the photographs on the staircase?

A.   It's possible.  I'm not sure.  I do not recall.

Q.   So you take the photographs of the staircase.  You immediately go back to guest services; is that right?

A.   I am not sure immediately.  I can't be

Page 64

certain.  I do get back to guest services that night.

Q.   So you go to guest services the first time after the seminar, then you go to the Medical Center, then you go to the staircase and take photographs?

A.   Right.

Q.   You take the photographs back to guest services?

A.   Yes.

Q.   That's the second time you visited them in person?

A.   Yes.

Q.   That's when the guest services takes you and your sister to the staircase?

A.   Well, that was the second time when I went to guest services, I told them the security guard never called me.  She got him up there and I spoke to the security guard.  That's when he told me the medical office is in control of the taking the report.  If I have anything else to say, go to customer service and tell them.  That's when I showed her the photograph.  She said hold on and took us upstairs.

Q.   The second time you are showing the photographs, a security officer meets you at the guest services desk to speak with you?

Page 65

A.   I went to customer service.  I said the security guard never called me.  She got the security guard up there.  She was not there.  I had walked over a couple of feet.  The security guard met me.

Q.   At what location?

A.   Right by guest services.  We were right by the window of the ship.  I told them what happened.  I was in a lot of pain at that point.  I showed them the photographs and, like I said, he said I can't take a report because the medical office is in control.  They have to tell me to make the report.  That's when he said go to customer services and give them any other information that you have.

Q.   Once that interaction with the security officer is complete, you go back to the guest services desk?

A.   Yes.

Q.   It's at that point where the guest services associate goes with you to the staircase and that's when you see the people, crew members, working on the staircase?

A.   He should never have had that face, I'm sorry.

Q.   What does his face look like?

A.   He was angry.  I can't even make the face.

Page 66

I was really taken back by that.

Q.   Why did his face look angry to you?

A.   What I think he was fixing the staircase and he didn't want me to see that.

Q.   It was like he got caught?

A.   Right; right.  He wouldn't take a report. You realize something was wrong with the staircase and now you are angry that I see you fixing it.

Q.   That's your feelings about --

A.   That's exactly what that face was about.

Q.   You didn't speak with him once you went back to the staircase with the guest services?

A.   No, no.  She ushered us back into the elevator.

Q.   Once you are ushered back into the elevator, tell me what happens next onboard.

A.   Where did I go?

Q.   Yes.

A.   I have no idea.  It might have been dinner time.  We may have met my friends for dinner.

Q.   Do you know if guest services called your cabin to speak with you?

A.   I never looked at that phone.  I couldn't tell you.

Q.   So you don't know one way or the other

Page 67

whether a voicemail was left for you to return to the guest services desk on June 12?

A.   I never looked at the phone.

Q.   So after you're ushered back into the elevator, you don't know where you go next?

A.   No.

Q.   Do you go to guest services for any reason for the remainder of that day or night?

A.   No, I don't think I did.

Q.   For the remainder of the cruise, do you ever go back to guest services?

A.   Oh, we did.  For these reasons or for another reason.  It's possible I switched credit cards during the time, yeah.

Q.   I will ask it.  After being ushered back into the elevator, you are not sure what you did onboard for the rest of that evening.

Did you ever go back to the guest services for any issue relating to the fall or the staircase?

A.   I don't believe so.

Q.   For the remainder of the voyage, did you attempt to contact guest services about an investigation into your accident?

A.   No.  Not that I recall anyway.

Q.   For the remainder of the voyage, do you

Page 68

recall if any voicemails were left within your cabin

and guest services requesting to speak to you about

what happened?

A.   I don't -- I don't remember.

Q.   Do you go back to the Medical Center after

June 12?

A.   Yes.

Q.   What do you go back to the medical center

for?

A.   I went because my shoulder -- now I'm

feeling it in different areas of my shoulder the

worst.  I'm in pain so I went back and they gave me a

shot of anti-inflammatories.  And I probably

complained about the billing too.

Q.   So using Defendants's Exhibit 1 and 2.  I

will ask you about the rest of the voyage and ask you

some questions, okay?

A.   Yes.

Q.   Looking at Defendant's Exhibit 2.  It looks

like on June 13, this is the day after your fall.

The ship rides to Amber Cove, Dominican Republic.

Did you get off the vessel in the Dominican

Republic that day?

A.   I did.

Q.   What do you recall doing in Dominican

Page 69

Republic that day on June 13?

A.   I don't remember.

Q.   Did you have an excursion that you went on that day?

A.   I don't remember.

Q.   It looks like you were off the ship between 10:30 a.m. and 4:17 p.m. that day?

A.   Yes.

Q.   So you spent all day at the Dominican Republic?

A.   Yes.

Q.   You don't recall anything that you did that day?

A.   I don't.  I really -- I don't know. Dominican Republic, I'm trying to think.  I don't remember.

Q.   Once you return from the Dominican Republic, what do you recall doing once back onboard the vessel that day on June 13?

A.   I don't remember.

Q.   So looking at Defendant's Exhibit 1, I see entries at Marco Polo bar and restaurant after 7 p.m.

A.   I don't know what the Marco Polo restaurant is.  We did not go -- I am not sure what the Marco Polo restaurant is.  We were comp'd -- my sister was

Page 70

comp'd for one restaurant and I was comp'd for the other. Other than that, we didn't go down to -- I don't know what the Marco Polo restaurant is.

Is it possible that -- yeah, I couldn't tell you.

Q. You could have been out eating onboard the ship once you returned from the Dominican Republic; right?

A. Right, yeah, yeah.

Q. So looking at Defendant's Exhibit 2, we are now on June 14. It looks like the ship is in Grand Turk. Did you leave the ship and go to Grand Turk that day?

A. I'm sure I did.

Q. What do you recall doing in Grand Turk that day?

A. Grand Turk?

I have no idea what I did in Grand Turk.

Q. Did you take any type of excursion activity?

A. It's possible. I just want to add in -- I was on two Tylenol 500's constantly during the trip. I know what you are -- so, yes, I did get off at all of the ports and I did, you know, it's not like I was scuba diving. If we went anywhere, I would just kind of sit, yeah. I did get off at each port.

Page 71

Q.    Okay.  So do you have any memory of what you did in Grand Turk on June 14.

A.    June 14, no.

Q.    Where did you get Tylenol 500's from?

A.    I took them on the ship with me.

Q.    Did you have any medications with you other than the Tylenol 500, the Lipitor and the Zoloft?

A.    No.

Q.    Why did you take Tylenol 500 with you?

A.    Just in case anybody had a headache.

Q.    Okay.  So the next day of the cruise is June 15 and the ship arrives in Halfmoon Cay, Bahamas.

Did get off the ship that day in the Bahamas on June 15?

A.    Yes.

Q.    What do you recall doing in the Bahamas that day?

A.    I recall going on a really bad bus tour.  I think they were trying to make something but it was in the beginning phase.  Yeah, I think that's what we did there.

Q.    The bus tour, is that just a sightseeing venture from a bus around the Bahamas or was there a destination and activity?

A.    No, it was just like around this thing and

Page 72

it just was not worth it.

Q.   Now looking at Defendant's Exhibit 1.  I will move through this a little bit here.  Beginning on June 16, 2024, there's multiple entries for a winner club activity.  Is that referring to --

A.   My slot playing.

Q.   How late into the night would you be playing slots?

A.   Probably late.

Q.   What's late?  1 a.m., 2 a.m. 3 a.m. or 4 a.m.?

A.   Whenever I get discouraged enough.

Q.   I ask because there's a few entries for 5:50 a.m. in the morning and 6:01 a.m. in the morning?

A.   Yes.

Q.   You are dedicated?

A.   I'm so dedicated.

Q.   For the remainder of the voyage it looks like you are able to move around the vessel and you're able to go to the casino?

A.   Yes.

Q.   Do you recall anything else significant that happens until you debark the ship on June 18, 2024?

A.   No.  Other than I did it all in pain.  First off, my friends were there.  I felt no one went in

Page 73

the pool because I had the sling on my arm.  No one -- it felt all we were doing is sitting in the Solarium, going to the you know just sitting you know but I did do it all in pain because I didn't want to --

Q.   Earlier we talked about how you went to the Medical Center after the initial visit on June 12; right?

A.   Yes.

Q.   You went back on June 17, 2024?

A.   Yeah, the 17.

Q.   Did you present before the same doctor on the 17?

A.   Yes.  It's possible that I told the doctor that the security guard told me that -- I don't think he was too happy with me.

Q.   The doctor?

A.   Yeah.

Q.   Why do you say that?

A.   I talked about the medical cost.  They took off either the visit or the shot I got but they did accommodate me for one or the other.

Q.   So the second visit to the Medical Center you spoke to the same doctor that treated you; right?

A.   Yes.

Page 74

Q.   What do you recall that was done on the second treatment?

A.   I got a shot in my buttocks of anti-inflammatories.

Q.   Do you specifically remember speaking to the doctor about any type of security investigation?

A.   It's possible, yeah.  I'm at a loss of words so I probably did.

Q.   Do you recall anything that the doctor said in response to any type of incident investigation onboard?

A.   No.  He just pretty much said the only thing I can do for you is give you the shot.  I remember him saying that.  It was just like they didn't want to take this report.

Q.   Did any one say that to you that they didn't want to take the report?

A.   No, but they didn't.

Q.   That was your feeling?

A.   That was my gut feeling.

Q.   After you spoke to the security officer on the day of your incident, June 12 outside of the guest services desk, did you speak to another security officer for the remainder of the voyage?

A.   No.

Page 75

Q.   Did you ever make any requests to Carnival after June 12 regarding anything pertaining to your fall, the staircase?

A.   No, no.

Q.   And earlier you mentioned an arm sling, was that given to you by the Medical Center?

A.   Yes.

Q.   Was that given to you on June 12?

A.   Yes.

Q.   So you get off the ship as scheduled on June 18, 2024; is that right?

A.   Yes.

Q.   When is the first time you present to a doctor on land about any injuries that you sustained in the fall?

A.   Well, when I come off the ship -- actually when I was on the ship my girlfriend -- when I was on the ship, my girlfriend, Joanne, came down with now we know was COVID.  She came down with COVID, so right after that, we all came down with COVID.  So I was in bed for a week.  And then when I first went to the doctor well when I was able to get an appointment was July 3rd I believe.

Q.   And who did you present to on July 3rd for medical treatment?

Page 76

A.   Dr. Tyorkin.

Q.   I will mark as Defense Exhibit 5 Plaintiff's answers to interrogatories.

(Thereupon, the document was marked for I.D.)

