Monica Borcegue
May 19, 2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  1:25-CV-22602-RAR
AT LAW AND IN ADMIRALTY

NANNETTE DALFINO,

        Plaintiff,

-vs-

CARNIVAL CORPORATION,

        Defendant.
_____/


        REMOTE DEPOSITION OF CARNIVAL CORPORATION
          WITNESS:  MONICA BORCEGUE
          DATE:     TUESDAY, MAY 19, 2026
          TIME:     10:06 A.M. -  3:47 P.M.


        STENOGRAPHICALLY REPORTED BY:
            JOANNE CAUDILL, FPR
        FLORIDA PROFESSIONAL REPORTER
   APPEARING REMOTELY FROM PINELLAS COUNTY, FLORIDA

Monica Borcegue
May 19, 2026

REMOTE APPEARANCES

On behalf of the Plaintiff:
DANIEL W. COURTNEY, P.A.
10800 Biscayne Boulevard
Suite 700
Miami, Florida 33161
(305)579-0008
DC@DANIELCOURTNEYLAW.COM
BY: DANIEL W. COURTNEY, ESQUIRE

On behalf of the Defendant:
GRAYROBINSON, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
(561)268-5727
COOPER.JARNAGIN@GRAYROBINSON.COM
BY:  W. COOPER JARNAGIN, ESQUIRE

- - -

Monica Borcegue
May 19, 2026

C O N T E N T S

REMOTE DEPOSITION OF MONICA BORCEGUE                  PAGE
DIRECT EXAMINATION BY MR. COURTNEY:                     4
CERTIFICATE OF OATH                                   186
CERTIFICATE OF REPORTER                               187
WITNESS NOTIFICATION LETTER                           188
Errata Sheet (to be forwarded upon execution)         189

PLAINTIFF'S EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Plaintiff's Notice of Taking Deposition | 6 |
| Exhibit 2 | Defendant's Notice of Objections | 6 |
| Exhibit 3 | ICare Notes | 23 |
| Exhibit 4 | Security Officer Watch Report | 35 |
| Exhibit 5 | Shipboard Medical Records | 61 |
| Exhibit 6 | Sail & Sign Statement | 72 |
| Exhibit 7 | Guest Statements | 75 |
| Exhibit 8 | HESS Procedures | 76 |
| Exhibit 9 | Housekeeping documents | 83 |
| Exhibit 10 | 17-page package sent by Ira Scharaga | 87 |
| Exhibit 11 | Photograph | 91 |
| Exhibit 12 | Defendant Carnival Answers to Plaintiff's Interrogatories | 105 |
| Exhibit 13 | Defendant Carnival Second Supplemental Answers to Plaintiff's Interrogatories | 107 |
| Exhibit 14 | Defendant Carnival Corporation's Second | 139 |
| Exhibit 15 | Bates Stamps 595-598 | 144 |
| Exhibit 16 | Bates Stamps 105 through 108 | 150 |
| Exhibit 17 | Bates Stamp 97 through 104 | 158 |
| Exhibit 18 | Photograph | 181 |

REMOTE DEPOSITION taken before Joanne Caudill, Florida Professional Reporter, and Notary Public in and for the State of Florida at Large in the above cause.

*****

THE COURT REPORTER:  Raise your right hand, please.

Do you solemnly swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

Thereupon,

MONICA BORCEGUE,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COURTNEY:

Q.   Good morning.

A.   Good morning.

Q.   Please tell me your name.

A.   Monica Borcegue.

Q.   And, Monica -- can I call you Monica?

A.   Absolutely.

Q.   Monica, who do you work for?

A.   Carnival Cruise Line.

Q.   What is your position with them?

A.   Guest claims manager.

Monica Borcegue
May 19, 2026

Q.   And how long have you worked for Carnival Cruise Line?

A.   It will be 20 years in September.

Q.   And how long have you been guest claims manager?

A.   About three years I want to say.  Time kind of all blends together, but I think it's been about three years.

Q.   For how long have you testified for Carnival at corporate representative depositions?

A.   Since 2011.

Q.   And so you are aware that today we're going to be here for a corporate representative deposition; is that correct?

A.   That's correct.

Q.   And we sent out a notice that contains 35 different areas of inquiry.

Have you seen that notice before?

A.   I have.

Q.   And are you the individual that Carnival has designated to speak as to each of these 35 different areas?

A.   Subject to a few objections, I am.

Q.   Okay.  And so I'm going to make the notice an exhibit to today's deposition.  It will be Exhibit 1.

Monica Borcegue
May 19, 2026

(Plaintiff's 1, Plaintiff's Notice of Taking Deposition of Defendant, Carnival Corporation, was marked for identification.)

BY MR. COURTNEY:

Q.   I notice about 2:40 p.m. or so yesterday I received objections.  I think it was maybe three -- three different objections.  Let me just look really fast.  It looked like to Nos. 29, 31, and 32.

Is that what you're referring to?

A.   Yes.

Q.   Okay.  I'll make that Exhibit 2.

(Plaintiff's 2, Defendant's Notice of Objections to Plaintiff's Notice of Taking Deposition of Defendant, Carnival Corporation, was marked for identification.)

BY MR. COURTNEY:

Q.   So can you tell me, please, subject to those objections, you're prepared to give testimony on behalf of Carnival; is that correct?

A.   Correct.

Q.   Okay.  Can you please tell me, Monica, what are your duties as guest claims manager?

A.   Sure.  So I assist in-house and outside counsel with discovery requests and research on all of the litigation cases.  So anything from prior incident

Monica Borcegue
May 19, 2026

searches to gathering documents, both shore side, from the ships, you know, anything that's needed for discovery purposes.

I also sit for corporate representative depositions, and I testify at trials when needed.

Q.   So are you involved in pre-litigation cases at all?

A.   Not really.  Unless they need something specific as far as research, I wouldn't really be involved.

Q.   How many times have you testified as a corporate representative for Carnival?

A.   At this point over 300.

Q.   And how many have you testified in the last three years?

A.   I wouldn't be able to give you an exact count. I don't keep track anymore.

Q.   Would you say it's been more than 25 per year?

A.   I would think so.

Q.   Okay.

A.   Recently, yeah, absolutely.

Q.   And have you ever testified in a case where a guest alleges that they fell down stairs?

A.   I'm sure I have.  Nothing comes to mind as far as an exact case or a name or a ship.  But I'm sure I

Monica Borcegue
May 19, 2026

have at some point.

Q.   I'm going to say that even though you've testified over 300 times -- and this is going to sound like a broken record -- I'm going to go over just a few quick rules with you.

A.   Sure.

Q.   As you know, we're here via Zoom, and so I'm going to do my best to wait until you finish your answer before I speak and I would request that, even if you know where I'm going with my questions, you wait until I finish my question before you begin your answer.  And, of course, I would also say to give your attorney an opportunity to make an objection, if he chooses to do so.

Is that fair?

A.   I'll do by best.  I'm usually really bad at that, but I will do my best.

Q.   Listen, if -- if you are bad at it, I'm just going to wag my finger at you because it doesn't make it to the record, but you'll know I'm very upset.  No, I'm just kidding.  I know it happens, and I don't take it personally.  But maybe I'll point to the court reporter or I'll make some kind of motion that we need -- we both need to be more careful.

A.   You got it.

Q.   To the extent that you answer my question, it

Monica Borcegue
May 19, 2026

will be my understanding that you understood the question that I was asking you.  And so I'm asking you, therefore, if there's any word, phrase, my voice isn't clear, if you're not a hundred percent sure that you understand what I'm asking you, please let me know and I will be happy to rephrase.

Is that clear?

A.   Yes.

Q.   To the extent that you ever want to take a break, I would ask, if there's a question pending, to first answer the question.  Or if I'm going to be done within two minutes, I'll say, "I'm just about done."  But I tend to give a break once every hour or so.  It's not a -- this isn't supposed to be more painful than it has to be.  And so if you need to either make a call or use the restroom or something, just you want to take a break, just let me know.  I'm happy to give that to you.

A.   Thank you.

Q.   You're welcome.

So how did you first find out that there was a passenger named Nannette Dalfino that was either making a claim or filed a lawsuit?  And I realize maybe it was just, you know, when the litigation started, but what do you recall in terms of how you first became aware of a passenger named Nannette Dalfino?

Monica Borcegue
May 19, 2026

A.    So are you asking me in my personal capacity because I am here to testify on behalf of Carnival so that there's a distinction there.

Q.    Sure.  Okay.  And so you know what, I'm asking both.  So let's say first, you personally, how would you first come across that name or that individual?

A.    It would be whenever, you know, research is requested for litigation purposes for discovery mainly. So at some point, once discovery is served, the attorneys will reach out to me and say, you know, here are the requests, here are the documents that we need.  So it generally is at that point when I find out, unless there's something going on before discovery is served, but I don't think that was the case here.

As far as Carnival is concerned, I mean, she -- she went to guest service on board the vessel.  So at that point in time, we knew there was an incident, and once we were served with, you know, a letter of representation, I believe from a different attorney, we would have found out shore side about this claim.  So there are different points for everybody in the company.

Q.    Yes.  And so let me ask you this:  What was your involvement personally, if any, at the time that Carnival first would have received a letter from an attorney by the name Ira Scharaga, S-C-H-A-R-A-G-A?

Monica Borcegue
May 19, 2026

A.    None at that time.  Nothing directly.  It comes to my department, but I don't -- again, I don't see things until I'm needed with, you know, discovery requests.

Q.    Generally speaking, when an attorney sends a letter of representation to Carnival for a personal injury claim on behalf of a client, what is it that Carnival does, generally speaking?

A.    So it would come in through different channels whether it comes in through the mail, e-mail, or sometimes even fax.  That's still coming in.  It would be processed through our -- first an assistant will get all of the correspondence, and then that goes into an inbox. It's a -- it's like an e-mail inbox.  We have our senior claims adjuster look at that inbox daily, and he will forward the e-mails to whoever.

So I should say the assistant either scans it in -- if it's not an e-mail, she'll scan it in.  If it's mailed or if it's faxed, she'll go ahead and she'll scan it through that inbox.  So everything becomes an e-mail.

At that point, it get distributed to the adjuster handling that vessel.  We have all of our -- our adjusters handle certain ships.  So whoever it belongs to will get that e-mail from the main claims inbox.

And then at that point, they'll start working

Monica Borcegue
May 19, 2026

the file, whether it's reaching out to the attorney or the client -- you know, the guest directly.  That's how they work it when it's not in litigation.

Q.   So the assistant who would have first gotten it, is that someone who has been in the same position for the past two years?

A.   Actually, at this point, we just had -- she retired.  So we just had somebody new take over that position maybe in the last two months or so.  But, yeah, the lady who was doing that before had been there forever.  So for the past two years, it would have been the same person, unless, of course, it was e-mailed directly to our claims inbox, and then she has no involvement.

Q.   What was the name of the individual who recently retired?

A.   Terri Abascal.

Q.   And what's the name of the individual who's now been in the position for the last two months or so?

A.   Stephanie Dalberry.

Q.   And you mentioned a senior claims adjuster who every day is looking at what's coming in.

Who is that individual today?

A.   That's Maurice Vega.

Q.   Was Maurice Vega in the same position two years

Monica Borcegue
May 19, 2026

ago?

A. Yes. He's been an adjuster for -- for a few years, I believe, like, seven or so. I don't know that the inbox has been around for two years. We kind of set that up rather recently, maybe in the last year or so. It might be two years at this point.

Q. I'm trying to think back.

A. Give or take.

Q. Yeah, I think I remember there was an e-mail maybe that went out from Ms. Vazquez saying there's, like, this new e-mail address ccllegalclaims, and I feel like it was February of 2024. I don't know if that feels right or not.

A. It might be. It might be. Like I say, time flies. So sometimes I think it's, you know, a long time ago and it's not and vice versa. So, yeah, that's what I'm talking about. It's that legal claims inbox.

Q. Who is the adjuster today that is assigned to the VENEZIA, V-E-N-E-Z-I-A?

A. Good question. I can tell you that if I can just look it up and make sure.

Q. Sure.

A. I get all my ships -- they all blend together. Everything blends together.

VENEZIA belongs to Mr. Vega, actually.

Monica Borcegue
May 19, 2026

Q.   Was Mr. Vega also the adjuster assigned to the VENEZIA back in June of 2024?

A.   I believe so.

Q.   So when he would have gotten a letter -- and I know that you may not have direct information to what he specifically did when he first got that letter.  So I accept that.

But just in terms of what you would typically expect from the adjuster for the ship in that situation, what would be his first moves once he gets the letter of rep from the attorney?

A.   So we send out an acknowledgment letter to the attorney, you know, that we've received your claim.  It's a general form letter.  And I do believe that that did go out in August of 2024.

Q.   Okay.  And --

A.   Not to your office, but to the first attorney that was representing her.

Q.   Right.

And before sending out any letter to an attorney, is an adjuster first supposed to look within Carnival's own records to see what is available?

A.   Yes.  So that's -- that's the process that we call setting up the file.  So they will do that kind of simultaneously.  Once they get the -- the letter of

Monica Borcegue
May 19, 2026

representation, they'll go ahead, they'll set up the file, look to see if we have any investigative materials, medical records from the ship, ICare, which is our guest services notes, all of that stuff, the Sail & Sign accounts.

And then they will send out the letter, you know, on that same day.  When they're working the file, they will do that.  That's, like, the initial steps that they would take.

Q.   What materials, if any, did Mr. Scharaga provide to Carnival at the time that he provided the letter of representation?

A.   I have access to the file.  I can see that it was just a letter of representation.  Let me see if there were any attachments to it.  I don't know.

I can see it was a 17-page correspondence.  There was photographs.  There was a copy of shipboard medical records that he included, and that's about it.

Q.   Was a determination made upon Carnival's receipt of that 17-page letter, package, group of documents as to whether or not an incident report was created following Ms. Dalfino's incident?

A.   So, at that time, they would look for an accident report.  I see that there isn't one in the system.

Monica Borcegue
May 19, 2026

So there was an e-mail sent out to the vessel directly requesting to see if there was any information. Sometimes -- we do that every time when we don't find it in the database because sometimes they don't upload it correctly or we can't see it on our end correctly.  So we always double-check with the vessels, just to make sure there is no accident report.

Here, I see that that was done.  The security team was contacted back in August of 2024 asking for any type of record from security.  And, at that time, the only thing available was the security watch report, which I believe you have a copy of from Security Officer Rawat. It's R-A-W-A-T.

And, at that point -- yeah, that was August 2024 -- the ship sent it, and then I'm -- it's just additional information, but it's -- I have it here -- in November of 2025, I went ahead and forwarded that e-mail just to double-check again if there was anything.  And I got an answer from the vessel that, again, the only thing available was the watch report that you have.  There's nothing else.  There was no investigation done.

Q.    What was the first date that someone from Carnival shore side contacted the ship about the 17-page package that Carnival received in June of 2024?

A.   Well, in response to that, right.  So he got the rep letter, and then he contacted the vessel just as part of regular research.  That would have been August 6, 2024.

Q.   What indication do you have whether anyone from shore side made a phone call to anyone on the VENEZIA in either June of 2024 and/or July of 2024 about Ms. Dalfino's 17-page package?

A.   A phone call, I'm not sure.  That might have been the guest care department.  I'm giving you information from our adjusters in our department, and I just realized that you did say shore side, which could be anybody shore side.  So I should make that correction.

I'm giving you information from what Maurice Vega did when he got the rep letter.  The guest services, or guest care is what we call them shore side, department might have received something first, and I do see that the attorney -- I'm going to call him Ira because the last name I'm sure --

Q.   That's fair.

A.   -- I'll butcher -- he sent something to guest care Friday, June 28, 2024, and at that point in time, the guest care person sent it over to our claims inbox June 29th, 2024, that there was a letter, you know, from the attorney and for us to handle.  Once an attorney

Monica Borcegue
May 19, 2026

contacts them, they usually forward it to our department.

Q. Are you aware of whether anyone in the guest care department did anything following their forwarding of those materials to your department on June 29, 2024?

A. I don't have any records. I don't believe so. Usually, the procedure is just to send it directly to us because they are attorney rep'd. But, you know, I -- I would have to confirm with the guest care department just to make sure that there's something that I don't see that may exist. But, generally, their procedure is they get something from an attorney and they forward it to our department.

Q. And I asked in a way about communicating or -- I was -- and I meant to include like -- if I didn't say it specifically, like phone calls anything, from Carnival shore side to the ship in June of 2024 or July of 2024.

Did anything like that happen regarding Nannette Dalfino?

A. Not from our department. Not from our department. Usually -- and you say phone calls, but usually everything is done by e-mail because it's very hard to call the ships. So I -- I don't see that there's anything from guest care.

I see that it came in from the attorney, and it was immediately forwarded to our claims inbox June 29th.

Monica Borcegue
May 19, 2026

So, you know, there is -- there is a process.  There's a delay to -- to get all these things answered.  I don't see anything from June to August, you know, as far as any e-mails or communication or anything like that.

Q.   In June of 2024, what was Carnival's policy regarding how long CCTV footage remained before it was recorded over from a ship such as the VENEZIA?

A.   It's not so much of a policy but about capacity on the cameras.  The cameras usually record over old footage every 14 days just because it's impossible to retain that much information.  So every 14 days the camera will kind of re-record over old footage.  So if it's not saved within that 14-day period, then the footage is lost.

Q.   Okay.  So my understanding was that you could be able to retrieve footage for up to 30 days, and when it came to, like, areas that involved children, that it's a longer period of time.  But is that incorrect?  It sounds like what I'm -- what I've seen, and maybe I'm confusing it with another cruise line.

But that's not correct?  You wouldn't be able to get video beyond the 14 days?

A.   No.  Our -- our cameras are 14 days.  There might be some that go up to 21 in the casino, but those are different cameras.  That's not controlled by our

Monica Borcegue
May 19, 2026

security department.  That's controlled by casino, and, you know, that -- that depends on the vessels.  But, generally, our CCTV cameras that belong to security, it's 14 days.

Q.   Okay.  In this case, there is a camera that's located above where Ms. Dalfino claims that she fell.

Is that your understanding?

A.   I believe so.  It's in the area of the Deck 10 staircase.  It would have captured the area.  That's my understanding.

Q.   Right.  That's what I was going to ask you.

Do you know what kind of camera it is in terms of what it actually captures?

A.   I'm not sure I understand the question.

Q.   Sure.

In terms of how far out it goes in either direction, is it like a bird's-eye.  Is it a specific -- like small spot or it's more wide?

A.   I'm not really sure.

Q.   Okay.

A.   I don't know.  Yeah.

Q.   Ms. Dalfino was interested in finding out what caused her fall; isn't that correct?

A.   What caused her fall or more like documenting the process?

Monica Borcegue
May 19, 2026

Q.    I would say -- go ahead.

A.    During her testimony -- I did read the testimony -- she -- during her deposition, I'd rather say, she did say that she had gone to medical, had spoken to security.  She was trying to report it to us, and she was informed that because the doctor -- it's actually policy where the doctor will call security, if the treatment goes beyond first aid, for an accident report investigation to be done.

Because she was treated just for first aid, you know, injuries that wasn't done.  So I think that then she did talk to security, and she, I guess, was interested in a report.  But it was documented through a watch report.  That's basically all that was done because, since the treatment was not above first aid, an investigation was not requested by medical.  So, you know, she did speak to guest services and security on board the vessel.  But, ultimately, an investigation was not completed.

Q.    So let me ask you this question.  I'll get back to that.  But just so I have an idea, what is it that you reviewed in preparation for your deposition?  I imagine you spoke to your attorney maybe a few times.  I don't want to know anything about those contacts.

But in terms of what you saw, whether it's

Monica Borcegue
May 19, 2026

video, photos, interrogatories, depositions, you know, ICare notes, please tell me what it is that you reviewed in preparation for this deposition today.

A.   Sure.  Well, let me start with all the discovery that was produced to your office with all the attachments.  So that was, like, 900 pages of attachments.  Within it, it's shipboard medical records for the Plaintiff.  There's ICare notes.  There are Sail & Sign statements, and then there's a lot of stuff about the -- the prior incidents that were provided as well.

I've reviewed her deposition testimony.  I've seen photographs that she took of the stairs.  I've seen the complaint and the answer in this case.  With the discovery, I think that covers a lot.  I can't really think of anything else.  If I do, I'll -- I'll let you know, but that's generally it.

Q.   Do you ever review your own testimony in other cases before you sit for a deposition?

A.   Not generally.  Unless I specifically have to do so for a reason, I wouldn't do that.

Q.   And in this case, did you review any of your previous testimony?

A.   No.

Q.   Do you ever review testimony given by other

Monica Borcegue
May 19, 2026

individuals designated by Carnival to be their corporate representative?

A.   Well, again, if there's a specific reason I have to do that for that case, I would.  In this case, I did not.

Q.   Okay.  In the ICare notes, which I will make Exhibit 3.

(Plaintiff's 3, ICare Notes, were marked for identification.)

BY MR. COURTNEY:

Q.   It would be amazing if I could find it while we're talking.  By the way, feel free to look at anything in your computer.  I will say that you will not waive any privilege.  To the extent that I may have alternative grounds down the road for a different reason to obtain something, I'm not waiving that.  But by you just sitting here and telling me something, that's not going to waive any privilege that you guys have as to work product.

A.   Okay.

Q.   Okay.  I think this is what I'm looking for.

Do you have in front of you the Comment Details?

A.   Yeah, I can pull them up.

Q.   Is that -- what do you call this?  Do you call this the Comment Details?  Do you call it the ICare

Monica Borcegue
May 19, 2026

notes?  What would you call this that I'm going to mark as Exhibit 3?

A.   ICare notes is what they're generally referred to.

Q.   Okay.  Let me know once you have it in front of you.

A.   Okay.  It's up.

Q.   Okay.  Hold on a second.  This is really -- if you go towards the middle of this first page, this is where she reports the incident; is that correct?

A.   It's kind of out of order.  The dates are out of order.  I see the entry from June 12, 2024.  It's kind of again out of order, but the first report would be 12:45 p.m.

Q.   Yes.

A.   Okay.

Q.   Do you want to just -- actually, you don't even need to read it.  But she is reporting that she slipped downstairs by the Lido; is that correct?

A.   Correct.

Q.   And it says, "Whilst going to the guest area by the midship"; is that right?

A.   Yes.

Q.   "Guest stated she's feeling some pain"; correct?

A.   Yes.

Q.   "But was concerned of the fees to visit the medical center"; is that right?

A.   Yes, that's correct.  You read it correct.

Q.   When you see that she slipped downstairs by the Lido is that Deck 10?

A.   Lido would be Deck 10 on this vessel.

Q.   And where she says she is going to the guest area by the midship, did this fall occur in the staircase that you described as midship or is it more by the forward, or which staircase is this?

A.   So Staircase 270 would be the forward.  There are three main carpeted staircases that go from the bottom to the top decks.  Staircase 270 would be considered the most forward staircase.

Q.   Got it.  Okay.

And based on reading the next note, it seems that there had been some kind of conversation about going to the medical center, and she's told that, you know, probably that she was told it's closed from 12:00 to 3:00 would be my guess and that it reopens at 3:00 p.m.  Would that be -- based on these notes, would you be saying that that's what took place there?

A.   I'm not really sure if they were open until 12:00 or if they just opened at 3:00.  They have

Monica Borcegue
May 19, 2026

different times for different days of the cruise.  It's my understanding she was told that they opened up at 3:00 p.m..  So, you know, I can see that in the notations.  It says, "Guest shall visit the medical center by 15:00 today."

Q.   Okay.  And --

A.   You know, as far as the times that they were actually opened, I wouldn't know, as I sit here today.

Q.   Can you read to me the rest of that entry?

A.   Sure.  It states, "Security" -- "security advised to further investigate, as per guest, incident took place around 10:35 a.m."

Q.   Okay.  So what is your understanding if -- well, do you know who wrote this note?

A.   The note on the first column will have the person who actually input the notes.  It would have been Johan Gomez.

Q.   And so given that he's the one -- I'm going to assume it's a male.

Given that he's the one who entered this note, does that also tell you that he would have been the one to have advised security to further investigate or would there be someone else who would have made that call or communication to security?

A.   I'm not sure if he would have tasked that to

Monica Borcegue
May 19, 2026

somebody else, if they have a specific way of doing things in guest services or if it was he himself who reached out to security.  I would just be, you know, assuming at this point.  There's no notation that would tell us exactly who reached out.

Q.   Okay.  And, by the way, let me just ask you this question.

These ICare notes or Comment Details, these are documents that are kept in the ordinary course of business; is that correct?

A.   That's correct.

Q.   And these are complete, true, and accurate descriptions of the original ICare notes; is that correct?

A.   Yes.

Q.   And just as a general -- of the 900 or so pages that Carnival provided in this case, are those all documents that are kept in the ordinary course of business?

MR. JARNAGIN:  Objection.  Form.  I would like to -- for her to wholesale agree with that, but it may be better to specifically go through it as you bring up the exhibits.

BY MR. COURTNEY:

Q.   Okay.  Is there -- let me ask you this

Monica Borcegue
May 19, 2026

question, Monica:  Is there anything specific that you could think of that you provided to us that you would say is something that was not kept in the ordinary course of business?

A.   Off the top of my head, I know that there was like a -- a booklet with some, like -- I guess it was from the shipyard for some kind of manufacturer with a bunch of pieces and things that are found on board the vessel.  That's not a Carnival document.  You know, it was -- it was something given to us by a different company.

Within the 900 pages, I'm not sure if there was anything else.  I reviewed it all, but I can't -- you know, I would have to see them just to make sure.  I don't want to give you incorrect information.

Q.   I appreciate that.  Okay.  So we can do that.

A.   Okay.

Q.   What is your -- when you see a note like the one that you just read, you trust that the guest services associate is writing something and it's truthful; correct?

A.   Correct.

Q.   Do you know who Mr. Gomez or someone tasked by Mr. Gomez spoke to at security to further investigate?

A.   No.  If it's not noted within the Comment

Monica Borcegue
May 19, 2026

Details, we wouldn't have any other record.  This is kind of a -- a summary of what is done.  You know, but if it's not in here, then we wouldn't really know.

Q.   And as you read, Ms. Dalfino told Mr. Gomez that this occurred at approximately 10:35 a.m.; correct?

A.   Right.  That's what he wrote down, correct.

Q.   The next time that Ms. Dalfino physically is by the guest services department, as far as we know, is at 5:23 p.m.; is that correct?

A.   I do believe that's correct.  I see they reached out to her, but it was via telephone at 4:00 o'clock.  They sent a letter at 4:00 o'clock to the room.  And then, yes, I see that it says guest at guest services desk, and that was at 5:23 p.m.

Q.   Okay.  So let's go back because you mentioned a few things.  You said that they reached out to her -- and I'm looking.  It looks like at 4:10 p.m. they left a voicemail for her; is that correct?

A.   That's correct.

Q.   So the earlier note where it talks about that she told Mr. Gomez that the incident took place around 10:35 a.m. and security was advised to further investigate, that was at 12:51 p.m.; correct?

A.   Correct.

Q.   Are you aware of anything that Carnival did or

Monica Borcegue
May 19, 2026

whether it's guest services or whether it's security or anyone or anything else that was done regarding the investigation into what occurred between 12:51 p.m. and let's just say 4:10 p.m., which is the next entry?

And I'm just going to say, other than we know that she went to the medical center at 3:00 o'clock, because that's what the records show, but in terms of guest services or security, are you aware of anything that Carnival did during that time range that I mentioned?

A. We don't have any records. Whether security called out to her or not via telephone or visited her cabin, I'm not sure. We wouldn't have record of that, but as far as the guest services notes, which is basically all we have between that period of time, I don't see anything noted.

Q. If security received this call at or around 12:51 p.m. telling him that a guest fell around 10:35 a.m., she slipped down the stairs, and it was on the Lido deck and it was while going to a guest area by midship, would you expect security to begin an investigation?

A. No. So they wouldn't begin an accident report investigation unless the doctor, you know, places a call and basically triggers the investigation. The policy for accident reporting is exactly that. It's anything beyond

Monica Borcegue
May 19, 2026

first aid treatment will get reported to security, and at that point, an investigation will be done.

That's not to say that security might have been advised by guest care -- or guest services to contact the guest.  They might have reached out -- depending on their workload or what they were doing, they might have reached out between 12:51 and 5:23, you know, via telephone, maybe visiting her cabin, but I don't have any record of that, and I don't believe that she met with security at any point in time during that time frame.  So I can't confirm it, but I -- you know, we don't have any records.

Q.   Would you expect someone from the security department to review CCTV cameras to see what occurred?

A.   They do that as part of the investigations.  If there is no accident report investigation, generally, they wouldn't review any footage.

Q.   Would you expect security to go to the area where she claims to have fallen to see if there was any issues that required attention?

A.   Maybe sometimes they might do that, just to make sure that the area is okay.  If they need to repair something, they might do that.  If anything needs to be cleaned up, they might do that.  So it just depends on the situation really.  It's -- it's not something that, you know, is recorded anywhere if they decide to do that.

Monica Borcegue
May 19, 2026

It's at their discretion.  It just, I guess, depends on -- on each case.

Q.   Carnival's in the interest -- Carnival's interested in reducing the amount of their guests that get hurt; correct?

A.   I mean, safety is -- is our first priority for both guests and crew.  We don't want anybody getting hurt on our ships.  So in a way, I guess I can agree with that.

Q.   And Staircase 270 is used by guests and crew; isn't that correct?

A.   Mostly guests.  It is a staircase used by the guests in the public area.  Some crew members, I guess, can use those stairs, but it's primarily for guest traffic.

Q.   Which crew members are allowed under Carnival's policies and procedures to use a staircase like 270?

A.   I mean, anybody could use it if they were going somewhere that their job required them to, I guess. Like, housekeeping would be able to use them. Entertainment might.  Security might.  Just, I guess, it depends on where they're going.

What I meant by it's used for guest traffic primarily is because it is a public area for the guests. So, you know, it doesn't lead to any crew areas

specifically, like their cabins or anything like that, but in the course of their jobs, if they needed to move around the vessel, they're free to as well to use that staircase.

Q. And you indicated that safety of the guests and crew is Carnival's number one priority; correct?

A. Sure. Yes.

Q. And so if someone slipped and fell on the stairs, you, as someone who is the guest claims manager, would want someone from housekeeping and/or security to go to the area where the guest alleges to have slipped and fallen in order to determine if there is any potential issue that another guest or crew member could get injured from; is that correct?

A. I wouldn't say just me as guest claims manager, but at Carnival as a whole, you know, like I said, safety is -- is Carnival's priority with not just guests but crew as well. So any time there is something reported, again, depending on what it is, if it's something like a staircase or a floor surface or whatnot, sure, it's -- it's usually looked at just to make sure it's inspected just to make sure that things are in normal working order. Or if something needs to be corrected, then they can go ahead and do that.

Q. The next entry from the ICare says at 4:39 p.m.

Monica Borcegue
May 19, 2026

TLC was sent to SR.  I feel like I --

A.   Right.

Q.   -- know what that stands for, but I'll just -- is it tender loving care, meaning like a letter -- like a -- is that what that stands for?

A.   Yes.  That's what they refer to the letters. Basically, follow-up letters, just to make sure that the guest knows we're trying to reach out, we want to make sure you're okay.  Here's a contact number for, you know, you to reach out whenever you get back to your state room.  SR stands for state room.

Q.   Okay.  And the next entry at 5:23 p.m.  Based on the notes, it would seem like from 12:51 p.m. until 5:23 p.m. no one went specifically to the area where she alleges to have fallen to determine whether there was any need for repair or clean up.  Is that fair to say?

A.   I'm not sure what time the security watch report was done.

Q.   That's a good point.  I think it was earlier. I think it was, like, in the 4:50 range or 4:40 range. We'll get to it.  But, yeah, that's a good point.

A.   Right.  Yeah.  'Cause that wouldn't be documented within -- anything security does wouldn't be included in the ICare.  So this is strictly only for guest services.  I don't see that guest services has any

Monica Borcegue
May 19, 2026

entries between 4:39 and 5:23.

But security might have done something.  I know security went back and actually had somebody take a look at the area and fix a rubber strip from the staircase. So I know they -- they did go.  I'm not sure what time that is.  I would have to refer to the -- the watch report.

Q.   Yeah.  And so why don't we make the security officer watch report Exhibit 4.

(Plaintiff's 4, Security Officer Watch Report, was marked for identification.)

BY MR. COURTNEY:

Q.   It's a one-page document that says 4:50 p.m. Let me see.  Do you have it in front of you?

A.   Yes.  The security officer watch report by Security Officer Rawat.

Q.   Exactly, yes.

A.   Okay.

Q.   And so I guess we can combine -- we can look at this one and then also the ICare notes to kind of puzzle together what went on around this time; right?  And maybe we can start off by, if you can, going back to that ICare comment that starts at 5:23 p.m., and I can just read it, and you tell me if I'm doing okay or if it's -- if it's not right.

Monica Borcegue
May 19, 2026

"Guest is at guest services department.  As per the guest, her shoulder is hurting.  Guest wanted to know about the cause of the accident as she does not want to incur medical bills."

So far so good?

A.   Yes.

Q.   Okay.  And let me just also say, this is the note that it says 5:23 p.m., but when we read what occurred here and we also have the benefit of the security watch report, it's more likely than not that this started before 5:23 p.m. and the -- the person who inputted the note, which was Nozipho Sibanda, just inputted the note at 5:23 p.m.  Is that fair to say?

A.   Right.  That's possible.  They will take the notes down as soon as they can.  Usually, it's simultaneous to the interaction.  But sometimes when there's a lot going on, they can summarize it whenever they get back to their computer.  So that might be a possibility that this was going on a little before 5:23, and that's just when the note was input.

Q.   Okay.  So so far we know that she -- her shoulder is hurting and she wanted to know about the cause of the accident because she does not want to incur medical bills; is that correct?

A.   You read that correctly, right.

Monica Borcegue
May 19, 2026

Q.   Okay.  Thank you.

If she's interested in knowing about the cause of the accident, what are the different available tools for Carnival to let her know what was the cause of the accident?

A.   I mean, I'm not really sure the phrasing of that, she "wanted to know the cause of the accident."  I mean, she -- she herself would know what happened.  She's the one who -- you know, who fell.  So I'm not really sure what this means by "Guest wanted to know about the cause of the accident."

I know that she testified that she wanted -- you know, she didn't want to pay for it.  She didn't think that she was -- needed to pay for it because it happened on the ship or whatnot.  So that might just be how this person took down the notes.  I'm not really sure how to interpret that she wanted to know about the cause of the accident because she doesn't want to pay for the medical bills.  That doesn't really make sense to me, but I -- you know, she was inquiring about security.  She wanted to speak to security or she had at this point.  The timeline is a little bit all over the place, but, you know, we know that security did speak to her at some point.  Obviously, guest services spoke to her.  You know, there's --

Monica Borcegue
May 19, 2026

Q.   Go ahead.  I'm sorry.

A.   The notes kind of speak for themselves, but it's kind of hard to piece together.

Q.   You would agree with me that often, when someone sends a letter of representation, either in that correspondence or in a subsequent correspondence, they will tell Carnival what they believe was the cause of the incident and why they believe Carnival should be responsible.

Is that something that's a typical part of the claims experience?

A.   Maybe not so much in the rep letter itself. That's very basic.  Maybe later, you know, if they send a demand package or some other type of correspondence, you know, down the road.  Initially, the letter we get is very basic, usually.  But at some point they will, you know, map everything out for us and put in their request.

Q.   Right.  Because if -- if they were not able to convey to Carnival why they believe Carnival should be responsible, Carnival would not interested in resolving a claim for which it did nothing wrong.  Is that fair to say?

A.   I mean, I guess it would depend on the situation, right.  Generally, that's how it would work, but there's always -- there can always be exceptions.  It

Monica Borcegue
May 19, 2026

would just depend.  Generally, they do let us know what occurred in their letter at some point or correspondence at some point.

Q.   And it's in Carnival's interest to determine if what the person is saying is accurate or if Carnival has a basis to say to the person, actually, we're not responsible and here's why?

A.   Sure.  That can definitely be the case.  We could investigate and see what information we have and -- and compare that to what we're being told.

Q.   And what are some of the ways that you've seen where a plaintiff or a Plaintiff's lawyer makes a claim as to how something occurred and then Carnival used its own tools to -- to say, "Actually, what you're saying is incorrect.  We are not responsible, and here is why"?

A.   Again, depending on the situation, there could be security reports, security watch reports, investigative reports.  Photographs or videos.  It would just depend on the situation, whether or not we have an investigation, whether we have ICare notes, or, you know, witness statements or -- it just depends.  There are multiple different ways of getting reports from the vessel.

Q.   You've had situations where a person claims Carnival did something wrong and then CCTV footage shows

Monica Borcegue
May 19, 2026

that what the person is saying is incorrect and the CCTV footage will exonerate or cause Carnival to see that it really should not be responsible for what the plaintiff is claiming.  Is that fair to say?

A.  I believe there's been cases like that.  Again, nothing comes to my head at this point in time.  I see so many things on a daily basis, but I'm sure videos can -- can speak for themselves sometimes, yes.

Q.  As an example, if we were taking a case where someone claims to have been injured going downstairs and they claim it's Carnival's fault and it turns out the person is carrying drinks in both their hands and falls down, that's something that Carnival has, in the past, said, you know, the person was not just intoxicated, but actively using both hands to carry alcoholic drinks.  Is that fair to say?

A.  We could use that fact from the video.  That's correct.

Q.  And you've used, for example, the Sail & Sign statements which shows how much alcohol a person may have purchased during the course of the day to show that their normal faculties were altered, such that they should be held responsible for not taking care of themselves when descending stairs.  That's also been done in the past. Is that fair to say?

Monica Borcegue
May 19, 2026

A.   We have certainly used information like that as well in the past.

Q.   Okay.  And so in this case, where Ms. Dalfino wanted to know about the cause of the accident, one of the tools that was available to Carnival on the ship would have been to review the CCTV footage; is that correct?

A.   If an accident investigation was done, then they would have done that.  That's correct.

Q.   Right.  And even if an accident investigation was not done, it was a tool that was available to the crew of the VENEZIA on June 12, 2024; correct?

A.   CCTV would have been available to them.  But, again, they wouldn't review that unless there is an accident report investigation.  That's just their procedure.

Q.   And going to the location of where she claims to have slipped and fallen between the hours of 12:50 and 4:50 p.m. was something that was available to the crew of the Carnival VENEZIA on June 12, 2024; correct?

A.   It was, and I believe they did -- they did visit the area.

Q.   Ultimately, they visited the area, but not before 4:00 p.m. on that day; correct?

A.   That's when security went to the area as far as

Monica Borcegue
May 19, 2026

their report says. Yes, it's correct.

Q. Right. So according to their security report, which was Exhibit 4, it says, starting at -- well, it stays 4:50 p.m. The person writes a note and later talks about going there and seeing that there is anti-skid strip on the first step slightly protruding at the corner; correct?

A. Yes, I see that. That's correct. That's -- once housekeeping manager checked and said that the anti-skid strip on the first step was slightly protruding at the corner, and it was rectified by a handyman that was also there.

Q. Okay. We know that that security officer reported for duty for that shift at 4:00 p.m.; correct?

A. That is correct.

Q. We do not have any indication, be it from the security department or the housekeeping department of anyone physically going to the area where Ms. Dalfino claimed to have fallen from the time that she reported it up until the times listed in that security officer's watch report; is that correct?

A. Correct. This would be the first entry in any security report on that day.

Q. Okay. So when she went -- and I'm going back to the ICare notes. She stated that her incident was

Monica Borcegue
May 19, 2026

caused by the staircase which had a loose part at the
top; is that correct?

A.    That's the 5:23 p.m. note.  That's what it
states, yes.

Q.    Okay.  And that was -- it was confirmed by
security and the housekeeping that there was, in fact, a
loose part at the top of the step; correct?

A.    In the watch report, it does state that,
correct.

Q.    And so she also -- she took a picture -- at
least she showed a picture to the guest services
associate that she was speaking to; correct?

A.    I see that noted, yes.

Q.    And the guest services associate went to check
with Ms. Dalfino to the area where the incident occurred;
is that correct?

A.    That's my understanding, yes.

Q.    All right.  Does Carnival have any information
to suggest that Ms. Dalfino did not fall in the area
where she claimed to have fallen?

A.    That's what she's claiming.  I mean, again, we
don't have any investigative report.  We don't have any
CCTV.  She's claiming that this is where it happened.
That's what's been alleged in this case.  So that's the
information that we have.

Monica Borcegue
May 19, 2026

Q.   Right.  And if -- if she wasn't telling the truth about that, Carnival would have been in a position on June 12th, 2024, to prove that she was not telling the truth by reviewing the CCTV footage from the time of her fall; correct?

A.   That would have been a way to do it.  That's correct.

Q.   Okay.  And the next -- I'm sorry.  Oh, I thought I heard something.

(Thereupon, a discussion was held off the record, after which the following proceedings were had:)

BY MR. COURTNEY:

Q.   The note continues to say that -- and if I'm incorrect on these abbreviations, you let me know -- "Security officer and assistant housekeeping manager were present at the staircase Deck 10 forward"; correct?

A.   Yes.

Q.   And the "Staircase was being put back in place on a small loose part."  Correct?

A.   That's correct.

Q.   And "Guest was advised she will be updated. Email tasked out"; is that correct?

A.   Correct.  Yes.

Q.   Last few lines, what this is telling you is that the guest services associate and Ms. Dalfino

Monica Borcegue
May 19, 2026

themselves observed the security officer and assistant housekeeping manager at the staircase Deck 10 forward; correct?

A.   That's correct.

Q.   And they observed -- at least the guest services associate observed that the staircase was being put back in place on the small loose part; correct?

A.   That's correct.

Q.   So, in other words, the guest services associate is not relaying that, you know, she heard or someone told her this is what was happening.  She's actually inputting this note as a first person eyewitness to what was happening; is that correct?

A.   I mean, I believe she was there with Ms. Dalfino.  That's, you know, what she testified to in her deposition.  Here, it doesn't state "I was there," but, I mean, we can kind of infer that from the -- from the note, right.  We know that they went up and they observed the security officer and handyman, housekeeping manager all were working on the step.  So I believe that it is something that was seen by the guest services associate.

Q.   What does the guest services associate mean when she says "Guest was advised she will be updated"?

MR. JARNAGIN:  Objection.  Form.

Monica Borcegue
May 19, 2026

THE WITNESS: I'm assuming -- and I don't want to assume, but -- but we are reading this note, you know, together. We can kind of piece it together. Because Ms. Dalfino wanted to know about the accident, she didn't want to incur medical bills, that might be what she might update her with, whether or not we'd be covering any bills. I think, in the end, they did cover a part of them, if I'm not mistaken. That could be what is being referred to.

I see that they did follow up just, you know, placing calls to inquire of her well-being later on. They left voicemails, and that's about it. So that's the follow-ups, and -- and the updated part, I'm assuming, is about medical. But it doesn't really specify. So I really can't tell you with certainty. That, I guess, would be a question for that associate.

BY MR. COURTNEY:

Q. Okay. And if we go now to the security officer watch report, which was Exhibit 4, it talks about how that she was requesting to speak with security services pertaining to an accident. Is that right?

A. Yes.

Q. And "she wants to report an accident involving her which happened at Deck 10 stairs #270, as one of the

Monica Borcegue
May 19, 2026

anti-skid rubber strip was allegedly misaligned due to which she fell on the stairs and sprained her right shoulder."  Is that correct?

A.   You read that correctly.

Q.   And then she says -- or excuse me -- Yogendra Rawat, I believe that's a male, but I'm not certain.

Do you know if it's a male or female?

A.   Who the security officer?

Q.   Yeah.

A.   I believe it's a male.

Q.   I think so too.  But, yeah, he says that "Further, stated she already went to medical center, but no accident report was generated."

You had mentioned -- I'm just going to stop reading for a moment, Monica.

You mentioned earlier that, if you go to the medical center, an accident report should be generated unless it's just first aid and then an accident report is not generated.

Is that Carnival's policy?

A.   Yes.

Q.   Okay.  Can you just tell me, what does it mean in terms of, like, basic first aid?

A.   So anything minor.  A sprain would be considered first aid.  They just treat her, you know,

Monica Borcegue
May 19, 2026

with a sling or whatnot.  Anything that doesn't require X-rays.  Once they take X-rays or any other kind of test that way, then it does -- you know, it does consist of more than first aid treatment.

But if it's just something where they pop in, they see a doctor, it's a minor injury, they're given a sling, maybe pain medication, that might be considered first aid treatment.

It's really at the discretion of the doctor. The treatment is -- they don't have, like, a set treatment this means first aid, this does not.  But, generally, if there are no X-rays taken, it is considered first aid.  It's just minor treatment.  They get the guest on their way, and that's basically the end of the -- the visit.

That's my understanding what happened when she went to see the doctor that -- that afternoon.

Q.   Now, she's -- according to Security Rawat, she's saying no accident report was generated.

Is she asking them to -- do you know if she asked them to create an accident report?

A.   Ms. Dalfino you mean?

Q.   Yeah.

A.   I'm not sure what she told, you know, medical. I'm not sure --

Monica Borcegue
May 19, 2026

Q.   Okay.

A.   -- if she requested anything from medical specifically.  I don't think anything is noted in the medical record.

Q.   It says in the report, further on Exhibit 4, that she "was informed that that area in charge will be informed accordingly."

I'm not sure what the words "in charge" means. Do you know what that means?

A.   Usually, housekeeping is -- is who is in charge of the area, as far as, you know, if generating a work order or whatnot.

Q.   I'm with you.  So, like, which department will be responding to this?

A.   Right.

Q.   "Subsequently, along with Management Training Housekeeper Vernon Fernandes checked said stairs and noticed the rubber anti-skid strip on the first step was slightly protruding at the corner.  The same was rectified by handyman first name unknown" -- I believe is what FNU stands for?

A.   Yes.

Q.   -- Naing is N-A-I-N-G, Lin, L-I-N, T-U-N; is that correct?

A.   That's correct.

Monica Borcegue
May 19, 2026

Q. Okay. And then it just says a note after that: "No accident was generated by medical center as guest refused to see the doctor."

Is that what it says?

A. That's what it says.

Q. Okay. So we know that that is not correct because we know at 3:00 p.m. approximately, at least according to the records, she went to the medical center. Is that correct?

A. That's correct. I think this is just a misunderstanding from the security officer. Because there was no report, I guess they assumed she never saw the doctor, but she did see the doctor. You know, in the statement itself, it does say that she already went to the medical center but no accident report was generated.

I guess the -- my guess is that Mr. Rawat just assumed she didn't see the doctor, but we know that -- we have records she did see the doctor. It was first aid treatment. So that's the reason why it wasn't generated.

Q. And we also saw the 17-page package that Ira sent to Carnival included a couple of photographs within the package; correct?

A. Yes. I believe those were the ones that she took of the area.

Q. Yes.

Monica Borcegue
May 19, 2026

A.    (Witness nodding head.)  Yes.

Q.    And they show rubber anti-skid strip on the first step slightly protruding at the corner; is that correct?

A.    I've seen the pictures.  I believe so.  At least in one of them, it does show that.

Q.    Does Carnival consider that to be a dangerous condition?

A.    I mean, not necessarily.  It would depend on the situation whether somebody, you know, is injured by the strip.  But, generally, the rubber strips aren't considered a dangerous condition.  They're actually there to -- to protect in slip resistance on the stairs.  So, you know, we don't know how that strip got lifted.

It could have been as a result of her fall. She herself could have, you know, stepped on that and brought it up herself during her -- her incident.  So we have no record of it, you know, needing corrective -- you know, a repair or anything like that before this fall. This was the first instance we heard or saw that it was out of place.

Q.    Was there a work order request made to fix that area?

A.    No.  Security and the housekeeping manager kind of called the handyman on their own because it was a

Monica Borcegue
May 19, 2026

result of an incident, and he came to the scene, and it was quickly rectified by him.  So no work order was done.

I did search for that, and I don't believe that there was anything documented.  And that's -- that happens.  When they can just quickly take care of something, they would avoid the paperwork, just because it has to go through management and different systems.  So that's -- that's common that they might just fix something on the spot.

Q.   And we're going to take a break in the next couple of minutes.  I just want to ask you this.

A.   Sure.

Q.   I've gone through over a hundred incidents on staircases.  And would you agree with me that in the vast majority of them there's -- it's found by Carnival that there's nothing wrong with the space or the situation and so that there's no action that's needed to be taken by Carnival?  Would you agree with that?

A.   For the majority of them, yeah, I would generally agree with that.  I don't believe that, you know, every -- every incident has something wrong with the stairs.  Sometimes it's misstep, or, you know, somebody not paying attention or whatnot.  So, yeah, I would agree with you.

Q.   You would agree that this was an accident where

Monica Borcegue
May 19, 2026

Carnival felt that action had to be taken?

A.   Well, the rubber was sticking out of the -- the holder, the metal holder.  So they did need to push that back into place, correct it, or re- -- not replace it, but repair it, I guess, or just push it back in.  It really -- it wasn't repaired or replaced.  It was kind of just pushed back into the little slot.  It was an easy fix.

Q.   You're aware that, as you approach that -- that nosing -- and by "nosing," I'm referring to the metal that has the -- that has the rubber in between that the floor dips a little bit before you get to that nosing; correct?

MR. JARNAGIN:  Object to form.

THE WITNESS:  I seen that in today's deposition notice, but I -- I'm not aware of that.  Carnival is not aware of any dip or any, you know, deformity in the -- in the step flooring on that landing.

BY MR. COURTNEY:

Q.   Has Carnival seen that allegation made in other cases where a person is approaching a stairway and they claim that the floor, the carpet dips a little bit before you meet the nosing?

A.   Not that I can recall, as I sit here today, as far as dips on nosings or stair landings or anything like

that.

Q.   And the rubber nosing being out of place and above where it's supposed to be, that's something that is not noticeable to the naked eye.  Is that fair to say?

A.   Wouldn't think so.  I -- if you're looking down and paying attention, I think that you can see it coming out of the -- like, the picture that we have, I think that, if it looks like that, that's something that you can observe if you're in the area and you were looking down at the floor.  I don't think that that's something that -- that, you know, would be hidden.

Q.   How would you explain Carnival not fixing it in the five hours before that it was ultimately fixed?

A.   I'm not sure that anybody would have encountered it.  I don't know.  I don't know who was in the area.  We wouldn't keep record of who traverses the area.  So I'm not sure who was in that area to -- to have seen it or if anybody had seen it up until it was reported.

Q.   Certainly, whichever assistant housekeeper or -- excuse me -- whichever housekeeping attendant would have been tasked to have that area would have encountered it at least one time during any five-hour span that that person is working; correct?

          MR. JARNAGIN:  Object to form.

Monica Borcegue
May 19, 2026

THE WITNESS:  If they were in that area and if they were cleaning that staircase.  I'm not sure -- you know, they roam around.  So I'm not sure what interactions they had with that area within that five-hour time span.

BY MR. COURTNEY:

Q.   Okay.  And I guess whether or not Carnival is aware of their being a dip leading into the nosing or even if there is no dip leading to the nosing, you would agree with me that, if a rubber nosing is out of place and it's higher than being just level with the rest of the step, that it is more likely that, if a person's foot was to go over that area, that it would be more likely that a person's foot would make contact with it if it is higher than if it's in its regular place where it's supposed to be?

MR. JARNAGIN:  Object to form.

THE WITNESS:  I mean, that would depend on where the person places their foot.  The step isn't small.  It's a pretty wide step.  So to make contact on that specific spot would mean, you know, they weren't looking down, they put their foot there, but I couldn't tell you if that's something that most people would do.  The step is wide enough, and if you're looking, it shouldn't be an issue.  So I

Monica Borcegue
May 19, 2026

really couldn't tell you yes or no.  I guess it would just depend on -- on the situation and who steps on it where.

BY MR. COURTNEY:

Q.   Okay.  And I'll just finish up this area here because I'm -- better than to take a break and then come back to it.

You would agree with me that there's a process, when work needs to be done on a ship, where typically a work request is filled out and it's given a level of priority whether it's minor, whether it's medium, whether it's high or urgent.

Are these things that you've seen before in work requests?

A.   Yeah, I mean, I think there's a drop-down menu where they can select the priority.

Q.   And, in this case, there was no written work request done.  It was handled after the security officer left that guest services area, he went ahead and started making at least one phone call; correct?

A.   Yeah.  I would agree with that.  It would -- I don't know if he made a phone call or just went somewhere, but it was handled pretty much on the spot.

Q.   Correct, that he --

A.   And that's, again -- that's pretty routine --

Monica Borcegue
May 19, 2026

sorry.

Q.   That's okay.

A.   That's pretty routine when, you know, somebody reports something, and if it's an easy fix that they can just call somebody and -- and get a handyman to come and fix it quickly, they will do that and not have to go through the whole work order paperwork channel.

Q.   And what he did was he made contact with the Management Training Housekeeping Vernon Fernandes and also the handyman Naing Lin Tun, and the three of them gathered at the location site; correct?

A.   That's correct.

Q.   And do you understand what was physically done in order to put it back into place?

A.   I believe it's an easy fix, but I would just be, you know, on my own personal observation when I've been on the vessels, and, you know, I kind of know what it looks like.

But as far as what was actually done and how it was done, we wouldn't have any report.  Generally, they would just push it back into place.  It fits within that metal nosing.  It kind of just, you know, tucks in there.  So it's an easy fix to just kind of push it back in and -- and make sure it's secure.

Q.   And is it like with glue or with like nails or

Monica Borcegue
May 19, 2026

neither or you don't know?

A.    I -- I don't know if they use anything extra, but I -- I do know that it just kind of fits in there. So if you just slip it into the holder, it stays in place.  I'm not sure if they use any additional glue or tools to secure it even more.

Q.    Okay.  Why don't we take a break.  I see that it's 11:21.  Does 11:30 work for you?  Okay.

(Thereupon, a short recess was taken, after which the following proceedings were had:)

BY MR. COURTNEY:

Q.    Well, what's your understanding in terms of whether or not Ms. Dalfino ever returned to the medical center?

A.    What's my understanding -- I missed the first part of it.

Q.    Sure.

What's your understanding as to whether or not Ms. Dalfino ever returned to the medical center?

A.    Oh.  Yeah, she went back I believe it was the last day of the cruise.

Q.    Okay.  The first day of the cruise was -- was it June 10th?  Do you have that information, by any chance?

A.    I can pull it up.

Monica Borcegue
May 19, 2026

Q.   Okay.

A.   It's very slow right now, but it's going.

All right.  The first day of the cruise was June 10, 2024.

Q.   And what was the last day of the cruise?

A.   June 18th.

Q.   Okay.  So we know that the fall allegedly occurred June 12th; correct?

A.   Correct.

Q.   What is Carnival's position as to whether or not Ms. Dalfino fell?

A.   What do you mean?

Q.   Does Carnival believe she fell on June 12th, or is Carnival's position that she did not fall on June 12th, or is Carnival's position, we don't know?

A.   We have the medical records from June 12th that she reported having fallen on the staircase that day.

Q.   And does Carnival typically accept the -- what the medical records say?

A.   I mean, generally, for the most part, she did suffer an incident that day.  The way it occurred, we might not agree with everything that's been, you know, alleged, but the fact that the incident happened on June 12th on the staircase I don't think we're disputing. We have records that show that that's what occurred.

Monica Borcegue
May 19, 2026

Q.   In terms of her sustaining an injury to her right shoulder during the fall, is that something that Carnival disputes?

A.   As far as the extent of the injuries and all of that, I will defer to our medical experts.  I -- you know, I've only reviewed the shipboard medical records.  I don't have any information about any treatment post cruise.  So I'll leave that for a medical expert.

Q.   Okay.  I have in front of me a PDF that has 104 pages, and I guess it's the first 104 pages of the Bates stamps.  I don't know if you --

A.   Okay.

Q.   -- maintain it kind of that way as well.

Do you have the ability to pull up that 104-page PDF?

A.   I can do that.

Q.   Okay.

A.   It's up.

Q.   Okay.  Great.

And it looks like the first ten pages of this 104 page PDF is medical records from the ship's medical center.

Would you agree with that?

A.   That's correct.

Q.   And are these documents that are kept in the

Monica Borcegue
May 19, 2026

regular course of business?

A.   Yes.

Q.   Are these records that you would agree are a complete, true, authentic copy of the records that were taken on the dates that they claimed to have been taken within these ten pages?

A.   Yes.

Q.   All right.  I'm going to make this the next exhibit, which I believe is Exhibit 5.

(Plaintiff's 5, Shipboard Medical Records, was marked for identification.)

BY MR. COURTNEY:

Q.   I'll just make it the full ten pages.  If you go to page 1 towards the top, does it give us an indication of when she would have appeared at the medical center?

A.   The intake form states 3:00 p.m.

Q.   Okay.  Towards the bottom of page 1, does she identify why she is visiting the medical center?

A.   The reason for today's visit is listed as "Fell down staircase."

Q.   All right.

A.   "Shoulders (both)" -- do you want me to read the whole thing?

Q.   Yeah, yeah.  Go ahead.  Yeah, please do.

Monica Borcegue
May 19, 2026

A.    Okay.  She writes, Shoulders (both) worse on right, left hand" -- actually, "worse on right, left hip, left knee, injured left hand."

Q.    Okay.  The second page talks about -- this is the form where she's agreeing to pay for her medical expenses; is that correct?

A.    That's correct.

Q.    And she indicated a few hours earlier to guest services how she had concerns about medical expenses; correct?

A.    I'm not sure what time those notes were put in.

Q.    I believe it was like 12:45?

A.    Yes, that's correct.  That was at 12:45 p.m. that she said she is feeling pain and was concerned of the fees to visit the medical center.

Q.    Okay.  And then on page 3, this shows how the first person that she met with was a registered nurse, and it gives the explanation about her right shoulder being painful and that she fell down the stairs; correct?

A.    That's correct.

Q.    It also shows that, as we go further down on page 3, that she would have returned on June 17th to the medical center; is that correct?

A.    Yes.

Q.    What's your understanding -- and we can feel

Monica Borcegue
May 19, 2026

free to use the records -- what's your understanding in terms of what was done for Ms. Dalfino -- let's start with June 12th?

A.   So --

Q.   At the medical center.

A.   -- I would have to refer to the --

Q.   Yeah.

A.   -- yeah.  I would have to refer to the -- the notes here.

So June 12th she saw a doctor.  She was complaining of pain on her right shoulder more than the left, along with hip pain.  She said she had a fall from the stairs, denies headache, nausea, vomiting, or weakness.  Restriction of overhead raising of her shoulders.  She came in walking.  She denies any pain upon weight-bearing.  And full range of neck motions, et cetera.

So she was physically examined by that same doctor, and she was given medications, Naproxen, which I believe is a pill she was given.  That's about it.  That was for June 12th.

June 17th she came in, and I see that she was given an injection -- it was pain medication -- by the same doctor.  And she was still complaining of right shoulder pain, and that's pretty much it.  She requested

Monica Borcegue
May 19, 2026

the pain medication.  And that's all I see for the 17th.
So it was only those two visits.

Q.   On June 12th, is the doctor giving her six pills of Naproxen, 500 milligrams, is that considered within, like, the first aid, in terms of how Carnival views that visit?

A.   Yeah, to give pain medication, that's -- that's usually done.  It's, again, basic treatment.  It's considered first aid.

Q.   Okay.  In terms of she was given an injection on June 17th, does Carnival consider that to be basic first aid?

A.   Yeah.  If she requested the pain medication, it was given to her.  But, again, there was no need for X-rays or anything like that.  It was just a strain, and she was given the pain medication.  And, again, that's quick treatment.  It's first aid treatment.  Nothing further was recommended as far as investigation.

Q.   Okay.  And so that would be within Carnival's policies and procedures that, if a person is given an injection of Ketoralac, that that is within basic first aid and does not trigger within Carnival's procedures for an accident report or an accident investigation to be conducted; is that correct?

A.   That's correct.

Monica Borcegue
May 19, 2026

Q.   Okay.  Was she complaining on June 12th that she had issues in terms of overhead raising of her shoulders?

A.   I believe I read that.  On the 12th.

Q.   Towards the top of page 5 of the PDF.

A.   Yeah.  That's what I was reading from the visit on the 12th.  "Restriction of overhead raising of her shoulders."

Q.   And then if you go a little bit further down, it seems that on the 17th, her complaints now, instead of it being both shoulders, it looks like her complaint's really for the right shoulder in terms of her shoulders; is that correct?

A.   On the 17th?

Q.   Yes.

A.   Yes.

Q.   Okay.  And the doctor also notes her left hip pain; correct?

A.   I see that on the 12th it states "along with left hip pain."

Q.   Okay.  And then towards the top of page 6 of the PDF, in terms of range of motion, I think it's on the fourth line or so, the doctor refers to it as abnormal -- correct? -- in terms of the active range of motion, the AROM?

Monica Borcegue
May 19, 2026

A.   I don't see -- on the top of page 5?

Q.   At the top of page 6 of the PDF.

A.   Oh, 6.  "Full age-appropriate ROM in the spine," is that what --

Q.   Yeah, a few lines --

A.   Oh, no.  I see what you're saying.

Q.   Yeah.

A.   AROM.  Wait.  "AROM:  Abduction, adduction, flexion, extension:  Abnormal."

Q.   Okay.  And then the next part is for the passive range of motion also abnormal; correct?

A.   Correct.

Q.   And the comment is "tender abduction of shoulders"; is that correct?

A.   Correct.  Yes.

Q.   And that's based on the doctor or the medical provider in the medical center feeling that her shoulders are tender?

A.   I would assume so.  This is the doctor's notes. So it's based on his physical or her physical examination.  I'm not sure if the doctor is a he or a she.

Q.   Right.  He also had a comment, the doctor, a little bit further down, where it says, "left thenar mild tenderness positive."  Do you see that?  A plus sign.

Monica Borcegue
May 19, 2026

A.    Yes.

Q.    Do you know what the left thenar is?

A.    I don't.

Q.    Okay.  I didn't know either.  So I looked it up.  It's my understanding it's this area by the -- by the palm by the thumb, the base of the thumb, that -- that it was mildly tender, according to the records.  Is that what the doctor says?  And I -- you don't have to take my word for it, but it just says it's -- it's the left thenar that it has mild tenderness.  Correct?

A.    That's what it states.  Yeah, I'm not familiar with what that is, but if that's your explanation of it, I have not reason to doubt you.  That's what the comments say.

Q.    At first I thought it was typo, but it is something.

Do you know if that injection -- I see, as you go further down, it says that it was -- the sales quantity was two vials.

Do you know if that means that she was -- that she received two injections, or do you know how that -- or maybe two different vials were used for the one injections.  Do you know either way?

A.    I can see she was given 60 milligrams of it. I'm not sure if it's just -- if it comes in 30s and it

was two vials.  That would make sense to me, but that's just going off of the notes.  I'm not a medical professional, so I don't know.

Q.   Understood.  Do you know where in the body -- where in the body it was injected?

A.   I'm not sure if it says it anywhere on here. I'm not sure of that.

No.  It's administered with no adverse effects noted, but it doesn't state where.

Q.   Would you agree that in first aid cases those are situations where no further medical treatment is necessary?

MR. JARNAGIN:  Objection.  Form.

THE WITNESS:  Sometimes.

BY MR. COURTNEY:

Q.   In terms of Carnival's own definition of whether or not an accident investigation needs to be triggered based on medical care, if a person needs additional -- if it's known at the time that they go to the medical center on the ship that the person is going to need further medical attention, would you agree that that would trigger Carnival's policies and procedures in terms of conducting an accident investigation?

A.   Not necessarily.  She came in asking for additional pain medication.  It was still a sprain.  It

Monica Borcegue
May 19, 2026

still didn't require any X-rays.  It didn't get, you know, any -- any worse.  Her pain was still around, but the injury itself didn't call for any additional treatment other than just administering pain medication.

So, again, it's at the discretion of the doctor, but this is still basic treatment.  So just because she went in for a follow-up doesn't necessarily make it beyond first aid.  So I guess the doctor didn't make the determination to consider this beyond first aid treatment even though there were two visits.

Q.   What's your understanding towards the end of the June 17th visit as to whether or not he made any recommendations for her going forward regarding her shoulder?

A.   Let's see.  On the 17th, I see a note under the "Disposition" section.

Q.   Yes.

A.   "The patient verbalized to be assessed by a non-orthopedist surgeon and consent to medical help professionals onboard: to prescribe medications.  Use of shoulder sling explained.  To avoid lifting weights."  And she was advised to undergo other imaging studies such as MRI and CT scans and consult with ortho surgeon as soon as possible.  So "Cleared all patient's doubts in simple and in medical terms.  The patient understands and

Monica Borcegue
May 19, 2026

agrees with the instructions provided."  And she left the medical center stable, ambulatory and satisfied with the attention.

So she was told to follow up and do some extra imaging, like MRIs or CAT scans, which are not available on board.

Q.   Would you agree with me that the fact that Carnival's ship doctor was telling her that she should consult with an orthopedic surgeon as soon as possible is indicative that this was not a first aid type of visit?

A.   No.  Again, the treatment provided to her was first aid.  Again, the administering of pain medications and such, he deemed it as first aid treatment.  We don't have MRI or CAT scans on board.  So that wasn't done.  And, basically, if she still is feeling pain, that was his advice, to follow up with -- with a doctor when she got home.  But nothing further was done on board, and that's the reason why security was not called to initiate an investigation.

Q.   Is it your understanding that the doctor or one of the nurses or some other person at the medical center provided a copy of these medical records to Ms. Dalfino?

A.   I don't have a notation of that anywhere, but I do know that we received the medical records in her rep letter.  So she got them somehow.  I'm not sure if was on

Monica Borcegue
May 19, 2026

board or if it was through guest care at a later date once she left the ship.

Q.   If she would have gotten them at a later date once she left the ship, would there be a note in the ICare entries that someone had provided her with her medical records?

A.   Usually, there would be.

Q.   And in the event that she would have received them from the doctor or someone in the medical center on the ship, that is consistent with Carnival's policy to give a copy of medical records to the guest if they ask for them; correct?

A.   I'm not sure of any policy, if one exists, that states that, but I believe if you ask for your records, they do provide them.  You just have to go and pick them up at some point during your cruise.

Q.   Okay.  The next page in this PDF is the start of -- it looks like a ledger that lists either looks like casino activity or drinks that were comp'd or -- do you refer to this as a Sail & Sign ledger or Sail & Sign statement, or what do you refer to this as?

A.   Sail & Sign statement.  So it's, basically, a copy of all of your purchases on board.

Q.   Okay.  And it looks like for the charges for medical, there's an entry on June 12th at 3:58 p.m. for

Monica Borcegue
May 19, 2026

$157.80; is that correct?

A.   That's correct.

Q.   And I'll just go ahead and make this four-page statement Exhibit 6.

(Plaintiff's 6, Sail & Sign Statement, was marked for identification.)

BY MR. COURTNEY:

Q.   The next entry that has to do with medical appears to be five days later on June 17th at 4:52 p.m. for $77.84; is that correct?

A.   That's correct.

Q.   And the following day, it looks like before disembarking the ship, some kind of arrangement was made where she would get a credit of $77.84, but there would be another charge of $38.92; is that correct?

A.   That's correct.

Q.   Are you familiar with how the numbers came to be in terms of the credit for 77.84 and the charge of 38.92?

A.   No.  I would have to request that information. I don't have access to that.

Q.   And so it's nothing that appears in, like, the ICare comments?

A.   I don't believe so.  I can check, but I don't think I saw anything.

Monica Borcegue
May 19, 2026

No, it's not listed on there.  So I'm not sure what was charged and why.

Q.   Okay.  The Sail & Sign statement is another tool that can be used by Carnival security in order to get information about the cause of an incident; correct?

A.   I'm not sure how they would use that to find a cause.  Other than if a person was drinking, they could get their transaction history, but I think that would be the extent of a Sail & Sign statement as far as a cause.

Q.   It could give someone the time that they were at a certain place on the ship; correct?

A.   Judging by their transaction, their location would be estimated.  That's correct.

Q.   So if we look at this one, for example, on June 12th at 10:22 a.m., it says "On US Premium - Coffee Shop."  Do we know which coffee shop that would be a reference to?

A.   The coffee shop, I believe, is on the Lido deck on this vessel.  And the "On Us" just basically means she was on a casino package she was covered -- all her drinks were covered by that promotion.  But, yeah, I believe that would have been Lido deck.

Q.   Did I refer to it as "On US Premium"?

A.   I think you did.

Q.   That's amazing.

A.   I think you did.

Q.   All right.  Thank you for enlightening me.

Right.  So there's a -- I believe it's called a Java Cafe on the Lido deck?

A.   Java Blue -- Java Blue Cafe or something like that, yeah.  I'm not too familiar with this vessel, but I believe that is on Lido and it's called Java Blue.

Q.   Okay.  And so if she was talking about -- actually, I don't know if she mentioned to anyone about getting coffee before the fall.  I don't know if that came up in any of the comments that we saw earlier.  That's not really a question.  Let me think.

Okay.  Let me see.  The next statement looks like it's more of a, I guess, Guest Statements Sail & Sign Transactions.

What's the difference between this and the other one, starting on page 15 of the PDF?  This looks like a two-page.

A.   Yeah, I'm not sure why that was included in our file.  That's basically what it looks like for us internally.  I guess when it was pulled, it was pulled along with the actual statement, the finalized PDF copy.  This is actually just a printout from our internal website where we print out that final one.  So it's the same information.  It's just a different format.

Monica Borcegue
May 19, 2026

Q.   Should I cover my eyes?  I shouldn't be looking at this?

A.   No, I think -- oh, I know why.  It's actually filtered -- I see why -- it's filtered by Giovanna.  Once you print out the -- the official statement, the responsible party won't come out alone.  Like all the transactions won't come out for that person alone.  They come out mixed.  So I think this was the only way we could separate Giovanna's transactions from Ms. Dalfino's.  I think that's why it was produced because I see that the folio numbers matches up.  So these are all of Giovanna's transactions.

Q.   So these are Giovanna's and not Nannette's?

A.   Correct.

Q.   Okay.  So --

A.   Sometimes it glitches and it doesn't print out. So I think that that's why it was provided in this format.  You can open your eyes.

Q.   All right.  Well, so you know what, I'll make it Exhibit 7 just so -- and you would call this, I guess, the Sail & Sign transactions?

A.   Yeah.  We can call the statement.  It's the guest statement.  It's just a different format.

Q.   Okay.  So that's Exhibit 7.

(Plaintiff's 7, Guest Statements, was marked

Monica Borcegue
May 19, 2026

for identification.)

BY MR. COURTNEY:

Q. I want to move ahead. I may skip some of these. I don't think there's any debate about her getting off the ship or on the ship following the fall. So I'm going to go to Exhibit 8.

These HESS procedures, can you tell me what HESS is?

A. Sure. So that's our SMS system, safety management system. We call it HESS. At Carnival, it stands for Health, Environmental, Safety, and Security, and it's where all of the policies and procedures for all the different departments are kept.

Q. And so these are pages 18 through 20 would be the HESS procedure related to falls and the prevention of falls?

A. 18 through 20, and we can include 21 and 22.

Q. Okay.

A. That's just an additional document that goes with that same policy.

Q. Okay. So we'll make 18 to 22 -- would this be Exhibit 8, I think, we're up to. Let's do that.

(Plaintiff's 8, HESS Procedures, was marked for identification.)

Monica Borcegue
May 19, 2026

BY MR. COURTNEY:

Q.   On page 19, it's talking about the responsibilities of the crew.  The first couple I believe would not be as germane to our situation perhaps maybe as the third one within the 3.3 Crew.

A.   Uh-huh.

Q.   So we have the first one has to do with keeping it clean, free of debris, obstacles.  Second one has to do with addressing spills.

Would you agree that's not our situation here?

A.   That's correct.

Q.   Okay.  The third one -- and I think that you've told me that your position -- well, I don't want to put words in your mouth.  This -- this says here that to "Report hazards to supervisors or managers promptly where immediate corrective action cannot be taken."

I don't know if I asked it in this way, so let me just ask it this way, whether or not the protruding rubber strip would -- that situation would have been considered by Carnival to be a hazard?

A.   So this is more for cleaning the areas, not so much for repairs, but in a way, I guess it can apply as far as the reporting.  So you would report a hazard -- this is why it's more for cleaning.  It's debris and spills and things like that that would be reported to

Monica Borcegue
May 19, 2026

housekeeping if you can't clean it up yourself.  That's more regarding the Own the Spill policies, which are given to all of our crew members, not just housekeeping.

And everybody is basically responsible for cleaning up spills if they see them.  Any food, any drinks spills anywhere, you would be -- you know, it's your responsibility to handle it as best you can.  If you can't, where the immediate corrective action cannot be taken, then you would report it to your supervisor, reach out to housekeeping, et cetera, so it can promptly be taken care of.

That's more for the Own the Spill policy, but in this case, the -- the protruding rubber strip was taken care of, you know, immediately by -- by security calling housekeeping and calling the handyman.  So no reporting to a supervisor was needed.  It was taken care of on the spot.  It kind of applies, but it doesn't really apply, if that makes sense.

Q.   I hear what you're saying.  I guess you had mentioned how it was a relatively simple procedure in terms of putting the rubber strip back in its place.

If that was the case, though, then a security officer could have done it himself without calling the housekeeper or handyman.

Would you agree with that?

Monica Borcegue
May 19, 2026

A.   I'm not sure if that's something that, you know, he would need to call a handyman or housekeeping just so that they are aware of the situation.  You know, I'm not sure that security would get involved in any repairs because what if you do need to use some sort of glue or tool or whatnot.  So that's probably why he called the housekeeping department, which oversees that area.

Own the Spill is a little bit different, just because that's something -- you know, if -- basically, if you see something, you do something.  But repairs and maintenance is -- is another, you know, facet of that.  So that's something that they always call housekeeping so that housekeeping can task the proper department to fix whatever needs repairing.

Q.   And so -- and I understand your position that -- well, let me ask it this way.  I understand your position that this is really more towards spills, but in terms of the word "hazard," would you -- would Carnival say that a protruding rubber anti-slip strip out of place is a hazard?

MR. JARNAGIN:  Object to form.

THE WITNESS:  It could be categorized as a hazard.  It's something that's out of place, and it's something that could -- could cause an incident,

Monica Borcegue
May 19, 2026

depending on the situation.  So it could be categorized or referred to as a hazard.  But, again, this is more geared towards Own the Spill.  This is more geared towards cleaning and not repairing.

BY MR. COURTNEY:

Q.   So let me ask you this question:  What procedure, if any, are you aware of that would instruct a crew member to report an anti-slip runner strip that's out of place to report it to a supervisor?

A.   That would be Bates Stamp No. 40.  We haven't quite gotten there yet.  That would be the work order procedure.

Q.   I'm with you.  Okay.  So we'll get there.

There are announcements that are made to guests in terms of different things to be careful of while they are on the cruise; correct?

A.   Announcements not via, like, the PA system. Maybe the in-cabin videos would be a form of announcement.  Those play on a loop in the guest cabins with different cruising tips and, you know, general safety messages.  We also have a flyer in their cabin that also states, you know, general safety messages for when you're on board the vessel.  I think that's pretty much how it's -- it's given to the guests.

Q.   What are the different things that Carnival has

Monica Borcegue
May 19, 2026

within the videos that play on the loop?

A. So there is about open decks, about gangways, about tender operations, balconies, mustard drills. Basically, holding handrails while you're on board the vessel. You're on a moving ship. Watch your step. Just things like that. Off the top of my head, that's what I recall.

Q. That's pretty good.

In terms of the -- the door when it opens, be careful that it may close quickly if you have another door open. Is that one of them maybe?

A. There's something about doors as well, yeah. It's --

Q. Also --

A. There's -- there's a few cruising tips. I can't remember them all. I have to refer to videos. But, yeah, it's about different areas on board the vessel.

Q. Is it like the pool deck chairs can be out of place, be careful not to, like, walk into those, something like that?

A. I believe so. There's a mention about chairs.

Q. Is there any --

A. Maybe not to, like, leave your stuff on the chairs unattended, things like that. There's different

Monica Borcegue
May 19, 2026

messages about chairs.

Q.   Is there any mention about the rubber anti-slip strips coming out of place?

A.   No.

Q.   Is there anything specific about the nosings on stairs being damaged?

A.   No.

Q.   Okay.  The area where this incident occurred, would it be referred to as an accommodation area?

A.   Yes.  It would be a guest public area or accommodation area.

Q.   And on -- on both sides, there's lots of state rooms on that floor as well; correct?

A.   On Deck 10, there are state rooms towards the front of the ship, yes.

Q.   Okay.  These documents are kept -- this is Exhibit 8.  These are documents that are kept in the ordinary course of business?

A.   Yes.

Q.   And these are accurate, true, complete, authentic copies of the originals?

A.   Yes.

Q.   And the same questions for the previous -- I think it was the Sail & Sign statements and guest statements?

Monica Borcegue
May 19, 2026

A.   Yes.

Q.   Okay.  Moving on to the Own the Spill, this is something that is taught to -- is it all crew members on the ship?

A.   Yes.  The Own the Spill policy is for everyone, regardless of department.

Q.   And this is pages 23 through -- do you put the Two Minute Trainer within this, or is it part of it, you think, in your --

A.   It's its own Two Minute Trainer, but for exhibit purposes, I mean, we can put them all of them together.  They're all housekeeping.  I don't know if that helps you.

Q.   Yeah.  So let's do pages 23 through 26, let's say.  We'll make that Exhibit 9.

(Plaintiff's 9, Housekeeping documents, was marked for identification.)

THE WITNESS:  If -- well, I don't want to tell you.

BY MR. COURTNEY:

Q.   No, it's okay.  Whatever -- if what I'm --

A.   We can through page 40.  And that's all of the housekeeping documents.  Just to make it easier.

Q.   Let's do that.  All those documents, are they kept in the regular course of business?

Monica Borcegue
May 19, 2026

A.    Yes.

Q.    True, accurate, authentic copies of originals?

A.    Yes.

Q.    Okay.  There was an allegation of water playing a role in this case.

Are you aware of anything within Carnival documents as to whether or not there was any wetness in any part of the stairs?

A.    No.  It's my understanding she says that she felt something wet on her clothes, but she didn't see any water.  We certainly don't have any documentation that there was any issue with water on the stairs.

Q.    Would you agree there's no indication as to whether or not in the six or so hours afterwards that anyone checked to see if it was still wet?

MR. JARNAGIN:  Object to form.

THE WITNESS:  The only -- the only time it was checked was with security and housekeeping and the handyman.  That's the only time that the stairs were checked, to my knowledge.

BY MR. COURTNEY:

Q.    And do you have any indication either way as to whether they checked to see if the area was wet?

A.    There's no notation about any wetness or any issues with water in the area.

Monica Borcegue
May 19, 2026

Q.   Okay.

A.   It would have been noted, had there been something.

Q.   Is it Carnival's position that the rubber nosing was protruding before the incident?  Was it Carnival's position that Ms. Dalfino herself made contact with it and that's what caused the rubber to protrude, or is it Carnival's position that it doesn't know?

A.   We -- we wouldn't have any record of -- of the condition of the area when the incident occurred.  It is possible that she herself could have, you know, moved it out of the position that it normally is in.  We don't have any indication that it was out of place before. There is no other repairs, no other work orders, no information from housekeeping ship report that anything was out of place.  So we couldn't tell you if this was already like that or if this was as a result of the fall.

Q.   Moving on to page 40.  You indicated earlier that, when it came to a situation like this, that this procedure for work order reporting would have been the policy and procedure that our situation would kind of fit under.  Is that fair to say?

A.   Well, our situation was a bit different.  It was reported to security, and security went ahead and kind of bypassed this work order procedure, called

housekeeping, called the handyman.  The handyman was called, and it was rectified.  So they kind of went around this procedure and just kind of did it quickly and took care of it.

But if this had not occurred -- this is a hypothetical now.  If this was something that a team member that's cleaning the area would have seen and it's something that's out of place, they then would have contacted their housekeeping manager and that person then would have opened up a work order and it would have been tasked to a handyman via the work order process.  That's how things are done generally when they are encountered by our housekeeping stewards.

Q.   Okay.  I see there's some correspondence back and forth about Ms. Dalfino says she was overcharged for things.

Did you see that in the e-mails?

A.   Yes.  You're referring to the ones -- 42, 43 -- no, I'm sorry -- 43, 44.  I think it goes on to Bates Stamp 49.  I see that that she was communicating with guest care about some statement issues.  Sometimes they put pending charges on the credit card, and then they clear after a while.  They don't actually get charged.  They just go on your account as pending until your credit card kind of, like, clears it or drops it or whatever

Monica Borcegue
May 19, 2026

they refer to it as.

Q. Starting on page 50, is this the 17-page package that was sent by Ira Scharaga to Carnival?

A. Yes.

Q. Okay. We'll make that Exhibit 10.

(Plaintiff's 10, 17-page package sent by Ira Scharaga, was marked for identification.)

BY MR. COURTNEY:

Q. And we have -- I guess it says certified mail and also e-mail is how it was received by Carnival; correct?

A. Yes. They mailed it, and they e-mailed it to the guest care department, which is what was forwarded to us.

Q. Is guestcare@carnival.com a working e-mail?

A. Yes. It's not our department. It's guest care, but -- that's how you reach them after a cruise.

Q. This 17-page document, is it something that Carnival kept in the ordinary course of business?

A. Yes. We -- I mean, once it comes into our department, it's part of our claims file. So even though it's not generated by us, it's kept within our claims file.

Q. Would this be -- 17 pages be an accurate depiction of what was received by Carnival at the end of

Monica Borcegue
May 19, 2026

June of 2024?

A.   Yes.

Q.   Okay.  So the second page -- or why don't you tell me whether it's page 51 of the Bates stamp or page 52 of the Bates stamp, you indicated that one of these photographs you could see the protruding rubber.

Can you tell me which one you were referring to?

A.   I actually wasn't referring to these two.  I was referring to just her pictures in general.  I assume they -- they overlapped, but I wasn't referring to either of these.  There's a better picture.  Even though these are black and white and kind of hard to see, but I believe that there is a better picture of what she is describing.

Q.   Okay.  Let me see if I can find something here for us.

A.   The pictures were in color, if that helps, the ones that I had seen.

Q.   Yeah.  Let's see.  Am I sharing?

A.   It's still loading.

Q.   Okay.

A.   There we go.

Q.   I don't know if this -- this may be the best one I got for you today.  It looks like it's got a circle

Monica Borcegue
May 19, 2026

around -- around it, but --

A.   Yeah, I think it's the same one that's in black and white.  It's just a different size or it's cropped.  But either way in color, I can tell a little bit better than in black and white.  That looks like the step.

Q.   Okay.  And so the part that you specifically were talking about where it looks like it's protruding would be where in this photograph?

A.   I would say to the right-hand side of this picture.

Q.   Okay.  Okay.

A.   It looks a little lifted.

Q.   Okay.  And this -- this picture, does it appear to you that the carpet as you approach, if you're standing from where -- you see someone in flip-flops in the picture?

A.   Yeah, I do.

Q.   If you approach towards the area where it's lifted, do you see how the ground is going in the -- in a slant towards it or no?

A.   I can't tell from this picture.  The striped carpet doesn't really help, but I don't -- I don't see that.

Q.   Do you see towards the right of this picture this gold rectangular looks like a decorative piece that

Monica Borcegue
May 19, 2026

would be more towards the top right of the picture?

A. The nosing of the step you mean? Oh, no, you mean, like, off to the right-hand side, like the top corner? It's like a -- it's like the side where the handrail would be attached to.

Q. Exactly. That's why I call it a decorative piece. I don't know if it's actually -- maybe it's playing a function. But, yeah, you see what I'm talking about?

A. Yes.

Q. Okay. Do you see towards -- towards the bottom how, as you go closer to the stairs, it goes from having no space with the carpet to then having space between it and the carpet?

A. I do see, like, a black line, but I don't know if that's space or if that's a filler of some sort or if that's, you know, edging of the carpet. I'm not really sure what that is. So it's hard to tell from a picture.

Q. Okay. What about now? I made it bigger.

Do you see it now? It's towards the bottom right of our screen.

A. Yeah. I can see what you're talking about. But I -- again, I don't know. It could just be the piece that's not flush with the floor. I'm not sure what that black line is, if it's space if it's filler if it's the

Monica Borcegue
May 19, 2026

top piece.  I couldn't tell you anything about the floor from this picture.

Q.   Okay.  We'll make this picture Exhibit 11.

(Plaintiff's 11, Photograph, was marked for identification.)

BY MR. COURTNEY:

Q.   Is there a demographic that you've noticed in your years working for Carnival that, like, a certain group -- it could be -- whether it's male/female, it could be certain age that just for some reason, these people are more likely to fall?

A.   No, I can't say that I've ever looked at statistics like that.  I'm not aware of anything like that that we may have.

Q.   Okay.  You've been involved in other cases where the cruise ship has made complaints to the ship builder that the rubber strips weren't reaching all the way to the railing; isn't that correct?

A.   Like a warranty claim, I believe?

Q.   Yes.

A.   I believe that was done on the HORIZON, if I'm not mistaken.

Q.   Okay.  And what happened in that situation regarding the warranty claim?

A.   I'm not sure.  I don't have details, as I sit

here today, about that.  I know we gave you, you know, what we had on it.  It was, like, a warranty claim form.

But, usually, if there's something within a certain period of time when the ship is brand-new, we can go ahead and file a warranty claim and it's taken care of by the -- by the shipyard.  I'm assuming they take ultimate responsibility for it.

But I don't have any information outside of what was provided to you, which was, basically, the forward, mid, and aft stairs on the HORIZON, but I don't really have details as to how short the strips were or what happened afterwards.  It's my understanding it was corrected and the ship is in normal working order now, you know, years later.

Q.   The HORIZON is one of the four sister ships of the VENEZIA; is that correct?

A.   The HORIZON is in a different class.  The VENEZIA was actually a Costa build for Costa Cruises.  So they're a modified version of that VISTA class for Carnival, meaning some of the areas are a different layout.  So HORIZON is part of the CARNIVAL VISTA class, which is VISTA, HORIZON, and PANORAMA.

Q.   And then CARNIVAL [sic] and the FIRENZE are their own class?

A.   The VENEZIA and FIRENZE.

Monica Borcegue
May 19, 2026

Q.   I'm sorry.

A.   Yeah, the CARNIVAL VENEZIA and CARNIVAL FIRENZE we took over from Costa, and those two are considered a modified VISTA class.  So some of the areas are laid out the same; some of the areas are unique to the VENEZIA and the FIRENZE.

Q.   When the strip doesn't reach the railing, that makes it more likely that the rubber strip will protrude from the top; correct?

A.   I'm not sure.

Q.   When the strip doesn't reach the railing, it makes it more likely for someone to have an accident where they fall down the stairs; correct?

A.   Again, I'm not sure if that would affect the way somebody, you know, moves down the stairs.

Q.   You're aware that there are some guests that wear heels, for example?

A.   Yeah.  They can.

Q.   And there's no warnings to guests that they should not wear heels; correct?

A.   No.  We don't get involved in what kind of footwear people wear while on board.

Q.   And there's no warnings such as, if you wear heels, you have to be extra careful.  That doesn't exist on Carnival ships in terms of those kind of warnings?

Monica Borcegue
May 19, 2026

A.   No.  That's -- that's more personal responsibility than something we would warn somebody about.

Q.   You would agree that the reason why there are these rubber anti-slip strips within the nosing is to prevent people from falling; correct?

A.   It's a slip resistant -- you know, I wouldn't say modification, but addition, I guess, is my word for it.  The nosing with rubber is -- is just an added protection for somebody who is using the stairs.

Q.   The reason, though, why it's there, for example, it's not something that's there for just esthetics.  It's there because it has a function that literature shows that, if properly laid out, there will be less falls; correct?

A.   I'm not aware --

MR. JARNAGIN:  Objection.

THE WITNESS:  -- of any literature, but -- sorry.  I'm not aware of any literature, but I know it's to mark the end of stairs so that it's visually -- you know, it's so that you can actually see where you're going and see where the lip is and also the rubber and the metal do act as some sort of slip resistance for the steps.  But, you know, I don't know about any literature that you might be

referring to.

BY MR. COURTNEY:

Q.   In the HORIZON case or in the situation where a warranty claim was made because of the rubber strips not reaching the rail, those are the same strips that are used on the VENEZIA; correct?

A.   I'm not sure if identical.  Generally, it is kind of a metal nosing with a rubber insert.  I'm not sure if they are the same, you know, make and model, color, whatnot.  This ship was built for Costa.  The other one was built for Carnival.  I don't know if they have any, you know, style or design specifications that are different.  But, generally, it is the same makeup of a metal nosing with a rubber insert.

Q.   The shipbuilder of the HORIZON was the same shipbuilder of the VENEZIA; correct?

A.   So I'm not sure it was the same shipyard, but I believe it was the same company.

Q.   Okay.  At the time that Carnival took over the operation of the VENEZIA, that would have been in 2023?

A.   I can confirm VENEZIA was May 2023, correct.

Q.   At that time, Carnival would have been aware of the warranty claim that was made as it pertained to the HORIZON; correct?

A.   Yes.  HORIZON was back in 20- -- it was built

in 2018.

Q.   And so if Carnival wanted to do something different in terms of the nosing and the rubber strips, it was in a position to do so at the time that it took possession of the VENEZIA at some point in 2023 or maybe shortly before that?

A.   Well, I'm not sure what you mean.  We've had the same nosings on the stairs installed in other vessels as well.  So are you saying, if we wanted to change that system, could we have?

Q.   Correct.

A.   I'm assuming they could have if there was anything wrong with it.  But really the warranty claim was just the rubber strips that weren't long enough, and that was rectified.  Other than that the -- this rubber insert with metal nosing system, for lack of a better word, is still in use and it's what's the norm on these ships.  So I don't believe that we had any reason to change it after the warranty claim was -- was done and rectified.

Q.   What's your understanding as to whether the rubber nosings that are on Stairwell 270 on the VENEZIA, whether or not they reach all the way to the rail?

A.   I don't believe that we have any issue as far as that.  I haven't seen any records or reports or any

Monica Borcegue
May 19, 2026

corrective documentation that that's an issue like it was on the HORIZON back in 2018 or 2019.

Q.   So if today if the rubber nosings -- or the rubber strips within the nosing didn't reach the rail, is that something that Carnival would want to fix?

A.   It depends on what the issue is.  If it's halfway through the step, that might be something that they want to rectify.  If it's a little short of the -- the step being fully covered, maybe it's not really that big of an issue.  I -- you know, it depends on the situation.

As far as it being an issue like it was on HORIZON, where it was, you know, the entire staircase on the entire ship, then that's -- that's something different.  But I don't have any record of that being an issue on the VENEZIA.

Q.   So on the HORIZON, it was a situation where on each of the stairs the nosing wouldn't reach the rail. Is that what it was?

A.   From the records, that's what it seems like. It seems that it was the forward, mid, and aft staircases that had issues.  It was a wider issue that required a claim.  It required rectification from the shipyard.  I, again, don't have anything like that for the VENEZIA.  I don't believe that's been an issue.

Monica Borcegue
May 19, 2026

THE WITNESS:  Is this a good time to take a break or --

MR. COURTNEY:  Absolutely.

THE WITNESS:  -- I don't want to throw you off.

MR. COURTNEY:  Absolutely.

(Thereupon, a short recess was taken, after which the following proceedings were had:)

BY MR. COURTNEY:

Q.   I am going to go through some of these areas of inquiry with you.  In terms of the allegations that Carnival is making in terms of affirmative defenses -- let's see.

Carnival alleged that the Plaintiff's damages were caused or exacerbated as a result of intervening and superseding factors that are independent of any fault of Defendant and which were not reasonably foreseeably to it.

Are you aware of anything that's occurred since June 12th of 2024 that Plaintiff did or whether there was another fall or another accident or something that has made her damages worse?

MR. JARNAGIN:  Yeah, I'll step in and just say that we're withdrawing that particular affirmative defense, and if --

MR. COURTNEY:  Okay.

Monica Borcegue
May 19, 2026

MR. JARNAGIN:  -- and if there's others, I'll just make that representation on the record as well.

MR. COURTNEY:  Okay.  That's good.

BY MR. COURTNEY:

Q.   In terms of the one -- the second one is that the Plaintiff did not exercise ordinary care, caution, or prudence for her own welfare to avoid the happening of this incident.

How did the Plaintiff not exercise ordinary care, caution, or prudence?

A.   So in her testimony she said she wasn't holding on to the handrails when she was first going down the stairs.  Her testimony also indicates that she misstepped, rather than slipping or tripping on the step.  She failed to properly observe and place her feet when descending the staircase.  She also had two travel companions that were with her who went down the same staircase right before her without issue.

She simply just wasn't holding on to the handrail at the time, not watching for her safety.  I also believe that she wasn't -- she didn't know if she was wearing her glasses.  That could have contributed to that as well.

And at this time, that's all the information I have, as I sit here today, for that defense.

Monica Borcegue
May 19, 2026

Q.   What's your understanding as to whether Ms. Dalfino has previously fallen in her lifetime?

A.   Fallen.  I know she was in a car accident and had injuries but not a fall.  I don't believe I read anything about -- actually, there was something about I believe it was some gravel or a hole or something like that that I recall from her testimony, but I'd have to refer back to it.  I don't remember exactly what it was.

Q.   Okay.  And so what time of day did this accident occur?

A.   I believe it was around 10:30 in the morning.

Q.   Okay.  To your knowledge, did Ms. Dalfino have any alcoholic beverages in the morning?

A.   In the morning, no, I don't believe so.  She had gone to get coffee.

Q.   What's your understanding as to whether there was anything in either of her hands at the time of this incident?

A.   I don't believe she said she was holding on to anything at the time.

Q.   And so is it Carnival's position that she hit the metal nosing and that caused the rubber nosing to lift or it was like that at the time that she made contact with it?

A.   We don't have any records that would give us

Monica Borcegue
May 19, 2026

that information.  It's possible that she could have brought it out of place when she fell on the step.  That's definitely a possibility.  As far as mechanism of the fall and all of that, I would defer to an expert who will provide opinions on this, but it's definitely a possibility that she could have moved the rubber strip and it was out of place as a result of her fall.

Q.  If a person is 52 years old and has gone up and down stairs many times, been on previous cruise ships on stairs, and never had issues with stairs and it's 10:30 in the morning, did not have any alcoholic beverages, was not holding anything in either of her hands, would you agree that it's more likely that the condition of that nosing was how it appeared in the photographs as opposed to it was in the correct position and she kicked it?

A.  No.  I -- I wouldn't be able to agree with that.  I don't believe that that has anything to do whether you've walked on a step 100 times or for the first time.  It's -- anything can happen.  Accidents do happen.  So I don't think that that has any -- any bearing on that or, you know, the time of the day or whether or not she had been on other cruises or down these stairs before.  You should always watch where you're stepping, watch where you're going, hold on to the handrails if you're going down the stairs, and care for

Monica Borcegue
May 19, 2026

your own safety.

Q.   Is it fair to say that the reason why Carnival is arguing that she did not exercise ordinary care is because she actually fell?

A.   That's correct.

Q.   Okay.  The next affirmative defense is that she failed to mitigate her loss or damages.

What is the basis of that that Carnival is making that allegation?

A.   So I am aware that she didn't immediately go for medical treatment.  Once she got off the vessel, she didn't go to a doctor until July of 2024.  But that -- I mean, medical records, again, I haven't reviewed anything post cruise.  That, I would defer to a medical expert on as far as, you know, the medical records and her treatment.

Q.   And is there anything specific -- I know she's making allegations to her right shoulder, left wrist, left hip, lower back.  She fractured her coccyx.  Is there anything that would have been different, as far as you know, in terms of how she is today, had she gone to a doctor earlier once she disembarked on June 18th?

A.   That's something for a medical expert to -- to testify on.  I'm not a medical professional, and I don't know.  It could have contributed.  A delay can always

contribute to your outcome.  Delay of medical treatment is always -- you know, it can be a reason, but that would be something for a medical expert to -- to speak on.

Q.  The next affirmative defense is that the Plaintiff was negligent.  And so her negligence was that she wasn't paying attention, or what would be her negligence?

A.  Yeah, it's the same answer as I had for the second affirmative defense.  Wasn't holding on to a handrail.  Her testimony indicates that she misstepped. You know, her travel companions didn't have any issues going down the staircase.  Hundreds of thousands of guests descend these steps without issue.  We don't have any other prior incidents on that step.  For the time that I searched, there was nothing, you know, in that area on that step other than the Plaintiff's incident, and that's -- you know, that's -- it's my same answer for the second defense as well as this one.

Q.  In terms of her damages that were the result of a preexisting injury or condition.  Are you aware of -- or which -- which preexisting injury or condition are you referring to?

A.  Again, that would be something for a medical expert to testify on.

Q.  Okay.

Monica Borcegue
May 19, 2026

A.   I haven't reviewed any medical records before the ship.

Q.   Okay.  So when it says to the affirmative defense, that any risks complained of by Plaintiff were open and obvious, obviating any duty to warn by Defendant, so is Carnival taking the position there that the rubber strip was protruding at the time that she encountered the staircase?

MR. JARNAGIN:  Objection.  Form.  Asked and answered.

THE WITNESS:  Again, we don't have any information that would let us know whether that was like that before she went down the stairs or if that's a result of her fall.

BY MR. COURTNEY:

Q.   Okay.  Letter K says her claims are a fraud in whole or in part.

Is it Carnival's position that this is a fraudulent claim?

MR. JARNAGIN:  So I'll step on this one and say that we're withdrawing Affirmative Defense K.

BY MR. COURTNEY:

Q.   Okay.  In terms of that the accident is governed by and subject to the terms, limitations, and conditions contained within the Plaintiff's passenger

Monica Borcegue
May 19, 2026

ticket contract, my understanding is the ticket contract is probably 20 or more pages.

Is there something specific that you're referring to within this allegation?

A.   No.   It was filed in the correct venue, within the correct time period.   I don't believe that there's anything in the ticket contract that she didn't comply with.

Q.   In terms of the interrogatory answers, this would be exhibit -- we will say this is 12.

(Plaintiff's 12, Defendant Carnival Corporation's Verified Answers to Plaintiff's Interrogatories, was marked for identification.)

BY MR. COURTNEY:

Q.   So we received verified answers to interrogatories first on January 15th, I believe -- no, January 7th of 2026, and it identifies that you are the one who answered these interrogatories.   Is that correct?

A.   I would have been, yes.

Which ones are you looking at, the -- so I can pull them up.

Q.   Sure.   This is -- it was served on me on January 7th.

A.   You said interrogatories, yes?

Q.   Yes.

Monica Borcegue
May 19, 2026

A.   Okay.

Q.   In terms of Question No. 6 has to do with inspections and whether or not there are inspections, it says that you don't -- "Defendant does not maintain documentation regarding every occasion of inspection of the subject stairway.  Routine inspection occurs through housekeeping during their daily shifts."  Right, that was the answer that you gave?

A.   Correct, yes.

Q.   Is that -- I understand that you don't maintain documentation, but how often are inspections conducted, for example, of Stairway No. 270?

A.   So they would be visual inspections when they're being cleaned.  During the -- there's two housekeeping shifts:  The day shift and night shift.  During the daytime, it's basically the crew members come around.  They will make sure that the stairs are free of any debris, any spills, anything that would require cleanup.  They will wipe down the handrails, the glasses if they -- like, like some of the stairs have glass partitions.  They will wipe those down.

     That's basically what the day shift does, and during these routine, you know, wipe-downs or cleanings, they will take a look at the area, and if there's anything that needs to be rectified in any way, then they

Monica Borcegue
May 19, 2026

will initiate a work order through the proper channels.

At night is when they would vacuum the stairs. Sometimes they're on a shampoo schedule.  Sometimes they would shampoo the staircase and that is also done by housekeeping.  Usually the shampooing is done sometime after midnight and during that operation if there's anything that's out of place needs to be repaired or maintained they would go ahead and they would start a work order through the channels.  Those are all visual inspections while cleaning occurs.

Q.   Eventually, following a court order, there was additional information that was provided that's responsive to a few of the interrogatories; is that correct?

A.   Yes.

Q.   Okay.  And that was provided to us on March 19, 2026.  We're going to make those Exhibit 13.

(Plaintiff's 13, Defendant Carnival Corporation's Second Supplemental Answers to Plaintiff's Interrogatories, was marked for identification.)

BY MR. COURTNEY:

Q.   Were you personally involved in gathering the materials that were provided to us on March 19, 2026?

A.   I was.

Q.   Okay.  Kept you busy for a few weeks?

Monica Borcegue
May 19, 2026

A.    You did.

Q.    Can you tell me how you went about the process of gathering the information that was provided on March 19, 2026?

A.    Okay.  So for the prior incidents, what I do is I pull data from our accident report database and our claims database.  So that would gather anything that was reported through, you know, investigations on board, the accident reports, and it would also cover anything that was not investigated on board but did come in as a claim or a lawsuit.

So I pulled data from these databases based on the time frame that I'm looking for and for the ships that I'm looking for.  And then once I have all of that data, I start going through it, narrowing down by location first.

So since I'm looking for staircases in this case, I would get rid of everything that is not related to stairs.  Then everything that does include a staircase I would look at further, and if it's not a carpeted staircase with a metal nosing, which was at issue here, I would go ahead and take it out of search.

So, essentially, what I was left with was all incidents on carpeted stairs with metal nosings all over the vessels.  I did that for VISTA class and for modified

Monica Borcegue
May 19, 2026

VISTA class, which was the three ships in the VISTA class, HORIZON, PANORAMA, and then for modified Vista class would have been VENEZIA and FIRENZE.

Q.   And how many total incidents did you encounter through your search?

A.   I don't know exactly how many there were.  You mean initially or the final results with responsive information?

Q.   I guess why don't you tell me -- what would you -- give me an example of a case that you would have seen it initially and then made a determination, you know what, I'm not going to provide this one because it's not responsive to the order?

A.   Sure.  Somebody stepping on or tripping over their luggage in a cabin.  That would have been taken out.  Anything not having to do with staircases would have been taken out.

Q.   Or if it's staircase that's an outdoor staircase versus an interior?

A.   Right.  That would have been my next step. Whether it was like a -- for example, a Jacuzzi step or a wooden staircase outdoors, that would have been taken out.  That would have been my second round of eliminations, if we can call it that.

Q.   Okay.  And so then, ultimately, you provided

the list that's in the interrogatories for everything that you felt could possibly meet what the judge ordered Carnival to provide?

A.   Correct.  And if I'm unsure about something, I can always refer to the accident investigation, photographs, statements, videos, anything that I might, you know, refer to if I'm not sure of a location or what actually happened.  So those searches are -- that's why I don't do them by keyword or anything like that.  I actually take the time and go into it and make sure that what I'm getting is responsive.

Q.   And do you know how many incidents you, ultimately, provided in the interrogatory?

A.   I have not counted them.  We can do that if you'd like, but you have them all.

Q.   Would you agree that it's over 100?

A.   It could be.  I know just for the ship itself it was 14, but for all the classes, you know, all the ships combined, I don't -- I don't recall.

Q.   And when it comes to whether or not it's the VENEZIA or the FIRENZE, do you yourself see a difference in terms of, when it comes to notice, whether or not Carnival's aware of an incident, if it's like the VENEZIA or the FIRENZE, given that they're direct sisters, as opposed to stepsisters?

Monica Borcegue
May 19, 2026

A.   No, I'm not sure what you mean -- you mean between the VISTA class and then the VENEZIA and the FIRENZE or --

Q.   Correct.  Like -- like, do you see it -- like, if it occurred on the HORIZON, that's not as, you know, germane to a VENEZIA case as, for example, if it happened on the FIRENZE?

A.   No, I don't look at trends that way.  I don't -- I don't -- I'm not aware of anything, you know, specific like that.

Q.   For the most part, you would agree that the interior stairwells on each of these five ships are substantially similar?  Would you agree with that?

A.   They are carpeted staircases with the metal nosings.  The layouts are pretty similar between the classes.  I'm not sure about dimensions.  That could differ, but generally they are alike.

Q.   Of the cases that were provided -- and I guess the -- the cases begin at the bottom of page 4 and they end at the top of page 20 -- probably we will see between seven and ten per page, something like that.  That's why I think it's over 100.  I didn't count them myself.

But are you aware of any of these cases that are -- over 100 of these cases where Carnival has accepted some responsibility for the incident?

Monica Borcegue
May 19, 2026

A.   I am not sure, as I sit here today, what -- what all the facts are for each individual incident. Nothing, you know, I can recall from any claim or lawsuit and definitely not from any incident that wasn't a claim or a lawsuit.

Q.   And you indicated you've been with Carnival since 2011; correct?

A.   Well, I've been testifying since 2011.

Q.   Okay.  I apologize.  You've been with Carnival since when?

A.   2006.

Q.   Okay.  And you've been -- how long have you been in the claims department, if you will?  I don't know if there's a more broad term I should be giving, but...

A.   Since 2007.

Q.   Okay.  You would agree that there's been over a thousand lawsuits and/or prelitigation claims regarding individuals who have fallen down stairs?

MR. JARNAGIN:  Object to form.

THE WITNESS:  I -- I don't know.  That, I have never looked into.  I'm not sure what the count would be specifically for stairs.

BY MR. COURTNEY:

Q.   Do you believe that the amount of falls that have occurred on these five ships that we are discussing

is a fair representation of the ships fleet-wide, or do you think there's a particular problem with people falling down stairs on these five ships?

A.   No, I don't believe that there's any type of trend or problem, as you refer to it.  I -- I did pull passenger counts for the same time period for all of these ships, and it was over 2.8 million, I believe.  So for sailing 2.8 million passengers -- and, of course, that doesn't tell you how many times those passengers go up and down stairs at any given point in time in the cruise, I believe, you know, a hundred and whatever it is -- I think it was like 140 or something like that -- of the prior incidents -- I looked at it now -- I don't think statistically that shows that there's a problem.

Accidents will happen on staircases.  That's not unique to ships.  I think that just happens anywhere. That can happen at home on your stairs.  So, no, I don't think that that actually shows that there's any sort of problem or anything that needs to be corrected.  I think, unfortunately, that some of these guests have had accidents on board the vessels.  But nothing that, you know, needs to be corrected or that's dangerous about these steps in any of these vessels.

Q.   In your time within the claims department since 2007, can you think of any case where a guest fell down

Monica Borcegue
May 19, 2026

the stairs where Carnival admitted that it was at least partially responsible for what occurred?

A.    As I sit here today, I can't recall of anything that would have been wrong with a stair that would have been something Carnival did wrong.  Nothing comes to mind, as I sit here right now.

Q.    Do you find in many of these cases that the guests who fall indicate that they were in a hurry?

A.    That could be an issue.  I've seen -- that I can recall that's kind of similar, I've seen children that are running down stairs or people that have been in a hurry to get down stairs.  I've seen that in the accident reports having to do with the carpeted staircases.

Q.    And how many of the cases have you seen where the raised nosing is listed as a cause or an alleged cause of an incident?

A.    I don't know about a raised nosing.  I know that some people do claim that either their heels got caught on the nosing in some way or, you know, they've hit the nosing in some way, whether ascending or descending the stairs, but I don't know about it being raised specifically.  Interactions with nosings I have seen, but I don't recall specifics about anybody alleging that it was raised.

Monica Borcegue
May 19, 2026

Q.    And have you seen cases where a person alleges that their heel got caught in the area of the nosing where there was missing where the strip should have been?

A.    No.

Q.    So it would be a situation where the heel just gets caught in the rubber nosing that's laid out appropriately?  Or how does that -- how does that happen?

A.    What I remember specifically -- and I don't believe it was part of this class.  It's just a different case -- was just the wedge -- it was like a wedged heel that had like a -- like a piece at the bottom that she was wearing, and that piece kind of got caught on just -- just because the metal nosing is not flush with the step, it's a little bit raised because it's the metal finish, that's where the heel or the wedge got caught.  So it wasn't out of place or anything like that.  It's just she kind of didn't pick up her foot and it got stuck on that metal part.

That's one that I remember.  But other than that, I don't know of any other cases specifically that come to mind.

Q.    Was that part of the allegation that the ground would slope down before it would go to the nosing?

A.    No.  And it wasn't a claim.  It was part of just the incidents I remember going over.  But I just

Monica Borcegue
May 19, 2026

remember because I remember the pictures and I remember the shoes.  That's why it comes to mind.

But there weren't any allegations of any misleveling or anything like that.  It was simply her shoe just -- her foot just hit the metal, and she just tripped on it.  That's what I recall from it.

Q.   One of the incidents that you provided in the interrogatory was Gregory Marrisette.

Are you familiar with that incident?

A.   The name kind of rings a bell, but I don't know details.

Q.   It's on page 8 of 22, if you're able to go to that in the interrogatory.

A.   Yes.  Okay.

Q.   Does this help refresh your recollection about this claim?

A.   I can see the date, the ship, and the description, but nothing stands out by looking at this specifically.

Q.   Okay.  Did he allege that his foot got caught on the anti-skid strip?

A.   His sneaker caught on the anti-skid strip on the fourth and fifth step, causing him to lose balance and get twisted it states.

Q.   Was that because it was raised?

Monica Borcegue
May 19, 2026

A.   I don't know.  I'd have to look at the investigative report to see if there's any information about that.  It's not something I recall.

Q.   Are you able to do that while we sit here?

A.   Yeah, I can pull it up if -- we said there was an agreement I can look at the accident reports; correct?

Q.   Correct.

MR. JARNAGIN:  Yeah, I just want to make sure on the record.  So we're agreeable that Ms. Borcegue can review work product and attorney-client privilege materials in order to answer your fact-based questions without an argument that that waives the privilege.  Right?

MR. COURTNEY:  Correct.  Correct.

MR. JARNAGIN:  Okay.  Thank you.

THE WITNESS:  Okay.  Oh -- I see the area was inspected, and there was nothing wrong with the stairs.  They were noticed to have anti-skid strips on each step, all intact.  Let me see if there's any photographs.  I don't see that there's anything that was out of place or needed to be fixed or missing.

He stated that it was slippery trimming on the stairs.  In his passenger injury statement, he says that the steps were slippery because of the metal trimming and it caused him to slide down a few steps.

Monica Borcegue
May 19, 2026

The front of the sneaker was on the metal trimming and caused him to twist his leg.

BY MR. COURTNEY:

Q.   Understood.

Do you believe that the shoes that people wear often play a role in whether or not there's an incident?

A.   It can.  Sometimes the shoes are, you know, rubber, but they're kind of -- the tread is worn.  That can definitely affect the way, you know, you're walking down the stairs what happens when you step on something that's metal.  Or even carpet.  So that definitely does play a role.

Q.   And we talked about heels.  Some guests prefer to wear flip-flops; is that correct?

A.   Yes.

Q.   And flip-flops, you would agree, are less safe in terms of walking around a ship -- or I should say, to say it differently, provide less safety than maybe sneakers would for a person who is going around the inside or outside of a ship.  Would you agree with that?

A.   Yes and no.  It depends on the conditions of the flip-flops.  Generally, I think sneakers would be a safer options versus flip-flops, for example.  But if they're brand-new flip-flops versus worn, old sneakers, right, then the flip-flops would be a better choice.

Monica Borcegue
May 19, 2026

So it just depends on how worn the shoes are, what type of shoes they are and what surfaces you're walking on.  Ultimately, it's -- it's you.  You know what kind of shoes you're wearing, how old they are, how used they are, and how you can avoid things and walk correctly and watch your step.

But the shoes definitely could have an impact on if, you know, whether you slip or trip or whatnot.

Q.   Would you agree that, if a person is descending stairs, with all other facts being equal, that, if the person is wearing sneakers versus wearing flip-flops, they're more likely to have an incident if they are wearing flip-flops?

A.   I can't agree with that.  Not necessarily.  Sometimes sneakers are so good that they catch, and that could be a tripping hazard.  Right.  So you -- it depends.  It depends on what kind of stairs, what the condition of your shoes are, where you step.  So everything is kind of -- it just depends on the situation.

Q.   Do you notice that more of the incidents occur while people are descending the stairs or ascending the stairs?

A.   Can you repeat that?

Q.   Sure.

Monica Borcegue
May 19, 2026

Do you find more guests or more claims that come in are for people who are descending the stairs or ascending the stairs?

A.   I've never really done the research on that statistically.  I'm not sure.  It's not something I've noticed.

Q.   Seems like another factor that comes in on some of these cases are when people are working their way through crowds.

Do you notice that?

A.   Not on the stairs.  Not that I recall.

Q.   How about people that are either avoiding photographers or people taking pictures?  Do you ever see that in these cases?

A.   Again, not stair-related.  That would be something on a different deck.

Q.   Do you notice on page 13 there's an incident where the person by the name of Mary Mendez from June 12, 2023?

A.   I see it, yes.

Q.   It says that she slipped on the first step.

Is that referring to, for example, she's at the stop of the stairwell the way Ms. Dalfino was and that's where she fell?

A.   I can look.

Monica Borcegue
May 19, 2026

Q.   Okay.  Yeah.  Please do.

A.   She is VISTA.  Mendez, correct.

Q.   Yes.

A.   I do see it is the top step.  It's like the landing step.

Q.   And what -- what time of day was her incident?

A.   Her incident occurred around 4:00 p.m.

Q.   And how old is she?

A.   She at the time was 58.

Q.   Was alcohol a factor?

A.   No.

Q.   Did she report it right away, or how long after the incident did she report it?

A.   I'm sorry.  I'm going through it.

Actually, they do mention that she had an alcoholic beverage and was the CHEERS! program, but I don't believe that they said it was a factor.  I think it was just a drink that they noted.  Sorry.  I was going back to your other question.  And then -- all right.  I just want to make sure I add that.

What was your other question after that?

Q.   When did she report it, like that night --

A.   Oh, when.  Okay.  Same day at around 5:55.  Hang on.  5:55 was when the investigator was notified.  This happened at around 4:00 p.m., and she went

immediately.

Q.   And was an accident report generated?

A.   Yes.

Q.   And what was found to be the cause of this incident?

A.   So she lost her balance, falling forward and then landed on the middle of the staircase on carpeted floor.

Q.   Were any photographs taken of the area that started her fall?

A.   Yes.

Q.   And was there anything found to be out of place or slippery or anything like that?

A.   No.  Everything was in normal condition.  The rubber strips were all in place.

Q.   There's an incident that occurred on the HORIZON on June 24, 2023, to an individual name Sergio Rodriguez Chaple it looks like.

A.   What's the date on it?

Q.   Sure.  June 24, 2023.

A.   Okay.  I've got it.

Q.   Okay.  What deck -- oh, it says Deck 9 it looks like in the column on the left.

Which stair did he fall on?

A.   He says he was unsure of which step.

Monica Borcegue
May 19, 2026

Q.   And what time of day did he report it?

A.   This was about 5:10 p.m.

Q.   Was alcohol a factor in this one?

A.   No, I don't see that it was.

Q.   And how old was he at the time?

A.   He was 62.

Q.   And he says that he slipped on an anti-skid strip?

A.   Correct.

Q.   Was an accident report generated?

A.   Yes.

Q.   And did anyone go to see if there was anything wrong with any of the anti-skid strips?

A.   So this was reported about two hours later. The condition of the area at the time could not be -- it says "could not be ascertained due to the late reporting to the investigator."  Exact condition could not be.  But at the time no apparent safety concerns were noted, and from the photographs, I can see that the safety -- the skid -- anti-skid strips are in place.  Every step looks normal, in okay condition.

Q.   Was CCTV preserved in his case?

A.   Let me see.  Yes, it was saved.

Q.   Is that something that's still saved?

A.   They save it for four years, I believe.  So

this was 2023.  It could still be in the system.

Q.  And what about the previous case we discussed the Mary Mendez?  Do you know if CCTV was preserved for that one?

A.  No.  It states that -- let me make sure this is Mary.  Yes.  It states that the CCTV footage was not available.  According to the staff electronic officer, the fish-eye CCTV in place was not connected on the system.  So I guess it was offline, and the footage was not available.

Q.  Can we talk about the Linda Richards case, which was June 24, 2023, on the VENEZIA.

A.  Richards.  Okay.

Q.  How old was she at the time of the incident?

A.  At the time -- it doesn't say.  She was born in '84, so...

Q.  Roughly about 39 or so?

A.  39.

Q.  Was alcohol a factor in hers?

A.  No.

Q.  What time of day did it occur?

A.  This happened around 5:50 p.m.

Q.  And did she report it right away?

A.  Yes, shortly after the accident.

Q.  Is there CCTV footage for this case?

Monica Borcegue
May 19, 2026

A.   CCTV footage of the midship guest elevator lobby, Deck 10, Stairs 160 was reviewed an hour prior and an hour after the time she reported.  However, no one was seen slipping and falling on the staircase.  That CCTV was saved for the case.  So they never saw her fall.

Q.   Did she go to the medical center?

A.   She did.

Q.   Did anyone look to see the area where she claimed that this occurred to see if there was anything wrong with the nosing?

A.   Yes.  So she went back along with security and supervisors pool and deck -- supervisor pools and deck.  Sorry.  They checked the area of the accident, and they noticed that all the steps were in good condition, no apparent safety concerns, everything was properly in place.  I would note the top step here, where she claims it happened, is tile.  It's not carpet, as in this case.

Q.   Okay.  Thank you.

The case of Juana Avolio, which is July 21st, 2023, on the PANORAMA.

A.   Okay.

Q.   Can you tell me if that occurred towards the top of the staircase?

A.   It's loading.

Q.   Uh-huh.

Monica Borcegue
May 19, 2026

A.   What's the last name?

Q.   Avolio, A-V-O --

A.   Got it.  I was spelling it wrong.

All right.  This happened the second step from the top.  She tripped on her own feet and fell forward.

Q.   The next case I want to talk about is Martinelli that was on the VISTA July 30, 2023.

A.   Okay.  All right.

Q.   Did that happen at the top of the staircase?

A.   Second step from the top.

Q.   Does it show whether or not there was any issue with the nosing?

A.   No issues with the nosing.  All the steps had anti-skid strips in place.  Lighting was working fine. It states her sandal heel got stuck on the second step and she fell down.

Q.   What's your understanding as to why that would happen?  Why would a sandal heel get stuck on, like, the second step?

A.   It's got a nosing as well.  Every step has a nosing.  So it's possible that, as she's going down, it just catches.  Let me see if there's anything further that she might have explained.

No, it's not very helpful.  She says that gravity caused the incident, so...

Monica Borcegue
May 19, 2026

Q.   The next case I wanted to talk about was Karen Richardson on the VISTA on August 11, 2023.

A.   Okay.

Q.   Did this occur at the top of the staircase?

A.   It says here left foot slipped on about the third step.  So she lost balance and tumbled down.

Q.   Any indication that there's anything wrong with the nosing?

A.   No.  She stated that she lost balance and couldn't hold herself from falling.

Q.   In terms of Kristopher Sauza, this was on the VENEZIA August 27th.

A.   Okay.

Q.   What time did this occur?

A.   7:30 p.m.

Q.   Did alcohol play a role in this?

A.   No.  I see he was observed in a sober condition.

Q.   And so he alleged that he slipped because the stair was wet?

A.   Let's see.  Yeah, it says he was coming down and didn't notice the stairs were wet.  He fell from the ninth -- I'm sorry -- from the tenth to the nine midship stairs.

Q.   Did he report the accident right away?

Monica Borcegue
May 19, 2026

I don't know if you answered Monica, I just couldn't hear you.

A.   Oh, yeah.  I don't even know what the answer -- I mean, what my -- what the question was.  I thought you were looking at something.

THE COURT REPORTER:  I didn't hear an answer either.

BY MR. COURTNEY:

Q.   Did he report it right away?

A.   He did.  I'm sorry about that.

Q.   That's okay.

And he went to the medical center?

A.   Yes.

Q.   And is there a CCTV that was preserved for this incident?

A.   Yes, there was.

Q.   Okay.  Was there anything that the investigator or whoever showed up first to the staircase afterwards finds that the stair was wet?

A.   No.  They did not come to the scene at the time.  He went to the medical center, and by the time they went back to the scene, the steps were noticed in a dry and good condition with no apparent safety concerns.

Q.   Were photographs taken of the stairs?

A.   Yes.

Monica Borcegue
May 19, 2026

Q. In terms of Derrick Jones, looks like he slipped on the VISTA on August 29, 2023.

Was this from the top of the stairs?

A. Jones. This was -- it doesn't say. It says it happened from Deck 5 to Deck 4, but it doesn't specify a step.

Q. I noted that in your search a few of the different terms that you used include the term "nosing," "metal nosing," "rubber nosing," "step nosing," things like that were terms that you used to conduct your search.

A. Well, that would have been for a different search. That wouldn't have been for a prior incident search.

Q. Okay.

A. The prior accident searches, I don't use keywords. It's the process I explained where I just start looking at each one individually and start, you know, taking out things that don't -- that aren't responsive and then go from there.

Q. So the one where you make those terms, that's for the ICare and the TGEM surveys?

A. Correct. Just because there's massive amounts of information on those databases where I have no choice but to use keywords.

Monica Borcegue
May 19, 2026

Q.   Was the nosing made part of the allegation in the Derrick Jones case?

A.   I don't believe so.  He says that he was wearing flip-flops, and he affirmed the area was in dry condition and everything was normal and in place, but he accidentally got his foot -- his foot got slipped is what it states.

Q.   Let's talk about the Israel Torres Reyes case from September 1st, 2023.

Does he indicate why he fell?

A.   He states he was walking down the stairs, stepped down on the metal -- no, slipped down on metal strip being moist.

Q.   Let's talk about Mr. Kazemi, K-A-Z-E-M-I, who fell on September 3, 2023, on the VENEZIA.

A.   Okay.

Q.   What time of day did that occur?

A.   Around 6:00 p.m.

Q.   Was alcohol a factor in that?

A.   No.

Q.   Did he say where on the staircase he fell?

A.   It doesn't say which step it was from Deck 4 to Deck 3.

Q.   Did it have anything to do with the nosing?

A.   It does not say anything about nosings.  They

reviewed the CCTV, and he was seen falling forward, hitting against the wall of the landing area.

Q.   In terms of the case of Regina Bunn, B-U-N-N, that occurred on the VENEZIA on Deck 270 on September 8, 2023, was there an indication as to whether there was anything wrong with the area that would have contributed to her fall?

A.   No.  The stairs were inspected.  They were in good condition, no safety concerns.  The nine steps were checked.  Everything was in normal condition, and that's it.

Q.   Do you agree that it's not a great idea to descend stairs holding a coffee in one hand and plate of donuts in another?

A.   I don't think that that's the best way.  You should have a free hand for the handrail.

Q.   The case of Dedra Wright, W-R I G-H-T, on December 14, 2023.  Does she complain --

A.   Which one?

Q.   Sure.  This is on the VENEZIA.

A.   Okay.

Q.   Last name Wright, W-R-I-G-H-T.

A.   Okay.

Q.   Can you tell me about when that occurred, what time?

Monica Borcegue
May 19, 2026

A.   It was in the evening.  She couldn't recall the time.

Q.   Was alcohol a factor in this case?

A.   I'm not sure if it was.  She was holding two drinks at the time of the accident, but I'm not sure about her consumption at the time.  It's not listed.

Q.   Let's move on to a passenger by the last name of Labossiere, L-A-B-O-S-S-I-E-R-E.  It occurred on December 19, 2023.

A.   Okay.

Q.   What time did this occur?

A.   Around 11:00 p.m.

Q.   Was alcohol a factor?

A.   No, I don't believe so.

Q.   Was this reported right away?

A.   No.  It was reported the following day.

Q.   Was an accident report generated?

A.   Yes.

Q.   Was CCTV preserved?

A.   Yes.

Q.   What was --

A.   Actually, CCTV was preserved, but it wasn't of the fall itself.  The exact area of the accident is not covered, but she was seen after she came off of the stairs limping as she was walking towards Deck 2, guest

Monica Borcegue
May 19, 2026

accommodations, starboard side area. So that's the footage that they saved, but the exact area wasn't covered.

Q. Did any repairs have to be made to the stairs?

A. No. They checked the area, and all the steps in that area were in okay condition. Nothing needed to be repaired.

Q. In terms of the case of the guest whose last name is Kiouressis, K-I-O-U-R-E-S-S-I-S, that occurred on the VENEZIA, and it was on January 6, 2024.

A. Okay.

Q. It seems as if she was descending the staircase from Deck 10. She slipped and twisted her left ankle on the landing area of Deck 9.

What time of day did this occur?

A. This was around 5:00 -- sorry. You kind of broke up. This was around 5:00 p.m.

Q. Was alcohol a factor?

A. No.

Q. When did she report it?

A. She reported immediately after.

Q. Was CCTV footage preserved?

A. The area is not covered, but CCTV located at the midship lobby, that was saved because she was seen being assisted by a team member and medical staff.

Monica Borcegue
May 19, 2026

Q.   Was there anything wrong with the nosing in this case?

A.   No.  The cause of this one was that her shoes were wet due to snow, as she was in the open deck.  So her shoes were wet when she was descending.

Q.   Guest with the last name Flocchini, F-L-O-C-C-H-I-N-I, which was on the PANORAMA, March 20, 2024.

A.   Okay.

Q.   What time of day did that incident occur?

A.   This was around 6:30 p.m.

Q.   Was alcohol a factor?

A.   Not that I can see, no.

Q.   And do we know where on the staircase she slipped?  Was it more like by the top?

A.   It's not noted.  It happened between Deck 11 and 10, but a specific step is not noted.

Q.   Does he say why this incident occurred?

A.   It states -- hang on.  He says he could have used the handrails coming down.

Q.   Was there any problems found to be with any of the stairs?

A.   No.  The area was inspected.  No apparent safety concern was noted.  Upon checking the CCTV footage, he was barefoot and holding a cup in his left

Monica Borcegue
May 19, 2026

hand, and he slipped and fell forward.

Q. Moving on to Wilkins on the HORIZON, March 31, 2024.

A. Okay.

Q. What time did this occur?

A. Around 8:15 p.m.

Q. Was alcohol a factor?

A. I don't believe so.

Q. She claims that she had her heel caught in the anti-skid strip?

A. Yes.

Q. Was it raised?

A. She states that it caught on the metal strip on the second from bottom stair and her foot folded over. As far as the strip, it was in good condition. All anti-skid strips were placed -- were in place on the carpeted stairs. And she just says she was wearing short heels and they caught, causing her to fall forward.

Q. Is there CCTV of the incident?

A. The CCTV was reviewed. It was noticed that she was holding a cell phone in her left hand, holding the handrail with her right, and when she reached the bottom of the stairs, she apparently stumbled and fell in a kneeling position.

Q. There's an incident that occurred about two

Monica Borcegue
May 19, 2026

days before the subject incident, and it occurred on the FIRENZE with someone whose initials are Z.E.  It appears to be a minor.

A.   Okay.  Got it.

Q.   How old was the minor who was injured?

A.   16.

Q.   What time of day did the incident occur?

A.   This was around 6:51 p.m.

Q.   Was alcohol a factor?

A.   No.

Q.   What did she trip on?

A.   Tripped on the second or third step she thinks.  She's not sure.  This was kind of different.  There's really not much information because she was debarked, and she didn't say much apparently.  Her grandmother was there.  She said they were descending the stairs, but she was walking behind them.  They didn't see the actual event.  They heard a loud thud, and she was already on the floor.  She claimed that she tripped on the step second or third from the bottom and fell, but there's no -- there's no further detail.

Q.   Is there CCTV footage of this incident?

A.   There is.  It doesn't really say anything else other than the event location was covered by CCTV and it was saved.

Monica Borcegue
May 19, 2026

Q.   Did that person bring a lawsuit?

A.   No.

Q.   Did they bring a claim?

A.   No.

Q.   So here you stated in the answers to interrogatories that video footage is available for 30 days.  In response to Question No. 11, it's on page 20 -- the question starts on page 20, and your portion of the answer continues towards the top of page 21.

Do you see that?

A.   I have to pull it up again because I closed out of it, but if it's there -- I'm not sure if the VENEZIA is different, but the Carnival fleet is usually 14 days unless it's a casino camera.  So that might have been obtained from somebody on board the VENEZIA.  I would have to double-check that.

Q.   Is that something that you would have checked before answering this interrogatory?

A.   If I didn't personally, sometimes counsel speaks to the shipboard team member directly to obtain information once I connect them.  I don't recall, specifically if I spoke to somebody about that, but I don't know of any cameras taking 30 days to rerecord. Again, my knowledge is 14 days, except for casino

Monica Borcegue
May 19, 2026

footage. So I would have to double-check with the ship.

Maybe it's something that this specific ship has

different than others.

Q. And the final page of this 22-page document,

that's your signature on March 19, 2026?

A. Hang on. Sorry.

Q. I don't know if you said anything. I couldn't

hear.

A. Hold on. Yeah. I'm trying to pull it back up.

Q. Ah.

A. Okay. I got it. On what page?

Q. I think it's page 22 of 22.

A. Okay.

Q. Is that your signature?

A. It is.

Q. Okay. I have a PDF that's 165 pages that

starts with Bates stamp 109.

A. Okay.

Q. And can you just tell me what these documents

are?

A. Starting with 109 -- it's 845 pages, yes,

that's the one you're talking about?

Q. Yeah, maybe we have it broken down separately

here. Let me just look so I can be on the same page as

you.

Monica Borcegue
May 19, 2026

A.   Okay.

Q.   Okay.  I'm opening up this monster.

MR. JARNAGIN:  That you -- that you created.

You did that.

BY MR. COURTNEY:

Q.   So this is an 845-page PDF?

A.   Yes.

Q.   Okay.  Well, I guess there's a document that describes.  It's -- it's in the response to a request for production that goes through and identifies what these things are; right?  Let me see.  That might be the best way to handle this.  Let me just look really fast.

Okay.  So what I'll do is I'll make Exhibit 14 the responses, the second supplemental responses to the request for production.

(Plaintiff's 14, Defendant Carnival Corporation's Second Supplemental Responses to Plaintiff's Request for Production, was marked for identification.)

BY MR. COURTNEY:

Q.   This is what was provided to us on March 19th, 2026.  This is an 8-page PDF where you indicated that you did a search for e-mails, text messages, other communications regarding raised, defective, or damaged stair nosings for VENEZIA and it

came back with none.

Do you see that?

A.   Correct.  That's No. 24?

Q.   Yes.

A.   Yeah.  No.

Q.   Is that -- is that a search that you yourself did?

A.   That -- yes, that would have been -- well, I sent that request over to the vessel.  I don't have access to e-mail inboxes like that, but I do send the request over to them and they search and answer back.

Q.   And who were you communicating with when you went through that process?

A.   For that I did -- I believe I also went through the safety department shore side, just in case they had anything, but for the ship I would have done the facilities maintenance manager who handles the work orders and also copied in -- I believe it might have been the chief engineer and staff chief engineer.  Those are my usual go-tos.  That's usually what I do when I check e-mails like this.

Q.   And so the next one No. 25 talks about minutes, notes, regarding meetings with safety, maintenance, accident prevention, stairway inspection, for this same type of interior stairway fleet-wide, and then the answer

Monica Borcegue
May 19, 2026

was to the five ships for the five years before the incident, and you guys produced pages 109 to 593.

Is that correct?

A.   That's correct.  Not all of it is going to be responsive, but we didn't redact it, I guess, because of the court order.  So this would match up with all of the prior incidents.  These are monthly meetings.  So within those months, those incidents would be, you know, included.  So you have a bunch of different incidents that wouldn't be responsive here, but within all of these are all of the priors that we produced.

Q.   And so for these documents, 109 through 593, would those all be kept in the regular course of business?

A.   Yes.

Q.   And would they be a true, complete, authentic copy of the original documents?

A.   Yes.

Q.   And so if I came across an incident that was in between Bates stamp 109 to 593, that just would have been an unintentional leaving it out from your interrogatory answers.  Is that fair to say?

MR. JARNAGIN:  Object to form.

THE WITNESS:  What do you mean if you came across -- sorry.  Do you --

BY MR. COURTNEY:

Q.   For example, there's 500 pages of these minutes, and there may be one -- well, actually, I'll give an example.  Of all of the interrogatory answers that you gave us and that I reviewed with you, some of which -- in the deposition today, you would agree all of them were incidents involving guests; correct?

A.   Yes.

Q.   And I believe it's possible that some of the incidents that are on Bates stamps 109 to 593 are incidents that occurred where crew members got hurt.  Is that possible?

A.   Correct.  Yeah, they would be noted in blue.

Q.   Okay.

A.   All of the red are guests, and all of the blue are crew.  And I believe there are some green ones also.  Those are contractors.  So those are also crew members, and that's why they're all in different colors.  I only did the searches for guests.  So you're asking if it's possible that you might come across carpeted stair incidents that weren't disclosed because they're crew, that's --

Q.   Yes.

A.   -- possible, yes.

Q.   Did you come across any incidents that ended up

being disclosed where Carnival admitted that it was responsible for the incident?

A.   No.  I believe we already discussed that.  I don't recall anything off the top of my head.

Q.   And forget about this case, but in other cases where you've seen in minutes where Carnival admits that it played a role in an incident, is there a certain language that you've seen, like two words or the short description where they show that they're admitting that they did something that was not proper?

MR. JARNAGIN:  Object to form.

THE WITNESS:  No, nothing -- nothing specific like that.  It would be -- there's no, like, language or format.

BY MR. COURTNEY:

Q.   For example, if you see a description where it says poor housekeeping in a slip-and-fall case, would that be an example where Carnival is admitting that it had some responsibility for the incident?

A.   No, not necessarily.  I would have to look at the incident and see what the facts were and what occurred.

Q.   I'm looking at this PDF page 487.  I guess it's Bates-stamped 595.

A.   Okay.

Monica Borcegue
May 19, 2026

Q. This was responsive to a request for production. I'm just trying to see. So this is a few -- a security watch report. This is regarding the subject incident?

A. Correct.

Q. Okay. And so we can make this four-page document an exhibit. This will be No. 15, I believe. So it will be Bates stamps 595 through 598.

(Plaintiff's 15, Bates Stamps 595-598, was marked for identification.)

BY MR. COURTNEY:

Q. And the incident is discussed on Bates stamp 596; is that correct?

A. Yes.

Q. And this is a summary of all the different reports for a two-day period; is that correct?

A. It wouldn't be accident reports. This is the observations of different security guards during their shift. So that's essentially what the watch reports are. It would be anything from, you know, disputes in cabins, family disputes, missing wallets, just all sorts of encounters during their shift.

Q. A boy can't find mom?

A. Yeah. Exactly.

Q. And this one, the title of this entry is what?

Monica Borcegue
May 19, 2026

A.    Of these documents you mean?

Q.    Of the subject incident on page 2?

A.    Oh, okay.  Sorry.  So the description is titled "Guest insisted to document her alleged accident at Deck 10."

Q.    And as we discussed earlier, the note at the bottom, where it says "No accident was generated by medical center as guest refused to see the doctor." That's not correct?

A.    Yeah, it's not correct.  I think that was just a misunderstanding.  The security guard, I guess, didn't realize she had seen the doctor and it was just first aid.

Q.    And then starting on Bates stamp 599, I guess for the next -- let's see -- 599 through 658 are all security watch reports or ICare comments for some of the other cases that have been revealed by Carnival in this case; correct?

A.    Correct.  I believe it was for FIRENZE and VENEZIA cases.

Q.    Okay.  And I have -- let's see.  What was the first page I mentioned to you?  Was it 599?  Okay.  Hold on.  So 599 through 658 -- 599 to 658 are all either security officer watch reports or summary watch reports; is that correct?

Monica Borcegue
May 19, 2026

A.   Correct.

Q.   And those are all for different cases that have been revealed by Carnival; correct?

A.   Yes, the ones we've discussed.

Q.   And are all those records that are kept in the ordinary course of business?

A.   Yes.  And, actually, let me go back.  Not all -- we didn't discuss all of them, but we've disclosed.

Q.   Yes.

A.   That a better way of putting it.

So, yes, they're mentioned somewhere within the document.  Again, they're unredacted.  So they're mixed in there.  You'll find them.  So that's for VENEZIA and for FIRENZE, I believe.

Q.   And they're -- these documents are all a true, complete, and accurate authentic copy of the originals of these documents?

A.   Yes.

Q.   Okay.  And then from 659 until 753, these are all ICare comments on the same or some of those cases; correct?

A.   Correct, where available.

Q.   Correct.  And these are also records that are kept in the ordinary course of business?

A.    Yes.

Q.    And they would be a true, complete, and authentic copy of the originals?

A.    Yes.  Correct.

Q.    Okay.  The next number of documents are referred to as Red Dot/Blue Dot documents; is that correct?

A.    Yes, diagrams.

Q.    Can you explain to me what those are?

A.    So these go hand in hand with the accident reports for guests and for crew.  What security does is they will take a deck plan and plot where the incidents occur on board the vessel.  So these aren't -- I should say they're not drawn to scale.  These are hand done by security on board.  This isn't automatically generated.  So it's an approximation of where the accidents occurred, and these would match up to the incidents that we've produced.

On some of these, we might see other incidents that are unresponsive because we -- we don't touch the document, we don't edit it in any way.  So you might see other things that aren't responsive to this case, but it's the full deck plan for whichever ship for that time period.

Q.    Are these documents kept in the regular course

Monica Borcegue
May 19, 2026

of business?

A.   Yes.

Q.   And these would be true, complete, authentic copies of the originals?

A.   Yes.

Q.   Okay.  And these would be from Bates stamp 754 until Bates stamp 803; correct?

A.   Correct, that's right.

Q.   Okay.  The next document starting at Bates stamp 805 until Bates stamp 861 are what kind of documents?

A.   These would be work orders from when the ship was still with Costa.

Q.   And are these documents that Costa keeps in the ordinary course of business?

A.   Yes, they are.

Q.   And these would be true, accurate, complete copies -- authentic copies of the originals?

A.   Yes.

Q.   And these range in date from approximately 2019 or so to 2022; is that correct?

A.   That's correct.  I think they actually did all sorts of stairs, not just the carpeted ones.  I'm not really sure, since I don't really, you know, know their system.  I think they were kind enough to search

Monica Borcegue
May 19, 2026

everything for us just in case.  So I'm not really sure which staircase goes with what.  They have a different numbering system and all of that than we do, but you have them all.

Q.   And then the last close to 100 pages or so is what?

A.   So this was provided by the vessel.  I believe this is kind of like a material specification booklet for all the materials found on board from that company.  So somewhere here is the metal nosing.  I'm not sure which pages exactly.  I can look.  I have the page by itself, and I can refer you to it.  Here we go.  It would be, I believe, 942.

Q.   Okay.

A.   Right.  942 would be the nosings used on board.

Q.   And do you know which ones specifically out of these is the subject one?

A.   That, I don't know.  I'm not sure on the staircase.

Q.   Okay.

A.   It's either the first or the second, but I'm not sure which one.

Q.   I'm trying to remember now, were there work orders that were produced from Carnival?  I believe --

A.   There were four.

Monica Borcegue
May 19, 2026

Q.   And they were part -- I'm trying to find them in terms of the -- maybe it's around the 90s or 80s.  I'm trying to see what number.

A.   105 through 108.

Q.   Okay.  So I'm going to make Bates stamp 105 through 108 Exhibit 16.

(Plaintiff's 16, Bates Stamps 105 through 108, was marked for identification.)

BY MR. COURTNEY:

Q.   Let's see.  You're able to pull them up?

A.   Yeah, I have them up.

Q.   Okay.  So we discussed how the maiden voyage for this ship under the Carnival brand would have been May 2023; is that correct?

A.   Let me double-check that.  I believe so.  Yes, May 29, 2023.

Q.   Okay.  And so these four pages were responsive to what specific request, if you recall?

A.   So this would have been going back to the time we took ownership of the vessel until the date of the incident, I believe it was.

Q.   And the search that was done would have been -- would have been what?

A.   For stairs.  It was Stairs 270, 160, and I forget what the -- what the aft ones are.  I don't know

if they're 50 or 60.  I think it might be Staircase 60.
I can look it up.  But, yeah, it's the three main
staircases:  Forward, mid, and aft.

Q.   And so it looks like three of them are for
Staircase 160 and one of them is for the subject
staircase, which is 270; is that correct?

A.   That's correct.

Q.   Okay.  And it looks like the first --

A.   I'm sorry to interrupt.  Just for completion,
the third staircase is 60.

Q.   Okay.  Thank you.

So the first one was related to an issue where
Deck 10 -- and it says -- this was from January 30, 2024;
is that correct?

A.   Yes.  Correct.

Q.   It says, "Carpet detach," and then it says
"(step)"?

A.   Yes.

Q.   What is your understanding of what that means?

A.   The carpet is detached from the step.

Q.   Okay.

A.   I'm not sure if it's on the riser or like the
actual step, but somewhere the carpet is detached.

Q.   Either way that would be considered a tripping
hazard.  Would you agree?

Monica Borcegue
May 19, 2026

MR. JARNAGIN:  Object to form.

THE WITNESS:  Depending on how -- depending on how detached it is.  If it's in a corner, maybe not so much.  If it's smack in the middle of it, maybe that might be a little more in the way for guests that are walking down the stairs.  So it just depends where the detachment is and how much of the carpet is detached.

BY MR. COURTNEY:

Q.   It seems like approximately, let's see, 33 hours later it was resolved.

Does that seem right to you?

A.   The work request was put in January 30th at 1:30 or so, 1:34, and it was closed out January 31st at -- is that 10:00 o'clock? -- 10:23 p.m.

Q.   Uh-huh.

A.   I'm not exactly sure when the work was done. It could be that the work gets done and then the work orders are closed once they have time to come back and sit at the computer and close them out, but it was closed the next day.

Q.   And this was considered a high priority situation; correct?

A.   They marked it high priority, that's correct.

Q.   And does that give you an indication as to

Monica Borcegue
May 19, 2026

whether or not it was in just like a corner where it wouldn't be a hazard versus somewhere that it would be considered a hazard?

A.   No.   They mark them different ways, depending on what the needs are, but I'm not really sure what their criteria is for marking them that way.   I know it's just a drop-down option, and that's -- you know, that's as far as I know.

Q.   The next one on the following page is the subject staircase; is that right?

A.   Correct.   270.

Q.   And it says that the -- in between Decks 3 and 2, the first step is loose.

What's your understanding of -- for example, is that the actual landing area, or is it the -- do you know what I mean?

A.   Yeah, I know what you mean.   I don't know what it's in reference to.   It could also be the nosing.   I'm not sure what part is loose.

Q.   And this one, at least the close-out, was about a day and a half later.   Is that fair to say?

A.   Correct.

Q.   The third one is referring to -- this was the day before our incident; is that right?

A.   6/11 -- yes.   Correct.   The day before.

Monica Borcegue
May 19, 2026

Q.   Okay.  And what they're saying is that the midship staircase has on Deck 3 that the stair carpet was coming off; is that right?

A.   Correct.

Q.   And this time the priority that was listed is top urgent; correct?

A.   Correct.

Q.   Is top urgent typically considered a more pressing need than just high priority?

A.   Again, I'm not sure what their criteria is or what order -- how they mark them.  I'm not sure.

Q.   And, in this case, it shows that the close-out was June 12, 2024, at 4:58 p.m.; correct?

A.   That's correct.

Q.   Is there anywhere that you can tell by looking at this request and/or the order who is the individual who did the work at this location?

A.   Who did the actual work, no.  Unless it's noted on here.  And that's rare.  They wouldn't -- they wouldn't write down who does the work.  The positions of who opens it and who closes -- or who requests it and who closes it out are listed, but other than that, we don't have any information.

Q.   So here we have the request was made by housekeeping management trainee, 32104; correct?

Monica Borcegue
May 19, 2026

A.    Yeah, the 32104 is a phone extension.

Q.    Are we able to see who the housekeeping management trainee was on the VENEZIA on June 11, 2024?

A.    It would have been the day shift housekeeping management trainee.  Since this was the day before the incident, it's likely that it was the same person as mentioned in our case.

This happened -- I see that this was requested at 1:48.  So it would have been the day shift, would have been the same shift.  It's likely that it is the same person.

Q.    So that would be the person who's listed in the ship security daily report along with the handyman whose first name was unknown?

A.    Right.  The handyman, I'm not sure was involved in this, but the housekeeping manager would have been -- likely would have been him.

Q.    Do you know if he would have himself gone to Staircase 160, Deck 3 where the carpet was coming off, if he himself would have gone there to see that it was fixed properly?

A.    I'm not sure what they do once the work is done, if they will call back the requester or if they just get it done and closed out.  I don't think that they do, based on the volume of work orders that there are.  I

Monica Borcegue
May 19, 2026

don't think they could physically do that with everything, but that would be a question for housekeeping.

Q.   Actually, it looks like there was one more, which is the final page, but may have been the first in time, which is January 2024 for a handrail being loose; correct?

A.   Correct, January 7th.

MR. COURTNEY:  Why don't we take a break, guys. Do you want five minutes or ten minutes?  Whatever you prefer.

THE WITNESS:  Let's do ten minutes.

MR. COURTNEY:  You got it.  See you in ten.

THE WITNESS:  Thank you.

(Thereupon, a short recess was taken, after which the following proceedings were had:)

BY MR. COURTNEY:

Q.   Okay.  So we reviewed a number of previous incidents, and we saw all different kinds of, you know, factors that could play a role in a fall.  It seems to me, like, from what we saw in terms of involving the nosings, it would be either that a person's shoe got wedged into the strip somehow or maybe the heel or part of it caught underneath the metal or the person maybe slipped on the metal portion of it, if it was wet.

Monica Borcegue
May 19, 2026

Are those the different kinds of factors that we saw in terms of the cases involving the nosings that we reviewed?

A.   In the specific ones that we reviewed, those were some of the reasons.

Q.   Okay.  Were there other reasons that you could think of in cases involving nosings that we didn't discuss where the nosing itself played a role?

A.   Not that I -- not that I can think of off the top of my head.

Q.   Is the case with Ms. Dalfino the only one that you came across where Carnival stated that something had to be done to fix the actual nosing?

MR. JARNAGIN:  Objection.

THE WITNESS:  I -- I can't remember.  I'd have to go through all of them to make sure.  It's nothing that comes to mind.

BY MR. COURTNEY:

Q.   Okay.  I'm just going back over just a few documents that I haven't gone over with you at all, and this was part of the first production that you made.  It was towards the end.  It was, I guess, 97, I believe -- or let me see.  It had to do with, like, day shift reports from housekeeping, and I'm going to just group them all together for -- I think it was 97 through 104,

Monica Borcegue
May 19, 2026

and I would just call these Exhibit 17.

(Plaintiff's 17, Bates Stamp 97 through 104, was marked for identification.)

BY MR. COURTNEY:

Q. Are you able to access those?

A. Yes. So 97 through -- well, 97 and 90- -- 97, 98 and 99 are all housekeeping shift reports for that voyage. It would be for the day before the incident, the day shift for June 11th; then the day shift report for June 12th; and then the night shift report for June 13th. That's what we had on the voyage.

And then Bates stamp 100 to 103 would be housekeeping job descriptions. So you have the housekeeping manager, the hotel steward. Now they go by housekeeping attendants, but it's the same position. And you have the house- -- the assistant housekeeping manager position. And then the final document would be the schedule. Bates stamp 104 would be the schedule for housekeeping on the date of the incident during the day shift.

Q. Okay. So let me ask you a few questions. In terms of starting with the final page, which was the day shift sign-on sheet, do you see there which crew member would have been responsible for maintaining the area where this incident occurred?

Monica Borcegue
May 19, 2026

A.   Yeah.   Let me get the information.   So for day shift there would have been two of them.   It would have been last name Lezama, L-E-Z-A-M-A, and last name Billano B-I-L-L-A-N-O.

Q.   And it looks like, for the most part, there are a number of tasks that are common between the two of them for the day shift; correct?

A.   Right.

Q.   And do you know generally how often they or at least one of them would have been around the Deck 10 forward staircase?

A.   No.   They're not on a time -- like a clock or a limit or a schedule.   They are to visit the zones that they're assigned to on a continuous basis, but it depends on how long certain things are taking them.   Like, if they're in charge of, for example, the elevators and there's something spilled in an elevator, it might take a little longer to finish that task and move on to the next area.   So they're just on a rotating basis, just hitting all of those different points throughout the shift.

Q.   Would your guess be that their schedule would have been something like 5:00 a.m. to 5:00 p.m. with those two breaks or 6:00 a.m. to 6:00 p.m.?   Go ahead.

A.   No, the day shift is 6:00 a.m. to 6:00 p.m.

Q.   And then they get two breaks, and they could

Monica Borcegue
May 19, 2026

also take dinner afterwards, or whenever they're off, they're off?

A.   Right.   When they're off, they're off. 6:00 p.m. would be the time that they're off.   And then you can see their break time is listed on the schedule.

Q.   What's your understanding as to whether Mr. Lezama is currently on a ship and what's his sign-off date, if so?

A.   I can get you the information quickly.   I don't have it, but I can look it up.

Q.   Thank you.

A.   Yep.   So Lezama is first name Jasmine.   She's no longer with the company.   She took a leave of absence sometime in 2024, October 2024, and she never returned.

And Billano, first name Vincent, he's on vacation.   He's scheduled to come back June 4th on board the MIRACLE.   That's subject to change, but that's what's on the schedule for now.

Q.   Okay.   And then in terms of the shift reports that were provided in this case, there were three different ones:  Day before, day of, and then following night.

How was it --

A.   Correct.

Q.   How was it determined to provide those three?

Monica Borcegue
May 19, 2026

A.   I will check what was sent from the ship.

I'm not sure.  I have -- that might have just been an oversight with the production because I have a day shift report and a night shift report for 6/11 and 6/12, and I also have a night shift report for 6/13.  I don't believe that there was a day shift report for 6/13.  That happens sometimes.  Sometimes they don't fill them out.  So I -- we have night and day for 11, 12, and then the one you have for the 13th.

Q.   And the one that's on the day of the incident -- so it's June 12th.  It would be Bates stamp 98, and it shows that the name of the manager is Vernon Fernandes; correct?

A.   Correct.

Q.   And this is the same Vernon Fernandes that would have been making that work request the day before for a different staircase and different deck; correct?

A.   That's correct.

Q.   And this would be the same Vernon Fernandes who would have been identified in the security watch report; correct?

A.   I believe so.

Q.   Where is he right now in terms of is he on a ship, or what's his story?

A.   I can look.

Monica Borcegue
May 19, 2026

Q.    Thank you.

A.    All right.  He is on the HORIZON and scheduled to be there until October 10th of this year.

Q.    As long as we're looking up people, one more, if you don't mind, and that's Security Officer Yogendra Rawat?

A.    He is on the ELATION, scheduled to be there, oh, until next week, and then he will join the MAGIC. There's no sign-off date as of right now for the MAGIC. He's transferring ships.

Q.    And so in this -- thank you for that.

A.    Yes.

Q.    In this Bates stamp 98 -- and I see that it mentions in the middle of the "Public Area" section, "Forward, midship and aft staircase and elevators were cleaned and constantly disinfected."

This is almost more of, like, a lawyer's question, but I imagine that, when it talks about cleaning and constantly disinfected, it's referring to all the staircases as well, not just the elevators.  Is that fair to say?

A.    I'm still looking to see where you're -- oh, I see.  "Forward, midship and aft staircase and elevators" -- yes, that's correct.

Like I explained, sometimes they have glass

Monica Borcegue
May 19, 2026

partitions.  Those are cleaned.  The handrails are cleaned.  So that's what they mean by the disinfected.  The elevators, same, like where the numbers are, the doors, all that, that's all wiped down.  That's part of their continuous job duties.

Q.   As far as you know, the shampooing of the flooring and the carpets, is that typically done during the day or at night?

A.   No, that's done at night.  Usually after midnight before the morning hours, that's when there's less passenger traffic.  So that's when they would do that.  And that is on a schedule.  So that's all listed in the night shift report.

Q.   And would that be something where, after they shampoo, is it air dry or is there some kind of device that's used to dry it, or what's your understanding, if you know?

A.   I'm not sure.  I don't know what the process would be.  Since that's not really an issue in this case, it's not something that I asked about on the ship.

Q.   Monica, you've had many years of experience where you've learned quite a bit.

A.   I know quite a bit.  I'm not sure about shampooing of the carpet.  That one is new to me, but I learn every day.

Monica Borcegue
May 19, 2026

Q.   Going back to some of these areas of inquiry that we had in our notice, in terms of any and all video in Carnival's possession that's related to this case that has not been produced, is there any?

A.   No.

Q.   Was body-worn camera ever used in this case?

A.   No.

Q.   Did Carnival take any photographs at or near the time of the incident related to this case?

A.   No.

Q.   In terms of any investigation by Carnival into this incident, we have -- after the security watch report, I guess that -- that would have been submitted to an assistant chief security officer to put into a daily summary watch report?

A.   Correct.

Q.   And then that could be made part of the voyage report at the end of the cruise.  Is that fair to say?

A.   We don't really do an end of the cruise voyage report.  It's just done by day.  So the summaries are for, you know, that day.  All the reports are compiled into that, and that would be it.

Q.   And the daily security watch reports -- excuse me.

The daily -- the summary security watch

Monica Borcegue
May 19, 2026

reports, those are shared with shore side?

A.   Not unless we specifically request it.  I don't know if security has their own, you know, way of doing things with those, but those are stored on the ship.  And we -- we access them only when we need to.  I request them from the vessels, and they send me a copy.  But other than that, I'm not sure that they're shared in any other way.

Q.   Is every accident report shared with shore side automatically?

A.   Every -- you broke up -- accident report?

Q.   Correct.

A.   We have access to the database.  So shore side can access it once they input it.  Again, I don't know if they have any sort of alert in any other department.  We -- we don't.  We just go in there and search for it as needed.

Q.   For example, if there's a highly sensitive matter or very serious injury case people from shore side who work in the security department may assist the people on the ship in conducting the investigation.  Is that fair to say?

A.   I'm not really sure.  I mean, that would have to be, like, something -- you know, like an assault or something criminal.  That's where, I believe, shore side

would take over the investigating, and they would get other agencies involved and things like that.  But as far as, like, slip-and-falls, I don't believe that shore side has anything to do with the investigations.

Q.   Can you tell me about Plaintiff's cruise history with Carnival?

A.   Sure.  So she sailed once before with us, and I can tell you when that was.  She said in 2022.  It was August 11th on the CARNIVAL MAGIC.

Q.   Significant donation to the casino on that trip?

A.   I don't see specifics, but onboard spending was almost $4,000.

Q.   Okay.  In terms of the injuries that she sustained as a result of this incident, do you dispute any of the incidents -- any of the areas of her body that she claimed were hurting her after the fall that she reported at the time of the fall?

A.   That, I would defer to a medical expert.  Like I said, I've only reviewed the onboard medical records, nothing prior and nothing after.  So that would be a question for our medical expert.

Q.   Have you yourself seen anything that causes you to doubt her complaints?

A.   I know that there are MRI results, I believe,

Monica Borcegue
May 19, 2026

where she's had prior degenerative conditions of her right shoulder and things like that.  I know of them, but like I said, I -- you know, I would defer that to a medical expert just because I haven't really reviewed records and I'm not a medical professional.

Q.   So I'm aware of a previous MRI to her lower back.

Are you saying that there is MRIs of her right shoulder as well that she had before this incident?

A.   I know she had a right shoulder surgery.  I'm not sure if the imaging is also for the right shoulder.

Q.   Okay.

A.   But I know there are several things regarding, like, her back and shoulder.  Like I said, I haven't reviewed any previous or post records.  So I couldn't really go into detail.

Q.   Okay.  What's your understanding of -- for No. 10, warning signs, cones that were physically within 25 feet of the site of the incident?

A.   I don't believe there are any signs that are permanently near the staircase or on the staircase, and I don't believe that there were any foldable or removable signs in the area that day.  There was no need for that.

Q.   "Carnival's policies and procedures for warning guests of the possibility and/or danger of falling aboard

Monica Borcegue
May 19, 2026

Carnival ships, specifically by stairways, interior and exterior."  I think you mentioned one thing earlier about that there might be a warning that's on the video loop that deals with the movement of the ship.

Are there any other things that you could think of where people are warned about the possibility and/or danger of falling, specifically on stairways interior and/or exterior?

A.   No.   There's nothing specific to stairs.   It's just those general messages that I mentioned on the flyer, the "Good to Know" flyer is what it's called.   The daily "Fun Times" newsletters that are delivered to the cabin and also the videos on the TV that will tell you to watch your step, you're on a moving vessel, hold on to handrail, just general things like that.   Nothing specific to the -- to Staircase 270.

Q.   What is Carnival's position as to what, if anything, Carnival should have done to prevent this incident?

A.   I don't believe that there was anything that we could have done differently.

Q.   And the next thing is regarding Carnival's position as to any comparative negligence on the part of the Plaintiff.  I think you already indicated that you believe that she's responsible for this incident as a

Monica Borcegue
May 19, 2026

result of missing a step, not using the handrail, not looking down and seeing the condition, to the extent that it did exist at the time of her incident before she hit it.

Is there anything else that you can tell me that Carnival is using to support its position that the Plaintiff was comparatively negligent?

A.   I believe I also mentioned the fact that she has prescription glasses.  She wasn't sure she was wearing them at the time.  That could have also contributed to it.  And I believe that's all I have as I sit here today.

Q.   The next area of inquiry is the policies and procedures regarding the maintenance of the subject flooring.

We discussed the Own the Spill policy and how really all crew members are supposed to be on the lookout for anything that could be a danger.  Beyond that, I think you indicated that there's inspections that are not documented, but people are -- I guess housekeeping specifically, when it comes to the stairs, would be looking out for things.

Is that fair?  Is that what you said?

A.   Right.  The visual inspections that are carried out during cleaning, routine cleaning, day shift, night

shift.

Q.   Okay.  Is there anything else regarding the maintenance of the particular floor area where this occurred that comes to mind?

A.   No.  Generally, you also have the vacuum Two Minute Trainer, which is about trailing wires, basically, you know, put up a sign when you're vacuuming.  The vacuuming is done late at night also.  The carpet shampooing we have talked about.  That's something that's done on a schedule, but that's basically how the stairs are maintained.

Q.   The next one has to do with the preservation of CCTV footage capturing slip-and-fall incidents.  You indicated to me that -- well, I don't want to put words in your mouth.

What is the policy and procedure that was in effect at the time of the incident regarding the preservation of CCTV footage for capturing slip-and-fall incidents?

A.   So, basically, it's part of the accident report investigation and what is saved is at the discretion of the investigator.  Usually, they will save a little before and a little after of the incident when it's -- when it's on the footage.  But there is no set time limit that's at their discretion.

Monica Borcegue
May 19, 2026

In this case, there was no video reviewed because there was no investigation.  Usually, if there is, the investigator will look for it, will look for any angles of any cameras that may have captured it, and then they save whatever they find as part of the accident report investigation.

Q.   Did you or anyone on your behalf speak to anyone that was on the ship to determine if they viewed any CCTV footage?

A.   I have requested not specifically as for whether or not they reviewed any or anything like that.  I just requested just, to make sure that we don't have any, and they've answered back that, you know, there's nothing, there's no investigations, no BWC, none of that.  That would have been the chief security officer on board the vessel.  I'm not sure when I sent that e-mail.

And then I'm trying to think if maybe counsel has had any conversations with -- with security.  I believe they've talked to Security Officer Rawat, but I don't believe that they spoke about anything about CCTV.

Just -- I would say just the security team on board.

Q.   Looking back, given that she had that injection and was told to see an orthopedic surgeon as soon as possible, would you expect in this situation for the

Monica Borcegue
May 19, 2026

medical center to let security know about the

significance of her injuries and therefore to conduct an

accident investigation?

MR. JARNAGIN:  Object to form.

THE WITNESS:  Again, it was first aid treatment

that was given to her.  It was just a pain medication

she requested.  And if she had questions about her

injury, which is what it seems like to me the doctor

was counseling her on, he suggested she follow up at

home because we don't have the imaging that he was,

you know, suggesting she asked for.  An MRI or CT,

that's something that she would have to do at home.

So I don't think that because he counseled her

that makes it, you know, any more severe.  I think it

was just first aid treatment that was given to her.

BY MR. COURTNEY:

Q.   What's Carnival position as to whether or not

it would show a guest on a ship CCTV footage in the event

that the guest was asking about the cause of their

accident?

A.   I don't believe that footage is shared with

guests.

Q.   We discussed, I think, already No. 17 that the

CCTV camera that was closest to the site of the incident,

it would have recorded this incident; correct?

Monica Borcegue
May 19, 2026

A.    I believe it does capture that top step area on Deck 10.

Q.    The next one in terms of whether any member of Carnival's crew reviewed the CCTV, I know we discussed it and sounds like you don't know if security did or not, but you're not aware of anyone within the whole Carnival shore side, ship side that has reviewed CCTV of this incident; correct?

MR. JARNAGIN:  Form.

THE WITNESS:  Yeah.  There was no reason for them to do so because there was no investigation.  So I don't believe anybody did review any cameras that day.

BY MR. COURTNEY:

Q.    Can you tell me about the Focus Team?

A.    Focus Team is comprised of a few department heads on board that will meet and discuss certain things about guests.  I guess onboard safety would be mostly what they discuss, incidents and such, and that's all part of the monthly safety meetings.  There are two main meetings.

I believe they are -- or their results of their meetings are discussed in the HESS Action Team meeting, with is a monthly meeting with all the department heads, staff captain, the CSO, the doctor, housekeeping manager,

et cetera.

Q.   So the most higher-ups people on the ship would be part of the HESS Action Team but not the Focus Team?

A.   I'm not sure who is on the Focus Team.  I can -- I can look that up.  Let me get a meeting from the ship so I can tell you exactly who it is.

The guest Focus Team, it's basically for -- a forum for management to identify, evaluate, and correct safety issues.  To promote best practices and to establish a safety culture where, you know, sharing ideas is encouraged.

Here, we have the guest services manager, the safety officer, the housekeeping manager, food operations manager, and entertainment director, security, beverage operations, and then sometimes -- it says "optional" -- the pool and deck supervisor can come.  Medical can send somebody.  The youth staff can send somebody.  Shore excursions can send somebody.  Photo, retail, casino, and the spa can also send somebody.  That's optional they don't always attend.

Q.   Of that whole group, who would be the highest level?  Would it be the guest services manager?  Or would it be safety officer?  Or who do you think would be the highest of that whole group?

A.   I would say that they're all equals amongst

Monica Borcegue
May 19, 2026

their departments.  It's -- you know, it's different
department heads.  So everybody is management pretty
much.

Q.   And the HESS Action Team is, like, the higher
levels of each of those things, basically?

A.   So the HESS Action Team meeting has officers
attend.  I'll go through that list with you.

Q.   Thank you.

A.   It would be the staff captain, the ship's
physician, the staff chief engineer, the electronics
officer, safety officer, environmental officer,
housekeeping manager, the CSO, the guest services
manager, the cruise director, the human resources
director.  I believe that's it.  I said chief security
officer.  Beverage operations manager.  That's about it.

Q.   Is the hotel --

A.   And then they can have other -- I'm sorry.
They can have other representatives, if they choose to
come, from different departments, but those are not
required.

Q.   I didn't hear you mention the hotel director.

Is that now the cruise director, or is that a
different position?

A.   No.  The hotel director is still a position.  I
don't see that he is listed on here or she.

Monica Borcegue
May 19, 2026

Q.    Uh-huh.

A.    No.  I'm looking.  I don't see that position required.

Q.    Okay.  And then the HESS Steering Committee, how is that different than the HESS Action Team?

A.    That is the HESS Action Team.

Q.    Right.  And so we had in paragraphs 24 and 25 requesting information about the HESS Steering Committee. Is that a different group or --

A.    Oh, Steering Committee is different.  Right. That's a different meeting.  I can get you that one as well.  The Steering Committee will have the captain, the staff captain, the hotel director, the chief engineer, the human resources director, and the environmental officer.

This meeting is a bit different.  They talk about not so much like the accident reports and things like that.  This is more like what kind of inspections are coming on board, like Coast Guard inspections, or what we have planned as far as different ports of call or how much compensation guest services gave out for certain issues like, you know, noise levels or complaints or casino.  It's more about guest satisfaction than the safety aspect of it.

Q.    And so are you aware of any changes that were

Monica Borcegue
May 19, 2026

made to policies, practices, and procedures as they

pertain to falls in the last five, six years as a result

of any of these meetings, whether it's for the Focus Team

or for the HESS Action Team or HESS Steering Committee?

MR. JARNAGIN:  Object to form.

THE WITNESS:  Not -- not involving the

staircase at issue here.  It's possible that for

other areas of the vessel maybe, but I -- nothing

that comes to mind as I sit here today.

BY MR. COURTNEY:

Q.   What about -- what is something that comes to

mind that other areas of the ship outside of stairwells?

A.   I'm not sure.  Like, I don't have a specific

instance that I remember or something specific, but it's

possible that changes can come out of these meetings.

That's the point of the meetings.  They share ideas, and

if they see room for improvement or if something needs to

be changed or worked on or maintained, repaired, et

cetera, that's the forum to do it.  So it's possible

that, you know, some of these meetings have brought some

changes but nothing really stands out.  It's not

something that I look at often enough to -- to recall or

anything like that.

Q.   I thought I saw somewhere that maybe it was on

the VISTA where there was, like, multiple incidents

Monica Borcegue
May 19, 2026

involving falls on interior stairs.  It was mid and aft dealing with because of moisture that was coming in maybe through the Lido deck.

Does that ring a bell to you at all?

A.   Not staircases, no.

Q.   But you've seen the cases where it's like on the other side of the sliding glass door, the condensation?

A.   Years ago I remember something about condensation, but that was more open decks and, like, doorways and things like that, not staircases.  And that was -- I don't even remember what ship that was.  That was years ago.  You're putting my memory to the test today.

Q.   Hey, that's what I'm here for.

Would you agree that by putting the nosing back in place in -- the metal portion of the nosing, by putting the rubber back in place, that would be a corrective action?

A.   You could describe it that way, I guess.  If it's in direct relation to an accident, maybe it was a corrective action that was taken as a result of an incident.  That could be a way to describe it.

Q.   Are there other corrective actions that you're familiar with that were taken by Carnival following any

Monica Borcegue
May 19, 2026

of the fall incidents that were disclosed in this case?

A.   Not without referring to the documents.

Q.   What's Carnival's policy and procedure for logging or documenting fall incidents that occur on board the VENEZIA?

A.   Same as for the entire fleet.  It's the accident reporting procedures where any guest that goes to medical and receives more than first aid treatment would have an accident report investigation initiated.

Q.   And so ones that just go for first aid, is there a log that's kept of people who are injured where it was only first aid?

A.   No, not other than medical records, but nothing about security or, you know, the incident specifically or anything like that.

Q.   Other than the HORIZON making their warranty claim, are you aware of other Carnival ships that made warranty claims pertaining to rubber strips on guest stairs not fitting the rail?

A.   No, not that I'm aware of.

Q.   No. 30 asked about Carnival's awareness of the dip in the carpet leading up to the first stair in the subject staircase.  We talked about this a little bit earlier.  Is it your position that there is no dip?

MR. JARNAGIN:  Objection.

THE WITNESS:  I'm not aware of any -- I'm not aware of any dip, as I sit here today.

BY MR. COURTNEY:

Q.   Pulling something up.  Give me a second.

Do you recall I showed you a photograph where we were talking about -- I guess, you described it as -- it was like a black -- I think you saw it as a black line.  So you weren't sure what was there.

Do you recall that?

A.   Yes.

Q.   Let me see if I can show you.

Do you see towards the top -- do you see where I'm making a circle around with my cursor?

A.   Yes.

Q.   And I'll represent to you this is a photograph that was taken by our expert when he went to inspect the ship in the last few months, and you see there's, like, a black -- hold on.  I know the word -- stanchion that is being used to block off the staircase?

A.   Yes.

Q.   And so I'm going to make a circle around an area that's by the railing at the top of the landing.

Do you see the circle I'm making?

A.   Yes.

Q.   Did you notice here how the floor kind of dips

Monica Borcegue
May 19, 2026

down and then up, kind of like a letter U, as it approaches the nosing?

A.   I don't really see a difference.  I -- it could be a carpet.  I couldn't -- without looking at it, I don't want to agree with something I don't really see.

Q.   Nor should you.  So I'm just going to zoom in a little bit more.  And I'm going to see if I can convince you right here on this Tuesday afternoon, Monica, that there is a dip here that goes -- the carpet dips down, like in a letter U, and it goes up towards the nosing. I'm going to ask you if you see that.

A.   I don't -- I don't see what I would describe as a dip.  I just don't see that from this photograph.

Q.   You would say this is like a level surface?

A.   I -- it looks to me like it is.  I don't see that it is a dip.  I wouldn't describe it as that.

Q.   Okay.  I'm going to try to make that photograph Plaintiff's Exhibit 18.

(Plaintiff's 18, Photograph, was marked for identification.)

BY MR. COURTNEY:

Q.   And so while you were unable to see what I see, are you familiar with other cases on other ships where it has been alleged that there is a dip that leads to that first nosing in an interior staircase?

Monica Borcegue
May 19, 2026

MR. JARNAGIN:  Object to form.

THE WITNESS:  No, I'm not.

BY MR. COURTNEY:

Q.   Are you aware of any cases that Carnival is either actively handling or has handled where people allege that there is a carpet that dips prior to going into a threshold?

A.   A threshold, not a staircase or just --

Q.   Correct.

A.   -- a regular threshold?

Not that I can recall.

Q.   Okay.

A.   I'm not sure.

Q.   Have you testified in any trials in the last three years?

A.   I believe I have.

Q.   Which cases have you testified at trial?

A.   I don't remember.  I don't remember.  I know I sit at some and don't testify, but sometimes I am called. I -- I think it was fairly recently.  It might have been this year, but I don't recall right now.  Maybe I think it was with Mr. Jarnagin, actually.  But I don't recall the name right now.  It's slipping my mind.  I'm in this -- I'm in depo mode today.

Q.   What kind of case was it that you --

Monica Borcegue
May 19, 2026

A.    I can look it up for you.

Q.    What kind of case was it that Mr. Jarnagin was the attorney for Carnival?

A.    I remember the gentleman.  It was about a stateroom light source going out.  So it wasn't a slip or anything like that or trip or fall or -- it was about the power going out in his cabin.  I don't recall his name right now, but I can look that up if you need to.

Q.    That sounds like a defense verdict to me.  No answer?  Did you guys get lit up on that one?

MR. JARNAGIN:  Actually, I think we separately discussed that one amongst ourselves, so...

MR. COURTNEY:  Cooper, I'm so old, man.

THE WITNESS:  How do you think I feel?  I can't remember these things.  I have to, like, look them up.

BY MR. COURTNEY:

Q.    Were you involved in the case where Carnival grossly overserved that poor lady who cannot remember 30 minutes of her life?

A.    Unfortunately, I was there for that week.  I did not testify in that case, but I was at that trial.

MR. COURTNEY:  Carnival is not using all their weapons, Cooper.  I don't know what's going on.

MR. JARNAGIN:  I can't speak on that one.

Monica Borcegue
May 19, 2026

THE WITNESS:  I don't want to speak on that one.

BY MR. COURTNEY:

Q.   Hold on.  Let's see.

I guess for No. 34 you would say that maintenance is permitted to conduct maintenance to interior staircase nosings without an official work request submitted.  Is that fair to say?

A.   You broke up at the beginning.

Q.   Sure.

A.   Repeat it.  Sorry.

Q.   Carnival's maintenance is permitted to work on interior staircase nosings even if there's no official work request submitted?

A.   Yes, yes.

Q.   If there's no work request submitted, would you expect there to be some documentation from the handyman or from some supervisor of a department that is involved?

A.   No.  They are free to just take care of something and, you know, move along if it's easy enough to do.

Q.   It saddens me to say this, but I have no other questions for.

A.   All right.

MR. JARNAGIN:  I'm happy to say I don't have

Monica Borcegue
May 19, 2026

any questions for you, Monica.  So thank you --

THE WITNESS:  Perfect.

MR. DRAHOS:  -- for your time today.

MR. COURTNEY:  Pleasure, Monica.

THE WITNESS:  Thank you guys.

MR. COURTNEY:  Thank you so much.  Thank you.

THE WITNESS:  Thank you.

MR. COURTNEY:  Would you like to read or waive?

THE WITNESS:  Read, please.

MR. COURTNEY:  Great.

THE COURT REPORTER:  Will you be ordering this?

MR. COURTNEY:  Yes, I'll be ordering.  And I need to get to you, I guess, the exhibits which will take a moment or two.

THE COURT REPORTER:  Mr. Jarnagin, do you want a copy?

MR. JARNAGIN:  Yes, we'll take a copy, please.

(Reading and signing of the REMOTE DEPOSITION was not waived by the witness and all parties.)

Monica Borcegue
May 19, 2026

CERTIFICATE OF OATH

THE STATE OF FLORIDA,

COUNTY OF PINELLAS.

          I, Joanne Caudill, Florida Professional Reporter, Notary Public, State of Florida, certify that MONICA BORCEGUE personally appeared before me on the 19th of May, 2026 and was duly sworn.

          Signed this 1st day of June 2026.

_____
Joanne Caudill, FPR
Notary Public, State of Florida
Commission No.:  #FF-687260
My commission expires:  September 14, 2029,

JOANNE CAUDILL
Commission # HH 687260
Expires September 14, 2029

Monica Borcegue
May 19, 2026

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA,

COUNTY OF PINELLAS.


        I, Joanne Caudill, Florida Professional Reporter, certify that I was authorized to and did stenographically report the REMOTE DEPOSITION of MONICA BORCEGUE; pages 1 through 185; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

        I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 1st day of June 2026.

_____
Joanne Caudill, FPR
Florida Professional Reporter

WITNESS NOTIFICATION LETTER

June 1, 2026


MONICA BORCEGUE
C/O
GRAYROBINSON, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
(561)268-5727
COOPER.JARNAGIN@GRAYROBINSON.COM
W. COOPER JARNAGIN, ESQUIRE


IN RE:  NANNETTE DALFINO VS. CARNIVAL CORPORATION
        REMOTE DEPOSITION, TAKEN ON MAY 19, 2026
        U.S. LEGAL SUPPORT JOB NO. 7146765-001


THE TRANSCRIPT OF THE ABOVE PROCEEDING IS NOW AVAILABLE
FOR YOUR REVIEW.


ANY CORRECTIONS YOU WISH TO MAKE TO THE TRANSCRIPT SHOULD
BE MADE ON THE ERRATA SHEET.  PLEASE DO NOT WRITE ON THE
TRANSCRIPT ITSELF.


WE RESPECTFULLY REQUEST THAT THE WITNESS COMPLETE THEIR
REVIEW WITHIN 30 DAYS, AND RETURN THE ERRATA SHEET TO OUR
OFFICE. YOU NEED NOT RETURN THE ENTIRE TRANSCRIPT.


SINCERELY,


_____
U.S. LEGAL SUPPORT, INC.
16825 NORTHCASE DRIVE
SUITE 900
HOUSTON, TEXAS 77060-6004

CC VIA TRANSCRIPT:
DANIEL W. COURTNEY, ESQUIRE
W. COOPER JARNAGIN, ESQUIRE

Monica Borcegue
May 19, 2026

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT~ENTER CHANGES ON THIS PAGE

IN RE:  NANNETTE DALFINO vs. CARNIVAL CORPORATION
MONICA BORCEGUE
05/19/2026
JOB#  7146765-001

Page No.     Line No.      Change                    Reason
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read the
foregoing document and that the facts stated in it are
true.

_____                    _____
Date                            MONICA BORCEGUE

Monica Borcegue
May 19, 2026

---
**Exhibits**
---

**EX 0001 M. Borcegue 051 926**
 3:8 5:25 6:1
**EX 0002 M. Borcegue 051 926**
 3:9 6:11,12
**EX 0003 M. Borcegue 051 926**
 3:10 23:7,8 24:2
**EX 0004 M. Borcegue 051 926**
 3:11 35:9,10 42:3 46:20 49:5
**EX 0005 M. Borcegue 051 926**
 3:12 61:9,10
**EX 0006 M. Borcegue 051 926**
 3:13 72:4,5
**EX 0007 M. Borcegue 051 926**
 3:13 75:20, 24,25
**EX 0008 M. Borcegue 051 926**
 3:14 76:6, 22,23 82:17
**EX 0009 M. Borcegue 051 926**
 3:14 83:15, 16

**EX 0010 M. Borcegue 051 926**
 3:15 87:5,6
**EX 0011 M. Borcegue 051 926**
 3:16 91:3,4
**EX 0012 M. Borcegue 051 926**
 3:16 105:11
**EX 0013 M. Borcegue 051 926**
 3:18 107:17, 18
**EX 0014 M. Borcegue 051 926**
 3:20 139:13, 16
**EX 0015 M. Borcegue 051 926**
 3:21 144:9
**EX 0016 M. Borcegue 051 926**
 3:21 150:6,7
**EX 0017 M. Borcegue 051 926**
 3:22 158:1,2
**EX 0018 M. Borcegue 051 926**
 3:23 181:18, 19

---
**#**
---

**#270**
 46:25

---
**$**
---

**$157.80**
 72:1
**$38.92**
 72:15
**$4,000**
 166:13
**$77.84**
 72:10,14

---
**1**
---

**1**
 5:25 6:1 61:14,18
**10**
 20:8 25:6,7 44:16 45:2 46:25 59:4 82:14 87:5,6 125:2 133:13 134:17 145:5 151:13 159:10 167:18 173:2
**100**
 101:18 110:16 111:22,24 149:5 158:12
**103**
 158:12
**104**
 60:9,10,21 157:25 158:2,18
**104-page**
 60:15
**105**
 150:4,5,7
**108**
 150:4,6,7
**109**
 138:17,21 141:2,12,20

 142:10
**10:00**
 152:15
**10:22**
 73:15
**10:23**
 152:15
**10:30**
 100:11 101:10
**10:35**
 26:12 29:5, 22 30:18
**10th**
 58:23 162:3
**11**
 91:3,4 127:2 134:16 137:7 155:3 161:8
**11:00**
 132:12
**11:21**
 58:8
**11:30**
 58:8
**11th**
 158:9 166:9
**12**
 24:12 41:12, 20 105:10,11 120:19 154:13 161:8
**12:00**
 25:20,25
**12:45**
 24:14 62:12, 13
**12:50**
 41:18
**12:51**
 29:23 30:3, 18 31:7 34:13
**12th**
 44:3 59:8, 13,15,16,24 63:3,10,21

64:3 65:1,4,
7,19 71:25
73:15 98:19
158:10
161:11

**13**
107:17,18
120:17

**13th**
158:10 161:9

**14**
19:10,11,22,
23 20:4
110:18
131:18
137:14,25
139:13,16

**14-day**
19:13

**140**
113:12

**15**
74:17 144:7,
9

**15:00**
26:5

**15th**
105:16

**16**
136:6 150:6,
7

**160**
125:2 150:24
151:5 155:19

**165**
138:16

**17**
87:24 158:1,
2 172:23

**17-page**
15:16,20
16:24 17:8
50:20 87:2,
6,18

**17th**
62:22 63:22
64:1,11

65:10,14
69:12,15
72:9

**18**
76:14,17,21
181:18,19

**18th**
59:6 102:22

**19**
77:2 107:17,
23 108:4
132:9 138:5

**19th**
139:22

**1:30**
152:14

**1:34**
152:14

**1:48**
155:9

**1st**
130:9

———————

**2**

**2**
6:11,12
132:25 145:2
153:13

**2.8**
113:7,8

**20**
5:3 76:14,17
105:2 111:20
134:8 137:8

**20-**
95:25

**2006**
112:11

**2007**
112:15
113:25

**2011**
5:11 112:7,8

**2018**
96:1 97:2

**2019**
97:2 148:20

**2022**
148:21 166:8

**2023**
95:20,21
96:5 120:19
122:17,20
124:1,12
125:20 126:7
127:2 129:2
130:9,15
131:5,18
132:9
150:14,16

**2024**
13:12 14:2,
15 16:9,15,
25 17:4,7,
22,24 18:4,
16 19:5
24:12 41:12,
20 44:3 59:4
88:1 98:19
102:12
133:10 134:8
135:3 151:13
154:13 155:3
156:6 160:14

**2025**
16:17

**2026**
105:17
107:17,23
108:4 138:5
139:22

**21**
19:24 76:17
137:10

**21st**
125:20

**22**
76:17,21
116:12
138:12

**22-page**
138:4

**23**
83:7,14

**24**
122:17,20
124:12 140:3
176:7

**25**
7:18 140:22
167:19 176:7

**26**
83:14

**270**
25:12,14
32:10,17
96:22 106:12
131:4 150:24
151:6 153:11
168:16

**27th**
127:12

**28**
17:22

**29**
6:8 18:4
129:2 150:16

**29th**
17:24 18:25

**2:40**
6:5

———————

**3**

**3**
23:7,8 24:2
62:16,22
130:15,23
153:12 154:2
155:19

**3.3**
77:5

**30**
19:16 126:7
137:7,24
151:13
179:21
183:20

**300**
  7:13  8:3
**30s**
  67:25
**30th**
  152:13
**31**
  6:8  135:3
**31st**
  152:14
**32**
  6:8
**32104**
  154:25  155:1
**33**
  152:11
**34**
  184:5
**35**
  5:16,21
**38.92**
  72:19
**39**
  124:17,18
**3:00**
  25:20,21,25
  26:3  30:6
  50:7  61:17
**3:58**
  71:25

---

**4**

**4**
  35:9,10  42:3
  46:20  49:5
  111:19  129:5
  130:22
**40**
  80:10  83:22
  85:18
**42**
  86:18
**43**
  86:18,19
**44**

**86:19**
**487**
  143:23
**49**
  86:20
**4:00**
  29:12  41:24
  42:14  121:7,
  25
**4:10**
  29:17  30:4
**4:39**
  33:25  35:1
**4:40**
  34:20
**4:50**
  34:20  35:13
  41:19  42:4
**4:52**
  72:9
**4:58**
  154:13
**4th**
  160:16

---

**5**

**5**
  61:9,10  65:5
  66:1  129:5
**50**
  87:2  151:1
**500**
  64:4  142:2
**51**
  88:4
**52**
  88:5  101:8
**58**
  121:9
**593**
  141:2,12,20
  142:10
**595**
  143:24  144:8

**595-598**
  144:9
**596**
  144:13
**598**
  144:8
**599**
  145:14,15,
  22,23
**5:00**
  133:16,17
  159:22
**5:10**
  123:2
**5:23**
  29:9,14  31:7
  34:12,14
  35:1,23
  36:8,11,13,
  19  43:3
**5:50**
  124:22
**5:55**
  121:23,24

---

**6**

**6**
  17:4  65:21
  66:2,3  72:4,
  5  106:2
  133:10
**6/11**
  153:25  161:4
**6/12**
  161:5
**6/13**
  161:5,6
**60**
  67:24  151:1,
  10
**62**
  123:6
**658**
  145:15,23
**659**
  146:20

**6:00**
  130:18
  159:23,24
  160:4
**6:30**
  134:11
**6:51**
  136:8

---

**7**

**7**
  75:20,24,25
**753**
  146:20
**754**
  148:6
**77.84**
  72:18
**7:30**
  127:15
**7th**
  105:17,23
  156:8

---

**8**

**8**
  76:6,22,23
  82:17  116:12
  131:5
**8-page**
  139:22
**803**
  148:7
**805**
  148:10
**80s**
  150:2
**84**
  124:16
**845**
  138:21
**845-page**
  139:6

Monica Borcegue
May 19, 2026

**861**
148:10

**8:15**
135:6

**9**

**9**
83:15,16
122:22
133:14

**90-**
158:6

**900**
22:6 27:16
28:12

**90s**
150:2

**942**
149:13,15

**97**
157:22,25
158:2,6

**98**
158:7 161:12
162:13

**99**
158:7

**A**

**A-V-O**
126:2

**a.m.**
26:12 29:5,
22 30:19
73:15
159:22,23,24

**Abascal**
12:17

**abbreviations**
44:14

**abduction**
66:8,13

**ability**
60:14

**able**
7:16 19:16,
21 32:20
38:18 101:16
116:12 117:4
150:10 155:2
158:5

**abnormal**
65:23 66:9,
11

**aboard**
167:25

**above**
4:3 20:6
21:15 54:3

**absence**
160:13

**absolutely**
4:21 7:21
98:3,5

**accept**
14:7 59:18

**accepted**
111:25

**access**
15:13 72:21
140:10 158:5
165:5,13,14

**accident**
15:24 16:7
21:8 30:22,
25 31:15
36:3,23
37:3,5,7,11,
18 41:4,8,
10,15 46:5,
22,24 47:13,
17,18 48:19,
21 50:2,15
52:25 64:23
68:17,23
93:12 98:20
100:3,10
104:23
108:6,9
110:5 114:13
117:6 122:2
123:10

124:24
125:13
127:25
129:16
132:5,17,23
140:24
144:17
145:4,7
147:10
165:9,11
170:20 171:5
172:3,20
176:17
178:21
179:7,9

**accidentally**
130:6

**accidents**
101:19
113:15,21
147:16

**accommodation**
82:9,11

**accommodations**
133:1

**account**
86:24

**accounts**
15:5

**accurate**
27:12 39:5
82:20 84:2
87:24 146:17
148:17

**acknowledgment**
14:12

**across**
10:6 141:19,
25 142:20,25
157:12

**act**
94:23

**action**
52:17 53:1
77:16 78:8

173:23 174:3
175:4,6
176:5,6
177:4
178:19,22

**actions**
178:24

**active**
65:24

**actively**
40:15 182:5

**activity**
71:19

**actual**
74:22 136:17
151:23
153:15
154:18
157:13

**add**
121:20

**added**
94:9

**addition**
94:8

**additional**
16:16 58:5
68:19,25
69:3 76:19
107:12

**address**
13:11

**addressing**
77:9

**adduction**
66:8

**adjuster**
11:15,22
12:21 13:2,
18 14:1,9,21

**adjusters**
11:23 17:11

**administered**
68:8

**administering**
69:4 70:12

Monica Borcegue
May 19, 2026

**admits**
143:6
**admitted**
114:1 143:1
**admitting**
143:9,18
**adverse**
68:8
**advice**
70:16
**advised**
26:11,22
29:22 31:4
44:21 45:24
69:22
**affect**
93:14 118:9
**affirmative**
98:11,23
102:6 103:4,
9 104:3,21
**affirmed**
4:12 130:4
**aft**
92:10 97:21
150:25 151:3
162:15,23
178:1
**afternoon**
48:17 181:8
**afterwards**
84:14 92:12
128:18 160:1
**age**
91:10
**age-appropriate**
66:3
**agencies**
166:2
**ago**
13:1,16
178:9,13
**agree**
27:21 32:8
38:4 52:14,
18,20,24,25

55:10 56:8,
21 59:22
60:23 61:3
68:10,21
70:7 77:10
78:25 84:13
94:4 101:13,
16 110:16
111:11,13
112:16
118:16,20
119:9,14
131:12 142:6
151:25
178:16 181:5
**agreeable**
117:9
**agreeing**
62:5
**agreement**
117:6
**agrees**
70:1
**ahead**
11:19 15:1
16:17 21:1
33:24 38:1
56:19 61:25
72:3 76:3
85:24 92:5
107:8 108:22
159:23
**aid**
21:8,10,15
31:1 47:18,
23,25 48:4,
8,11,13
50:18 64:5,
9,12,17,22
68:10 69:8,9
70:10,12,13
145:13
172:5,15
179:8,10,12
**air**
163:15
**alcohol**
40:20 121:10

123:3 124:19
127:16
130:19
132:3,13
133:18
134:12 135:7
136:9
**alcoholic**
40:15 100:13
101:11
121:16
**alert**
165:15
**alike**
111:17
**allegation**
53:20 84:4
102:9 105:4
115:22 130:1
**allegations**
98:10 102:18
116:3
**allege**
116:20 182:6
**alleged**
43:24 59:23
98:13 114:16
127:19 145:4
181:24
**allegedly**
47:1 59:7
**alleges**
7:23 33:11
34:15 115:1
**alleging**
114:24
**allowed**
32:16
**altered**
40:22
**alternative**
23:14
**amazing**
23:11 73:25
**ambulatory**
70:2

**amount**
32:4 112:24
**amounts**
129:23
**and/or**
17:7 33:10
112:17
154:16
167:25
168:6,8
**angles**
171:4
**ankle**
133:13
**announcement**
80:19
**announcements**
80:14,17
**answer**
8:8,11,25
9:11 16:19
22:14 103:8,
17 106:8
117:11
128:3,6
137:9
140:11,25
183:10
**answered**
19:2 104:10
105:18 128:1
171:13
**answering**
137:19
**answers**
105:9,12,15
107:19 137:5
141:22 142:4
**anti-skid**
42:5,10 47:1
49:18 51:2
116:21,22
117:18
123:7,13,20
126:14
135:10,16

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| **anti-slip**<br>79:20 80:8<br>82:2 94:5<br>**anybody**<br>17:13 32:7,<br>18 54:14,18<br>114:24<br>173:12<br>**anymore**<br>7:17<br>**anyone**<br>17:5,6 18:2<br>30:2 42:18<br>74:9 84:15<br>123:12 125:8<br>171:7,8<br>173:6<br>**apologize**<br>112:9<br>**apparent**<br>123:18<br>125:15<br>128:23<br>134:23<br>**apparently**<br>135:23<br>136:15<br>**appeared**<br>61:15 101:14<br>**appears**<br>72:9,22<br>136:2<br>**applies**<br>78:17<br>**apply**<br>77:22 78:18<br>**appreciate**<br>28:16<br>**approach**<br>53:9 89:14,<br>18<br>**approaches**<br>181:2<br>**approaching**<br>53:21<br>**appropriately**<br>115:7 | **approximately**<br>29:5 50:7<br>148:20<br>152:10<br>**approximation**<br>147:16<br>**area**<br>20:8,9 24:21<br>25:9 30:20<br>31:17,21<br>32:13,24<br>33:11 34:14<br>35:4 41:22,<br>23,25 42:18<br>43:15,19<br>49:6,11<br>50:24 51:23<br>54:9,16,17,<br>22 55:1,4,13<br>56:5,19 67:5<br>79:8 82:8,9,<br>10,11 84:23,<br>25 85:10<br>86:7 89:18<br>103:16<br>106:24 115:2<br>117:16 122:9<br>123:15<br>125:8,13<br>130:4 131:2,<br>6 132:23<br>133:1,2,5,6,<br>14,23 134:23<br>153:15<br>158:24<br>159:19<br>162:14<br>167:23<br>169:13 170:3<br>173:1 180:22<br>**areas**<br>5:17,22<br>19:17 32:25<br>77:21 81:17<br>92:20 93:4,5<br>98:9 164:1<br>166:16<br>177:8,12 | **arguing**<br>102:3<br>**argument**<br>117:12<br>**AROM**<br>65:25 66:8<br>**around**<br>13:4 26:12<br>29:21 30:17,<br>18 33:3<br>35:21 55:3<br>69:2 86:3<br>89:1 100:11<br>106:17<br>118:17,19<br>121:7,23,25<br>124:22<br>130:18<br>132:12<br>133:16,17<br>134:11 135:6<br>136:8 150:2<br>159:10<br>180:13,21<br>**arrangement**<br>72:13<br>**ascending**<br>114:21<br>119:22 120:3<br>**ascertained**<br>123:16<br>**asked**<br>18:13 48:21<br>77:17 104:9<br>163:20<br>172:11<br>179:21<br>**asking**<br>9:2,5 10:1,4<br>16:9 48:20<br>68:24 142:19<br>172:19<br>**aspect**<br>176:24<br>**assault**<br>165:24<br>**assessed** | 69:18<br>**assigned**<br>13:18 14:1<br>159:14<br>**assist**<br>6:23 165:20<br>**assistant**<br>11:12,17<br>12:4 44:15<br>45:1 54:20<br>158:16<br>164:14<br>**assisted**<br>133:25<br>**associate**<br>28:20 43:12,<br>14 44:25<br>45:6,10,22,<br>23 46:17<br>**assume**<br>26:19 46:2<br>66:19 88:10<br>**assumed**<br>50:12,17<br>**assuming**<br>27:4 46:1,14<br>92:6 96:12<br>**attached**<br>90:5<br>**attachments**<br>15:15 22:6,7<br>**attend**<br>174:20 175:7<br>**attendant**<br>54:21<br>**attendants**<br>158:15<br>**attention**<br>31:19 52:23<br>54:6 68:21<br>70:3 103:6<br>**attorney**<br>8:12 10:19,<br>25 11:5 12:1<br>14:11,13,17,<br>21 17:18,25<br>18:7,11,24 |

21:23 183:3

**attorney-client**
117:10

**attorneys**
10:9

**August**
14:15 16:9,
15 17:4 19:3
127:2,12
129:2 166:9

**authentic**
61:4 82:21
84:2 141:16
146:17 147:3
148:3,18

**automatically**
147:15
165:10

**available**
14:22 16:11,
20 37:3
41:5,11,13,
19 70:5
124:7,10
137:6 146:23

**avoid**
52:6 69:21
99:7 119:5

**avoiding**
120:12

**Avolio**
125:19 126:2

**aware**
5:12 9:24
18:2 29:25
30:8 53:9,
16,17 55:8
79:3 80:7
84:6 91:13
93:16 94:16,
19 95:22
98:18 102:10
103:20
110:23
111:9,23
167:6 173:6
176:25

179:17,20
180:1,2
182:4

**awareness**
179:21

---

**B**

---

**B-I-L-L-A-N-O**
159:4

**B-U-N-N**
131:3

**back**
13:7 14:2
16:9 21:20
29:15 34:10
35:3,22
36:18 42:24
44:18 45:7
53:4,5,7
56:7 57:14,
21,23 58:20
78:21 86:14
95:25 97:2
100:8 102:19
121:19
125:11
128:22 138:9
140:1,11
146:7 150:19
152:19
155:23
157:19
160:16 164:1
167:7,14
171:13,23
178:16,18

**bad**
8:15,17

**balance**
116:23 122:6
127:6,9

**balconies**
81:3

**barefoot**
134:25

**base**
67:6

**based**
25:17,22
34:12 66:16,
20 68:18
108:12
155:25

**basic**
38:13,16
47:23 64:8,
11,21 69:6

**basically**
21:14 30:15,
24 34:7
48:14 70:15
71:22 73:19
74:20 78:4
79:10 81:4
92:9 106:16,
22 170:6,10,
20 174:7
175:5

**basis**
39:6 40:7
102:8
159:14,19

**Bates**
60:10 80:10
86:19 88:4,5
138:17
141:20
142:10
144:8,9,12
145:14
148:6,7,9,10
150:5,7
158:2,12,18
161:11
162:13

**Bates-stamped**
143:24

**bearing**
101:21

**begin**
8:11 30:21,
22 111:19

**beginning**
184:9

**behalf**
6:18 10:2
11:7 171:7

**behind**
136:17

**believe**
10:19 13:3
14:3,14
16:12 18:5
20:8 29:10
31:9 38:7,8,
19 40:5
41:21 45:14,
20 47:6,10
49:20 50:23
51:5 52:3,20
57:15 58:20
59:13 61:9
62:12 63:20
65:4 71:14
72:24 73:18,
21 74:3,7
77:3 81:22
88:14 91:19,
21 95:18
96:18,24
97:25 99:21
100:4,6,11,
14,19 101:17
105:6,16
112:24
113:4,7,11
115:9 118:5
121:17
123:25 130:3
132:14 135:8
140:14,18
142:9,16
143:3 144:7
145:19
146:15
149:7,13,24
150:15,21
157:22
161:6,22
165:25

166:3,25
167:20,22
168:20,25
169:8,11
171:19,20
172:21
173:1,12,22
175:14
182:16

**bell**
116:10 178:4

**belong**
20:3

**belongs**
11:23 13:25

**benefit**
36:9

**best**
8:8,15,16
78:7 88:24
131:15
139:11 174:9

**better**
27:22 56:6
88:12,14
89:4 96:16
118:25
146:11

**beverage**
121:16
174:14
175:15

**beverages**
100:13
101:11

**big**
97:10

**bigger**
90:19

**Billano**
159:3 160:15

**bills**
36:4,24
37:19 46:5,7

**bird's-eye**
20:17

**bit**
37:22 53:12,
22 65:9
66:24 79:9
85:23 89:4
115:14
163:22,23
176:16
179:23 181:7

**black**
88:13 89:2,5
90:15,25
180:7,18

**blend**
13:23

**blends**
5:7 13:24

**block**
180:19

**blue**
74:5,7
142:13,15

**board**
10:16 21:18
28:8 70:6,
14,17 71:1,
23 80:23
81:4,17
93:22 108:8,
10 113:21
137:16
147:13,15
149:9,15
160:16
171:15,22
173:17
176:19 179:4

**body**
68:4,5
166:16

**body-worn**
164:6

**booklet**
28:6 149:8

**Borcegue**
4:11,19
117:9

**born**
124:15

**bottom**
25:14 61:18
90:11,20
111:19
115:11
135:14,22
136:20 145:7

**boy**
144:23

**brand**
150:13

**brand-new**
92:4 118:24

**break**
9:10,13,16
52:10 56:6
58:7 98:2
156:9 160:5

**breaks**
159:23,25

**bring**
27:23 137:1,
3

**broad**
112:14

**broke**
133:17
165:11 184:9

**broken**
8:4 138:23

**brought**
51:17 101:2
177:20

**build**
92:18

**builder**
91:17

**built**
95:10,11,25

**bunch**
28:8 141:9

**Bunn**
131:3

**business**
27:10,19

28:4 61:1
82:18 83:25
87:19 141:14
146:6,25
148:1,15

**busy**
107:25

**butcher**
17:21

**BWC**
171:14

**bypassed**
85:25

---

**C**

**cabin**
30:13 31:8
80:21 109:15
168:13 183:7

**cabins**
33:1 80:19
144:20

**Cafe**
74:4,5

**call**
4:20 9:15
14:24 17:6,
9,16,18
18:22 21:7
23:24,25
24:1 26:23
30:17,23
56:20,22
57:5 69:3
75:20,22
76:10 79:2,
13 90:6
109:24
155:23 158:1
176:20

**called**
30:12 51:25
70:18 74:3,7
79:7 85:25
86:1,2
168:11

Monica Borcegue
May 19, 2026

182:19
**calling**
 78:15,23
**calls**
 18:15,20
 46:11
**camera**
 19:12 20:5,
 12 137:15
 164:6 172:24
**cameras**
 19:9,23,25
 20:3 31:13
 137:24 171:4
 173:12
**capacity**
 10:1 19:8
**captain**
 173:25 175:9
 176:12,13
**capture**
 173:1
**captured**
 20:9 171:4
**captures**
 20:13
**capturing**
 170:13,18
**car**
 100:3
**card**
 86:22,25
**care**
 17:10,16,22,
 23 18:3,8,23
 31:4 34:4
 40:23 52:5
 68:18 71:1
 78:11,14,16
 86:4,21
 87:13,17
 92:5 99:6,10
 101:25 102:3
 184:19
**careful**
 8:23 80:15
 81:10,20

93:24
**Carnival**
 4:23 5:1,9,
 20 6:2,14,19
 7:12 10:2,
 15,24 11:6,8
 15:11 16:24,
 25 18:15
 23:1 27:17
 28:9 29:25
 30:9 33:16
 37:4 38:7,8,
 19,20 39:5,
 13,25 40:2,
 13 41:5,20
 43:18 44:2
 50:21 51:7
 52:15,18
 53:1,16,20
 54:12 55:7
 59:13,18
 60:3 64:5,11
 73:4 76:10
 77:20 79:19
 80:25 84:6
 87:3,10,19,
 25 91:8
 92:20,21,23
 93:2,25
 95:11,19,22
 96:2 97:5
 98:11,13
 102:2,8
 104:6 105:11
 107:18 110:3
 111:24
 112:6,9
 114:1,5
 137:14
 139:16
 143:1,6,18
 145:17 146:3
 149:24
 150:13
 157:12
 164:8,11
 166:6,9
 168:1,18
 169:6 172:17

 173:6 178:25
 179:17 182:4
 183:3,18,23
**Carnival's**
 14:22 15:19
 19:5 32:3,16
 33:6,17 39:4
 40:11 47:20
 59:10,14,15
 64:19,22
 68:16,22
 70:8 71:10
 85:4,6,8
 100:21
 104:18
 110:23 164:3
 167:24
 168:17,22
 173:4 179:3,
 21 184:12
**carpet**
 53:22 89:14,
 22 90:13,14,
 17 118:11
 125:17
 151:16,20,23
 152:7 154:2
 155:19
 163:24 170:8
 179:22
 181:4,9
 182:6
**carpeted**
 25:13
 108:20,24
 111:14
 114:13 122:7
 135:17
 142:20
 148:23
**carpets**
 163:7
**carried**
 169:24
**carry**
 40:15
**carrying**
 40:12

**case**
 7:22,25
 10:14 20:5
 22:14,22
 23:4 27:17
 32:2 39:8
 40:9 41:3
 43:24 56:17
 78:13,22
 84:5 95:3
 108:18
 109:10 111:6
 113:25
 115:10
 123:22
 124:2,11,25
 125:5,17,19
 126:6 127:1
 130:2,8
 131:3,17
 132:3 133:8
 134:2 140:15
 143:5,17
 145:18
 147:22 149:1
 154:12 155:7
 157:11
 160:20
 163:19
 164:3,6,9
 165:19 171:1
 179:1 182:25
 183:2,18,22
**cases**
 6:25 7:6
 22:19 40:5
 53:21 68:10
 91:15
 111:18,19,
 23,24 114:7,
 15 115:1,20
 120:8,14
 143:5
 145:17,20
 146:2,21
 157:2,7
 178:6 181:23
 182:4,17

**casino**
  19:24 20:1
  71:19 73:20
  137:15,25
  166:10
  174:18
  176:23
**CAT**
  70:5,14
**catch**
  119:15
**catches**
  126:22
**categorized**
  79:23 80:2
**Caudill**
  4:1
**caught**
  114:20
  115:2,6,12,
  15 116:20,22
  135:9,13,18
  156:24
**caused**
  20:23,24
  43:1 85:7
  98:14 100:22
  117:25 118:2
  126:25
**causing**
  116:23
  135:18
**caution**
  99:6,10
**ccllegalclaim
s**
  13:11
**CCTV**
  19:6 20:3
  31:13 39:25
  40:1 41:6,13
  43:23 44:4
  123:22
  124:3,6,8,25
  125:1,4
  128:14 131:1
  132:19,22

**133:22,23
  134:24
  135:19,20
  136:22,24
  170:13,18
  171:9,20
  172:18,24
  173:4,7**
**cell**
  135:21
**center**
  25:3,19 26:5
  30:6 47:12,
  17 50:2,8,15
  58:14,19
  60:22 61:16,
  19 62:15,23
  63:5 66:17
  68:20 70:2,
  21 71:9
  125:6
  128:12,21
  145:8 172:1
**certain**
  11:23 47:6
  73:11 91:8,
  10 92:4
  143:7 159:15
  173:17
  176:21
**certainly**
  41:1 54:20
  84:11
**certainty**
  46:15
**certified**
  87:9
**cetera**
  63:17 78:10
  174:1 177:19
**chairs**
  81:19,22,25
  82:1
**chance**
  58:24
**change**
  96:9,19
  160:17

**changed**
  177:18
**changes**
  176:25
  177:15,21
**channel**
  57:7
**channels**
  11:9 107:1,9
**Chaple**
  122:18
**charge**
  49:6,8,10
  72:15,18
  159:16
**charged**
  73:2 86:23
**charges**
  71:24 86:22
**check**
  43:14 72:24
  140:20 161:1
**checked**
  42:9 49:17
  84:15,18,20,
  23 125:13
  131:10 133:5
  137:18
**checking**
  134:24
**CHEERS**
  121:16
**chief**
  140:19
  164:14
  171:15
  175:10,14
  176:13
**children**
  19:17 114:10
**choice**
  118:25
  129:24
**choose**
  175:18
**chooses**
  8:13

**circle**
  88:25
  180:13,21,23
**claim**
  9:22 10:20
  11:7 14:13
  38:21 39:12
  40:11 53:22
  91:19,24
  92:2,5 95:4,
  23 96:13,19
  97:23 104:19
  108:10
  112:3,4
  114:19
  115:24
  116:16 137:3
  179:17
**claimed**
  42:19 43:20
  61:5 125:9
  136:19
  166:17
**claiming**
  40:4 43:21,
  23
**claims**
  4:25 5:4
  6:22 11:15,
  24 12:13,21
  13:17 17:23
  18:25 20:6
  31:18 33:9,
  15 38:11
  39:24 40:10
  41:17 87:21,
  22 104:16
  108:7
  112:13,17
  113:24 120:1
  125:16 135:9
  179:18
**class**
  92:17,19,21,
  24 93:4
  108:25
  109:1,2,3
  111:2 115:9

classes
 110:18
 111:16
clean
 34:16 77:8
 78:1
cleaned
 31:23 106:14
 162:16
 163:1,2
cleaning
 55:2 77:21,
 24 78:5 80:4
 86:7 107:10
 162:19
 169:25
cleanings
 106:23
cleanup
 106:19
clear
 9:3,7 86:23
Cleared
 69:24
clears
 86:25
client
 11:7 12:2
clock
 159:12
close
 81:10 149:5
 152:20
close-out
 153:20
 154:12
closed
 25:20 137:12
 152:14,19,20
 155:24
closer
 90:12
closes
 154:21,22
closest
 172:24

clothes
 84:10
Coast
 176:19
coccyx
 102:19
coffee
 73:15,16,18
 74:10 100:15
 131:13
color
 88:18 89:4
 95:10
colors
 142:18
column
 26:15 122:23
combine
 35:19
combined
 110:19
come
 10:6 11:9
 56:6 57:5
 75:6,7,8
 106:16
 108:10
 115:21 120:2
 128:20
 142:20,25
 152:19
 160:16
 174:16
 175:19
 177:15
comes
 7:24 11:1,10
 40:6 67:25
 87:20
 110:20,22
 114:5 116:2
 120:7 157:17
 169:21 170:4
 177:9,11
comment
 23:21,25
 27:8 28:25

 35:23 66:13,
 23
comments
 67:13 72:23
 74:11 145:16
 146:21
Committee
 176:4,8,10,
 12 177:4
common
 52:8 159:6
communicating
 18:13 86:20
 140:12
communication
 19:4 26:24
communication
s
 139:24
comp'd
 71:19
companions
 99:17 103:11
company
 10:21 28:11
 95:18 149:9
 160:13
comparative
 168:23
comparatively
 169:7
compare
 39:10
compensation
 176:21
compiled
 164:21
complain
 131:18
complained
 104:4
complaining
 63:11,24
 65:1
complaint
 22:14

complaint's
 65:11
complaints
 65:10 91:16
 166:24
 176:22
complete
 27:12 61:4
 82:20 141:16
 146:17 147:2
 148:3,17
completed
 21:19
completion
 151:9
comply
 105:7
comprised
 173:16
computer
 23:13 36:18
 152:20
concern
 134:24
concerned
 10:15 25:2
 62:14
concerns
 62:9 123:18
 125:15
 128:23 131:9
condensation
 178:8,10
condition
 51:8,12
 85:10 101:13
 103:20,21
 119:18
 122:14
 123:15,17,21
 125:14
 127:18
 128:23 130:5
 131:9,10
 133:6 135:15
 169:2

Monica Borcegue
May 19, 2026

conditions
104:25
118:21 167:1
conduct
129:10 172:2
184:6
conducted
64:24 106:11
conducting
68:23 165:21
cones
167:18
confirm
18:8 31:11
95:21
confirmed
43:5
confusing
19:20
connect
137:22
connected
124:8
consent
69:19
consider
51:7 64:11
69:9
considered
25:15 47:25
48:7,12
51:12 64:4,9
77:20 93:3
151:24
152:22 153:3
154:8
consist
48:3
consistent
71:10
constantly
162:16,19
consult
69:23 70:9
consumption
132:6

contact
31:4 34:9
55:14,20
57:8 85:6
100:24
contacted
16:9,24 17:2
86:9
contacts
18:1 21:24
contained
104:25
contains
5:16
continues
44:13 137:9
continuous
159:14 163:5
contract
105:1,7
contractors
142:17
contribute
103:1
contributed
99:22 102:25
131:7 169:11
controlled
19:25 20:1
conversation
25:18
conversations
171:18
convey
38:19
convince
181:7
Cooper
183:13,24
copied
140:18
copies
82:21 84:2
148:4,18
copy
15:17 16:12
61:4 70:22

71:11,23
74:22 141:17
146:17 147:3
165:6
185:16,17
corner
42:7,11
49:19 51:3
90:4 152:3
153:1
corporate
5:10,13 7:4,
12 23:1
Corporation
6:2,14
Corporation's
105:12
107:19
139:17
correct
5:14,15
6:19,20
19:21 20:23
24:10,19,20,
25 25:4
27:10,11,14
28:21,22
29:5,6,9,10,
18,19,23,24
32:5,11
33:6,14
36:24 40:18
41:7,9,12,
20,24 42:1,
7,8,14,15,
21,22 43:2,
7,9,12,16
44:5,7,16,
19,20,22,23
45:3,4,7,8,
13 47:3
49:24,25
50:6,9,10,22
51:4 53:4,13
54:24 56:20,
24 57:11,12
59:8,9 60:24
62:6,7,10,

13,19,20,23
64:24,25
65:13,18,24
66:11,12,14,
15 67:10
71:12 72:1,
2,10,11,15,
16 73:5,11,
13 75:14
77:11 80:16
82:13 87:11
91:18 92:16
93:9,13,20
94:6,15
95:6,16,21,
24 96:11
101:15 102:5
105:5,6,18
106:9 107:14
110:4 111:4
112:7 117:6,
7,14 118:14
121:2 123:9
129:23 140:3
141:3,4
142:7,13
144:5,13,16
145:9,10,18,
19,25 146:1,
3,22,23,24
147:4,7
148:7,8,21,
22 150:14
151:6,7,14,
15 152:23,24
153:11,22,25
154:4,6,7,
13,14,25
156:7,8
159:7 160:24
161:13,14,
17,18,21
162:24
164:16
165:12
172:25 173:8
174:8 182:9
corrected
33:23 92:13

113:19,22

**correction**
17:13

**corrective**
51:18  77:16
78:8  97:1
178:19,22,24

**correctly**
16:5  36:25
47:4  119:5

**correspondenc e**
11:13  15:16
38:6,14  39:2
86:14

**Costa**
92:18  93:3
95:10
148:13,14

**counsel**
6:23  137:20
171:17

**counseled**
172:13

**counseling**
172:9

**count**
7:16  111:22
112:21

**counted**
110:14

**counts**
113:6

**couple**
50:21  52:11
77:3

**course**
8:12  12:12
27:9,18  28:3
33:2  40:21
61:1  82:18
83:25  87:19
113:8  141:13
146:6,25
147:25
148:15

**court**
4:5  8:21
107:11  128:6
141:6
185:11,15

**COURTNEY**
4:15  6:4,16
23:10  27:24
35:12  44:12
46:18  53:19
55:6  56:4
58:11  61:12
68:15  72:7
76:2  77:1
80:5  83:20
84:21  87:8
91:6  95:2
98:3,5,8,25
99:3,4
104:15,22
105:14
107:21
112:23
117:14  118:3
128:8  139:5,
20  142:1
143:15
144:11  150:9
152:9  156:9,
13,17  157:18
158:4  172:16
173:14
177:10  180:3
181:21  182:3
183:13,17,23
184:3  185:4,
6,8,10,12

**cover**
46:8  75:1
108:9

**covered**
73:20,21
97:9  132:24
133:3,23
136:24

**covering**
46:7

**covers**
22:15

**create**
48:21

**created**
15:22  139:3

**credit**
72:14,18
86:22,24

**crew**
32:7,10,13,
16,25  33:6,
13,18  41:12,
19  77:3,5
78:3  80:8
83:3  106:16
142:11,16,
17,21  147:11
158:23
169:17  173:4

**criminal**
165:25

**criteria**
153:6  154:10

**cropped**
89:3

**crowds**
120:9

**cruise**
4:23  5:2
19:20  26:1
58:21,22
59:3,5  60:8
71:16  80:16
87:17  91:16
101:9  102:14
113:11
164:18,19
166:5
175:13,22

**cruises**
92:18  101:22

**cruising**
80:20  81:15

**CSO**
173:25
175:12

**CT**
69:23  172:11

**culture**
174:10

**cup**
134:25

**cursor**
180:13

---

**D**

**daily**
11:15  40:7
106:7  155:13
164:14,23,25
168:12

**Dalberry**
12:20

**Dalfino**
9:21,25
18:18  20:6,
22  29:4,7
41:3  42:18
43:15,19
44:25  45:15
46:4  48:22
58:13,19
59:11  63:2
70:22  85:6
86:15  100:2,
12  120:23
157:11

**Dalfino's**
15:22  17:8
75:10

**damaged**
82:6  139:25

**damages**
98:13,21
102:7  103:19

**danger**
167:25  168:7
169:18

**dangerous**
51:7,12
113:22

Monica Borcegue
May 19, 2026

**data**
  108:6,12,15
**database**
  16:4 108:6,7
  165:13
**databases**
  108:12
  129:24
**date**
  16:23 71:1,3
  116:17
  122:19
  148:20
  150:20
  158:19 160:8
  162:9
**dates**
  24:11 61:5
**day**
  12:22 15:7
  40:21 41:24
  42:23 58:21,
  22 59:3,5,
  17,21 72:12
  100:9 101:21
  106:15,22
  121:6,23
  123:1 124:21
  130:17
  132:16
  133:15
  134:10 136:7
  152:21
  153:21,24,25
  155:4,5,9
  157:23
  158:8,9,19,
  22 159:1,7,
  24 160:21
  161:4,6,8,
  10,16 163:8,
  25 164:20,21
  167:23
  169:25
  173:13
**days**
  19:10,11,16,
  22,23 20:4

26:1 72:9
  136:1 137:7,
  14,24,25
**daytime**
  106:16
**dealing**
  178:2
**deals**
  168:4
**debarked**
  136:14
**debate**
  76:4
**debris**
  77:8,24
  106:18
**December**
  131:18 132:9
**decide**
  31:25
**deck**
  20:8 25:6,7
  30:20 44:16
  45:2 46:25
  73:18,22
  74:4 81:19
  82:14 120:16
  122:22
  125:2,12
  129:5
  130:22,23
  131:4 132:25
  133:13,14
  134:4,16
  145:5
  147:12,23
  151:13 154:2
  155:19
  159:10
  161:17 173:2
  174:16 178:3
**decks**
  25:14 81:2
  153:12
  178:10
**decorative**
  89:25 90:6

**Dedra**
  131:17
**deemed**
  70:13
**defective**
  139:25
**Defendant**
  6:2,14 98:16
  104:6 105:11
  106:4 107:18
  139:16
**Defendant's**
  6:12
**defense**
  98:24 99:25
  102:6 103:4,
  9,18 104:4,
  21 183:9
**defenses**
  98:11
**defer**
  60:5 101:4
  102:14
  166:19 167:3
**definitely**
  39:8 101:3,5
  112:4 118:9,
  11 119:7
**definition**
  68:16
**deformity**
  53:17
**degenerative**
  167:1
**delay**
  19:2 102:25
  103:1
**delivered**
  168:12
**demand**
  38:14
**demographic**
  91:7
**denies**
  63:13,15
**department**
  11:2 17:10,

11,16 18:1,
  3,4,8,12,19,
  20 20:1 29:8
  31:13 36:1
  42:17 49:13
  79:7,14 83:6
  87:13,16,21
  112:13
  113:24
  140:15
  165:15,20
  173:16,24
  175:2 184:18
**departments**
  76:13 175:1,
  19
**depend**
  38:23 39:1,
  19 51:9
  55:18 56:2
**depending**
  31:5 33:19
  39:16 80:1
  152:2 153:4
**depends**
  20:2 31:23
  32:1,22
  39:21 97:6,
  10 118:21
  119:1,17,19
  152:6 159:14
**depiction**
  87:25
**depo**
  182:24
**deposition**
  4:1 5:13,25
  6:2,13 21:3,
  22 22:3,12,
  19 45:16
  53:15 142:6
  185:18
**depositions**
  5:10 7:5
  22:1
**Derrick**
  129:1 130:2

Monica Borcegue
May 19, 2026

descend
  103:13
  131:13
descending
  40:24 99:16
  114:22
  119:9,22
  120:2 133:12
  134:5 136:16
describe
  178:20,23
  181:12,16
described
  25:10 180:6
describes
  139:9
describing
  88:15
description
  116:18
  143:9,16
  145:3
descriptions
  27:13 158:13
design
  95:12
designated
  5:21 23:1
desk
  29:14
detach
  151:16
detached
  151:20,23
  152:3,8
detachment
  152:7
detail
  136:21
  167:16
details
  23:22,25
  27:8 29:1
  91:25 92:11
  116:11
determination
  15:19 69:9

109:11
determine
  33:12 34:15
  39:4 171:8
determined
  160:25
device
  163:15
diagrams
  147:8
differ
  111:17
difference
  74:16 110:21
  181:3
different
  5:17,21 6:7
  10:19,21
  11:9 19:25
  23:15 26:1
  28:10 37:3
  39:22 52:7
  67:22 74:25
  75:23 76:13
  79:9 80:15,
  20,25 81:17,
  25 85:23
  89:3 92:17,
  20 95:13
  96:3 97:15
  102:20 115:9
  120:16
  129:8,12
  136:13
  137:14 138:3
  141:9 142:18
  144:15,18
  146:2 149:2
  153:4 156:19
  157:1 159:20
  160:21
  161:17
  175:1,19,23
  176:5,9,10,
  11,16,20
differently
  118:18
  168:21

dimensions
  111:16
dinner
  160:1
dip
  53:17 55:8,9
  179:22,24
  180:2 181:9,
  13,16,24
dips
  53:12,22,25
  180:25 181:9
  182:6
direct
  4:14 14:5
  110:24
  178:21
direction
  20:17
directly
  11:1 12:2,13
  16:2 18:6
  137:21
director
  174:14
  175:13,14,
  21,22,24
  176:13,14
disclosed
  142:21 143:1
  146:9 179:1
discovery
  6:24 7:2
  10:8,9,13
  11:3 22:5,15
discretion
  32:1 48:9
  69:5 170:21,
  25
discuss
  146:8 157:8
  173:17,19
discussed
  124:2 143:3
  144:12 145:6
  146:4 150:12
  169:16

172:23
  173:4,23
  183:12
discussing
  112:25
discussion
  44:10
disembarked
  102:22
disembarking
  72:13
disinfected
  162:16,19
  163:2
Disposition
  69:16
dispute
  166:15
disputes
  60:3 144:20,
  21
disputing
  59:24
distinction
  10:3
distributed
  11:21
doctor
  21:6,7 30:23
  48:6,9,17
  50:3,13,17,
  18 63:10,19,
  24 64:3
  65:17,23
  66:16,21,23
  67:8 69:6,8
  70:8,16,20
  71:9 102:12,
  22 145:8,12
  172:8 173:25
doctor's
  66:19
document
  28:9 35:13
  76:19 87:18
  138:4 139:8
  144:7 145:4

Monica Borcegue
May 19, 2026

146:13
147:21 148:9
158:17
**documentation**
84:11 97:1
106:5,11
184:17
**documented**
21:13 34:23
52:4 169:20
**documenting**
20:24 179:4
**documents**
7:1 10:11
15:21 27:9,
18 60:25
82:16,17
83:16,23,24
84:7 138:19
141:12,17
145:1
146:16,18
147:5,6,25
148:11,14
157:20 179:2
**doing**
12:10 27:1
31:6 35:24
165:3
**donation**
166:10
**donuts**
131:14
**door**
81:9,11
178:7
**doors**
81:12 163:4
**doorways**
178:11
**Dot**
147:6
**Dot/blue**
147:6
**double-check**
16:6,18
137:17 138:1

150:15
**doubt**
67:13 166:24
**doubts**
69:24
**downstairs**
24:19 25:5
40:10
**DRAHOS**
185:3
**drawn**
147:14
**drills**
81:3
**drink**
121:18
**drinking**
73:7
**drinks**
40:12,15
71:19 73:20
78:6 132:5
**drop-down**
56:15 153:7
**drops**
86:25
**dry**
128:23 130:4
163:15,16
**due**
47:1 123:16
134:4
**duly**
4:12
**duties**
6:22 163:5
**duty**
42:14 104:5

─────────

**E**

─────────

**e-mail**
11:10,14,18,
20,24 13:9,
11 16:1,18
18:21 87:10,
15 140:10

171:16
**e-mailed**
12:12 87:12
**e-mails**
11:16 19:4
86:17 139:23
140:21
**earlier**
29:20 34:19
47:16 62:8
74:11 85:18
102:22 145:6
168:2 179:24
**easier**
83:23
**easy**
53:7 57:4,
15,23 184:20
**edging**
90:17
**edit**
147:21
**effect**
170:17
**effects**
68:8
**either**
9:15,21
11:17 17:7
20:16 38:5
67:4,23
71:18 84:22
88:11 89:4
100:17
101:12
114:19
120:12 128:7
145:23
149:21
151:24
156:22 182:5
**ELATION**
162:7
**electronic**
124:7
**electronics**
175:10

**elevator**
125:1 159:17
**elevators**
159:16
162:15,20,24
163:3
**eliminations**
109:24
**Email**
44:22
**encounter**
109:4
**encountered**
54:15,22
86:12 104:8
**encounters**
144:22
**encouraged**
174:11
**end**
16:5 46:8
48:14 69:11
87:25 94:20
111:20
157:22
164:18,19
**ended**
142:25
**engineer**
140:19
175:10
176:13
**enlightening**
74:2
**entered**
26:20
**entertainment**
32:21 174:14
**entire**
97:13,14
179:6
**entries**
35:1 71:5
**entry**
24:12 26:9
30:4 33:25
34:12 42:22

71:25 72:8
144:25
**environmental**
76:11 175:11
176:14
**equal**
119:10
**equals**
174:25
**essentially**
108:23
144:19
**establish**
174:10
**esthetics**
94:13
**estimated**
73:13
**et**
63:16 78:10
174:1 177:18
**evaluate**
174:8
**evening**
132:1
**event**
71:8 136:18,
24 172:18
**Eventually**
107:11
**everybody**
10:21 78:4
175:2
**everyone**
83:5
**exacerbated**
98:14
**exact**
7:16,25
123:17
132:23 133:2
**exactly**
27:5 30:25
35:17 90:6
100:8 109:6
144:24
149:11

152:17 174:6
**examination**
4:14 66:21
**examined**
4:12 63:18
**exceptions**
38:25
**excursions**
174:18
**excuse**
47:5 54:21
164:23
**exercise**
99:6,9 102:3
**exhibit**
5:25 6:11
23:7 24:2
35:9 42:3
46:20 49:5
61:9 72:4
75:20,24
76:6,22
82:17 83:11,
15 87:5 91:3
105:10
107:17
139:13 144:7
150:6 158:1
181:18
**exhibits**
27:23 185:13
**exist**
18:10 93:24
169:3
**exists**
71:13
**exonerate**
40:2
**expect**
14:9 30:21
31:12,17
171:25
184:17
**expenses**
62:6,9
**experience**
38:11 163:21

**expert**
60:8 101:4
102:14,23
103:3,24
166:19,22
167:4 180:16
**experts**
60:5
**explain**
54:12 147:9
**explained**
69:21 126:23
129:17
162:25
**explanation**
62:18 67:12
**extension**
66:9 155:1
**extent**
8:25 9:9
23:14 60:4
73:9 169:2
**exterior**
168:2,8
**extra**
58:2 70:4
93:24
**eye**
54:4
**eyes**
75:1,18
**eyewitness**
45:12

---

**F**

**F-L-O-C-C-H-
I-N-I**
134:7
**facet**
79:12
**facilities**
140:17
**fact**
40:17 43:6
59:23 70:7
169:8

**fact-based**
117:11
**factor**
120:7
121:10,17
123:3 124:19
130:19
132:3,13
133:18
134:12 135:7
136:9
**factors**
98:15 156:20
157:1
**facts**
112:2 119:10
143:21
**faculties**
40:22
**failed**
99:15 102:7
**fair**
8:14 17:20
34:16 36:13
38:21 40:4,
16,25 54:4
85:22 102:2
113:1 141:22
153:21
162:21
164:18
165:22
169:23 184:8
**fairly**
182:20
**fall**
20:23,24
25:9 43:19
44:5 51:15,
19 59:7,14
60:2 63:12
74:10 76:5
85:17 91:11
93:13 98:20
100:4 101:4,
7 104:14
114:8
122:10,24

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| 125:5 131:7 132:23 135:18 156:20 166:17,18 179:1,4 183:6 | **fault** 40:11 98:15 **fax** 11:11 **faxed** 11:19 **February** 13:12 | **file** 12:1 14:24 15:2,7,13 74:20 87:21, 23 92:5 **filed** 9:22 105:5 | 146:15 **first** 4:12 9:11, 20,24 10:5, 6,24 11:12 12:4 14:6, 10,17,21 |
| **fallen** 31:18 33:12 34:15 41:18 42:19 43:20 59:17 100:2, 3 112:18 | **feel** 13:11 23:12 34:1 62:25 183:14 **feeling** 24:24 62:14 66:17 70:15 | **fill** 161:7 **filled** 56:10 **filler** 90:16,25 **filtered** 75:4 | 16:23 17:17 21:8,10,15 24:9,13 26:15 31:1 32:6 42:6, 10,22 45:12 47:18,23,25 |
| **falling** 94:6 113:3 122:6 125:4 127:10 131:1 167:25 168:7 | **feels** 13:12 **fees** 25:2 62:15 | **final** 74:24 109:7 138:4 156:5 158:17,22 | 48:4,8,11,13 49:18,20 50:18 51:3, 20 58:15,22 59:3 60:10, |
| **falls** 40:12 76:15, 16 94:15 112:24 177:2 178:1 | **feet** 99:15 126:5 167:19 **fell** 7:23 20:6 30:18 33:8 | **finalized** 74:22 **find** 9:20 10:12 16:3 23:11 73:6 88:16 | 20 62:17 64:5,9,12, 17,21 67:15 68:10 69:8,9 70:10,12,13 77:3,7 99:12 |
| **familiar** 67:11 72:17 74:6 116:9 178:25 181:23 | 37:9 47:2 59:11,13 61:20 62:19 101:2 102:4 113:25 | 114:7 120:1 144:23 146:14 150:1 171:5 | 101:19 105:16 108:16 120:21 128:18 |
| **family** 144:21 **far** 7:9,24 10:15 | 120:24 126:5,16 127:22 130:10,15,21 135:1,23 | **finding** 20:22 **finds** 128:19 **fine** | 145:12,22 149:21 151:8,12 153:13 155:14 156:5 |
| 19:3 20:16 26:7 29:8 30:14 36:5, 21 41:25 49:11 53:25 | 136:20 **felt** 53:1 84:10 110:2 **female** | 126:14 **finger** 8:18 **finish** | 157:21 160:12,15 172:5,15 179:8,10,12, 22 181:25 |
| 57:19 60:4 64:18 73:9 77:23 96:24 97:12 101:3 102:15,20 | 47:7 **Fernandes** 49:17 57:9 161:13,15,19 **fifth** | 8:8,11 56:5 115:14 159:18 **FIRENZE** 92:23,25 | **fish-eye** 124:8 **fit** 85:21 **fits** 57:21 58:3 |
| 135:15 153:7 163:6 166:2 176:20 **fast** 6:7 139:12 | 116:23 | 93:2,6 109:3 110:21,24 111:3,7 136:2 145:19 | **fitting** 179:19 |

**five**
54:13 72:9
111:12
112:25 113:3
141:1 156:10
177:2

**five-hour**
54:23 55:5

**fix**
35:4 51:22
52:8 53:8
57:4,6,15,23
79:14 97:5
157:13

**fixed**
54:13 117:21
155:20

**fixing**
54:12

**fleet**
137:14 179:6

**fleet-wide**
113:1 140:25

**flexion**
66:9

**flies**
13:15

**flip-flops**
89:15
118:14,16,
22,23,24,25
119:11,13
130:4

**Flocchini**
134:6

**floor**
33:20 53:12,
22 54:10
82:13 90:24
91:1 122:8
136:19 170:3
180:25

**flooring**
53:18 163:7
169:15

**Florida**
4:2,3

**flush**
90:24 115:13

**flyer**
80:21 168:11

**FNU**
49:21

**Focus**
173:15,16
174:3,4,7
177:3

**foldable**
167:22

**folded**
135:14

**folio**
75:11

**follow**
46:10 70:4,
16 172:9

**follow-up**
34:7 69:7

**follow-ups**
46:13

**following**
15:22 18:3
44:11 58:10
72:12 76:5
98:7 107:11
132:16 153:9
156:16
160:21
178:25

**follows**
4:13

**food**
78:5 174:13

**foot**
55:12,14,19,
22 115:17
116:5,20
127:5 130:6
135:14

**footage**
19:6,10,12,
14,16 31:16
39:25 40:2
41:6 44:4

124:6,9,25
125:1 133:2,
22 134:25
136:22 137:6
138:1
170:13,18,24
171:9
172:18,21

**footwear**
93:22

**foreseeably**
98:16

**forever**
12:11

**forget**
143:5 150:25

**form**
14:14 27:20
45:25 53:14
54:25 55:17
61:17 62:5
68:13 79:22
80:18 84:16
92:2 104:9
112:19
141:23
143:11 152:1
172:4 173:9
177:5 182:1

**format**
74:25 75:18,
23 143:14

**forth**
86:15

**forum**
174:8 177:19

**forward**
11:16 18:1,
11 25:11,12,
15 44:16
45:2 69:13
92:10 97:21
122:6 126:5
131:1 135:1,
18 151:3
159:11
162:15,23

**forwarded**
16:17 18:25
87:13

**forwarding**
18:3

**found**
10:20 28:8
52:15 122:4,
12 134:21
149:9

**four**
92:15 123:25
149:25
150:17

**four-page**
72:3 144:6

**fourth**
65:23 116:23

**fractured**
102:19

**frame**
31:10 108:13

**fraud**
104:16

**fraudulent**
104:19

**free**
23:12 33:3
63:1 77:8
106:17
131:16
184:19

**Friday**
17:22

**front**
23:21 24:5
35:14 60:9
82:15 118:1

**full**
61:13 63:16
66:3 147:23

**fully**
97:9

**Fun**
168:12

**function**
90:8 94:13

Monica Borcegue
May 19, 2026

**G**

**G-H-T**
131:17

**gangways**
81:2

**gather**
108:7

**gathered**
57:11

**gathering**
7:1 107:22
108:3

**gave**
92:1 106:8
142:5 176:21

**geared**
80:3,4

**general**
14:14 27:16
80:20,22
88:10
168:10,15

**generally**
10:12 11:5,8
18:10 20:3
22:17,20
24:3 31:15
38:24 39:1
48:12 51:11
52:20 57:20
59:20 86:12
95:7,13
111:17
118:22 159:9
170:5

**generated**
47:13,17,19
48:19 50:2,
15,19 87:22
122:2 123:10
132:17 145:7
147:15

**generating**
49:11

**gentleman**
183:4

**germane**
77:4 111:6

**get all**
11:12 13:23
19:2

**getting**
32:7 39:22
74:10 76:5
110:11

**Giovanna**
75:4

**Giovanna's**
75:9,12,13

**give**
6:18 7:16
8:12 9:13,17
13:8 28:15
61:14 64:7
71:11 73:10
100:25
109:10 142:4
152:25 180:4

**given**
22:25 26:18,
20 28:10
48:6 56:10
63:19,20,23
64:10,14,16,
20 67:24
78:3 80:24
110:24
113:10
171:23
172:6,15

**giving**
17:10,14
64:3 112:14

**glass**
106:20
162:25 178:7

**glasses**
99:22 106:19
169:9

**glitches**
75:16

**glue**
57:25 58:5
79:6

**go-tos**
140:20

**goes**
11:13 20:16
21:8 76:19
86:19 90:12
139:10 149:2
179:7 181:9,
10

**going**
5:12,24 8:2,
3,4,8,10,18
9:11 10:13
17:18 20:11
23:17 24:1,
21 25:8,18
26:18 30:5,
20 32:18,22
35:22 36:17,
19 40:10
41:17 42:5,
18,24 47:14
52:10 59:2
61:8 68:2,20
69:13 76:6
89:19 94:22
98:9 99:12
101:24,25
103:12
107:17
108:15
109:12
115:25
118:19
121:14,18
126:21 141:4
150:5,19
157:19,24
164:1 180:21
181:6,7,11,
17 182:6
183:5,7,24

**gold**
89:25

**Gomez**
26:17 28:23,
24 29:4,21

**good**
4:16,17
13:20 34:19,
21 36:5 81:8
98:1 99:3
119:15
125:14
128:23 131:9
135:15
168:11

**governed**
104:24

**grandmother**
136:15

**gravel**
100:6

**gravity**
126:25

**great**
60:19 131:12
185:10

**green**
142:16

**Gregory**
116:8

**grossly**
183:19

**ground**
89:19 115:22

**grounds**
23:15

**group**
15:20 91:9
157:24
174:21,24
176:9

**guard**
145:11
176:19

**guards**
144:18

**guess**
21:12 25:21
28:6 32:1,8,

Monica Borcegue
May 19, 2026

13,19,21
35:19 38:23
46:16 50:12,
16 53:5 55:7
56:1 60:10
69:8 74:14,
21 75:20
77:22 78:19
87:9 94:8
109:9 111:18
124:9 139:8
141:5 143:23
145:11,14
157:22
159:21
164:13
169:20
173:18
178:20 180:6
184:5 185:13

**guest**
4:25 5:4
6:22 7:23
10:16 12:2
15:3 17:10,
15,16,21,23
18:2,8,23
21:17 24:21,
24 25:8
26:4,11 27:2
28:19 29:8,
13 30:1,8,
14,18,20
31:4,5
32:14,23
33:9,11,13,
15 34:8,25
36:1,2
37:10,24
43:11,14
44:21,25
45:5,9,21,
23,24 48:14
50:2 56:19
62:8 71:1,11
74:14 75:23,
25 80:19
82:10,24
86:21 87:13,

16 113:25
125:1 132:25
133:8 134:6
145:4,8
172:18,19
174:7,12,22
175:12
176:21,23
179:7,18

**guestcare@
carnival.com**
87:15

**guests**
32:4,7,10,
12,13,24
33:5,17
80:14,24
93:16,19
103:13
113:20 114:8
118:13 120:1
142:7,15,19
147:11 152:5
167:25
172:22
173:18

**guys**
23:18 141:2
156:9 183:10
185:5

---

**H**

**half**
153:21
**halfway**
97:7
**hand**
4:5 62:2,3
131:13,16
135:1,21
147:10,14
**handle**
11:23 17:25
78:7 139:12
**handled**
56:18,23

182:5
**handles**
140:17
**handling**
11:22 182:5
**handrail**
90:5 99:20
103:10
131:16
135:22 156:6
168:15 169:1
**handrails**
81:4 99:12
101:25
106:19
134:20 163:1
**hands**
40:12,15
100:17
101:12
**handyman**
42:11 45:19
49:20 51:25
57:5,10
78:15,24
79:2 84:19
86:1,11
155:13,15
184:17
**hang**
121:24
134:19 138:6
**happen**
18:17
101:19,20
113:15,17
115:7 126:9,
18
**happened**
37:8,15
43:23 46:25
48:16 59:23
91:23 92:12
110:8 111:6
121:25
124:22
125:17 126:4
129:5 134:16

155:8
**happening**
45:11,13
99:7
**happy**
9:6,17
184:25
**hard**
18:22 38:3
88:13 90:18
**hazard**
77:20,23
79:19,21,24
80:2 119:16
151:25
153:2,3
**hazards**
77:15
**head**
28:5 40:6
51:1 81:6
143:4 157:10
**headache**
63:13
**heads**
173:17,24
175:2
**Health**
76:11
**hear**
78:19 128:2,
6 138:8
175:21
**heard**
44:9 45:10
51:20 136:18
**heel**
115:2,5,10,
15 126:15,18
135:9 156:23
**heels**
93:17,20,24
114:19
118:13
135:18
**held**
40:23 44:10

Monica Borcegue
May 19, 2026

**help**
  69:19 89:22
  116:15
**helpful**
  126:24
**helps**
  83:13 88:18
**HESS**
  76:7,8,10,
  15,23 173:23
  174:3 175:4,
  6 176:4,5,6,
  8 177:4
**Hey**
  178:15
**hidden**
  54:11
**high**
  56:12
  152:22,24
  154:9
**higher**
  55:11,15
  175:4
**higher-ups**
  174:2
**highest**
  174:21,24
**highly**
  165:18
**hip**
  62:2 63:12
  65:17,20
  102:19
**history**
  73:8 166:6
**hit**
  100:21
  114:21 116:5
  169:3
**hitting**
  131:2 159:19
**hold**
  24:8 101:24
  127:10 138:9
  145:22
  168:14

  180:18 184:4
**holder**
  53:3 58:4
**holding**
  81:4 99:11,
  19 100:19
  101:12 103:9
  131:13 132:4
  134:25
  135:21
**hole**
  100:6
**home**
  70:17 113:17
  172:10,12
**HORIZON**
  91:21 92:10,
  15,17,21,22
  95:3,15,24,
  25 97:2,13,
  17 109:2
  111:5 122:17
  135:2 162:2
  179:16
**hotel**
  158:14
  175:16,21,24
  176:13
**hour**
  9:13 125:2,3
**hours**
  41:18 54:13
  62:8 84:14
  123:14
  152:11
  163:10
**house-**
  158:16
**housekeeper**
  49:17 54:20
  78:24
**housekeeping**
  32:20 33:10
  42:9,17 43:6
  44:15 45:2,
  19 49:10
  51:24 54:21

  57:9 78:1,3,
  10,15 79:2,
  7,13,14
  83:12,16,23
  84:18 85:15
  86:1,9,13
  106:7,15
  107:5 143:17
  154:25
  155:2,4,16
  156:3 157:24
  158:7,13,14,
  15,16,19
  169:20
  173:25
  174:13
  175:12
**human**
  175:13
  176:14
**hundred**
  9:4 52:13
  113:11
**Hundreds**
  103:12
**hurry**
  114:8,12
**hurt**
  32:5,7
  142:11
**hurting**
  36:2,22
  166:17
**hypothetical**
  86:6

_____

I

_____

**ICARE**
  15:3 22:2,8
  23:6,8,25
  24:3 27:8,13
  33:25 34:24
  35:20,22
  39:20 42:25
  71:5 72:23
  129:22

  145:16
  146:21
**idea**
  21:21 131:12
**ideas**
  174:10
  177:16
**identical**
  95:7
**identificatio
n**
  6:3,15 23:9
  35:11 61:11
  72:6 76:1,24
  83:17 87:7
  91:5 105:13
  107:20
  139:19
  144:10 150:8
  158:3 181:20
**identified**
  161:20
**identifies**
  105:17
  139:10
**identify**
  61:19 174:8
**imagine**
  21:22 162:18
**imaging**
  69:22 70:5
  167:11
  172:10
**immediate**
  77:16 78:8
**immediately**
  18:25 78:14
  102:10 122:1
  133:21
**impact**
  119:7
**impossible**
  19:10
**improvement**
  177:17
**in-cabin**
  80:18

Monica Borcegue
May 19, 2026

**in-house**
  6:23
**inbox**
  11:13,14,15,
  20,24 12:13
  13:4,17
  17:23 18:25
**inboxes**
  140:10
**incident**
  6:25 10:17
  15:21,22
  24:10 26:11
  29:21 38:8
  42:25 43:15
  51:17 52:1,
  21 59:21,23
  73:5 79:25
  82:8 85:5,10
  99:8 100:18
  103:16
  110:23
  111:25
  112:2,4
  114:17 116:9
  118:6 119:12
  120:17
  121:6,7,13
  122:5,16
  124:14
  126:25
  128:15
  129:13
  134:10,18
  135:19,25
  136:1,7,22
  141:2,19
  143:2,7,19,
  21 144:4,12
  145:2 150:21
  153:24 155:6
  158:8,19,25
  161:11
  164:9,12
  166:15
  167:9,19
  168:19,25
  169:3

  170:17,23
  172:24,25
  173:8 178:23
  179:14
**incidents**
  22:10 52:13
  103:14
  108:5,24
  109:4 110:12
  113:13
  115:25 116:7
  119:21
  141:7,8,9
  142:7,10,11,
  21,25
  147:12,17,19
  156:19
  166:16
  170:13,19
  173:19
  177:25
  179:1,4
**include**
  18:14 76:17
  108:19 129:8
**included**
  15:18 34:24
  50:21 74:19
  141:9
**incorrect**
  19:18 28:15
  39:15 40:1
  44:14
**incur**
  36:4,23 46:5
**independent**
  98:15
**indicate**
  114:8 130:10
**indicated**
  33:5 62:8
  85:18 88:5
  112:6 139:23
  168:24
  169:19
  170:14
**indicates**
  99:13 103:10

**indication**
  17:5 42:16
  61:15 84:13,
  22 85:13
  127:7 131:5
  152:25
**indicative**
  70:10
**individual**
  5:20 10:6
  12:15,18,23
  112:2 122:17
  154:16
**individually**
  129:18
**individuals**
  23:1 112:18
**infer**
  45:17
**information**
  14:5 16:2,16
  17:11,14
  19:11 28:15
  39:9 41:1
  43:18,25
  58:23 60:7
  72:20 73:5
  74:25 85:15
  92:8 99:24
  101:1 104:12
  107:12 108:3
  109:8 117:2
  129:24
  136:14
  137:22
  154:23 159:1
  160:9 176:8
**informed**
  21:6 49:6,7
**initial**
  15:8
**initially**
  38:15 109:7,
  11
**initials**
  136:2
**initiate**

  70:18 107:1
**initiated**
  179:9
**injected**
  68:5
**injection**
  63:23 64:10,
  21 67:17
  171:23
**injections**
  67:21,23
**injured**
  33:14 40:10
  51:10 62:3
  136:5 179:11
**injuries**
  21:11 60:4
  100:4 166:14
  172:2
**injury**
  11:7 48:6
  60:1 69:3
  103:20,21
  117:23
  165:19 172:8
**input**
  26:16 36:20
  165:14
**inputted**
  36:12,13
**inputting**
  45:12
**inquire**
  46:11
**inquiring**
  37:20
**inquiry**
  5:17 98:10
  164:1 169:13
**insert**
  95:8,14
  96:16
**inside**
  118:20
**insisted**
  145:4

Monica Borcegue
May 19, 2026

inspect
180:16
inspected
33:21 117:17
131:8 134:23
inspection
106:5,6
140:24
inspections
106:3,11,13
107:10
169:19,24
176:18,19
installed
96:8
instance
51:20 177:14
instruct
80:7
instructions
70:1
intact
117:19
intake
61:17
interaction
36:16
interactions
55:4 114:23
interest
32:3 39:4
interested
20:22 21:13
32:4 37:2
38:20
interior
109:19
111:12
140:25
168:1,7
178:1 181:25
184:7,13
internal
74:23
internally
74:21

interpret
37:17
interrogatories
22:1 105:13,
16,18,24
107:13,20
110:1 137:6
interrogatory
105:9 110:13
116:8,13
137:19
141:21 142:4
interrupt
151:9
intervening
98:14
intoxicated
40:14
investigate
26:11,22
28:24 29:23
39:9
investigated
108:10
investigating
166:1
investigation
16:22 21:9,
16,18 30:3,
21,23,24
31:2,15
39:20 41:8,
10,15 64:18,
23 68:17,23
70:19 110:5
164:11
165:21
170:21
171:2,6
172:3 173:11
179:9
investigations
31:14 108:8
166:4 171:14
investigative

15:2 39:18
43:22 117:2
investigator
121:24
123:17
128:17
170:22 171:3
involved
7:6,10 19:17
79:4 91:15
93:21 107:22
155:15 166:2
183:18
184:18
involvement
10:23 12:14
involving
46:24 142:7
156:21
157:2,7
177:6 178:1
Ira
10:25 17:18
50:20 87:3,6
Israel
130:8
issue
33:13 55:25
84:12 96:24
97:1,6,10,
12,16,22,25
99:18 103:13
108:21 114:9
126:11
151:12
163:19 177:7
issues
31:19 65:2
84:25 86:21
97:22 101:10
103:11
126:13 174:9
176:22

---

**J**

---

Jacuzzi

109:21
January
105:16,17,23
133:10
151:13
152:13,14
156:6,8
Jarnagin
27:20 45:25
53:14 54:25
55:17 68:13
79:22 84:16
94:17 98:22
99:1 104:9,
20 112:19
117:8,15
139:3 141:23
143:11 152:1
157:14 172:4
173:9 177:5
179:25
182:1,22
183:2,11,25
184:25
185:15,17
Jasmine
160:12
Java
74:4,5,7
Joanne
4:1
job
32:19 158:13
163:5
jobs
33:2
Johan
26:17
join
162:8
Jones
129:1,4
130:2
Juana
125:19
judge
110:2

Monica Borcegue
May 19, 2026

**Judging**
73:12
**July**
17:7 18:16
102:12
125:20 126:7
**June**
14:2 16:25
17:7,22,24
18:4,16,25
19:3,5 24:12
41:12,20
44:3 58:23
59:4,6,8,13,
15,16,24
62:22 63:3,
10,21,22
64:3,11 65:1
69:12 71:25
72:9 73:15
88:1 98:19
102:22
120:19
122:17,20
124:12
154:13 155:3
158:9,10
160:16
161:11

———————

**K**

———————

**K-A-Z-E-M-I**
130:14
**K-I-O-U-R-E-S-S-I-S**
133:9
**Karen**
127:1
**Kazemi**
130:14
**keep**
7:17 54:16
**keeping**
77:7
**kept**
27:9,18 28:3

60:25 76:13
82:16,17
83:25 87:19,
22 107:25
141:13
146:5,25
147:25
179:11
**Ketoralac**
64:21
**keyword**
110:9
**keywords**
129:17,25
**kicked**
101:15
**kidding**
8:20
**kind**
5:6 8:22
13:4 14:24
19:12 20:12
24:11,12
25:18 28:7
29:1 35:20
38:2,3 45:17
46:3 48:2
51:24 53:6
57:17,22,23
58:3 60:13
72:13 78:17
85:21,25
86:2,3,25
88:13 93:21,
25 95:8
114:10
115:12,17
116:10 118:8
119:4,17,19
133:16
136:13
148:10,25
149:8 163:15
176:18
180:25 181:1
182:25 183:2
**kinds**
156:19 157:1

**Kiouressis**
133:9
**knee**
62:3
**kneeling**
135:24
**knew**
10:17
**know**
7:2 8:7,9,
19,20 9:5,
17,23 10:4,
7,10,18 11:3
12:2 13:3,
12,15 14:5,
13 15:7,15
17:24 18:7
19:1,3 20:2,
12,21 21:11,
17,24 22:1,
17 24:5
25:19 26:3,
7,8,14 27:3
28:5,9,14,23
29:2,3,8
30:5,23
31:7,11,25
32:25 33:16
34:3,9 35:2,
5 36:2,21,22
37:4,7,8,9,
10,12,13,17,
20,23,25
38:13,15,17
39:1,20
40:14 41:4
42:13 44:14
45:10,15,18
46:3,4,10
47:7,25
48:3,20,24
49:9,11
50:6,7,13,17
51:10,14,16,
18,19 52:21,
22 53:17
54:11,15
55:3,21

56:22 57:3,
16,17,22
58:1,2,3
59:7,15,22
60:6,11
67:2,4,17,
20,21,23
68:3,4 69:2
70:24 73:16
74:9,10
75:3,19
77:17 78:6,
14 79:2,3,
10,12 80:20,
22 83:12
85:8,11
88:24 90:7,
15,17,23
92:1,14
93:15 94:7,
19,21,24,25
95:9,11,12
97:10,13
99:21 100:3
101:21
102:15,17,
21,25 103:2,
11,15,17
104:12
106:23 108:8
109:6,11
110:7,12,17,
18 111:5,9
112:3,13,20
113:11,22
114:18,20,22
115:20
116:10 117:1
118:7,9
119:3,8
124:3 128:1,
3 129:19
134:14
137:24 138:7
141:8 144:20
148:24
149:16,18
150:25
153:6,7,8,

Monica Borcegue
May 19, 2026

15,17 155:18
156:19 159:9
163:6,17,18,
23 164:21
165:3,14,24
166:25
167:2,3,10,
13 168:11
170:7 171:13
172:1,11,14
173:4,5
174:10 175:1
176:22
177:20
179:14
180:18
182:18
183:24
184:20
**knowing**
37:2
**knowledge**
84:20 100:12
137:25
**known**
68:19
**Kristopher**
127:11

---

**L**

---

L-A-B-O-S-S-
I-E-R-E
132:8
L-E-Z-A-M-A
159:3
L-I-N
49:23
**Labossiere**
132:8
**lack**
96:16
**lady**
12:10 183:19
**laid**
93:4 94:14
115:6

**landed**
122:7
**landing**
53:18 121:5
131:2 133:14
153:15
180:22
**landings**
53:25
**language**
143:8,13
**Large**
4:3
**late**
123:16 170:8
**lawsuit**
9:22 108:11
112:3,5
137:1
**lawsuits**
112:17
**lawyer**
39:12
**lawyer's**
162:17
**layout**
92:21
**layouts**
111:15
**lead**
32:25
**leading**
55:8,9
179:22
**leads**
181:24
**learn**
163:25
**learned**
163:22
**leave**
60:8 81:24
160:13
**leaving**
141:21
**ledger**
71:18,20

**left**
29:17 46:12
56:19 62:2,3
63:12 65:17,
20 66:24
67:2,10 70:1
71:2,4
102:18,19
108:23
122:23 127:5
133:13
134:25
135:21
**leg**
118:2
**legal**
13:17
**letter**
10:18,24
11:6 14:4,6,
10,12,14,20,
25 15:6,12,
14,20 17:2,
15,24 29:12
34:4 38:5,
12,15 39:2
70:25 104:16
181:1,10
**letters**
34:6,7
**level**
55:11 56:10
174:22
181:14
**levels**
175:5 176:22
**Lezama**
159:3 160:7,
12
**Lido**
24:19 25:6,7
30:19 73:18,
22 74:4,7
178:3
**life**
183:20
**lifetime**
100:2

**lift**
100:23
**lifted**
51:14 89:12,
19
**lifting**
69:21
**light**
183:5
**Lighting**
126:14
**limit**
159:13
170:24
**limitations**
104:24
**limping**
132:25
**Lin**
49:23 57:10
**Linda**
124:11
**line**
4:23 5:2
19:20 65:23
90:15,25
180:8
**lines**
44:24 66:5
**lip**
94:22
**list**
110:1 175:7
**listed**
42:20 61:20
73:1 114:16
132:6 154:5,
22 155:12
160:5 163:12
175:25
**Listen**
8:17
**lists**
71:18
**lit**
183:10

Monica Borcegue
May 19, 2026

**literature**
94:14,18,19, 25

**litigation**
6:25 9:23
10:8 12:3

**little**
36:19 37:22
53:7,12,22
65:9 66:24
79:9 89:4,12
97:8 115:14
152:5 159:18
170:22,23
179:23 181:7

**loading**
88:21 125:24

**lobby**
125:2 133:24

**located**
20:6 133:23

**location**
41:17 57:11
73:12 108:16
110:7 136:24
154:17

**log**
179:11

**logging**
179:4

**long**
5:1,4,9
13:15 19:6
96:14 112:12
121:12
159:15 162:4

**longer**
19:18 159:18
160:13

**look**
6:7 11:15
13:21 14:21
15:2,23
23:12 35:3,
19 73:14
106:24
108:20 111:8

117:1,6
120:25 125:8
138:24
139:12
143:20
149:11 151:2
160:10
161:25 171:3
174:5 177:22
183:1,8,15

**looked**
6:8 33:21
67:4 91:12
112:21
113:13

**looking**
12:22 23:20
29:17 54:5,9
55:22,25
75:1 105:20
108:13,14,17
116:18 128:5
129:18
143:23
154:15
162:4,22
169:2,22
171:23 176:2
181:4

**lookout**
169:17

**looks**
29:17 54:8
57:18 60:20
65:11 71:18,
24 72:12
74:13,17,20
88:25 89:5,
7,12,25
122:18,22
123:20 129:1
151:4,8
156:4 159:5
181:15

**loop**
80:19 81:1
168:3

**loose**
43:1,7 44:19
45:7 153:13,
19 156:6

**lose**
116:23

**loss**
102:7

**lost**
19:14 122:6
127:6,9

**lot**
22:9,15
36:17

**lots**
82:12

**loud**
136:18

**loving**
34:4

**lower**
102:19 167:6

**luggage**
109:15

---

**M**

**made**
15:19 17:6
26:23 51:22
53:20 56:22
57:8 69:12
72:13 80:14
85:6 90:19
91:16 95:4,
23 98:21
100:23
109:11 130:1
133:4 154:24
157:21
164:17 177:1
179:17

**MAGIC**
162:8,9
166:9

**maiden**
150:12

**mail**
11:10 87:9

**mailed**
11:19 87:12

**main**
11:24 25:13
151:2 173:20

**maintain**
60:13 106:4,
10

**maintained**
107:8 170:11
177:18

**maintaining**
158:24

**maintenance**
79:12
140:17,23
169:14 170:3
184:6,12

**majority**
52:15,19

**make**
5:24 6:11
8:13,18,22
9:15 13:21
16:6 17:13
18:9 23:6
28:14 31:21
33:21,22
34:7,8 35:8
37:19 55:14,
20 57:24
61:8,13 68:1
69:8,9 72:3
75:19 76:21
83:15,23
87:5 91:3
95:9 99:2
106:17
107:17
110:10 117:8
121:20 124:5
129:21
139:13 144:6
150:5 157:16
171:12
180:21

Monica Borcegue
May 19, 2026

181:17

**makes**
39:12 78:18
93:8,12
172:14

**makeup**
95:13

**making**
9:21 56:20
98:11 102:9,
18 161:16
179:16
180:13,23

**male**
26:19 47:6,
7,10

**male/female**
91:9

**man**
183:13

**management**
49:16 52:7
57:9 76:10
154:25
155:3,5
174:8 175:2

**manager**
4:25 5:5
6:22 33:9,15
42:9 44:15
45:2,20
51:24 86:9
140:17
155:16
158:14,16
161:12
173:25
174:12,13,
14,22
175:12,13,15

**managers**
77:15

**manufacturer**
28:7

**map**
38:17

**March**
107:17,23
108:4 134:8
135:3 138:5
139:22

**mark**
24:1 94:20
153:4 154:11

**marked**
6:2,14 23:8
35:11 61:11
72:6 75:25
76:23 83:17
87:7 91:4
105:13
107:20
139:18
144:10 150:8
152:24 158:3
181:19

**marking**
153:6

**Marrisette**
116:8

**Martinelli**
126:7

**Mary**
120:18
124:3,6

**massive**
129:23

**match**
141:6 147:17

**matches**
75:11

**material**
149:8

**materials**
15:2,10 18:4
107:23
117:11 149:9

**matter**
165:19

**Maurice**
12:24,25
17:14

**mean**
10:15 32:6,
18 37:6,8
38:23 43:21
45:14,17,23
47:22 48:22
51:9 55:18,
21 56:15
59:12,20
83:11 87:20
90:2,3 96:7
102:13 109:7
111:1 128:4
141:24 145:1
153:16,17
163:2 165:23

**meaning**
34:4 92:20

**means**
37:10 48:11
49:8,9 67:20
73:19 151:19

**meant**
18:14 32:23

**mechanism**
101:3

**medical**
15:3,18
21:4,16 22:7
25:3,19 26:4
30:6 36:4,24
37:19 46:5,
14 47:12,17
48:24 49:2,4
50:2,8,15
58:13,19
59:16,19
60:5,6,8,21
61:10,15,19
62:5,9,15,23
63:5 66:16,
17 68:2,11,
18,20,21
69:19,25
70:2,21,22,
24 71:6,9,
11,25 72:8
102:11,13,

14,15,23,24
103:1,3,23
104:1 125:6
128:12,21
133:25 145:8
166:19,20,22
167:4,5
172:1 174:16
179:8,13

**medication**
48:7 63:23
64:1,7,13,16
68:25 69:4
172:6

**medications**
63:19 69:20
70:12

**medium**
56:11

**meet**
53:23 110:2
173:17

**meeting**
173:23,24
174:5 175:6
176:11,16

**meetings**
140:23 141:7
173:20,21,23
177:3,15,16,
20

**member**
33:13 80:8
86:7 133:25
137:21
158:23 173:3

**members**
32:13,16
78:3 83:3
106:16
142:11,17
169:17

**memory**
178:13

**Mendez**
120:18 121:2
124:3

Monica Borcegue
May 19, 2026

**mention**
81:22 82:2
121:15
175:21
**mentioned**
12:21 29:15
30:10 47:14,
16 74:9
78:20 145:22
146:12 155:7
168:2,10
169:8
**mentions**
162:14
**menu**
56:15
**messages**
80:21,22
82:1 139:24
168:10
**met**
31:9 62:17
**metal**
53:3,10
57:22 94:23
95:8,14
96:16 100:22
108:21,24
111:14
115:13,14,18
116:5 117:24
118:1,11
129:9 130:12
135:13
149:10
156:24,25
178:17
**mid**
92:10 97:21
151:3 178:1
**middle**
24:9 122:7
152:4 162:14
**midnight**
107:6 163:10
**midship**
24:22 25:9,
10 30:20

125:1 127:23
133:24 154:2
162:15,23
**mild**
66:24 67:10
**mildly**
67:7
**milligrams**
64:4 67:24
**million**
113:7,8
**mind**
7:24 114:6
115:21 116:2
157:17 162:5
170:4 177:9,
12 182:23
**minor**
47:24 48:6,
13 56:11
136:3,5
**Minute**
83:8,10
170:6
**minutes**
9:12 52:11
140:22 142:3
143:6
156:10,12
183:20
**MIRACLE**
160:17
**misaligned**
47:1
**misleveling**
116:4
**missed**
58:15
**missing**
115:3 117:21
144:21 169:1
**misstep**
52:22
**misstepped**
99:14 103:10
**mistaken**
46:9 91:22

**misunderstand ing**
50:11 145:11
**mitigate**
102:7
**mixed**
75:8 146:13
**mode**
182:24
**model**
95:9
**modification**
94:8
**modified**
92:19 93:4
108:25 109:2
**moist**
130:13
**moisture**
178:2
**mom**
144:23
**moment**
47:15 185:14
**Monica**
4:11,19,20,
22 6:21 28:1
47:15 128:1
163:21 181:8
185:1,4
**monster**
139:2
**monthly**
141:7
173:20,24
**months**
12:9,19
141:8 180:17
**morning**
4:16,17
100:11,13,14
101:11
163:10
**motion**
8:22 65:22,
24 66:11

**motions**
63:16
**mouth**
77:14 170:15
**move**
33:2 76:3
132:7 159:18
184:20
**moved**
85:11 101:6
**movement**
168:4
**moves**
14:10 93:15
**moving**
81:5 83:2
85:18 135:2
168:14
**MRI**
69:23 70:14
166:25 167:6
172:11
**MRIS**
70:5 167:8
**multiple**
39:22 177:25
**mustard**
81:3

---

### N

**N-A-I-N-G**
49:23
**nails**
57:25
**Naing**
49:23 57:10
**naked**
54:4
**name**
4:18 7:25
10:6,25
12:15,18
17:19 49:20
116:10
120:18
122:17 126:1

131:22 132:7
133:9 134:6
155:14 159:3
160:12,15
161:12
182:23 183:7
**named**
9:21,25
**Nannette**
9:21,25
18:18
**Nannette's**
75:13
**Naproxen**
63:19 64:4
**narrowing**
108:15
**nausea**
63:13
**necessarily**
51:9 68:24
69:7 119:14
143:20
**necessary**
68:12
**neck**
63:16
**need**
7:8 8:22,23
9:15 10:11
24:18 31:21
34:16 53:3
64:14 68:21
79:2,5 154:9
165:5 167:23
183:8 185:13
**needed**
7:2,5 11:3
33:2 37:14
52:17 78:16
117:21 133:6
165:17
**needing**
51:18
**needs**
31:22 33:23
56:9 68:17,

18 79:15
106:25 107:7
113:19,22
153:5 177:17
**negligence**
103:5,7
168:23
**negligent**
103:5 169:7
**never**
50:12 101:10
112:21 120:4
125:5 160:14
**newsletters**
168:12
**night**
106:15 107:2
121:22
158:10
160:22
161:4,5,8
163:8,9,13
169:25 170:8
**nine**
127:23 131:9
**ninth**
127:23
**nodding**
51:1
**noise**
176:22
**non-
orthopedist**
69:19
**norm**
96:17
**normal**
33:22 40:22
92:13 122:14
123:21 130:5
131:10
**Nos**
6:8
**nosing**
53:10,12,23
54:2 55:8,9,
10 57:22

85:5 90:2
94:5,9 95:8,
14 96:3,16
97:4,18
100:22
101:14
108:21
114:16,18,
20,21 115:2,
6,13,23
125:10
126:12,13,
20,21 127:8
129:8,9
130:1,24
134:1 149:10
153:18
157:8,13
178:16,17
181:2,10,25
**nosings**
53:25 82:5
96:8,22 97:3
108:24
111:15
114:23
130:25
139:25
149:15
156:22
157:2,7
184:7,13
**Notary**
4:2
**notation**
27:4 70:23
84:24
**notations**
26:4
**note**
25:17 26:14,
15,20 28:18
29:20 36:8,
12,13,20
42:4 43:3
44:13 45:12,
18 46:2 50:1
69:15 71:4

125:16 145:6
**noted**
28:25 30:16
43:13 49:3
68:9 85:2
121:18
123:18 129:7
134:16,17,24
142:13
154:18
**notes**
15:4 22:2,8
23:6,8 24:1,
3 25:22
26:16 27:8,
13 30:14
34:13 35:20
36:15 37:16
38:2 39:20
42:25 62:11
63:9 65:17
66:19 68:2
140:23
**notice**
5:16,18,24
6:1,5,12,13
53:16 110:22
119:21
120:10,17
127:22 164:2
180:25
**noticeable**
54:4
**noticed**
49:18 91:7
117:18 120:6
125:14
128:22
135:20
**notified**
121:24
**November**
16:17
**Nozipho**
36:12
**number**
33:6 34:9
147:5 150:3

156:18 159:6

**numbering**
149:3

**numbers**
72:17 75:11
163:3

**nurse**
62:17

**nurses**
70:21

---

O

**Object**
53:14 54:25
55:17 79:22
84:16 112:19
141:23
143:11 152:1
172:4 177:5
182:1

**objection**
8:13 27:20
45:25 68:13
94:17 104:9
157:14
179:25

**objections**
5:23 6:6,7,
13,18

**observation**
57:16

**observations**
144:18

**observe**
54:9 99:15

**observed**
45:1,5,6,19
127:17

**obstacles**
77:8

**obtain**
23:15 137:21

**obtained**
137:16

**obviating**
104:5

**obvious**
104:5

**Obviously**
37:24

**occasion**
106:5

**occur**
25:9 100:10
119:21
124:21
127:4,14
130:17
132:11
133:15
134:10 135:5
136:7 147:13
179:4

**occurred**
29:5 30:3
31:13 36:9
39:2,13
43:15 59:8,
21,25 82:8
85:10 86:5
98:18 111:5
112:25 114:2
121:7 122:16
125:9,22
131:4,24
132:8 133:9
134:18
135:25 136:1
142:11
143:22
147:16
158:25 170:4

**occurs**
106:6 107:10

**October**
160:14 162:3

**office**
14:17 22:5

**officer**
16:12 35:9,
10,15,16
42:13 44:15
45:1,19
46:19 47:8

50:11 56:18
78:23 124:7
145:24 162:5
164:14
171:15,19
174:13,23
175:11,15
176:15

**officer's**
42:20

**officers**
175:6

**official**
75:5 184:7,
13

**offline**
124:9

**okay**
5:24 6:11,21
7:20 10:4
14:16 19:15
20:5,20
23:6,19,20
24:5,7,8,16
25:16 26:6,
13 27:6,25
28:16,17
29:15 31:21
34:9,12
35:18,24
36:7,21 37:1
41:3 42:13,
24 43:5 44:8
46:19 47:22
49:1 50:1,6
55:7 56:5
57:2 58:7,8,
22 59:1,7
60:9,12,17,
19 61:18
62:1,4,16
64:10,19
65:1,17,21
66:10 67:4
71:17,24
73:3 74:8,13
75:15,24
76:18,21

77:12 80:13
82:8,16
83:2,21 84:4
85:1 86:14
87:5 88:3,
16,22 89:6,
11,13 90:11,
19 91:3,15,
23 95:19
98:25 99:3
100:9,12
102:6 103:25
104:3,16,23
106:1
107:16,25
108:5 109:25
112:9,12,16
116:14,20
117:15,16
121:1,23
122:21,22
123:21
124:13
125:18,21
126:8 127:3,
13 128:11,17
129:15
130:16
131:21,23
132:10
133:6,11
134:9 135:4
136:4
138:11,13,
16,18 139:1,
2,8,13
142:14
143:25 144:6
145:3,21,22
146:20 147:5
148:6,9
149:14,20
150:5,12,17
151:8,11,21
154:1 156:18
157:6,19
158:21
160:19
166:14

167:12,17
170:2 176:4
181:17
182:12
**onboard**
69:20
166:12,20
173:18
**once**
9:13 10:9,18
14:10,25
17:25 24:5
42:9 48:2
71:2,4 75:4
87:20
102:11,22
108:14
137:22
152:19
155:22
165:14 166:7
**one**
15:24 26:18,
20,21 28:19
33:6 34:14
35:20 37:9
41:4 46:25
51:6 54:23
56:20 67:22
70:20 71:13
73:14 74:17,
24 77:5,7,8,
12 81:11
88:5,7,25
89:2 92:15
95:11 99:5
103:18
104:20
105:18
109:12
115:19 116:7
123:3 124:4
125:3
129:18,21
131:13,19
134:3 138:22
140:22 142:3
144:25

149:17,22
151:5,12
153:9,20,23
156:4 157:11
159:10
161:9,10
162:4 163:24
168:2 170:12
173:3 176:11
183:10,12,25
184:2
**one-page**
35:13
**ones**
50:23 86:18
88:19 105:20
142:16 146:4
148:23
149:16
150:25 157:4
160:21
179:10
**open**
25:24 75:18
81:2,11
104:5 134:4
178:10
**opened**
25:25 26:2,8
86:10
**opening**
139:2
**opens**
81:9 154:21
**operation**
95:20 107:6
**operations**
81:3 174:13,
15 175:15
**opinions**
101:5
**opportunity**
8:13
**opposed**
101:14
110:25

**option**
153:7
**optional**
174:15,19
**options**
118:23
**order**
24:11,12,13
33:12,23
49:12 51:22
52:2 57:7,14
73:4 80:11
85:20,25
86:10,11
92:13 107:1,
9,11 109:13
117:11 141:6
154:11,16
**ordered**
110:2
**ordering**
185:11,12
**orders**
85:14 140:18
148:12
149:24
152:19
155:25
**ordinary**
27:9,18 28:3
82:18 87:19
99:6,9 102:3
146:6,25
148:15
**original**
27:13 141:17
**originals**
82:21 84:2
146:17 147:3
148:4,18
**ortho**
69:23
**orthopedic**
70:9 171:24
**outcome**
103:1

**outdoor**
109:18
**outdoors**
109:22
**outside**
6:23 92:8
118:20
177:12
**overcharged**
86:15
**overhead**
63:14 65:2,7
**overlapped**
88:11
**oversees**
79:7
**overserved**
183:19
**oversight**
161:3
**ownership**
150:20

---

**P**

---

**p.m**
26:3
**p.m.**
6:5 24:14
25:21 29:9,
14,17,23
30:3,4,18
33:25 34:12,
13,14 35:13,
23 36:8,11,
13 41:19,24
42:4,14 43:3
50:7 61:17
62:13 71:25
72:9 121:7,
25 123:2
124:22
127:15
130:18
132:12
133:17
134:11 135:6

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| 136:8 152:15 154:13 159:22,23,24 160:4 | 172:6 | 163:11 | 30:15 92:4 105:6 113:6 144:16 147:24 |
| **PA** 80:17 | **painful** 9:14 62:19 | **passengers** 113:8,9 | **permanently** 167:21 |
| **package** 15:20 16:25 17:8 38:14 50:20,22 73:20 87:3,6 | **palm** 67:6 | **passive** 66:11 | **permitted** 184:6,12 |
| | **PANORAMA** 92:22 109:2 125:20 134:7 | **past** 12:6,11 40:13,24 41:2 | **person** 12:12 17:23 26:16 36:11 37:16 39:5, 6,24 40:1, |
| **page** 24:9 60:21 61:14,18 62:4,16,22 65:5,21 66:1,2 71:17 74:17 77:2 83:22 85:18 87:2 88:3,4 111:19,20,21 116:12 120:17 137:8,10 138:4,11,12, 24 143:23 145:2,22 149:11 153:9 156:5 158:22 | **paperwork** 52:6 57:7 | **patient** 69:18,25 | 12,14,20 42:4 45:12 53:21 54:24 55:19 62:17 64:20 68:18, 20 70:21 73:7 75:7 86:9 101:8 115:1 118:19 119:9,11 120:18 137:1 155:6,11,12 156:24 |
| | **paragraphs** 176:7 | **patient's** 69:24 | |
| | **part** 17:3 31:14 38:10 43:1,7 44:19 45:7 46:8,13 58:16 59:20 66:10 83:8 84:8 87:21 89:6 92:21 104:17 111:11 115:9,18,22, 24 130:1 150:1 153:19 156:23 157:21 159:5 163:4 164:17 168:23 170:20 171:5 173:20 174:3 | **pay** 37:13,14,18 62:5 | |
| | | **paying** 52:23 54:6 103:6 | |
| | | **PDF** 60:9,15,21 65:5,22 66:2 71:17 74:17, 22 138:16 139:6,22 143:23 | |
| | | | **person's** 55:12,14 156:22 |
| | | **pending** 9:10 86:22, 24 | **personal** 10:1 11:6 57:16 94:1 |
| **pages** 22:6 27:16 28:12 60:10, 20 61:6,13 76:14 83:7, 14 87:24 105:2 138:16,21 141:2 142:2 149:5,11 150:17 | | **people** 55:24 91:11 93:22 94:6 113:2 114:11,19 118:5 119:22 120:2,8,12, 13 162:4 165:19,20 168:6 169:20 174:2 179:11 182:5 | **personally** 8:21 10:5,23 107:22 137:20 |
| | **partially** 114:2 | | **pertain** 177:2 |
| | **particular** 98:23 113:2 170:3 | | **pertained** 95:23 |
| | **parties** 185:19 | | **pertaining** 46:22 179:18 |
| | **partitions** 106:21 163:1 | **percent** 9:4 | **phone** 17:6,9 18:15,20 56:20,22 135:21 155:1 |
| **pain** 24:24 48:7 62:14 63:11, 12,15,23,25 64:1,7,13,16 65:18,20 68:25 69:2,4 70:12,15 | **party** 75:6 | **Perfect** 185:2 | |
| | **passenger** 9:21,25 104:25 113:6 117:23 132:7 | **period** 19:13,18 | |

Monica Borcegue
May 19, 2026

Photo
  174:18
photograph
  89:8 91:4
  180:5,15
  181:13,17,19
photographers
  120:13
photographs
  15:17 22:13
  39:18 50:21
  88:6 101:14
  110:6 117:20
  122:9 123:19
  128:24 164:8
photos
  22:1
phrase
  9:3
phrasing
  37:6
physical
  66:20
physically
  29:7 42:18
  57:13 63:18
  156:1 167:18
physician
  175:10
pick
  71:15 115:17
picture
  43:10,11
  54:7 88:12,
  14 89:10,13,
  16,21,24
  90:1,18
  91:2,3
pictures
  51:5 88:10,
  18 116:1
  120:13
piece
  38:3 46:3
  89:25 90:7,
  23 91:1
  115:11,12

pieces
  28:8
pill
  63:20
pills
  64:4
place
  25:23 26:12
  29:21 37:22
  44:18 45:7
  51:21 53:4
  54:2 55:10,
  15 57:14,21
  58:5 73:11
  78:21 79:20,
  24 80:9
  81:20 82:3
  85:13,16
  86:8 99:15
  101:2,7
  107:7 115:16
  117:21
  122:12,15
  123:20 124:8
  125:16
  126:14 130:5
  135:16
  178:17,18
places
  30:23 55:19
placing
  46:11
plaintiff
  22:8 39:12
  40:3 98:19
  99:6,9 103:5
  104:4 168:24
  169:7
plaintiff's
  6:1,12,13
  23:8 35:10
  39:12 61:10
  72:5 75:25
  76:23 83:16
  87:6 91:4
  98:13 103:16
  104:25
  105:11,12

  107:18,19
  139:16,18
  144:9 150:7
  158:2 166:5
  181:18,19
plan
  147:12,23
planned
  176:20
plate
  131:13
play
  80:19 81:1
  118:6,12
  127:16
  156:20
played
  143:7 157:8
playing
  84:4 90:8
please
  4:6,18 6:17,
  21 9:5 22:2
  61:25 121:1
  185:9,17
Pleasure
  185:4
plot
  147:12
point
  7:13 8:1,21
  10:9,12,17
  11:21,25
  12:7 13:6
  16:14 17:22
  27:4 31:2,10
  34:19,21
  37:21,24
  38:16 39:2,3
  40:6 71:16
  96:5 113:10
  177:16
points
  10:21 159:20
policies
  32:17 64:20
  68:22 76:12

  78:2 167:24
  169:13 177:1
policy
  19:5,8 21:7
  30:24 47:20
  71:10,13
  76:20 78:12
  83:5 85:21
  169:16
  170:16 179:3
pool
  81:19 125:12
  174:16
pools
  125:12
poor
  143:17
  183:19
pop
  48:5
portion
  137:9 156:25
  178:17
ports
  176:20
position
  4:24 12:5,9,
  19,25 44:2
  59:10,14,15
  77:13 79:16,
  18 85:4,6,8,
  12 96:4
  100:21
  101:15
  104:6,18
  135:24
  158:15,17
  168:17,23
  169:6 172:17
  175:23,24
  176:2 179:24
positions
  154:20
positive
  66:25
possession
  96:5 164:3

Monica Borcegue
May 19, 2026

| possibility | preserved | 117:10,13 | professional |
| --- | --- | --- | --- |
| 36:19 101:3, | 123:22 124:3 | **probably** | 4:2 68:3 |
| 6 167:25 | 128:14 | 25:20 79:6 | 102:24 167:5 |
| 168:6 | 132:19,22 | 105:2 111:20 | **professionals** |
| **possible** | 133:22 | **problem** | 69:20 |
| 36:14 69:24 | **pressing** | 113:2,5,14, | **program** |
| 70:9 85:11 | 154:9 | 19 | 121:16 |
| 101:1 126:21 | **pretty** | **problems** | **promote** |
| 142:9,12,20, | 55:20 56:23, | 134:21 | 174:9 |
| 24 171:25 | 25 57:3 | **procedure** | **promotion** |
| 177:7,15,19 | 63:25 80:23 | 18:6,10 | 73:21 |
| **possibly** | 81:8 111:15 | 41:16 76:15 | **promptly** |
| 110:2 | 175:2 | 78:20 80:7, | 77:15 78:10 |
| **post** | **prevent** | 12 85:20,21, | **proper** |
| 60:7 102:14 | 94:6 168:18 | 25 86:3 | 79:14 107:1 |
| 167:15 | **prevention** | 170:16 179:3 | 143:10 |
| **potential** | 76:15 140:24 | **procedures** | **properly** |
| 33:13 | **previous** | 32:17 64:20, | 94:14 99:15 |
| **power** | 22:23 82:23 | 22 68:22 | 125:15 |
| 183:7 | 101:9 124:2 | 76:7,12,23 | 155:21 |
| **practices** | 156:18 | 167:24 | **protect** |
| 174:9 177:1 | 167:6,15 | 169:14 177:1 | 51:13 |
| **pre-** | **previously** | 179:7 | **protection** |
| **litigation** | 100:2 | **proceedings** | 94:10 |
| 7:6 | **primarily** | 44:11 58:10 | **protrude** |
| **preexisting** | 32:14,24 | 98:7 156:16 | 85:7 93:8 |
| 103:20,21 | **print** | **process** | **protruding** |
| **prefer** | 74:24 75:5, | 14:23 19:1 | 42:6,10 |
| 118:13 | 16 | 20:25 56:8 | 49:19 51:3 |
| 156:11 | **printout** | 86:11 108:2 | 77:18 78:13 |
| **prelitigation** | 74:23 | 129:17 | 79:20 85:5 |
| 112:17 | **prior** | 140:13 | 88:6 89:7 |
| **Premium** | 6:25 22:10 | 163:18 | 104:7 |
| 73:15,23 | 103:14 108:5 | **processed** | **prove** |
| **preparation** | 113:13 125:2 | 11:12 | 44:3 |
| 21:22 22:3 | 129:13,16 | **produced** | **provide** |
| **prepared** | 141:7 166:21 | 22:5 75:10 | 15:11 71:15 |
| 6:18 | 167:1 182:6 | 141:2,11 | 101:5 109:12 |
| **prescribe** | **priority** | 147:18 | 110:3 118:18 |
| 69:20 | 32:6 33:6,17 | 149:24 164:4 | 160:25 |
| **prescription** | 56:11,16 | **product** | **provided** |
| 169:9 | 152:22,24 | 23:18 117:10 | 15:11 22:10 |
| **present** | 154:5,9 | **production** | 27:17 28:2 |
| 44:16 | **priors** | 139:10,15,18 | 70:1,11,22 |
| **preservation** | 141:11 | 144:2 157:21 | 71:5 75:17 |
| 170:12,18 | **privilege** | 161:3 | 92:9 107:12, |
| | 23:14,18 | | 16,23 108:3 |

Monica Borcegue
May 19, 2026

109:25
110:13
111:18 116:7
139:21 149:7
160:20
**provider**
66:17
**prudence**
99:7,10
**public**
4:2 32:13,24
82:10 162:14
**pull**
23:23 58:25
60:14 105:21
108:6 113:5
117:5 137:12
138:9 150:10
**pulled**
74:21 108:12
**Pulling**
180:4
**purchased**
40:21
**purchases**
71:23
**purposes**
7:3 10:8
83:11
**push**
53:3,5
57:21,23
**pushed**
53:7
**put**
38:17 44:18
45:7 55:22
57:14 62:11
77:13 83:7,
11 86:22
152:13
164:14
170:7,14
**putting**
78:21 146:11
178:13,16,18

**puzzle**
35:20

---

**Q**

---

**quantity**
67:19
**question**
8:11,25 9:1,
10,11 13:20
20:14 21:20
27:7 28:1
46:16 74:12
80:6 106:2
121:19,21
128:4 137:7,
8 156:2
162:18
166:22
**questions**
8:10 82:23
117:12
158:21 172:7
184:23 185:1
**quick**
8:5 64:17
**quickly**
52:2,5 57:6
81:10 86:3
160:9
**quite**
80:11
163:22,23

---

**R**

---

**R-A-W-A-T**
16:13
**rail**
95:5 96:23
97:4,18
179:19
**railing**
91:18 93:7,
11 180:22
**Raise**
4:5

**raised**
114:16,18,
23,25 115:14
116:25
135:12
139:24
**raising**
63:14 65:2,7
**range**
30:9 34:20
63:16 65:22,
24 66:11
148:20
**rare**
154:19
**Rawat**
16:12 35:16
47:6 48:18
50:16 162:6
171:19
**re-**
53:4
**re-record**
19:12
**reach**
10:10 34:8,
10 78:9
87:17 93:7,
11 96:23
97:4,18
**reached**
27:3,5
29:11,16
31:5,6
135:22
**reaching**
12:1 91:17
95:5
**read**
21:2 24:18
25:4 26:9
28:19 29:4
35:23 36:8,
25 47:4
61:23 65:4
100:4 185:8,
9

**reading**
25:17 46:2
47:15 65:6
185:18
**realize**
9:22 145:12
**realized**
17:12
**reason**
22:21 23:3,
15 50:19
61:20 67:13
70:18 91:10
94:4,11
96:18 102:2
103:2 173:10
**reasons**
157:5,6
**recall**
9:24 53:24
81:7 100:7
110:19 112:3
114:3,10,24
116:6 117:3
120:11 132:1
137:22 143:4
150:18
177:22
180:5,9
182:11,21,22
183:7
**receipt**
15:20
**received**
6:6 10:24
14:13 16:25
17:17 30:17
67:21 70:24
71:8 87:10,
25 105:15
**receives**
179:8
**recently**
7:21 12:16
13:5 182:20
**recess**
58:9 98:6
156:15

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| **recollection**<br>  116:15<br>**recommendations**<br>  69:13<br>**recommended**<br>  64:18<br>**record**<br>  8:4,19 16:10<br>  19:9 29:1<br>  30:13 31:8<br>  44:11 49:4<br>  51:18 54:16<br>  85:9 97:15<br>  99:2 117:9<br>**recorded**<br>  19:7 31:25<br>  172:25<br>**records**<br>  14:22 15:3,<br>  18 18:5 22:7<br>  30:7,11<br>  31:11 50:8,<br>  18 59:16,19,<br>  25 60:6,21<br>  61:3,4,10<br>  63:1 67:7<br>  70:22,24<br>  71:6,11,14<br>  96:25 97:20<br>  100:25<br>  102:13,15<br>  104:1 146:5,<br>  24 166:20<br>  167:5,15<br>  179:13<br>**rectangular**<br>  89:25<br>**rectification**<br>  97:23<br>**rectified**<br>  42:11 49:20<br>  52:2 86:2<br>  96:15,20<br>  106:25<br>**rectify**<br>  97:8 | **red**<br>  142:15 147:6<br>**redact**<br>  141:5<br>**reducing**<br>  32:4<br>**refer**<br>  34:6 35:6<br>  63:6,8<br>  71:20,21<br>  73:23 81:16<br>  87:1 100:8<br>  110:5,7<br>  113:5 149:12<br>**reference**<br>  73:17 153:18<br>**referred**<br>  24:3 46:9<br>  80:2 82:9<br>  147:6<br>**referring**<br>  6:9 53:10<br>  86:18 88:7,<br>  9,10,11 95:1<br>  103:22 105:4<br>  120:22<br>  153:23<br>  162:19 179:2<br>**refers**<br>  65:23<br>**refresh**<br>  116:15<br>**refused**<br>  50:3 145:8<br>**regarding**<br>  18:17 19:6<br>  30:2 69:13<br>  78:2 91:24<br>  106:5 112:17<br>  139:24<br>  140:23 144:3<br>  167:13<br>  168:22<br>  169:14<br>  170:2,17<br>**Regina**<br>  131:3 | **registered**<br>  62:17<br>**regular**<br>  17:3 55:15<br>  61:1 83:25<br>  141:13<br>  147:25<br>  182:10<br>**related**<br>  76:15 108:18<br>  151:12<br>  164:3,9<br>**relation**<br>  178:21<br>**relaying**<br>  45:10<br>**remained**<br>  19:6<br>**remember**<br>  13:9 81:16<br>  100:8 115:8,<br>  19,25 116:1<br>  149:23<br>  157:15<br>  177:14<br>  178:9,12<br>  182:18<br>  183:4,15,19<br>**REMOTE**<br>  4:1 185:18<br>**removable**<br>  167:22<br>**reopens**<br>  25:21<br>**rep**<br>  14:11 17:2,<br>  15 38:12<br>  70:24<br>**rep'd**<br>  18:7<br>**repair**<br>  31:21 34:16<br>  51:19 53:5<br>**repaired**<br>  53:6 107:7<br>  133:7 177:18 | **repairing**<br>  79:15 80:4<br>**repairs**<br>  77:22 79:5,<br>  11 85:14<br>  133:4<br>**repeat**<br>  119:24<br>  184:11<br>**rephrase**<br>  9:6<br>**replace**<br>  53:4<br>**replaced**<br>  53:6<br>**report**<br>  15:21,24<br>  16:7,11,20<br>  21:5,8,13,14<br>  24:13 30:22<br>  31:15 34:18<br>  35:7,9,10,15<br>  36:10 41:15<br>  42:1,2,21,23<br>  43:8,22<br>  46:20,24<br>  47:13,17,18<br>  48:19,21<br>  49:5 50:12,<br>  15 57:20<br>  64:23 77:15,<br>  23 78:9<br>  80:8,9 85:15<br>  108:6 117:2<br>  121:12,13,22<br>  122:2 123:1,<br>  10 124:23<br>  127:25 128:9<br>  132:17<br>  133:20 144:3<br>  155:13<br>  158:9,10<br>  161:4,5,6,20<br>  163:13<br>  164:13,15,<br>  18,20 165:9,<br>  11 170:20<br>  171:6 179:9 |

**reported**
  31:1 33:18
  42:14,19
  54:19 59:17
  77:25 85:24
  108:8 123:14
  125:3
  132:15,16
  133:21
  166:18
**reporter**
  4:2,5 8:21
  128:6
  185:11,15
**reporting**
  24:18 30:25
  77:23 78:16
  85:20 123:16
  179:7
**reports**
  24:10 39:17,
  18,22 57:4
  96:25 108:9
  114:13 117:6
  144:16,17,19
  145:16,24
  147:11
  157:24 158:7
  160:19
  164:21,23
  165:1 176:17
**represent**
  180:15
**representatio
n**
  10:19 11:6
  15:1,12,14
  38:5 99:2
  113:1
**representativ
e**
  5:10,13 7:4,
  12 23:2
**representativ
es**
  175:18
**representing**
  14:18

**request**
  8:9 38:17
  51:22 56:10,
  18 72:20
  139:9,15,18
  140:9,11
  144:1 150:18
  152:13
  154:16,24
  161:16
  165:2,5
  184:8,14,16
**requested**
  10:8 21:16
  49:2 63:25
  64:13 155:8
  171:10,12
  172:7
**requester**
  155:23
**requesting**
  16:2 46:21
  176:8
**requests**
  6:24 10:11
  11:4 56:14
  154:21
**require**
  48:1 69:1
  106:18
**required**
  31:19 32:19
  97:22,23
  175:20 176:3
**rerecord**
  137:24
**research**
  6:24 7:9
  10:7 17:3
  120:4
**resistance**
  51:13 94:24
**resistant**
  94:7
**resolved**
  152:11

**resolving**
  38:20
**resources**
  175:13
  176:14
**responding**
  49:14
**response**
  17:1 137:7
  139:9
**responses**
  139:14,17
**responsibilit
ies**
  77:3
**responsibilit
y**
  78:7 92:7
  94:2 111:25
  143:19
**responsible**
  38:9,20
  39:7,15
  40:3,23 75:6
  78:4 114:2
  143:2 158:24
  168:25
**responsive**
  107:13
  109:7,13
  110:11
  129:20
  141:5,10
  144:1 147:22
  150:17
**rest**
  26:9 55:11
**Restriction**
  63:14 65:7
**restroom**
  9:16
**result**
  51:15 52:1
  85:17 98:14
  101:7 103:19
  104:14
  166:15 169:1

  177:2 178:22
**results**
  109:7 166:25
  173:22
**retail**
  174:18
**retain**
  19:11
**retired**
  12:8,16
**retrieve**
  19:16
**returned**
  58:13,19
  62:22 160:14
**revealed**
  145:17 146:3
**review**
  22:18,22,25
  31:13,16
  41:6,14
  117:10
  173:12
**reviewed**
  21:22 22:2,
  12 28:13
  60:6 102:13
  104:1 125:2
  131:1 135:20
  142:5 156:18
  157:3,4
  166:20
  167:4,15
  171:1,11
  173:4,7
**reviewing**
  44:4
**Reyes**
  130:8
**Richards**
  124:11,13
**Richardson**
  127:2
**rid**
  108:18
**right**
  4:5 13:13

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| 14:19 17:1 20:11 24:22 25:3 29:6 34:2,22 35:21,25 36:14,25 38:18,24 41:10 42:2 43:18 44:1 45:18 46:22 47:2 49:15 59:2,3 60:2 61:8,22 62:2,18 63:11,24 65:12 66:23 74:2,3 75:19 89:24 90:1, 21 99:18 102:18 106:7 109:20 114:6 117:13 118:25 119:16 121:12,19 124:23 126:4,8 127:25 128:9 132:15 135:22 139:11 148:8 149:15 152:12 153:10,24 154:3 155:15 159:8 160:3 161:23 162:2,9 167:2,8,10, 11 169:24 176:7,10 181:8 182:21,23 183:8 184:24 **right-hand** 89:9 90:3 **ring** 178:4 | **rings** 116:10 **riser** 151:22 **risks** 104:4 **road** 23:15 38:15 **roam** 55:3 **Rodriguez** 122:18 **role** 84:5 118:6, 12 127:16 143:7 156:20 157:8 **ROM** 66:3 **room** 29:13 34:11 177:17 **rooms** 82:13,14 **rotating** 159:19 **Roughly** 124:17 **round** 109:23 **routine** 56:25 57:3 106:6,23 169:25 **rubber** 35:4 47:1 49:18 51:2, 11 53:2,11 54:2 55:10 77:19 78:13, 21 79:20 82:2 85:4,7 88:6 91:17 93:8 94:5,9, 23 95:4,8,14 96:3,14,15, 22 97:3,4 | 100:22 101:6 104:7 115:6 118:8 122:15 129:9 178:18 179:18 **rules** 8:5 **runner** 80:8 **running** 114:11 _____ **S** _____ **S-C-H-A-R-A-G-A** 10:25 **saddens** 184:22 **safe** 118:16 **safer** 118:23 **safety** 32:6 33:5,16 76:9,11 80:21,22 99:20 102:1 118:18 123:18,19 125:15 128:23 131:9 134:24 140:15,23 173:18,20 174:9,10,13, 23 175:11 176:24 **Sail** 15:4 22:9 40:19 71:20, 22 72:5 73:3,9 74:14 75:21 82:24 **sailed** 166:7 | **sailing** 113:8 **sales** 67:18 **sandal** 126:15,18 **satisfaction** 176:23 **satisfied** 70:2 **Sauza** 127:11 **save** 123:25 170:22 171:5 **saved** 19:13 123:23,24 125:5 133:2, 24 136:25 170:21 **saying** 13:10 25:22 39:5,14 40:1 48:19 66:6 78:19 96:9 154:1 167:8 **says** 24:21 25:8 26:4 29:13 33:25 35:13 36:8 42:1,3 45:24 47:5, 11 49:5 50:1,4,5 66:24 67:8, 9,18 68:6 73:15 77:14 84:9 86:15 87:9 104:3, 16 106:4 117:23 120:21 122:22,25 123:7,16 126:24 127:5,21 129:4 130:3 |

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| 134:19 | 77:8 88:3 | 18,19,21 | 137:11 |
| 135:17 | 99:5 103:9, | 172:1 173:5 | 139:11 140:2 |
| 143:17 145:7 | 18 107:19 | 174:14 | 143:16,21 |
| 151:13,16 | 109:23 | 175:14 | 144:2 145:8, |
| 153:12 | 126:4,10,15, | 179:14 | 15,21 |
| 174:15 | 19 135:14 | **see** | 147:19,21 |
| **scale** | 136:12,20 | 11:2 14:22 | 150:3,10 |
| 147:14 | 139:14,17 | 15:2,13,14, | 152:10 |
| **scan** | 149:21 180:4 | 16,24 16:2, | 155:2,8,20 |
| 11:18,19 | **section** | 5,8 17:17 | 156:13 |
| **scans** | 69:16 162:14 | 18:9,22,24 | 157:23 |
| 11:17 69:23 | **secure** | 19:3 24:12 | 158:23 160:5 |
| 70:5,14 | 57:24 58:6 | 25:5 26:3 | 162:13,22,23 |
| **scene** | **security** | 28:14,18 | 166:12 |
| 52:1 128:20, | 16:8,10,11, | 29:10,13 | 171:24 |
| 22 | 12 20:1,3 | 30:16 31:13, | 175:25 176:2 |
| **Scharaga** | 21:5,7,12,17 | 18 34:25 | 177:17 |
| 10:25 15:10 | 26:10,22,24 | 35:14 39:9 | 180:11,12, |
| 87:3,7 | 27:3 28:24 | 40:2,6 42:8 | 17,23 181:3, |
| **schedule** | 29:22 30:1, | 43:13 46:10 | 5,7,11,12, |
| 107:3 158:18 | 8,11,17,21 | 48:6,17 | 13,15,22 |
| 159:13,21 | 31:1,3,9,12, | 50:3,13,17, | 184:4 |
| 160:5,18 | 17 32:21 | 18 54:6 58:7 | **seeing** |
| 163:12 | 33:10 34:17, | 63:22 64:1 | 42:5 169:2 |
| 170:10 | 23 35:2,3,8, | 65:19 66:1, | **select** |
| **scheduled** | 10,15,16 | 6,25 67:17, | 56:16 |
| 160:16 | 36:10 37:20, | 24 69:15 | **send** |
| 162:2,7 | 21,23 39:17 | 74:13 75:4, | 14:12 15:6 |
| **screen** | 41:25 42:2, | 11 78:5 | 18:6 38:13 |
| 90:21 | 13,17,20,23 | 79:11 84:10, | 140:10 165:6 |
| **search** | 43:6 44:15 | 15,23 86:14, | 174:16,17, |
| 52:3 108:22 | 45:1,19 | 17,20 88:6, | 18,19 |
| 109:5 129:7, | 46:19,21 | 13,16,20 | **sending** |
| 11,13,14 | 47:8 48:18 | 89:15,19,22, | 14:20 |
| 139:23 | 50:11 51:24 | 24 90:8,11, | **sends** |
| 140:6,11 | 56:18 70:18 | 15,20,22 | 11:5 38:5 |
| 148:25 | 73:4 76:11 | 94:22 98:12 | **senior** |
| 150:22 | 78:14,22 | 110:21 | 11:14 12:21 |
| 165:16 | 79:4 84:18 | 111:4,20 | **sense** |
| **searched** | 85:24 125:11 | 116:17 | 37:19 68:1 |
| 103:15 | 144:3,18 | 117:2,16,19, | 78:18 |
| **searches** | 145:11,16,24 | 20 120:13,20 | **sensitive** |
| 7:1 110:8 | 147:11,15 | 121:4 123:4, | 165:18 |
| 129:16 | 155:13 | 12,19,23 | **separate** |
| 142:19 | 161:20 162:5 | 125:8,9 | 75:9 |
| **second** | 164:12,14, | 126:22 | **separately** |
| 24:8 62:4 | 23,25 165:3, | 127:17,21 | 138:23 |
| | 20 171:15, | 134:13 | 183:11 |
| | | 136:17 | |

Monica Borcegue
May 19, 2026

**September**
  5:3 130:9,15
  131:5
**Sergio**
  122:17
**serious**
  165:19
**served**
  10:9,13,18
  105:22
**service**
  10:16
**services**
  15:4 17:15
  21:17 27:2
  28:19 29:8,
  14 30:1,8,14
  31:4 34:25
  36:1 37:24
  43:11,14
  44:25 45:6,
  9,21,23
  46:21 56:19
  62:9 174:12,
  22 175:12
  176:21
**set**
  13:4 15:1
  48:10 170:24
**setting**
  14:24
**seven**
  13:3 111:21
**several**
  167:13
**severe**
  172:14
**shampoo**
  107:3,4
  163:15
**shampooing**
  107:5 163:6,
  24 170:9
**share**
  177:16
**shared**
  165:1,7,9

  172:21
**sharing**
  88:20 174:10
**she'll**
  11:18,19
**sheet**
  158:23
**shift**
  42:14
  106:15,22
  144:19,22
  155:4,9,10
  157:23
  158:7,9,10,
  20,23 159:2,
  7,20,24
  160:19
  161:4,5,6
  163:13
  169:25 170:1
**shifts**
  106:7,15
**ship**
  7:25 14:9
  15:3 16:15,
  24 18:16
  19:7 37:15
  41:5 56:9
  68:20 70:8
  71:2,4,10
  72:13 73:11
  76:5 81:5
  82:15 83:4
  85:15 91:16
  92:4,13
  95:10 97:14
  104:2 110:17
  116:17
  118:17,20
  138:1,2
  140:16
  147:23
  148:12
  150:13
  155:13 160:7
  161:1,24
  163:20
  165:4,21

  168:4 171:8
  172:18 173:7
  174:2,6
  177:12
  178:12
  180:17
**ship's**
  60:21 175:9
**shipboard**
  15:17 22:7
  60:6 61:10
  137:21
**shipbuilder**
  95:15,16
**ships**
  7:2 11:23
  13:23 18:22
  32:8 92:15
  93:25 96:18
  101:9 108:13
  109:1 110:19
  111:12
  112:25
  113:1,3,7,16
  141:1 162:10
  168:1 179:17
  181:23
**shipyard**
  28:7 92:6
  95:17 97:23
**shoe**
  116:5 156:22
**shoes**
  116:2 118:5,
  7 119:1,2,4,
  7,18 134:3,5
**shop**
  73:16,18
**shore**
  7:1 10:20
  16:24 17:6,
  12,13,16
  18:16 140:15
  165:1,9,13,
  19,25 166:3
  173:7 174:17
**short**
  58:9 92:11

  97:8 98:6
  135:17 143:8
  156:15
**shortly**
  96:6 124:24
**shoulder**
  36:2,22 47:3
  60:2 62:18
  63:11,25
  65:12 69:14,
  21 102:18
  167:2,9,10,
  11,14
**shoulders**
  61:23 62:1
  63:15 65:3,
  8,11,12
  66:14,17
**show**
  30:7 40:21
  51:2,6 59:25
  126:11 143:9
  172:18
  180:11
**showed**
  43:11 128:18
  180:5
**shows**
  39:25 40:20
  62:16,21
  94:14
  113:14,18
  154:12
  161:12
**Sibanda**
  36:12
**sic**
  92:23
**side**
  7:1 10:20
  16:24 17:6,
  12,13,16
  18:16 89:9
  90:3,4 133:1
  140:15
  165:1,9,13,
  19,25 166:3
  173:7 178:7

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| **sides** | 180:2 182:19 | **slip-and-** | **sorts** |
| 82:12 | **site** | **falls** | 144:21 |
| **sign** | 57:11 167:19 | 166:3 | 148:23 |
| 15:4 22:9 | 172:24 | **slipped** | **sound** |
| 40:19 66:25 | **sitting** | 24:18 25:5 | 8:3 |
| 71:20,22 | 23:16 | 30:19 33:8, | **sounds** |
| 72:5 73:3,9 | **situation** | 11 41:18 | 19:19 173:5 |
| 74:15 75:21 | 14:9 31:24 | 120:21 123:7 | 183:9 |
| 82:24 170:7 | 38:24 39:16, | 127:5,19 | **source** |
| **sign-off** | 19 51:10 | 129:2 130:6, | 183:5 |
| 160:7 162:9 | 52:16 56:2 | 12 133:13 | **spa** |
| **sign-on** | 77:4,10,19 | 134:15 135:1 | 174:19 |
| 158:23 | 79:3 80:1 | 156:25 | **space** |
| **signature** | 85:19,21,23 | **slippery** | 52:16 90:13, |
| 138:5,14 | 91:23 95:3 | 117:22,24 | 16,25 |
| **significance** | 97:11,17 | 122:13 | **span** |
| 172:2 | 115:5 119:20 | **slipping** | 54:23 55:5 |
| **Significant** | 152:23 | 99:14 125:4 | **speak** |
| 166:10 | 171:25 | 182:23 | 5:21 8:9 |
| **signing** | **situations** | **slope** | 21:17 37:21, |
| 185:18 | 39:24 68:11 | 115:23 | 23 38:2 40:8 |
| **signs** | **size** | **slot** | 46:21 103:3 |
| 167:18,20,23 | 89:3 | 53:7 | 171:7 183:25 |
| **similar** | **skid** | **slow** | 184:1 |
| 111:13,15 | 123:20 | 59:2 | **speaking** |
| 114:10 | **skip** | **smack** | 11:5,8 43:12 |
| **simple** | 76:3 | 152:4 | **speaks** |
| 69:25 78:20 | **slant** | **small** | 137:21 |
| **simply** | 89:20 | 20:18 44:19 | **specific** |
| 99:19 116:4 | **slide** | 45:7 55:20 | 7:9 20:17 |
| **simultaneous** | 117:25 | **SMS** | 23:3 27:1 |
| 36:16 | **sliding** | 76:9 | 28:1 55:21 |
| **simultaneousl** | 178:7 | **sneaker** | 82:5 102:17 |
| **y** | **slightly** | 116:22 118:1 | 105:3 111:10 |
| 14:25 | 42:6,10 | **sneakers** | 134:17 138:2 |
| **sister** | 49:19 51:3 | 118:19,22,24 | 143:12 |
| 92:15 | **sling** | 119:11,15 | 150:18 157:4 |
| **sisters** | 48:1,7 69:21 | **snow** | 168:9,16 |
| 110:24 | **slip** | 134:4 | 177:13,14 |
| **sit** | 51:13 58:4 | **sober** | **specifically** |
| 7:4 22:19 | 94:7,24 | 127:17 | 14:6 18:15 |
| 26:8 53:24 | 119:8 183:5 | **solemnly** | 22:20 27:22 |
| 91:25 99:25 | **slip-and-fall** | 4:7 | 33:1 34:14 |
| 112:1 114:3, | 143:17 | **sort** | 49:3 89:6 |
| 6 117:4 | 170:13,18 | 79:5 90:16 | 112:22 |
| 152:20 | | 94:23 113:18 | 114:23 |
| 169:12 177:9 | | 165:15 | 115:8,20 |

116:19
137:23
149:16 165:2
168:1,7
169:21
171:10
179:14
**specification**
149:8
**specification
s**
95:12
**specifics**
114:24
166:12
**specify**
46:15 129:5
**spelling**
126:3
**spending**
166:12
**Spill**
78:2,12 79:9
80:3 83:2,5
169:16
**spilled**
159:17
**spills**
77:9,25
78:5,6 79:18
106:18
**spine**
66:4
**spoke**
21:23 28:24
37:24 137:23
171:20
**spoken**
21:4
**spot**
20:18 52:9
55:21 56:23
78:17
**sprain**
47:24 68:25
**sprained**
47:2

**SR**
34:1,11
**stable**
70:2
**staff**
124:7 133:25
140:19
173:25
174:17
175:9,10
176:13
**stair**
53:25 114:4
122:24
127:20
128:19
135:14
139:25
142:20 154:2
179:22
**stair-related**
120:15
**staircase**
20:9 25:9,
11,12,14,15
32:10,12,17
33:4,20 35:4
43:1 44:16,
18 45:2,6
55:2 59:17,
24 61:21
97:13 99:16,
18 103:12
104:8 107:4
108:19,21
109:18,19,22
122:7 125:4,
23 126:9
127:4 128:18
130:21
133:12
134:14
149:2,19
151:1,5,6,10
153:10 154:2
155:19
159:11
161:17

162:15,23
167:21
168:16 177:7
179:23
180:19
181:25 182:8
184:7,13
**staircases**
25:13 52:14
97:21 108:17
109:16
111:14
113:15
114:14 151:3
162:20
178:5,11
**stairs**
7:23 22:13
30:19 32:14
33:9 40:24
46:25 47:2
49:17 51:13
52:22 62:19
63:13 82:6
84:8,12,19
90:12 92:10
93:13,15
94:10,20
96:8 97:18
99:13 101:9,
10,23,25
104:13
106:17,20
107:2
108:19,24
112:18,22
113:3,10,17
114:1,11,12,
22 117:18,23
118:10
119:10,17,
22,23 120:2,
3,11 125:2
127:22,24
128:24 129:3
130:11
131:8,13
132:25 133:4

134:22
135:17,23
136:16
148:23
150:24 152:6
168:9 169:21
170:10 178:1
179:19
**stairway**
53:21 106:6,
12 140:24,25
**stairways**
168:1,7
**stairwell**
96:22 120:23
**stairwells**
111:12
177:12
**stamp**
80:10 86:20
88:4,5
138:17
141:20
144:12
145:14
148:6,7,10
150:5 158:2,
12,18 161:11
162:13
**stamps**
60:11 142:10
144:8,9
150:7
**stanchion**
180:18
**standing**
89:15
**stands**
34:3,5,11
49:21 76:11
116:18
177:21
**starboard**
133:1
**start**
11:25 22:4
35:22 63:2

Monica Borcegue
May 19, 2026

71:17 107:8 108:15 129:18

**started**
9:23 36:11 56:19 122:10

**starting**
42:3 74:17 87:2 138:21 145:14 148:9 158:22

**starts**
35:23 137:8 138:17

**state**
4:3 34:10,11 43:8 45:16 68:9 82:12, 14

**stated**
24:24 42:25 47:12 117:22 127:9 137:5 157:12

**statement**
50:14 71:21, 22 72:4,5 73:3,9 74:13,22 75:5,22,23 86:21 117:23

**statements**
22:9 39:21 40:20 74:14 75:25 82:24, 25 110:6

**stateroom**
183:5

**states**
26:10 43:4 61:17 65:19 67:11 71:14 80:22 116:24 124:5,6 126:15 130:7,11 134:19 135:13

**statistically**
113:14 120:5

**statistics**
91:13

**stays**
42:4 58:4

**Steering**
176:4,8,10, 12 177:4

**step**
42:6,10 43:7 45:20 49:18 51:3 53:18 55:12,19,20, 24 81:5 89:5 90:2 97:7,9 98:22 99:14 101:2,18 103:14,16 104:20 109:20,21 115:13 116:23 117:19 118:10 119:6,18 120:21 121:4,5 122:25 123:20 125:16 126:4,10,15, 19,20 127:6 129:6,9 130:22 134:17 136:12,19 151:17,20,23 153:13 168:14 169:1 173:1

**Stephanie**
12:20

**stepped**
51:16 130:12

**stepping**
101:24 109:14

**steps**
15:8 56:2 94:24 103:13 113:23 117:24,25 125:14 126:13 128:22 131:9 133:5

**stepsisters**
110:25

**steward**
158:14

**stewards**
86:13

**sticking**
53:2

**stop**
47:14 120:23

**stored**
165:4

**story**
161:24

**strain**
64:15

**strictly**
34:24

**strip**
35:4 42:6,10 47:1 49:18 51:2,11,14 77:19 78:13, 21 79:20 80:8 93:7,8, 11 101:6 104:7 115:3 116:21,22 123:8 130:13 135:10,13,15 156:23

**striped**
89:21

**strips**
51:11 82:3 91:17 92:11 94:5 95:4,5 96:3,14 97:4

117:18 122:15 123:13,20 126:14 135:16 179:18

**stuck**
115:17 126:15,18

**studies**
69:22

**stuff**
15:4 22:9 81:24

**stumbled**
135:23

**style**
95:12

**subject**
5:23 6:17 104:24 106:6 136:1 144:3 145:2 149:17 151:5 153:10 160:17 169:14 179:23

**submitted**
164:13 184:8,14,16

**subsequent**
38:6

**Subsequently**
49:16

**substantially**
111:13

**suffer**
59:21

**suggest**
43:19

**suggested**
172:9

**suggesting**
172:11

**summaries**
164:20

**summarize**
36:17
**summary**
29:2 144:15
145:24
164:15,25
**superseding**
98:15
**supervisor**
78:9,16 80:9
125:12
174:16
184:18
**supervisors**
77:15 125:12
**supplemental**
107:19
139:14,17
**support**
169:6
**supposed**
9:14 14:21
54:3 55:16
169:17
**sure**
6:23 7:24,25
8:6 9:4 10:4
13:21,22
16:6 17:9,19
18:9 20:14,
15,19 22:4
25:24 26:10,
25 28:12,14
30:13 31:21
33:7,20,21,
22 34:7,9,17
35:5 37:6,
10,16 39:8
40:7 48:24,
25 49:8
52:12 54:14,
17 55:2,3
57:24 58:5,
17 62:11
66:21 67:25
68:6,7 70:25
71:13 73:1,6
74:19 76:9

79:1,4
90:18,24
91:25 93:10,
14 95:7,9,17
96:7 105:22
106:17
109:14
110:7,10
111:1,16
112:1,21
117:8 119:25
120:5 121:20
122:20 124:5
131:20
132:4,5
136:13
137:13
148:24
149:1,10,18,
22 151:22
152:17
153:5,19
154:10,11
155:15,22
157:16 161:2
163:18,23
165:7,23
166:7 167:11
169:9
171:12,16
174:4 177:13
180:8 182:13
184:10
**surface**
33:20 181:14
**surfaces**
119:2
**surgeon**
69:19,23
70:9 171:24
**surgery**
167:10
**surveys**
129:22
**sustained**
166:15
**sustaining**
60:1

**swear**
4:7
**sworn**
4:12
**system**
15:25 76:9,
10 80:17
96:10,16
124:1,9
148:25 149:3
**systems**
52:7

---

**T**

---

**T-U-N**
49:23
**take**
8:20 9:9,16
12:8 13:8
15:9 35:3
36:14 48:2
52:5,10 56:6
58:7 67:9
92:6 98:1
106:24
108:22
110:10
147:12 156:9
159:17 160:1
164:8 166:1
184:19
185:14,17
**taken**
4:1 48:12
52:17 53:1
58:9 61:5
77:16 78:9,
11,14,16
92:5 98:6
109:15,17,22
122:9 128:24
156:15
178:22,25
180:16
**taking**
6:1,13 40:9,
23 104:6

120:13
129:19
137:24
159:15
**talk**
21:12 124:11
126:6 127:1
130:8,14
176:16
**talked**
118:13 170:9
171:19
179:23
**talking**
13:17 23:12
74:8 77:2
89:7 90:8,22
138:22 180:6
**talks**
29:20 42:4
46:20 62:4
140:22
162:18
**task**
79:14 159:18
**tasked**
26:25 28:23
44:22 54:22
86:11
**tasks**
159:6
**taught**
83:3
**team**
16:9 86:6
133:25
137:21
171:21
173:15,16,23
174:3,4,7
175:4,6
176:5,6
177:3,4
**telephone**
29:11 30:12
31:7
**tell**

4:7,18 6:17,
21 13:20
22:2 26:21
27:5 35:24
38:7 46:15
47:22 55:23
56:1 76:7
83:18 85:16
88:4,7 89:4,
21 90:18
91:1 108:2
109:9 113:9
125:22
131:24
138:19
154:15
166:5,8
168:13 169:5
173:15 174:6

**telling**
23:17 30:18
44:1,3,24
70:8

**ten**
60:20 61:6,
13 111:21
156:10,12,13

**tend**
9:13

**tender**
34:4 66:13,
18 67:7 81:3

**tenderness**
66:25 67:10

**tenth**
127:23

**term**
112:14 129:8

**terms**
9:24 14:8
20:12,16
21:25 30:7
47:23 58:12
60:1 63:2
64:5,10
65:2,12,22,
24 68:16,23
69:25 72:18

78:21 79:19
80:15 81:9
93:25 96:3
98:10,11
99:5 102:21
103:19
104:23,24
105:9 106:2
110:22
118:17
127:11
129:1,8,10,
21 131:3
133:8 150:2
156:21 157:2
158:22
160:19
161:23
164:2,11
166:14 173:3

**Terri**
12:17

**test**
48:2 178:13

**testified**
4:13 5:9
7:11,14,22
8:3 37:12
45:15
182:14,17

**testify**
7:5 10:2
102:24
103:24
182:19
183:22

**testifying**
112:8

**testimony**
6:18 21:2,3
22:12,18,23,
25 99:11,13
100:7 103:10

**text**
139:23

**TGEM**
129:22

**thank**
9:18 37:1
74:2 117:15
125:18
151:11
156:14
160:11
162:1,11
175:8 185:1,
5,6,7

**thenar**
66:24 67:2,
10

**thing**
16:11,20
61:24 168:2,
22

**things**
11:3 19:2
27:2 28:8
29:16 33:22
40:7 56:13
77:25 80:15,
25 81:6,25
86:12,16
119:5 129:9,
19 139:11
147:22
159:15 165:4
166:2 167:2,
13 168:5,15
169:22
173:17 175:5
176:17
178:11
183:15

**think**
5:7 6:6 7:19
10:14 13:7,
9,15 21:11
22:15,16
23:20 28:2
34:19,20
37:14 46:7
47:11 49:3
50:10 54:5,
6,7,10 56:15
59:24 65:22

72:25 73:8,
24 74:1,12
75:3,8,10,17
76:4,22
77:12 80:23
82:24 83:9
86:19 89:2
101:20
111:22
113:2,12,14,
16,18,19,25
118:22
121:17
131:15
138:12
145:10
148:22,25
151:1 155:24
156:1 157:7,
9,25 168:2,
5,24 169:19
171:17
172:13,14,23
174:23 180:7
182:20,21
183:11,14

**thinks**
136:12

**third**
77:5,12
127:6
136:12,20
151:10
153:23

**thought**
44:9 67:15
128:4 177:24

**thousand**
112:17

**thousands**
103:12

**three**
5:6,7 6:6
7:15 25:13
57:10 109:1
151:2,4
160:20,25
182:15

Monica Borcegue
May 19, 2026

**threshold**
  182:7,8,10
**throw**
  98:4
**thud**
  136:18
**thumb**
  67:6
**ticket**
  105:1,7
**tile**
  125:17
**time**
  5:6 10:17,23
  11:1 13:14,
  15 15:11,23
  16:3,10
  17:22 19:18
  29:7 30:9,15
  31:10 33:18
  34:17 35:5,
  21 40:6
  42:19 44:4
  54:23 55:5
  62:11 68:19
  73:10 84:17,
  19 92:4
  95:19,22
  96:4 98:1
  99:20,24
  100:9,17,20,
  23 101:19,21
  103:14 104:7
  105:6 108:13
  110:10
  113:6,10,24
  121:6,9
  123:1,5,15,
  18 124:14,
  15,21 125:3
  127:14
  128:21
  130:17
  131:25
  132:2,5,6,11
  133:15
  134:10 135:5
  136:7 147:23

  150:19
  152:19 154:5
  156:6 159:12
  160:4,5
  164:9 166:18
  169:3,10
  170:17,24
  185:3
**timeline**
  37:22
**times**
  7:11 8:3
  21:23 26:1,7
  42:20 101:9,
  18 113:9
  168:12
**tips**
  80:20 81:15
**title**
  144:25
**titled**
  145:3
**TLC**
  34:1
**today**
  5:12 12:23
  13:18 22:3
  26:5,8 53:24
  88:25 92:1
  97:3 99:25
  102:21 112:1
  114:3 142:6
  169:12 177:9
  178:14 180:2
  182:24 185:3
**today's**
  5:25 53:15
  61:20
**told**
  25:19,20
  26:2 29:4,21
  39:10 45:11
  48:24 70:4
  77:13 171:24
**tool**
  41:11 73:4
  79:6

**tools**
  37:3 39:14
  41:5 58:6
**top**
  25:14 28:5
  43:2,7 61:14
  65:5,21
  66:1,2 81:6
  90:1,3 91:1
  93:9 111:20
  121:4
  125:16,23
  126:5,9,10
  127:4 129:3
  134:15 137:9
  143:4 154:6,
  8 157:10
  173:1
  180:12,22
**Torres**
  130:8
**total**
  109:4
**touch**
  147:20
**track**
  7:17
**traffic**
  32:15,23
  163:11
**trailing**
  170:6
**trainee**
  154:25
  155:3,5
**Trainer**
  83:8,10
  170:6
**Training**
  49:16 57:9
**transaction**
  73:8,12
**transactions**
  74:15 75:7,
  9,12,21
**transferring**
  162:10

**travel**
  99:16 103:11
**traverses**
  54:16
**tread**
  118:8
**treat**
  47:25
**treated**
  21:10
**treatment**
  21:8,15 31:1
  48:4,8,10,
  11,13 50:19
  60:7 64:8,17
  68:11 69:4,
  6,10 70:11,
  13 102:11,16
  103:1 172:5,
  15 179:8
**trend**
  113:5
**trends**
  111:8
**trial**
  182:17
  183:22
**trials**
  7:5 182:14
**trigger**
  64:22 68:22
**triggered**
  68:18
**triggers**
  30:24
**trimming**
  117:22,25
  118:1
**trip**
  119:8 136:11
  166:11 183:6
**tripped**
  116:6 126:5
  136:12,19
**tripping**
  99:14 109:14
  119:16

151:24
**true**
  27:12  61:4
  82:20  84:2
  141:16
  146:16  147:2
  148:3,17
**trust**
  28:19
**truth**
  4:7,8  44:2,4
**truthful**
  28:20
**try**
  181:17
**trying**
  13:7  21:5
  34:8  138:9
  144:2  149:23
  150:1,3
  171:17
**tucks**
  57:22
**Tuesday**
  181:8
**tumbled**
  127:6
**Tun**
  57:10
**turns**
  40:11
**TV**
  168:13
**twist**
  118:2
**twisted**
  116:24
  133:13
**two**
  9:12  12:6,9,
  11,19,25
  13:4,6  64:2
  67:19,21,22
  68:1  69:10
  83:8,10  88:9
  93:3  99:16
  106:14

123:14  132:4
135:25  143:8
159:2,6,23,
25  170:5
173:20
185:14
**two-day**
  144:16
**two-page**
  74:18
**type**
  16:10  38:14
  70:10  113:4
  119:2  140:25
**typical**
  38:10
**typically**
  14:8  56:9
  59:18  154:8
  163:7
**typo**
  67:15

_____

**U**
_____

**Uh-huh**
  77:6  125:25
  152:16  176:1
**ultimate**
  92:7
**ultimately**
  21:18  41:23
  54:13  109:25
  110:13  119:3
**unable**
  181:22
**unattended**
  81:25
**undergo**
  69:22
**underneath**
  156:24
**understand**
  9:4  20:14
  57:13  79:16,
  17  106:10

**understanding**
  9:1  19:15
  20:7,10
  26:2,13
  43:17  48:16
  58:12,15,18
  62:25  63:1
  67:5  69:11
  70:20  84:9
  92:12  96:21
  100:1,16
  105:1  126:17
  151:19
  153:14  160:6
  163:16
  167:17
**understands**
  69:25
**understood**
  9:1  68:4
  118:4
**unintentional**
  141:21
**unique**
  93:5  113:16
**unknown**
  49:20  155:14
**unredacted**
  146:13
**unresponsive**
  147:20
**unsure**
  110:4  122:25
**update**
  46:6
**updated**
  44:21  45:24
  46:13
**upload**
  16:4
**upset**
  8:19
**urgent**
  56:12  154:6,
  8
**usual**
  140:20

_____

**V**
_____

**V-E-N-E-Z-I-A**
  13:19
**vacation**
  160:16
**vacuum**
  107:2  170:5
**vacuuming**
  170:7,8
**vast**
  52:14
**Vazquez**
  13:10
**Vega**
  12:24,25
  13:25  14:1
  17:15
**VENEZIA**
  13:19,25
  14:2  17:6
  19:7  41:12,
  20  92:16,18,
  25  93:2,5
  95:6,16,20,
  21  96:5,22
  97:16,24
  109:3
  110:21,23
  111:2,6
  124:12
  127:12
  130:15
  131:4,20
  133:10
  137:13,16
  139:25
  145:20
  146:14  155:3
  179:5
**venue**
  105:5
**verbalized**
  69:18
**verdict**
  183:9

Monica Borcegue
May 19, 2026

| | | | |
|---|---|---|---|
| **verified** | **viewed** | | 170:14 181:5 |
| 105:12,15 | 171:8 | ———————— | 184:1 185:15 |
| **Vernon** | **views** | **W** | **wanted** |
| 49:17 57:9 | 64:6 | ———————— | 36:2,22 |
| 161:12,15,19 | **Vincent** | | 37:7,10,12, |
| **versa** | 160:15 | **W-R** | 17,21 41:4 |
| 13:16 | **visit** | 131:17 | 46:4 96:2,9 |
| **version** | 25:2 26:4 | **W-R-I-G-H-T** | 127:1 |
| 92:19 | 41:22 48:15 | 131:22 | **warn** |
| **versus** | 61:20 62:15 | **wag** | 94:2 104:5 |
| 109:19 | 64:6 65:6 | 8:18 | **warned** |
| 118:23,24 | 69:12 70:10 | **wait** | 168:6 |
| 119:11 153:2 | 159:13 | 8:8,10 66:8 | **warning** |
| **vessel** | **visited** | **waive** | 167:18,24 |
| 10:16 11:22 | 30:12 41:23 | 23:13,17 | 168:3 |
| 16:1,19 17:2 | **visiting** | 185:8 | **warnings** |
| 21:18 25:7 | 31:8 61:19 | **waived** | 93:19,23,25 |
| 28:9 33:3 | **visits** | 185:19 | **warranty** |
| 39:23 73:19 | 64:2 69:10 | **waives** | 91:19,24 |
| 74:6 80:23 | **Vista** | 117:12 | 92:2,5 95:4, |
| 81:5,18 | 92:19,21,22 | **waiving** | 23 96:13,19 |
| 102:11 140:9 | 93:4 108:25 | 23:16 | 179:16,18 |
| 147:13 149:7 | 109:1,2 | **walk** | **watch** |
| 150:20 | 111:2 121:2 | 81:20 119:5 | 16:11,20 |
| 168:14 | 126:7 127:2 | **walked** | 21:14 34:17 |
| 171:16 177:8 | 129:2 177:25 | 101:18 | 35:6,9,10,15 |
| **vessels** | **visual** | **walking** | 36:10 39:17 |
| 16:6 20:2 | 106:13 107:9 | 63:15 118:9, | 42:21 43:8 |
| 57:17 96:8 | 169:24 | 17 119:3 | 46:20 81:5 |
| 108:25 | **visually** | 130:11 | 101:23,24 |
| 113:21,23 | 94:21 | 132:25 | 119:6 144:3, |
| 165:6 | **voice** | 136:17 152:6 | 19 145:16,24 |
| **vials** | 9:3 | **wall** | 161:20 |
| 67:19,22 | **voicemail** | 131:2 | 164:12,15, |
| 68:1 | 29:18 | **wallets** | 23,25 168:14 |
| **vice** | **voicemails** | 144:21 | **watching** |
| 13:16 | 46:12 | **want** | 99:20 |
| **video** | **volume** | 5:6 9:9,16 | **water** |
| 19:22 22:1 | 155:25 | 21:24 24:17 | 84:4,11,12, |
| 40:17 137:6 | **vomiting** | 28:15 32:7 | 25 |
| 164:2 168:3 | 63:13 | 33:10 34:8 | **way** |
| 171:1 | **voyage** | 36:3,23 | 18:13 23:12 |
| **videos** | 150:12 | 37:13,18 | 27:1,6 32:8 |
| 39:18 40:7 | 158:8,11 | 46:1,5 52:11 | 44:6 48:3,14 |
| 80:18 81:1, | 164:17,19 | 61:23 76:3 | 59:21 60:13 |
| 16 110:6 | | 77:13 83:18 | 67:23 75:8 |
| 168:13 | | 97:5,8 98:4 | 77:17,18,22 |
| | | 117:8 121:20 | 79:17 84:22 |
| | | 126:6 156:10 | |

| | | | |
|---|---|---|---|
| 89:4 91:18 93:15 96:23 106:25 111:8 114:20,21 118:9 120:8, 23 131:15 139:12 146:11 147:21 151:24 152:5 153:6 165:3, 8 178:20,23 | went 10:16 13:10 16:17 30:6 34:14 35:3, 21 41:25 42:24 43:14 45:18 47:12 48:17 50:8, 14 56:19,22 58:20 69:7 85:24 86:2 99:17 104:13 108:2 121:25 125:11 128:12,21,22 140:13,14 180:16 | 106:19,21 wipe-downs 106:23 wiped 163:4 wires 170:6 withdrawing 98:23 104:21 witness 4:9 39:21 46:1 51:1 53:15 55:1, 18 68:14 79:23 83:18 84:17 94:18 98:1,4 104:11 112:20 117:16 141:24 143:12 152:2 156:12,14 157:15 172:5 173:10 177:6 180:1 182:2 183:14 184:1 185:2,5,7,9, 19 | 11 107:1,9 117:10 140:17 148:12 149:23 152:13,17,18 154:17,18,20 155:22,25 161:16 165:20 184:7,12,14, 16 worked 5:1 177:18 working 11:25 15:7 33:22 45:20 54:24 87:15 91:8 92:13 120:8 126:14 |
| ways 39:11,22 153:4 | | | workload 31:6 |
| weakness 63:14 | | | worn 118:8,24 119:1 |
| weapons 183:24 | wet 84:10,15,23 127:20,22 128:19 134:4,5 156:25 | | worse 62:1,2 69:2 98:21 |
| wear 93:17,20,22, 23 118:5,14 | | | Wright 131:17,22 |
| wearing 99:22 115:12 119:4,11,13 130:4 135:17 169:10 | wetness 84:7,24 | wooden 109:22 | wrist 102:18 |
| | whatnot 33:20 37:15 48:1 49:12 52:23 79:6 95:10 119:8 | word 9:3 67:9 79:19 94:8 96:17 180:18 | write 154:20 |
| website 74:24 | | | writes 42:4 62:1 |
| wedge 115:10,15 | whichever 54:20,21 147:23 | words 45:9 49:8 77:14 143:8 170:14 | writing 28:20 |
| wedged 115:10 156:23 | Whilst 24:21 | | written 56:17 |
| week 162:8 183:21 | white 88:13 89:3,5 | work 4:22 12:3 23:18 38:24 49:11 51:22 52:2 56:9, 10,14,17 57:7 58:8 80:11 85:14, 20,25 86:10, | wrong 38:21 39:25 52:16,21 96:13 114:4, 5 117:17 123:13 125:10 126:3 |
| weeks 107:25 | wholesale 27:21 | | |
| weight-bearing 63:16 | wide 20:18 55:20, 24 | | |
| weights 69:21 | wider 97:22 | | |
| welfare 99:7 | Wilkins 135:2 | | |
| well-being 46:11 | wipe | | |

Monica Borcegue
May 19, 2026

| | | |
|---|---|---|
| 127:7 131:6 134:1 | **years** 5:3,6,8 7:15 12:6,11,25 13:3,4,6 91:8 92:14 101:8 123:25 141:1 163:21 177:2 178:9, 13 182:15 | |
| **wrote** 26:14 29:6 | | |
| **X** | | |
| **X-RAYS** 48:2,12 64:15 69:1 | | |
| | **yesterday** 6:5 | |
| **Y** | **Yogendra** 47:5 162:5 | |
| | **youth** 174:17 | |
| **yeah** 7:21 12:9 13:9,16 16:14 20:21 23:23 34:21, 22 35:8 47:9,11 48:23 52:19, 23 56:15,21 58:20 61:25 63:7,8 64:7, 13 65:6 66:5,7 67:11 73:21 74:6, 19 75:22 81:12,17 83:14 88:20 89:2,17 90:8,22 93:2,18 98:22 103:8 117:5,8 121:1 127:21 128:3 138:9, 23 140:5 142:13 144:24 145:10 150:11 151:2 153:17 155:1 159:1 173:10 | **Z** | |
| | **Z.E.** 136:2 | |
| | **zones** 159:13 | |
| | **zoom** 8:7 181:6 | |
| **year** 7:18 13:5 162:3 182:21 | | |