MR. COURTNEY:  This is her initial answers?

BY MR. JARNAGIN:

Q.   Initial, yeah.

So the first doctor you recall presenting to on July 3rd following the cruise was Dr. Tyorkin?

A.   That's what I remember, yes.

Q.   At the time that you presented to Dr. Tyorkin, what were your complaints?

A.   My complaint was my right shoulder and my wrist.

Q.   Which wrist?

A.   My left wrist.

Q.   Did you have any complaints to Dr. Tyorkin about any other parts of your body after that initial visit following the cruise?

A.   No.  I did mention although my back was bothering me, well, one, my hip, pelvis and back was bothering.  I just fell down the stairs and I had a prior back injury.

Normally two or three times of the year it

Page 77

would go out a couple of days and I would be fine.  I thought it was a normal bruising of my left side from going down the stairs and my back went out.  That's what I thought when I went to Dr. Tyorkin.  So I didn't bring that up at that point.  I just knew my left wrist and right shoulder was bothering me.

Q.  After your fall onboard the vessel, did you ever take any photographs of any bruising to your body?

A.  I did not, no.

Q.  Are you aware of any photographs that exist that depict bruising of your body as a result of the fall?

A.  No.

Q.  Had you treated with Dr. Tyorkin prior to the initial visit following the cruise?

A.  No.

Q.  When is the last time you medically treated with Dr. Tyorkin?

A.  That would be in September, the end of September.  After that my mother went into the hospital and she passed away in December and it just -- I would go to New Jersey for the three days and then I worked for four days.  I just didn't have that day to take off to go to any doctors.

Page 78

Q.   So when you say the last time you saw Dr. Tyorkin was the end of September, that's September of 2025?

A.   Yes.

Q.   I understand you underwent a right shoulder arthroscopy following the cruise?

A.   Yes.

Q.   Dr. Tyorkin performed that procedure?

A.   Yes.

Q.   When did you undergo that procedure?

A.   I believe February of 2025.

Q.   Did Dr. Tyorkin ever discuss with you that fall onboard the cruise ship necessitated the right shoulder arthroscopy?

A.   No.  He never -- it was just the tear that needed to be fixed.  He never discussed --

MR. COURTNEY:  Do you understand what he is asking you?

THE WITNESS:  No.

MR. COURTNEY:  Remember, if you don't understand what he is asking you -- let me finish.

THE WITNESS:  Okay.

MR. COURTNEY:  If you don't understand what he is asking, say I am not sure I understand it.

Page 79

THE WITNESS: Okay. If you could rephrase it.

BY MR. JARNAGIN:

Q. Okay. In the course of your treatment with Dr. Tyorkin after the cruise, did Dr. Tyorkin ever discuss with you what he thought caused the need for the right shoulder arthroscopy?

A. I mean Dr. Tyorkin was informed that I did fall on a cruise ship and my pain -- so I had taken the MRIs, so we really discussed the injuries and how to repair it. I don't think he ever said you know this was what caused it. Obviously there is a correlation but he never actually came out and said that was from the cruise ship.

Q. So what's your understanding of what the injury was to your right shoulder?

A. I believe it was a tear of the tendon and rotator cuff. I am not sure.

Q. Now it sounds like after the cruise you underwent diagnostic imaging?

A. Yes.

Q. MRIs, CT's, that type of thing.

Have you ever had your right shoulder medically imaged prior to going on to the cruise in 2024?

Page 80

A.   No.

Q.   Now you were treating with Dr. Tyorkin after the cruise.  Were you treating with any other doctors that you are claiming after this lawsuit?

A.   You want all of my doctors?

Q.   I have your answers to interrogatories.  I will ask some specific questions.

MR. COURTNEY:  Cooper, there is additional answers that are not part of Exhibit 5 that we included a week or two weeks ago.

BY MR. JARNAGIN:

Q.   Okay.  Let's go to page three of Defense Exhibit 5.  Looking at answer number nine.

A.   Yes.

Q.   Which doctors have treated you for the right shoulder since the cruise?

A.   Right shoulder would be Dr. Tyorkin and Dr. M-i-t-g-a-n-g, Joshua Mitgang.  I was in a lot of pain.  I will tell you the truth.  I thought this was broken at one point.

MR. COURTNEY:  What's this?  What are you talking about?

THE WITNESS:  My left thumb, wrist area.  So I made an appointment with Dr. Mitgang and he ruled out the break.  There was no break.

Page 81

BY MR. JARNAGIN:

Q.   To your left wrist?

A.   To my left wrist but he did see because he was able to look at the MRI on the screen.  He said there's something there because it lights up as he was going and he gave me a shot of something in my shoulder.

Q.   In your right shoulder?

A.   In my right shoulder.

Q.   When did you undergo the injection by Dr. Mitgang into the right shoulder?

A.   In July of 2025.

Q.   A year after you left the cruise?

A.   I'm sorry, July of 2024.

Q.   Other than July of 2024 for that injection by Dr. Mitgang, did you ever treat with him again?

A.   No, no.

Q.   So Dr. Mitgang's treatment is limited to that one injection?

A.   That was it.

Q.   Dr. Tyorkin and Dr. Mitgang, that's the right shoulder, any other doctors for the right shoulder?

A.   Not the right shoulder.

Q.   The left wrist and hand, what doctors did

Page 82

you treat with for any claimed injuries to your left wrist or hand?

A.   That would be Dr. Lenard Edelstein, Dr. De Tolla and Dr. Roger.

Q.   Since leaving the cruise, they are on page five.  Since leaving the cruise ship in June of 2024, describe to me what kind of medical treatment you received for your left wrist and left hand.

A.   Left wrist, physical therapy.  Dr. Edelstein gave me a shot, an injection in my wrist.  Dr. De Tolla gave me injection in my wrist and that's the treatment and physical therapy.  Yeah, that's it.

Q.   What did Dr. Roger do?

A.   Dr. Roger he examined me.  I have to go back because there's a tear in my wrist.  He wants me to go for an EMG which I haven't done.  Like I said, after that my mother -- I didn't have the time so now I'm going to go back to him.

Q.   When was the last time you saw Dr. Roger?

A.   That would also be in the end of September.

(Thereupon, there was a brief recess.)

Q.   So when you saw Dr. Roger in 2025, what was your reason for seeking out treatment for him?

A.   Dr. Edelstein, he is basically a consultant type of doctor.  He doesn't do surgery any longer.

Page 83

Dr. DeTolla I went to and I saw her physician's assistant.  She examined me and then Dr. DeTolla came in and gave me a shot.

I felt the doctor should at least look at my hand.  She administered the shot.  So I didn't go back to her again.  Dr. Roger I have to get this fixed.  It's hurting.  Something is wrong with the wrist and I need to --

Q.   You are wearing a device on your left wrist today; right?

A.   Yes.

Q.   Did any doctor prescribe that device to you?

A.   Yeah.  I know Dr. Edelstein said wear the wrist support.  Dr. Roger said to wear it all of the time even in bed.  And, yeah, they did tell me to purchase one.

Q.   So how often are you wearing the left wrist device on a daily basis?  Strike that question.

How often are you wearing the left wrist device?

A.   Everyday.

Q.   In particular what's requiring the need for you to wear the left wrist device?

A.   Well, typing is a chore because by the time I would get out of work if I didn't have this on, the

Page 84

left side would be sore and in pain.  I have to keep it in place so it doesn't get worse.  I don't want to tear it anymore.

Q.   On your answers you list a coxic tailbone injury.

A.   Yes.

Q.   What did you do for that?

A.   Physical therapy for the back.  Other than that I was told there's nothing other to do for the coxic.

Q.   Which doctor was that?

A.   Dr. Tyorkin.

Q.   Then you are also claiming injury to your left hip?

A.   Yes.

Q.   Which doctors have treated you for that claimed injury since the cruise?

A.   Dr. Tyorkin's office treated me for the -- I haven't had treatment.  Like, I haven't sought treatment just for the hip.  I had physical therapy for my back and hip but eventually I will get to that.  I'm going for one thing to the other.  I had the right shoulder done.  I want the wrist fixed then I will proceed to the other areas.

Q.   Then you are also claiming injury to your

Page 85

lumbar spine?

A.   Yes, on exacerbation.

Q.   So we discussed earlier you were involved in that motor vehicle accident in 2013?

A.   Yes.

Q.   You said you had injured your lower back in that car accident?

A.   Yes, but I will tell you the truth, it's different.  It's consistent pain.  It's not like it was from the accident.  Like I said, at a point a couple of years after the accident, I would only have episodes two or three times a year.  My back would go out for a couple of days and I would be fine.  This is consistent.  Dr. Fenig for the pain management has given me the epidural.

I am not sure if it was three or four epidurals that I had which are incredible.  Not only do I have the back pain from the spine, I have incontinence.  I think it is hitting a nerve.

She was explaining that's where the symptoms come from.  If I don't have these steroid injections and I have had accidents, I wear like say like now my back is starting up again.  I'm going to Dr. Fenig on Thursday.

I will ask her for another steroid

Page 86

injection.  I am not sure if I am able to continue getting steroid injections but I do have pain down my legs.  I have the pins and needles.

Because of the incontinence and when my back starts getting worse, I start urinating.  I am not able to hold it in.  And in the beginning when it started up again, I'm able to wear a sanitary napkin.  At some points I had to wear adult diapers until I get the injection.

Like I said, I don't know how long I could do injections for.  I don't know how healthy it is.  I don't know how many times I could.  I don't know if I have to start any alternative.  It's not like it was in the 2013 accident.  It is exacerbated.

Q.   Has a doctor treated you for the lumbar spine since the cruise other than Dr. Fenig?

A.   No.  Dr. Tyorkin.

MR. COURTNEY:  Medical doctors?

BY MR. JARNAGIN:

Q.   I'm excluding physical therapists.

A.   Just those two.

Q.   Dr. Fenig and Dr. Tyorkin?

A.   F-e-n-i-g.

Q.   You described the incontinence you had?

A.   Yes.

Page 87

Q.   How many episodes of incontinence have you had since the cruise ship voyage in June of 2024?

A.   Whenever the steroid wears off that is when it starts again the back pain and also sexual intercourse is extremely painful during that time. So while the steroid is working it's fine.  When it starts wearing off, I have to stop having sexual intercourse with my husband.

Q.   I will ask some questions on that in a bit. Right now I want to focus on incontinence.

When you say you have an episode of incontinence, are you talking peeing yourself or unloading of your bladder in your pants?

A.   I have one or two times full, I could not hold anything in.  Most of the time, I can get to the bathroom but I am wetting my pants.

Q.   Prior to the cruise had you ever had episodes of incontinence?

A.   No.

Q.   How many times have you felt the need to utilize adult diapers since the cruise?

A.   I would say two or three.  Like I said, if I don't go for that steroid, I am not able to make an appointment right away when it starts then I have to wear them.

Page 88

Q.   When you said two or three, are you referring to two or three times you felt the need to wear adult diapers?

A.   In between the steroid injections.

Q.   Have you reported the incontinence to any doctor?

A.   Yes, Dr. Fenig.

Q.   When you reported the episodes of incontinence to Dr. Fenig, what is the response you received?

A.   Get the steroid injection.  You know it's time to do another one.  There's really nothing because it's the nerve that I guess the -- something is hitting up against the nerve and the symptoms come on.

Q.   Since the cruise, have you had any gynecologist appointments?

A.   Yes.

Q.   Did you report any symptoms of incontinence to your gynecologist during those appointments?

A.   I didn't.  I really don't -- I don't -- I'm there for a gynecology appointment.  I want to get that done.  I have to tell you, I went to a gynecology appointment in July.  Okay, the -- when they open you up with the gadget and they take the

Page 89

swab, it was uncomfortable pain.

She did the internal, I almost passed out on the table.  Okay.  Now she thought it was a prolapsed cyst, okay, that was causing me the pain.  That was in July of 2024.  I didn't realize I had the broken coxic at that time so that was the pain now I know.  So yeah, that was my gynecology appointment.

Q.   How long had you treated with that particular gynecologist?

A.   That was the first time I treated with her.

Q.   In July of 2024?

A.   Yes.

Q.   What's the gynecologist's name?

A.   Maureen Marino.  I am not sure if that's the dermatologist or gynecologist.  I don't know. (Phonetic)

MR. COURTNEY:  Did we provide that name or no?

THE WITNESS:  If I saw the name, I would be able to tell.

BY MR. JARNAGIN:

Q.   I don't see it.  You have a way to figure out the name of your gynecologist; right?

A.   Yes.

Q.   Have you been to subsequent appointments

Page 90

with the same gynecologist?

A.   No.

Q.   You had the one in July of 2024?

A.   Yes.

Q.   You have not been to one since?

A.   I have not done anything.  I have to get back to my doctors.

MR. COURTNEY:  Did she say that's what led her to learn about the fractured coxic?  Can you ask her that?

BY MR. JARNAGIN:

Q.   Did your July 2024 gynecologist appointment cause you to discover you had a fractured coxic?

A.   No.  Okay.  Like I said, I went for my right shoulder and my left wrist.  July my back was hurting so bad but what was funny was my left pelvic area like that curve, the crest of the pelvic area was hurting me also besides the hip but the pelvic area was hurting me.

When I went to Dr. Tyorkin, I am not sure if I went -- I think it was the beginning of August.  I said my pelvis was hurting, not only my back but my pelvis and my hip is hurting.

So that's when he gave me the prescriptions for the MRI of the pelvis and the hip and that's when

Page 91

they saw the fracture of the coxic with the pelvis

MRI.

Q.   So you have not reported any episodes of incontinence to any other doctor other than Fenig?

A.   Yeah.

Q.   You have not seen a gynecologist since the July of 2024 appointment?

A.   Yes.

Q.   We will request that doctor's name in discovery.  I won't hold us up on that.  That request is coming so look for it, okay?

A.   Okay.

Q.   You talked about the incident affecting sexual relations with your husband.

A.   Yes.

Q.   Tell me what is it that's causing you difficulty having sex.

A.   My back.

Q.   It's painful to your lower back to have sex?

A.   When he is inside of me it hurts a lot, severe.

Q.   It causes pain to the lower back?

A.   To the lower back, yes.

Q.   So you are still able to have sex it's just painful to the lower back?

Page 92

A.   No.   The only time I'm able to have relations with my husband is when I have the steroid injection and it's still working.  Because then the pain subsides and I'm able to have but other than that when it starts wearing off, that is when it ends.

Q.   So your husband wants you to have the injections; right?

A.   Happy day.

Q.   Have you spoken to any medical doctor about that pain you are feeling when you do have sexual intercourse?

A.   I spoke to Dr. Fenig about it.

Q.   Okay.  When is the last time you felt the need to use adult diapers?

A.   That's probably in the -- let me think.  Probably in the end of the summer.  The beginning of September that the steroid was coming off.

Q.   End of summer 2025?

A.   Yeah.  August, September, during that time.

Q.   So the last time you saw Dr. Tyorkin was September of 2025?

A.   Yes.

Q.   You have not seen Dr. Mitgang since after the injection?

Page 93

A.   Right.

Q.   Dr. Fenig was September of 2025 was the last time?

A.   Yes.

Q.   Dr. Edelstein for the left wrist that was June of 2025 for an injection was the last time you saw that doctor?

A.   June?  It's possible.  I'm trying to think. I am not sure.  Whenever I found he couldn't do anything further, that's when I stopped seeing him.

Q.   And Dr. Roger, the last time you saw that doctor was --

A.   September also.

Q.   2025?

A.   Yes.

Q.   Do you have any medical appointments for any of your claimed injuries currently scheduled?

A.   I do.  I'm seeing Dr. Fenig on this Thursday.  I am not sure what date that is.  Today is the 27th so the 29th.  I have to make an appointment with Dr. Roger and Dr. Tyorkin.

Q.   You have something with Dr. Fenig Thursday but Dr. Roger and Tyorkin no appointments scheduled?

A.   No.  I put everything on hold after my mother passed and before my mother because she was in

Page 94

the hospital.

Q.   You still have medical insurance through Magna Care?

A.   Yes.

Q.   Has that been your medical insurance since you have been working for Ira?

A.   Yeah, since I have been married, it is my husband's insurance.

Q.   Have you made any type of calculation about any expenses that you paid that you are claiming as a result of what happened to you on the cruise ship?

A.   Definitely this trip.  Expenses?  No.  I mean like I said, I bought this.  I am not going to make a claim for minimal amounts.

Q.   Have you treated with any type of eye doctor since going on the cruise in June of 2024?

A.   No.

Q.   You don't have any surgery scheduled for the future currently?

A.   Currently, no.

Q.   Have we discussed all of the injuries that you are claiming as a result of what happened to you on the cruise ship?

A.   Yeah, the right shoulder, left wrist, hip, back.

Page 95

MR. COURTNEY:  Are you referring to the things that have not resolved?  She has other stuff she's not making a claim for.  There are things that were in her body that resolved.  I don't know if you remember.  I don't even remember.  Do you know what I'm talking about?  Were there other parts of your body that are now okay?

THE WITNESS:  My left arm hurt, I did bruise my whole left side.

BY MR. JARNAGIN:

Q.   The point of the question is to make sure I am not missing something big.

MR. COURTNEY:  Right.

THE WITNESS:  Oh, yeah, no.

BY MR. JARNAGIN:

Q.   Once you returned home from the voyage in June of 2024, you continued working as a paralegal for Ira?

A.   Yes.

Q.   Now I also saw some amended answers to interrogatories an activity you enjoyed doing was the paint and sip?

A.   Well, I want to let you know as my employment with Ira that has changed also because of

Page 96

my left wrist.  I am not able to you know type up interrogatories or motions or lengthy documents. Another girl at the office does that now.

Q.   I consider that a benefit for you.

A.   I know that but I can't -- do you want to know what I can't do in the office?

Q.   Sure.

A.   I can't lift the large files anymore.  I can't bend down and be as agile as I was.  I can't sit for long periods of time, that's why I have to keep getting up.  I would say the typing, I will tell you the truth, I like writing.  I'm a creative person.  So I did enjoy writing motions and you know the affirmations in support, that I enjoyed but I can't do that now.

Q.   At the time you went on the ship in June of 2024, were you working in an office for Ira?

A.   Yes.

Q.   Were you working in the office five days a week?

A.   Four.  When the accident happened, I believe I was working three days.  He had gotten an additional client for collections then I went on to four.

Q.   Did you ever perform work remotely at home?

Page 97

A.   No.

Q.   I do see a gynecologist listed Dr. Kara Lieberman.

A.   Marina was my dermatologist. (Phonetic)

Q.   I'm looking at the amended answers to Defendant's interrogatory number 12 that was served on December 11, 2025.  I will touch on these providers briefly with you.

A.   I know you mentioned about the painting. Did you want to talk about that first?

Q.   Pain to where?

A.   You were going into Paint and Sips.

Q.   Sorry, thanks for bringing me back.  Tell me about the Paint and Sip activity.

A.   When I went back to school when I was 40, I never did anything artistic.  I never doodled or did anything.  I was a Liberal Arts major because I didn't know what to major in so it was a late registration.

They said you can take an art class.  They mentioned photography and said drawing or painting. I said painting sounds good.  By the end of the class, the professor wanted me to be in the show.  It was a late blooming talent and I got so into it.  I just enjoy painting.

Page 98

I am not only -- Paint and Sips came later. I have been painting all of this time for what 12 years just as a hobby, then in 2023 I mentioned to my sister because Paint and Sips became popular.

My sister said do it in her church.  So I did that in my sister's church.  They paid me by check then I had actually two Paint and Sips, one in 2023 and one in 2024 in her church, then I had -- then I put a flyer up on Facebook.

Does anyone want to do it in their back yard?  I enjoy it so anyway I got a job.  It was a paint association that hired me, 44 kids.  It was chaos but they had a great time so I did -- I really wanted to pursue -- it was a side gig I wanted to do. Now I can't do that.  I can't keep my arm up.  The painting takes hours.  I did an Incredible Hulk for eight hours doing it.  I can't keep my arm up like that anymore.  That kills me.

Q.   Do you use your left hand or right hand to write?

A.   I'm left hand dominant.

Q.   So are you still able to paint and are limited?

A.   I can't paint.  I can't keep my arm up for that long.  The pain in my shoulder is horrible.

Page 99

After the pain, the stiffness that comes out of that.

Q.    When is the last time you attempted to paint?

A.    Probably before the cruise and afterwards I have not done anything because the shoulder is hurt.

Q.    When did the Hulk painting happen?

A.    Oh, that was years ago.  I can show you my paintings.  I like to do that.

Q.    The last Paint and Sip event you participated in prior to the cruise, when did that happen?

A.    That I believe was in March of 2024.

Q.    Were you doing that for the money or because you enjoyed?

A.    I did it for both.  It's good for both.

Q.    I believe in an answer to interrogatory stated you may total 1,500 from the prior Paint and Sip?

A.    15 and change.  It didn't sound like a lot. In retirement my husband said that's good.  You do Paint and Sips.  It really would work out.  It would be something enjoyable and you are making a little extra money.

Q.    So you just have not even attempted to try to paint since the cruise?

Page 100

A.   I have, believe it or not.  After the operation, probably in the fall of 2025 that's when I knew I couldn't --

Q.   What happened in the fall of 2025?

A.   I'm just saying like the pain -- I didn't attempt to.  After the operation I let it heal then I did try to keep my arm up.  That's how I know the pain and the stiffness comes.  I know I can't do that anymore.  It's really bad because emotionally that's when I was sad, I would paint.  When I was happy, I would paint.

Q.   Are you currently treating with a primary care provider?

A.   I haven't been to Dr. Yia, Y-i-a, in a while.  I don't go to doctors very often.  Yeah, it's bad I know and because I'm going to all of these other doctors, I am not -- my husband runs out all of the time going to doctors and I am not like that, which I should but anyway.

Q.   Have you ever been arrested before?

A.   No.

Q.   Are you currently taking any prescription medications?

A.   The Lipitor and right now in November of 2025 I had an anxiety attack.  Before then for almost

25 years I was on Zoloft. November of 2025 I had an anxiety attack going over the bridge and I contacted Dr. Fineberg and he said it could be that I'm perimenopausal and the Zoloft doesn't -- it's not as effective, so I'm now on something with a C, oh, God. I'm holding my head too. I am not going to think of it. Cymbalta, sorry. From November of 2025 I started that and it's wonderful.

Q. Why do you think you had an anxiety attack in November of 2025?

A. Now I'm definitely like menopausal.

Q. Full blown?

A. Yeah.

Q. Did your mother suffer some type of medical event that led to her passing last fall?

A. You really want to know, my mother fell in the kitchen. She had a sugar low. She hit her head and had a very slight subdural hematoma. She went to the hospital. They said it would eventually absorb itself. They discharged her. They said do you want her to go to a rehab?

So she was laying in bed for a while. We said rehab would be good to get her going. And she was in the rehab one day, they did not manage her diabetes and she went into ketoacidosis and from

Page 102

ketoacidosis that her congestive heart failure was triggered and she passed away.

Q.   So I will move on to a happier subject now. So tell me in the years prior to going on the cruise in 2024, what did daily life look to you?  I mean I have an understanding you worked as a paralegal and have two daughters that live with you and your cats but otherwise what were you doing in Long Island for fun or enjoyment?

A.   I actually lived in Queens up until May of 2025.  You really want to know?  I was a Girl Scout leader.  I opened a community organization to facilitate after school programs in my daughter's public school and I also ran the drama class in that program.

Like I said, I worked for that beauty supply and I did a couple of Tupperware things with the beauty supplies.  What else did I do?  I went out with my friends.

MR. COURTNEY:  Were you asking about years prior or the year prior?

MR. JARNAGIN:  The year.

THE WITNESS:  I was telling you my whole history.

BY MR. JARNAGIN:

Page 103

Q. Let's start from the beginning, your birth, no within a year prior to the cruise.

A. Within the year prior? During COVID, I know you said a year prior but it comes into play. During COVID I was 250 pounds, more than today. I lost 50 pounds during COVID.

I was walking miles. I would walk, run, walk, run. I really got into good shape. I got to 184. At one point which is more that the 50 pounds but I went up a little bit.

I stayed at 200 until the accident. But I had gone to 184. I was really getting into walking and running and taking care of myself and then this happened. I can't walk. I can't run. And I'm gaining weight slowly but surely.

Q. Let's talk about the physical activities you were doing in a year prior to the cruise in 2024.

A. I was walking and running, yes.

Q. Outside?

A. Outside.

Q. Or in a gym or facility?

A. No, outside. We would go to parks. We would go all over.

Q. And what distances would you walk and run when you did this?

Page 104

A.   I would say me and my girlfriend, Diane, we did about two miles.  In the beginning it's slow but I definitely got up to two miles.

Q.   And what's preventing you from walking or running since the cruise ship incident?

A.   The pain.

Q.   The pain where?

A.   In my back, in my legs.  When you walk, you are swinging your arms.  It's very painful.

Q.   Since you went on the cruise voyage in 2024, have any doctors we talked about prescribed you pain medication?

A.   They said I will prescribe you this.  I don't fill them.  I don't know if they are pain medication or -- I just don't like prescription pain medication.  I stay away from whatever they prescribe.  I stick to my Tylenol 500 whenever I need and that's it.

Q.   Within the past month, how many times have you used the Tylenol 500 to treat any pain connected to your right shoulder?

A.   I use it everyday.  A couple of times a day.  Usually in the morning I take two, in the afternoon I take two.  Depending on what I'm feeling at night, I usually take it at night too.

Page 105

Q.   Are you able to operate a car?

A.   I am.

Q.   I believe earlier you told me you had your right shoulder arthroscopy in February of 2025?

A.   Yes.

Q.   After you had that surgery, did you have to wear any type of device for your right shoulder or right arm?

A.   I would think, yeah.  To tell you the truth, it was like maybe a week and they told me to take the sling off, which I thought it was odd.  I was like all right if the doctor is telling me to take the sling off.

Q.   So you would have worn that type of device after the right shoulder surgery for about a week?

A.   Yes.

Q.   Did you have to use any other type of device to assist you following the right shoulder surgery?

A.   No.

Q.   I will mark as Defendant's 6, three photographs that were provided by you in discovery to us.

Were these photographs taken as the same as Defense Exhibit 3 the photographs we discussed earlier?

Page 106

A.   Yes.

Q.   These photographs were taken after you left the Medical Center on that day on June 12?

A.   Yes.

Q.   In Defendant's 6-1, do you see a caution sign in the left-hand corner?

A.   I do see it.  But do you see this bar right here?  If you are coming --

MR. COURTNEY:  When you say bar, are you referring to the pillar when you say bar?

THE WITNESS:  Yeah, if you are coming towards the steps that pillar is blocking that sign.  Okay.  So when I'm coming, I am not looking behind the pillar.  I'm looking at the staircase in front of me.

BY MR. JARNAGIN:

Q.   So do you know one way or the other if there was a caution sign present immediately prior to your fall onboard the ship that day?

A.   I did not see that sign.

Q.   When you went back to the staircase to take the photographs that we see in Defendant's 6-1, did you see any crew members anywhere around the staircase?

A.   I did not.  I do not recall, no.  I don't

Page 107

think anyone was there.

MR. COURTNEY:  You mean at the time she took the photographs?

BY MR. JARNAGIN:

Q.   Yeah.

A.   No, not that I'm aware of.

Q.   Then we look at Defendant's 6-2, who made the blue circle?

A.   I believe I did.  Yeah.

Q.   When did you make the blue circle.

A.   Probably after I retained Daniel.

Q.   And 6-3, did you also make the blue circle we see there?

A.   I did, uh-huh.

Q.   Have we talked about all of the interactions you had with Carnival Cruise onboard Carnival?

A.   What?

Q.   I will ask it again.  Have we discussed all of the interactions that you had with crew members onboard the vessel regarding your fall incident?

A.   I believe so.

Q.   That's all of the questions I have for you. I appreciate your time.

A.   Thank you very much.

MR. COURTNEY:  I don't have any questions.

Page 108

Put her down for a read.

MR. JARNAGIN:  Type it up please.

MR. COURTNEY:  I will hold off on a copy.

(Thereupon, the deposition was concluded at 1:50 p.m.)

Page 109

CERTIFICATE OF OATH

I, Paul Cunningham, Florida Professional Reporter, Notary Public, State of Florida certify that Nanette Dalfino personally appeared before me on January 27, 2026 and was duly sworn.

Signed this 13th day of February, 2026.

_____

Paul Cunningham, FPR

Notary Public, State of Florida

Commission No: GG100673

Commission Expires: June 22, 2029

Page 110

CERTIFICATE OF REPORTER

STATE OF FLORIDA          )
                          )  SS:
COUNTY OF MIAMI-DADE      )

            I, Paul Cunningham, Florida Professional Reporter, certify that I was authorized to and did stenographically report the deposition of Nanette Dalfino, pages 1 through 112; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes to the best of my ability.

            I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

            Dated this 13th day of February, 2026.


_____

PAUL CUNNINGHAM, FPR

Page 111

FLORIDA PROFESSIONAL REPORTER

WITNESS NOTIFICATION LETTER

February 13, 2026
Nanette Dalfino
C/O: Daniel Courtney, Esquire
10800 Biscayne Blvd., Suite 700
Miami, FL 33161

In re: Nanette Dalfino vs. Carnival Corporation

U.S. Legal Support No. 7057711

The transcript of the above-referenced proceeding is now available for your review.

Please call to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a U.S. Legal Support office located nearest you.

Any corrections you wish to make to the transcript should be made on the errata sheet. Please do not write on the transcript itself.

Please complete your review within 21 days.

Sincerely,
Paul Cunningham, FPR
U.S. Legal Support, Inc.
One S.E. Third Avenue, Suite 2500
Miami, FL 33131
(305) 373-8404

cc via transcript
(Cooper Jarnagin, Esq.)

Page 112

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

IN RE: ( Nanette Dalfino vs. Carnival Corporation )

(Nanette Dalfino)

(1-27-2026)

Page #   Line #    Correction

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts stated
in it are true.


_____        _____
Date                                      Nanette Dalfino

# Carnival®

DEFENDANT'S
EXHIBIT
1
1-27-26

MS NANNETTE DALFINO

| | |
|---|---|
| Ship: | CARNIVAL VENEZIA |
| Cabin: | 9205 |
| Booking Number: | Z7X8H4 |

| | |
|---|---|
| Cabin Section: | 45 |
| Sail Date: | 06/10/2024 |
| Printed On: | 08/06/2024 01:47:36 PM |
| Page: | 1 of 4 |

### ACCOUNT #72834

Folio 62745        *MS NANNETTE DALFINO
                   ( * Responsible party)

| Date | Time | Location/Description | Folio | Charges | Credits |
|---|---|---|---|---|---|
| 06/10/2024 | 11:04 AM | CASINO COMP ON US PREMIUIM - CASINO BAR | 62745 | $0.00 | |
| 06/10/2024 | 11:13 AM | REFUND TAXES, FEES & PORT EXPENSES | 62745 | | $8.66 |
| 06/10/2024 | 04:16 PM | CARNAVALE BAR | 62745 | $9.52 | |
| 06/10/2024 | 05:16 PM | CHAT PLAN | 62745 | $5.00 | |
| 06/10/2024 | 08:01 PM | MARCO POLO REST | 62745 | $0.00 | |
| 06/10/2024 | 10:50 PM | THEATRE ROSSO BAR | 62745 | $0.00 | |
| 06/10/2024 | 10:50 PM | ADDITIONAL THEATRE ROSSO BAR GRATUITIES | 62745 | $2.00 | |
| 06/11/2024 | 01:13 AM | ON US PREMIUM - CASINO BAR | 62745 | $0.00 | |
| 06/11/2024 | 04:55 AM | WINNER CLUB ACTIVITY | 62745 | $20.00 | |
| 06/11/2024 | 11:04 AM | ON US PREMIUM - SOUTHRN LS STBD SVC | 62745 | $0.00 | |
| 06/11/2024 | 07:11 PM | ON US PREMIUM - THEATRE ROSSO BAR | 62745 | $0.00 | |
| 06/11/2024 | 09:24 PM | ON US PREMIUM - LIMELIGHT LOUNGE | 62745 | $0.00 | |
| 06/11/2024 | 09:24 PM | ADDITIONAL LIMELIGHT LOUNGE GRATUITIES | 62745 | $1.00 | |
| 06/12/2024 | 10:22 AM | ON US PREMIUM - COFFEE SHOP | 62745 | $0.00 | |
| 06/12/2024 | 11:08 AM | ON US PREMIUM - SOUTHRN LS STBD SVC | 62745 | $0.00 | |
| 06/12/2024 | 02:02 PM | ON US PREMIUM - CARNAVALE BAR | 62745 | $0.00 | |
| 06/12/2024 | 03:58 PM | MEDICAL | 62745 | $157.80 | |
| 06/12/2024 | 04:15 PM | ON US PREMIUM - COFFEE SHOP | 62745 | $0.00 | |
| 06/12/2024 | 06:06 PM | ON US PREMIUM - IL VIAGGIO BAR | 62745 | $0.00 | |
| 06/12/2024 | 06:15 PM | CUCINA DEL CAPITANO | 62745 | $0.00 | |
| 06/12/2024 | 06:15 PM | ADDITIONAL CUCINA DEL CAPITANO GRATUITIES | 62745 | $10.00 | |
| 06/13/2024 | 09:07 AM | ON US PREMIUM - COFFEE SHOP | 62745 | $0.00 | |
| 06/13/2024 | 07:43 PM | MARCO POLO SERV BAR | 62745 | $0.00 | |
| 06/13/2024 | 07:49 PM | MARCO POLO REST | 62745 | $0.00 | |
| 06/14/2024 | 02:24 PM | ON US PREMIUM - CARNAVALE BAR | 62745 | $0.00 | |
| 06/14/2024 | 02:43 PM | ON US PREMIUM - CARNAVALE BAR | 62745 | $0.00 | |
| 06/14/2024 | 06:34 PM | ON US PREMIUM - STEAKHOUSE BAR | 62745 | $0.00 | |
| 06/14/2024 | 06:35 PM | ON US PREMIUM - STEAKHOUSE BAR | 62745 | $0.00 | |
| 06/14/2024 | 06:35 PM | ADDITIONAL STEAKHOUSE BAR GRATUITIES | 62745 | $7.00 | |
| 06/14/2024 | 06:46 PM | THE POINT STEAKHOUSE | 62745 | $0.00 | |
| 06/14/2024 | 08:07 PM | ON US PREMIUM - STEAKHOUSE BAR | 62745 | $0.00 | |
| 06/14/2024 | 10:00 PM | ON US PREMIUM - VENEZIA LOBBY BAR | 62745 | $0.00 | |
| 06/15/2024 | 08:39 AM | COFFEE SHOP | 62745 | $0.00 | |
| 06/15/2024 | 05:18 PM | BR VIKING PROD | 62745 | $24.00 | |
| 06/15/2024 | 05:30 PM | HALF MOON CAY BAR | 62745 | $2.95 | |
| 06/15/2024 | 05:30 PM | ADDITIONAL HALF MOON CAY BAR GRATUITIES | 62745 | $1.00 | |

CCL000011

# Carnival®

| | | | | | |
|---|---|---|---|---|---|
| MS NANNETTE DALFINO | | | Cabin Section: | 45 | |
| Ship: | CARNIVAL VENEZIA | | Sail Date: | 06/10/2024 | |
| Cabin: | 9205 | | Printed On: | 08/06/2024 01:47:36 PM | |
| Booking Number: | Z7X8H4 | | Page: | 2 of 4 | |

| Date | Time | Location/Description | Folio | Charges | Credits |
|---|---|---|---|---|---|
| 06/15/2024 | 07:58 PM | MARCO POLO REST | 62745 | $0.00 | |
| 06/15/2024 | 07:59 PM | ON US PREMIUM - MARCO POLO SERV BAR | 62745 | $0.00 | |
| 06/16/2024 | 12:48 AM | ON US PREMIUM - CASINO BAR | 62745 | $0.00 | |
| 06/16/2024 | 02:35 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 02:38 AM | WINNER CLUB ACTIVITY | 62745 | $100.00 | |
| 06/16/2024 | 02:43 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 02:47 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 02:50 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 02:52 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 02:54 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 02:56 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 03:01 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 03:04 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 05:06 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 05:11 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 05:30 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 05:48 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 05:50 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 05:54 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 06:01 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 06:04 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 06:06 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 08:00 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 08:30 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/16/2024 | 09:21 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 09:26 AM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/16/2024 | 12:13 PM | ON US PREMIUM - MARCO POLO SERV BAR | 62745 | $0.00 | |
| 06/16/2024 | 02:03 PM | GRATUITIES FOR YOUR TEAM MEMBERS | 62745 | $144.00 | |
| 06/16/2024 | 02:31 PM | GONDOLA BAR | 62745 | $0.00 | |
| 06/16/2024 | 03:57 PM | ON US PREMIUM - COFFEE SHOP | 62745 | $0.00 | |
| 06/16/2024 | 07:54 PM | MARCO POLO REST | 62745 | $0.00 | |
| 06/17/2024 | 08:41 AM | ON US PREMIUM - COFFEE SHOP | 62745 | $0.00 | |
| 06/17/2024 | 12:09 PM | ON US PREMIUM - CASINO BAR | 62745 | $0.00 | |
| 06/17/2024 | 01:02 PM | WINNER CLUB ACTIVITY | 62745 | $100.00 | |
| 06/17/2024 | 01:05 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 01:14 PM | ON US PREMIUM - CASINO BAR | 62745 | $0.00 | |
| 06/17/2024 | 01:35 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 01:38 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 02:04 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 02:55 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 02:58 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |

CCL000012

# Carnival®

MS NANNETTE DALFINO

| | | |
|---|---|---|
| Ship: | CARNIVAL VENEZIA | |
| Cabin: | 9205 | |
| Booking Number: | Z7X8H4 | |

| | | |
|---|---|---|
| Cabin Section: | 45 | |
| Sail Date: | 06/10/2024 | |
| Printed On: | 08/06/2024 01:47:36 PM | |
| Page: | 3 of 4 | |

| Date | Time | Location/Description | Folio | Charges | Credits |
|---|---|---|---|---|---|
| 06/17/2024 | 03:08 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 03:11 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 03:16 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 03:19 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 03:21 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 03:30 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 04:52 PM | MEDICAL | 62745 | $77.84 | |
| 06/17/2024 | 07:50 PM | MARCO POLO REST | 62745 | $0.00 | |
| 06/17/2024 | 10:48 PM | WINNER CLUB ACTIVITY | 62745 | $100.00 | |
| 06/17/2024 | 10:51 PM | WINNER CLUB ACTIVITY | 62745 | $100.00 | |
| 06/17/2024 | 10:53 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 10:56 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:10 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:13 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:16 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:20 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:21 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:24 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:26 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 11:29 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 11:31 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 11:33 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:39 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:41 PM | WINNER CLUB ACTIVITY | 62745 | $100.00 | |
| 06/17/2024 | 11:48 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/17/2024 | 11:53 PM | WINNER CLUB ACTIVITY | 62745 | $200.00 | |
| 06/17/2024 | 11:59 PM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/18/2024 | 12:11 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/18/2024 | 12:24 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/18/2024 | 12:26 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/18/2024 | 12:29 AM | WINNER CLUB ACTIVITY | 62745 | $150.00 | |
| 06/18/2024 | 08:08 AM | MEDICAL | 62745 | | $77.84 |
| 06/18/2024 | 08:09 AM | MEDICAL | 62745 | $38.92 | |

| | | | |
|---|---|---|---|
| TOTAL CHARGES | | $9901.03 | $86.50 |
| SETTLE TO NANNETTE DALFINO'S CARD MSTR 0810 | | $3631.61 | |
| SETTLE TO NANNETTE DALFINO'S CARD VISA 3620 | | $1644.00 | |
| SETTLE TO NANNETTE DALFINO'S CARD MSTR 2555 | | $4538.92 | |

CCL000013

# Carnival®

MS NANNETTE DALFINO

| | | | |
|---|---|---|---|
| Ship: | CARNIVAL VENEZIA | Cabin Section: | 45 |
| Cabin: | 9205 | Sail Date: | 06/10/2024 |
| Booking Number: | Z7X8H4 | Printed On: | 08/06/2024 01:47:36 PM |
| | | Page: | 4 of 4 |



Earn 20,000 FunPoints® after your first purchase or balance transfer. That's enough [FunPoints®] to redeem for a $200 statement credit towards your next cruise. Apply online at CarnivalFunpoints.com/3513

* No internet purchase is required when connected to the ship's Wi-Fi
* Please see Terms and Conditions available online. Offer subject to credit approval.

THIS IS YOUR BILL AS OF THE TIME STAMPED ABOVE.  IF YOU HAVE A CREDIT CARD ON FILE WITH US, NO NEED TO CHECK OUT AT GUEST SERVICES.  ON EMBARKATION DAY, A BANK HOLD OF $100 TO $200 (DEPENDING ON CRUISE LENGTH) IS PLACED ON ALL CREDIT AND DEBIT CARD ACCOUNTS TO VERIFY THAT THE CARD WAS VALID. AS MONEY IS SPENT THROUGHOUT YOUR CRUISE, ADDITIONAL HOLDS ARE OBTAINED. THIS WILL RESULT IN MULTIPLE AMOUNTS BEING HELD.  ON THE DAY YOUR CRUISE RETURNS, CARNIVAL IMMEDIATELY SETTLES YOUR ACCOUNT WITH YOUR BANK FOR THE TOTAL AMOUNT OF YOUR ONBOARD EXPENSES. IMPORTANT: HOLDS WILL REMAIN ON YOUR ACCOUNT FOR ONE OR MORE DAYS DEPENDING ON YOUR ISSUING BANK'S HOLD POLICY, LIMITING YOUR ACCESS TO FUNDS. DEBIT CARD HOLDERS: THE AMOUNT SPENT ON YOUR SAIL & SIGN ACCOUNT PLUS ANY BANK HOLDS PROCESSED WILL BE DEDUCTED FROM YOUR AVAILABLE FUNDS. YOUR BANK IS RESPONSIBLE FOR RELEASING ANY PENDING HOLDS FROM YOUR ACCOUNT. CARNIVAL IS NOT ABLE TO EXPEDITE THE RELEASE OF BANK HOLDS. PLEASE CONTACT YOUR BANK FOR ASSISTANCE. IF THERE ARE MORE THAN $10 OF UNUSED FUNDS FROM YOUR CASH DEPOSIT, WE WILL MAIL A REFUND CHECK TO YOUR ADDRESS ON FILE. UNUSED FUNDS OF LESS THAN $10 WILL BE DONATED TO ST. JUDE CHILDREN'S RESEARCH HOSPITAL UNLESS OTHERWISE CLAIMED.

CCL000014

# Movement Detail



| Passenger Name | Crew ID | Stateroom | DOB | Age | ID Type | Booking Number | Nationality | Gender | Department | Position | Contact | Activity | Seq | Port | Type | Device Name | User | Gangway Location | DateTime | Passenger Type | Emergency Contact | Emergency Relationship | Emergency Name | Voyage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DALFINO, NANNETTE | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | ON | 1 | MANHATTAN, NEW YORK CITY, NY | EZSCAN | NYC EZ BOARD 6 | NYC62 | (Embarkation) Guest Port Services | 6/10/2024 11:42:01 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | OFF | 1 | AMBER COVE, DOMINICAN REPUBLIC | EZSCAN | VXSECEZ09 | 566811 | Deck 0 Marshaling Area Aft Port Side | 6/13/2024 10:32:16 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | ON | 1 | AMBER COVE, DOMINICAN REPUBLIC | EZSCAN | VXSECEZ09 | 560515 | Deck 0 Marshaling Area Aft Port Side | 6/13/2024 4:17:53 PM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | OFF | 1 | GRAND TURK | EZSCAN | VXSECEZ10 | 566805 | Deck 0 Marshaling Area Aft Starboard Side | 6/14/2024 8:15:49 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | ON | 1 | GRAND TURK | EZSCAN | VXSECEZ04 | 446188 | Deck 0 Forward Gangway Port Side | 6/14/2024 1:43:57 PM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | OFF | 2 | HALF MOON CAY, THE BAHAMAS | EZSCAN | VXSECEZ11 | 441307 | Deck 0 Marshaling Area Aft Port Side | 6/15/2024 10:08:36 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | ON | 1 | HALF MOON CAY, THE BAHAMAS | EZSCAN | VXSECEZ13 | 446188 | Deck 0 Marshaling Area Aft Starboard Side | 6/15/2024 3:11:50 PM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 09/04/1971 | 52 | P | Z7X8H4 | US | F | | | 9175607278 | OFF | 1 | MANHATTAN, NEW YORK CITY, NY | EZSCAN | VXSECEZ12 | 590099 | Deck 3 Guest Embarkation Forward Starboard Side. | 6/18/2024 8:43:50 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| INNELLA, GIOVANNA | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | ON | 1 | MANHATTAN, NEW YORK CITY, NY | EZSCAN | BCN EZ BOARD 5 | NYC93 | (Embarkation) Guest Port Services | 6/10/2024 11:43:15 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | OFF | 1 | AMBER COVE, DOMINICAN REPUBLIC | EZSCAN | VXSECEZ13 | 569140 | Security Services | 6/13/2024 10:30:19 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | ON | 1 | AMBER COVE, DOMINICAN REPUBLIC | EZSCAN | VXSECEZ09 | 560515 | Deck 0 Marshaling Area Aft Port Side | 6/13/2024 4:08:39 PM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | OFF | 1 | GRAND TURK | EZSCAN | VXSECEZ10 | 566805 | Deck 0 Marshaling Area Aft Starboard Side | 6/14/2024 8:15:02 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | ON | 1 | GRAND TURK | EZSCAN | VXSECEZ02 | 446188 | Deck 0 Forward Gangway Starboard Side | 6/14/2024 1:36:15 PM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | OFF | 1 | HALF MOON CAY, THE BAHAMAS | EZSCAN | VXSECEZ11 | 441307 | Deck 0 Marshaling Area Aft Port Side | 6/15/2024 10:08:22 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | ON | 2 | HALF MOON CAY, THE BAHAMAS | EZSCAN | VXSECEZ10 | 543180 | Deck 0 Marshaling Area Aft Port Side | 6/15/2024 3:11:52 PM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |
| | | 9205 | 02/04/1969 | 55 | P | Z7X8H4 | US | F | | | 7188664811 | OFF | 1 | MANHATTAN, NEW YORK CITY, NY | EZSCAN | VXSECEZ12 | 590099 | Deck 3 Guest Embarkation Forward Starboard Side. | 6/18/2024 8:43:56 AM | Guest | 9175607193 | SPOUSE | DALFINO, ANGELO | VX20240610008 |

DEFENDANT'S EXHIBIT
2 RC
1-27-26

CCL000017



DEFENDANT'S EXHIBIT 3 PG__ 1-27-26   tabbies.





Carnival Cruise Lines

*Carnival*

Comment Details for Booking Number - Z7X8H4 StateRoom - 9205

| Comment By | Comment Time | Case-ID | Guest Name | Comment Type | Comment |
|---|---|---|---|---|---|
| Ronald Brian Mogol | 21/Jun/2024 05.08 PM | CORR-SS-VX-06212024-1027 | NANNETTE DALFINO | Issue Identification | Nannette Dalfino wi two credit cards that she used on the ship was charged two of the same amounts of 4538.92 USD. Booking Number : Z7X8H4 Email Address : ndalfino@aol.com Ship : Carnival Venezia Sail Date : Jun 10, 2024 |
| Ronald Brian Mogol | 21/Jun/2024 05.08 PM | CORR-SS-VX-06212024-1027 | NANNETTE DALFINO | Issue Resolution | Last 4 digit MSTR 0810, VISA 3620, and MSTR 2555 NOT verified. Attached S&S as file. Will send the S&S once info are received. |
| Ronald Brian Mogol | 21/Jun/2024 05.08 PM | CORR-SS-VX-06242024-1006 | NANNETTE DALFINO | Issue Identification | Nannette Dalfino wi two credit cards that she used on the ship was charged two of the same amounts of 4538.92 USD. Booking Number : Z7X8H4 Email Address : ndalfino@aol.com Ship : Carnival Venezia Sail Date : Jun 10, 2024 |
| Ronald Brian Mogol | 21/Jun/2024 05.08 PM | CORR-SS-VX-06242024-1006 | NANNETTE DALFINO | Issue Resolution | Last 4 digit MSTR 0810, VISA 3620, and MSTR 2555 NOT verified. Attached S&S as file. Will send the S&S once info are received. |
| Ronald Brian Mogol | 24/Jun/2024 11.27 AM | CORR-SS-VX-06242024-1006 | NANNETTE DALFINO | Issue Identification | Nannette Dalfino wi verified last 4 digits 2555. The gst mentioned that there is another pending charge on her credit card for $1,100.00. |
| Ronald Brian Mogol | 24/Jun/2024 11.28 AM | CORR-SS-VX-06242024-1006 | NANNETTE DALFINO | Issue Resolution | Last 4 digit MSTR 2555 verified. Attached S&S as file. S&S sent. |
| Ronald Brian Mogol | 22/Jun/2024 12.10 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | File | Original-email.eml |
| Ronald Brian Mogol | 24/Jun/2024 11.29 AM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | EmailAttachment | Final Sail and Sign Statement |
| Ronald Brian Mogol | 24/Jun/2024 11.32 AM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | Correspondence | N/A |
| Ronald Brian Mogol | 21/Jun/2024 08.12 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | File | Original-email.eml |
| Ronald Brian Mogol | 21/Jun/2024 05.09 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | File | Original-email_IC-SS-06212024-85 |
| Ronald Brian Mogol | 21/Jun/2024 05.09 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | File | 72834 |
| Ronald Brian Mogol | 21/Jun/2024 05.11 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | Correspondence | N/A |
| Ronald Brian Mogol | 21/Jun/2024 05.20 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | File | Original-email.eml |
| Ronald Brian Mogol | 21/Jun/2024 05.08 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | Issue Identification | Nannette Dalfino wi two credit cards that she used on the ship was charged two of the same amounts of 4538.92 USD. Booking Number : Z7X8H4 Email Address : ndalfino@aol.com Ship : Carnival Venezia Sail Date : Jun 10, 2024 |
| Ronald Brian Mogol | 21/Jun/2024 05.08 PM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | Issue Resolution | Last 4 digit MSTR 0810, VISA 3620, and MSTR 2555 NOT verified. Attached S&S as file. Will send the S&S once info are received. |
| Ronald Brian Mogol | 24/Jun/2024 11.27 AM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | Issue Identification | Nannette Dalfino wi verified last 4 digits 2555. The gst mentioned that there is another pending charge on her credit card for $1,100.00. |
| Ronald Brian Mogol | 24/Jun/2024 11.28 AM | SSRS-SS-VX-06212024-16 | NANNETTE DALFINO | Issue Resolution | Last 4 digit MSTR 2555 verified. Attached S&S as file. S&S sent. |
| Johan Gomez | 12/Jun/2024 04.37 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | File | TLC |
| Johan Gomez | 12/Jun/2024 12.45 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Issue Identification | Guest slipped downstairs by the Lido, whilst going to the guest area by the midship, guest stated that she's feeling some pain, but was concerned of the fees to visit the medical center. |
| Johan Gomez | 12/Jun/2024 12.51 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | Medical assistance offered, guest shall visit the medical center by 15:00 today, Security advised to further investigate, as per guest, incident took place around 10:35am. |
| Johan Gomez | 12/Jun/2024 04.10 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | Unable to reach out to gst, VM left, shall check back with gst yet another time, later on the day. |
| Tejashree Thool | 12/Jun/2024 04.39 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | TLC was sent to SR. |
| Nozipho Sibanda | 12/Jun/2024 05.23 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | Gst at GSD. As per gst her shoulder is hurting. Gst wanted to know about the cause of the accident as she does not want to incur medical bills. Gst stating it was caused by the staircase which had a loose part at the top. Gst showed picture. GSA went to check with gst to check. SO and AHKM were present at the staircase deck 10 fwd. Staircase was being put back in place on small loose part. Gst was advised she will be updated. Email tasked out. |
| Nozipho Sibanda | 12/Jun/2024 06.41 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | Follow up call placed to advise gst to pass by GS and speak to SO regarding incident report. No response. VM left. |
| Irene Geronimo Sarzaba | 13/Jun/2024 10.40 AM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | GSA placed a TLC call, no answer. VM left. To inquire on gst well being. |
| Alejandro Ramio James Jaramillo | 14/Jun/2024 09.33 AM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | A TLC call was made with no success. VM left . |
| Alejandro Ramio James Jaramillo | 15/Jun/2024 10.38 AM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | A TLC call was made with no success. VM left . Gst is offboard. |
| Johan Gomez | 15/Jun/2024 03.37 PM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | A TLC call was made with no success. Yet another VM left . |
| Sharon Coutinho | 16/Jun/2024 10.06 AM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Pause For Investigation | TLC call given, GST mentioned she was doing fine, no further assistance needed |
| Sharon Coutinho | 16/Jun/2024 10.06 AM | SILP-SB-VX-06122024-2 | NANNETTE DALFINO | Issue Resolution | Nothing Further SC |
| Johan Gomez | 12/Jun/2024 12.51 PM | I-SB-VX-06122024-13 | NANNETTEDALFINO | WrapUp Comments | N/A |
| Maurice Vega | null | I-SS-08062024-50 | NANNETTEDALFINO | WrapUp Comments | N/A |

DEFENDANT'S EXHIBIT

tabbies

4    PC

1-27-26

CCL000041

8/6/2024 1/2 Generated By ICare Application

| iCare application account | 21/Jun/2024 05.12 PM | IC-SS-06212024-85 | NANNETTEDALFINO | WrapUp Comments | N/A |
| iCare application account | 21/Jun/2024 09.57 AM | IC-SS-06212024-85 | NANNETTE DALFINO | File | Original-email.eml |

CCL000042

8/6/2024 2/2 Generated By ICare Application

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**MIAMI DIVISION**

Case No.: 1:25-cv-22602-RUIZ/Louis

At Law and in Admiralty

NANETTE DALFINO,

      Plaintiff,

vs.

CARNIVAL CORPORATION,

      Defendant.

_____/



**PLAINTIFF'S ANSWERS TO DEFENDANT'S INITIAL INTERROGATORIES**

    COMES NOW the Plaintiff, NANETTE DALFINO, by and through her undersigned counsel, hereby answers Defendant, CARNIVAL CORPORATION's Initial Interrogatories as follows:

1. What is the name and address of the person answering these interrogatories, and if applicable, the person's official position or relationship with the party to whom the interrogatories are directed?

    **Answer:** Nannette Theresa Dalfino, ███████████████████████ self.

2. State all addresses where you have lived for the past ten (10) years and the dates lived at each address.

████████████████████████████████████

3. Were you suffering from any physical infirmity, disability or sickness within one (1) month prior to the subject Cruise? If so, what was the nature of the infirmity, disability, or sickness and for how long of a period of time had it persisted? If treatment was sought, please state the name, present or last known address and telephone number of the attending physician and/or medical center which provided treatment.

    **Answer:** I was not suffering from any physical infirmity, disability or sickness within one (1) month prior to the subject cruise.

1

4. Describe in detail, each act or omission on the party of any party to this lawsuit that you contend constituted negligence that was a contributing legal cause of the incident in question, including but not limited to, exactly what you contend that the shipboard medical staff should have done during the time period in question in order to have met the applicable standard of care.

**Answer:** The defendant, servants, agents and/or employees failed in its ownership, operation, control, maintenance, management and repair of their cruise ship, more particularly its ship known as The Venezia (hereinafter referred to as "cruise ship") in that they failed to repair/replace the broken/lifted rubber nosing on the steps of the staircases within its cruise ship; failing to maintain the staircase steps of its cruise ships; in allowing the rubber nosing on the steps of the staircases within its cruise ship to remain broken/lifted for an unreasonable amount of time; in allowing the steps of the staircases on their cruise ship to become wet; in allowing the steps to remain wet for an unreasonable amount of time; in failing to attempt to eliminate and/or reduce the water gathered on the carpets of their cruise ship, more particularly the steps of its staircases; in allowing for a dangerous and hazardous condition to remain on its cruise ship; in failing to repair dangerous and hazardous conditions on its cruise ship; in failing to warn of the dangerous condition; in failing to offer x-ray testing to plaintiff; in failing to report the subject incident to the security office of its cruise ship.

5. Describe in detail all actions taken by you, your family member(s) and/or your traveling companion(s) to prevent the incident.

**Answer:** I took every precaution within my power to keep myself safe and free of mishaps/accidents while on the subject cruise ship.

6. Did you consume any alcoholic beverage or take any drugs or medications within 12 hours before the time of the incident described in the complaint? If so, state the type and amount of alcoholic beverages, drugs, or medication which were consumed, and when and where you consumed them.

**Answer:** Objection, irrelevant, overbroad, invades privacy rights of Plaintiff. Without waiving said objections, I did not take any alcohol or illegal drugs, or any medications that would affect my ability to function normally.

7. State the names, addresses and telephone numbers of all witnesses who have knowledge of any matters concerning this case, and for each such witness, provide a summary of his/her knowledge.

**Answer:** I am aware of the following witnesses:

Rosemarie Montefusco, 480 Bara Street, Brick, New Jersey 08723. She has knowledge of the subject incident and my damages.

Diane Dady, 40 Calvert Avenue, Ronkonkoma, New York 11779. She has knowledge of the subject incident and my damages.

2

8. Have you heard or do you know about any statement or remark made by or on behalf of any party to this lawsuit concerning any issue in this lawsuit? If so, state the name and address of each person who made the statement or statements, the name and address of each person who heard it, and the date, time and substance of each statement.

**Answer:** I was told by a security guard, name unknown, that the doctor's office was the entity that would make the determination as to whether or not an official report of the accident would be taken.

9. Describe each injury for which you are claiming damages in this case, specifying the part of the body that was injured; and, as to any injuries you contend are permanent, the effects on your injury that you claim are permanent.

**Answer:** As a result of the subject fall, I have suffered the following injuries:

**Right Shoulder**
Arthroscopy, Debridement, Bursectomy, Synovectomy and Chondroplasty;
Rotator Cuff Tear;
Labral Tear;
Glenohumeral Chondral Injury;
Post-Traumatic Bursitis;
Post-Traumatic Synovitis;
Supraspinatus Tendinosis with low-grade interstitial tear in the critical zone;
Infraspinatus Tendinosis;
Subscapularis Tendinosis;
Thickening Of The Inferior Glenohumeral Ligament which can be seen with adhesive capsulitis or scarring from tear;
Capsular Hypertrophy and Synovitis at the margins of the acromioclavicular joint, the acromion has a lateral downslope;
Subacromial/Subdeltoid Bursitis;
Right Shoulder Derangement;
Pain, Tenderness And Restriction Of Movement;

**Left Wrist/Hand**
Traumatic Volar Instability Of Distal Radial Ulnar Joint (Druj);
Basal Joint Radial Instability;
Midcarpal Instability, Positive Midcarpal Shift Test;
Tear Of The Radial Attachment Of The Triangular Fibrocartilage Complex (Tfcc);
Tear Of The Lunotriquetral Ligament;
Prominent Ganglion Cyst Volar To The Radius/Scaphoid Joint;
Tendinosis Of The Extensor Carpi Ulnaris Tendon In The
Ulnar Styloid Groove;
Tenosynovitis of the First Extensor Compartment Compatible with Mild Dequarvain's Tenosynovitis;
Tenosynovitis Of The Extensor Carpi Radialis Brevis And Longus Tendons;
Bowing Of The Flexor Retinaculum With Increased Signal To Median Nerve, which can be seen with Carpal Tunnel Syndrome;
Dysfunction Of Median, Ulnar, And Radial Nerve;
Dysfunction At The Trapezial Area Of The Left Wrist;

3

Positive Tinels Test At Superficial Radial Nerve At The
Juncture And Middle-Thirds Of The Forearm;
Positive Tinels Test At Dorsal Branch Of The Ulnar Nerve;
Ulnar Neuropathy;
Injection Into Midcarpal Joint;
Numbness And Paresthesias In The Distribution Of The
Superficial Radial Nerve;
Numbness In The Distribution Of The Dorsal Branch Of The
Left Ulnar Nerve;
Painful Clicking And Clunking;
Pain, Tenderness, Weakness And Restriction Of Movement;
Significant Loss Of Grip And Pinch Strength;
Traumatic Sprain;
Traumatic Sprain Of The Basal Joint;
Use Of Splint/Brace/Widget;

**Coccyx/Tailbone**
Non-Displaced Fracture Of The Second Coccygeal Segment;
Sacrococcygeal Disorders;
Pain, Tenderness And Restriction Of Movement;

**Left Hip**
Tear Of The Anterior Superior Labrum;
Left Greater Trochanteric Bursitis;
Cartilage Loss And Marrow Edema In The Anterior Superior Acetabulum;
Pain, Tenderness And Restriction Of Movement;

**Lumbar Spine**
Three Lumbar Epidural Sterior Injections With Epidurogram
L1-2 Central Herniation With Thecal Sac Impingement;
L2-3 Broad-Based Disc Herniation With Annular Tear With Thecal Sac
Impingement with a Bilateral Foraminal Impingement;
L4-5 Right And Left Foraminal Herniation With Bilateral Impingement More
Prominent Left On The Right;
L5-S1 Central Herniation With Annular Tear With Thecal Sac Impingement and
Disc Bulge With Bilateral Foraminal Impingement;
T-11-12 And T12-L1 Left Paracentral Herniation With Thecal Sac Impingement;
Urinary Urge Incontinence Requiring Use Of Adult Diapers;
Radiculopathy;
Dyspareunia – Painful Sexual Intercourse;
Pain, Numbness And Tingling In Both Legs;
Spasms;
Pain, Tenderness And Restriction Of Movement.

10. Have you ever been injured from any medical problems in the same area of his
body that you identified in Interrogatory No. 9 above? If so, list the areas, injuries
or problems, when the injuries occurred, and when those problems first arose
and reason/cause for same?

**Answer:** I am claiming an exacerbation and worsening of a prior injury to my

4

back.  I was involved in a motor vehicle accident on May 18, 2013 wherein my motor vehicle was struck in the rear end by another motor vehicle that was initially struck by another motor vehicle.

11. List the names and business addresses of each physician, medical facility or other health care provider who has treated or examined you for the injuries for which you seek damages in this case; and state as to each the date of treatment or examination and the injury or condition for which you were examined or treated and whether you have any pending appointments.

**Answer:** I have been treated by the following providers as a result of the subject incident.

Carnival *Venezia* Medical Center

Dr. Maxim Tyorkin, 116-15 Queens Boulevard, Forest Hills, N.Y. 11373
Injuries: Right Shoulder, Left Wrist, Left Hip and Back
Medical treatment from 7/3/2024 to present and is ongoing on a follow-up basis

Joshua T. Mitgang, M.D., 444 Merrick Rd, Lynbrook, NY 11563
Injuries: Examined me after incident and gave me a shot in my right shoulder.

Best Care PT & Chiro, PLLC., 116-15 Queen Boulevard, Forest Hills, N.Y. 11373
Injuries: Right Shoulder, Left Wrist, Left Hip and Back
Medical treatment was terminated due to my move to Long Island, N.Y. on 4/15/25

Dr. Fenig, Triboro Spine & Joint Medicine, 305 7th Avenue, N.Y., N.Y. 10001
Injuries: Back – Lumbar Spine
Medical treatment from 11/21/24 to present and is ongoing

Dr. S. Leonard Edelstein, 176-60 Union Turnpike, Fresh Meadows, N.Y. 11366
Injuries: Left Wrist
Medical treatment from October 9, 2024 to June 25, 2025

Dr. Ignatius Roger, 28-25 Jackson Avenue, Long Island City, N.Y. 11101
Injuries: Left Wrist
Medical treatment from September 24, 2025 and is ongoing

Lenox Hill Radiology, 88-12 Queens Boulevard, Elmhurst, N.Y. 11373
Injuries: Right Shoulder, Left Wrist, Left Hip, Pelvis and Back
Medical treatment on July 15, 2024, August 20, 2024 and September 21, 2024

Dr. Jadie De Tolla, NYU Langone Ambulatory Care Bay Ridge, 6740 4th Ave, Brooklyn, NY 11209.

Orthoflex Physical Therapy, 158-03 91st St, Howard Beach, NY 11414.

Fifth Avenue Surgery Center, 305 East 47th St, New York, NY 10017.

5

12. List the name and business addresses of all other physicians, medical facilities or other health care providers by whom or at which you have been examined or treated in the past ten (10) years; and state as to each the dates of examination or treatment and the condition or injury for which you were examined or treated.

**Answer:** Objection, irrelevant, overbroad, not properly limited in time and/or scope.

13. List the names and addresses of all pharmacies where you had prescriptions filled in the past ten (10) years.

**Answer:** I filled my prescriptions relating to the aforementioned injuries at Walgreens, 80-11 Eliot Avenue, Middle Village, N.Y. 11379.

14. List the names and addresses, and policy numbers of any and all entities that you have received health insurance benefits, disability benefits, social security, and similar benefits, including any health insurance companies for which you have been insured during the past ten (10) years.

**Answer:** My medical insurance is Magnacare, PO Box 1001, Garden City, N.Y. 11530.

15. If there is any activity that you are totally unable to do now, because of the alleged injury sustained in the incident alleged in the Complaint that you could do before the incident in suit? If so, described each such activity.

**Answer:** I am unable to do the following due to pain or restricted movement:

Walk/Run distances;
Sleep a full night without waking up due to pain;
Sit for a long time;
Fully bend my hip and back;
Fully raise my right arm;
Fully reach my back with my right arm;
Fully move my left wrist;
Fully squat;
Walk up more than 6 stairs without stopping;
Type without pain or weakness;
Lift heavy items;
Hold anything approximately 1 pound or more with left hand/wrist;
Have sexual relations with my husband;
Paint (Hobby);
Clean my house;
Cook without assistance;
Do laundry;
Blow dry my hair without assistance;
Opening jars, etc.

6

16. Have you made an agreement with anyone that would limit the party's liability to anyone for any of the damages sued upon in this case? If so, state the terms of the agreement and the parties to it.

    **Answer:** No.

17. List each item of expense or damage, other than loss of income or earning capacity, that you claim to have incurred as a result of the incident described in the complaint, giving for each item the date incurred, the name and business address to whom each was paid or is owed and the goods and services for which each was incurred.

    **Answer:** All medical bills which I have incurred as a result of the subject incident are being provided contemporaneously with my responses to Request for Production.

18. Do you contend that you have lost any income, benefits, or earning capacity in the past or future as a result of the incident described in the complaint? If so, state the nature of the income, benefits, or earning capacity, and the amount and the method that you used in computing the amount.

    **Answer:** I am not claiming a loss of earnings from the date of accident to the present date. I reserve my right to amend and supplement this demand prior to the time of trial.

19. Has anything been paid or is anything payable from any third party for the damages listed in your answers to these interrogatories? If so, state the amounts paid or payable, the name and business address of the person or entity who paid or owes said amounts, and which of those third parties have a right to subrogation.

    **Answer:** My medical bills for treatment with Dr. Edelstein and Dr. Roger have been paid through my medical insurance with Magnacare, PO Box 1001, Garden City, N.Y. 11530. I do not have the total amount paid at this time. Discovery is ongoing.

20. Identify all photographs or videos that were taken of you during the subject cruise, including the name of the individual(s) who took said photographs/videos and the devices said photographs/videos were taken from.

    **Answer:** I am not in possession of any photographs/videos taken of my person during the subject cruise.

21. Identify any and all social media sites or applications in which you posted any content or images to between the dates of June 10, 2024 through June 18, 2024, including but not limited to: Tik/Tok, Facebook, Twitter, Instagram, Foursquare, YouTube, Pinterest, Tumblr, and Snapchat. If any posts or social media profiles have been deleted or deactivated since June 18, 2024, identify fully what specifically has been deleted or deactivated.

7

**Answer:** None.

22. Other than a retained expert, did anyone ever criticize any manner, method, action/inaction, or activity used by the Defendant and/or the shipboard medical staff? If so, please state for each criticism: the name, address, profession and relationship to you, if any, of the person(s) who made the criticism, the substance of the criticism, and the date(s) of the criticism.

    **Answer:** My sister, Rosemarie Montefusco, 480 Bara Street, Brick, New Jersey 08723, criticized the security guard that spoke to me regarding my incident and the manner he looked at us when we went upstairs with the customer service representative. She said he should have taken a full report, he ignored what you were telling him and when we went upstairs with the customer service representative, he looked at us like he was shocked and really mad that we saw them fixing the stairs.

23. Please state whether you have ever been a party, either plaintiff or defendant, in a lawsuit, or ever made a claim for personal injuries, either out of court, or through workers compensation or any other proceedings, the nature of the injury involved, the date of the injury occurred, the county and state the injury occurred in, an identifying case number, and the name and address of the defendant or other person against whom the claim was made.

    **Answer:** I was a plaintiff in a lawsuit for personal injuries sustained to my left shoulder, back and neck as a result of a car accident which occurred on May 13, 2013 on the Long Island Expressway at 164th Street, Queens, New York. The lawsuit was commenced in the Supreme Court of the State of New York, County of Queens under index number 7073/2014. The defendant in this matter was Stephanie K. Cuoco, 27 Holiday Park Drive, Centereach, New York 11720 and Stephanie Cuoco, 5 Peacock Court, Coram, New York 11727.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY a true and correct copy of the foregoing was e-mailed this 18th day of November, 2025 to: All parties listed on the Service List below.

Respectfully submitted,

DANIEL W. COURTNEY, P.A.
10800 Biscayne Blvd.
Suite 700
Miami, Florida  33161
Telephone: (305) 579-0008
Facsimile: (305) 563-7055

By: s/ Daniel W. Courtney
Daniel W. Courtney, Esq.
Florida Bar No.: 499781

8

## SERVICE LIST

| | |
|---|---|
| **Daniel W Courtney, Esq.**<br>dc@danielcourtneylaw.com<br>Florida Bar No.: 499781<br>DANIEL W. COURTNEY, P.A.<br>10800 Biscayne Blvd., Suite 700<br>Miami, Fl 33161<br>Tel: (305) 579-0008<br>Fax: (305) 563-7055<br>*Attorney for Plaintiff* | **Michael J. Drahos, Esq.**<br>Michael.Drahos@Gray-Robinson.com<br>Florida Bar No. 0617059<br>GRAY ROBINSON, P.A.<br>515 North Flagler Drive<br>Suite 650<br>West Palm Beach, Florida 33140<br>Telephone: (561) 268-5727<br>*Co-Attorney for Defendant*<br>**W. Cooper Jarnagin, Esq.**<br>Cooper.Jarnagin@Gray-Robinson.com<br>Florida Bar No. 117767<br>GRAY ROBINSON, P.A.<br>515 North Flagler Drive<br>Suite 650<br>West Palm Beach, Florida 33140<br>Telephone: (561) 268-5727<br>*Co-Attorney for Defendant*<br>**Ashley Genoese, Esq.**<br>Ashley.Genoese@Gray-Robinson.com<br>Florida Bar No. 1019357<br>GRAY ROBINSON, P.A.<br>515 North Flagler Drive<br>Suite 650<br>West Palm Beach, Florida 33140<br>Telephone: (561) 268-5727<br>*Co-Attorney for Defendant* |

9

_____
NANETTE DALFINO

STATE OF New York          )
                           ) ss:
COUNTY OF Nassau           )

Sworn to and subscribed before me this 16th day of October, 2025, by Nannette Dalfino, who is personally known to me or who has produced NYS Drivers License as identification.

WITNESS my hand and official seal in the County and State last aforesaid this 16th day of October, 2025.

_____

PRINT NAME: Ira M. Scharaga

NOTARY PUBLIC

Commission Number: 02SC4708172

My Commission Expires: July 31, 2029

SEAL

IRA M. SCHARAGA
Notary Public, State of New York
No. 02SC4708172
Qualified in Nassau County
Commission Expires July 31, 20_29_

8





